

**EXHIBIT A**



LA REPUBLICA BOLIVARIANA DE VENEZUELA
EN SU NOMBRE
**EL TRIBUNAL SUPREMO DE JUSTICIA**

[Translator's Note: The emblem above reads as following- The "Bolivarian Republic of Venezuela- in its name- **THE SUPREME COURT**]

BOLIVARIAN REPUBLIC OF VENEZUELA

JUDICIAL POWER
First Court of First Instance for Trial for the Protection of Children and Adolescents of the Judicial District of the State of Anzoátegui, El Tigre extension, July first (1), two thousand fourteen (2014)
(204th and 155th)

MAIN ISSUE: BP12-V-2007-000684
CASE: BP12-V-2007-000684
FINAL JUDGMENT: PARTIALLY UPHELD
ON THE GROUNDS: DAMAGES AND PERJURIES
WITH CONCLUSIONS
MOTION PART
Pursuant to the provisions of Article 485 of the Organic Law for the Protection of Children and Adolescents, the final judgment in the present matter is hereby published in full in clear, precise and laconic terms, without the need for narratives, identifying the parties, the attorneys-in-fact and, the factual and legal grounds for the decision as well as the determination of the object or thing on which it falls. On June 4th of the current year, the oral and public hearing was held, and this court having pronounced its decision immediately, it now reproduces the same in the opportunity ordered by article 488-D of the Organic Law for the Protection of Children and Adolescents in the following terms:
In the lawsuit for Damages and Injuries, filed by citizen: ARTURO GUILLEN, Venezuelan, of legal age, holder of identity cards No. 8. 472.425, in his capacity

1

USAO_003942

as public defender, in representation of the child: .... respectively, the daughters of citizen CARLOS RAMON CEDEÑO, who was a Venezuelan, of legal age and holder of identity card No. 3.501.003, who died in the city of El Tigre on 12/01/2004. Action filed against the citizen CARLOS EDUARDO ORENSE AZOCAR, Venezuelan of legal age, holder of identity card Nº 4.2017.557, residing at Barinas Street, house Nº 04-39, Anaco, Anzoátegui State,

The petitioner, exposed in his libel suit that in its excerpt the fundamental facts of legal relevance are indicated in the following terms:

That it is clear from the minutes of the preliminary hearing held before the Court of First Criminal Instance, in Control Function No. 01 of the State of Anzoátegui, for the crime of homicide for futile and ignoble motives, provided and punished in Article 408, ordinal 1, of the Venezuelan Criminal Code, that in the development of the hearing, the judge considered that the facts in which the father of the represented parties was killed, fall under the crime of quarrel, punished in Article 424, second paragraph of the Criminal Code. The petitioner alleges that in the development of the aforementioned criminal proceeding, the accused, citizen CARLOS EDUARDO ORENSE AZOCAR, already identified, admitted the facts for homicide in a quarrel, as follows: "..I admit the facts for homicide in quarrels which was what happened there, that is to say the qualification given by the Court, I admit that I acted that way during the course of the quarrel and under threat to my life, caused to me by Carlos Cedeño..."; and that the admission of such facts, allowed the control judge to sanction the accused for the commission of the crime of homicide in quarrels foreseen in article 424, second part of the Penal Code, as can be seen in the decision published on 12/01/2004 - file No. 1C-1756-02. Based on the above, the petitioner states that, as a consequence of the death of the father of the represented parties, they suffer the lack of affection, moral and economic protection that the deceased gave them and that all of which negatively affects their quality of life and the psycho-affective conduct of the family, which motivated a specialized consultation. Subsequently, he alleges, based on articles: 2 , 26 and 78, of the Constitution of the Bolivarian Republic of Venezuela; articles 1, 4, 5 and 8 of the Organic Law for the Protection of Children and Adolescents; articles 1185 and 1196 of the Civil Code, article 113 of the Criminal Code and 422 of the Organic Code of Criminal Procedure, that he goes to this competent authority to sue the citizen CARLOS EDUARDO ORENSE AZOCAR, already identified, to pay to his represented parties the amount of two hundred and fifty two million bolivars ( equivalent to 252.000.00 bolivars) for the reparation of material damages and the compensation of damages arising from an unlawful act as a consequence of the criminal conviction of the citizen: CARLOS Eduardo Orense on the occasion of the death of the father of his principals citizen Carlos Cedeño; First: reparation of moral damages caused to his principals, Second: Loss of profit, considering that the average age of his principals is 14.6 years, he estimates that at a rate of

2

500,000 bolivars/month for each child is equal to 1,500,000 bolivars/month for each child is equal to 1,500,000 bolivars.500,000 bolivars (equivalent to 1,500.00 current bolivars) up to the age of 25 years, that is to say, what remains between the average age and the majority of the represented parties in consideration of article 384 of the Organic Law for the protection of children and adolescents, which establishes that the maintenance obligation extends to the age of twenty-five years and such is the aspiration of the represented parties, the amount of 252,000.000.00 (equivalent to 252.000,00 current bolivars), since their deceased father was a prosperous businessman in the oil industry, estimating the present claim for the amount of six hundred million bolivars (equivalent to 600.000,00 current bolivars) all this stemming from the criminal conviction to which the above mentioned citizen was subject to, on the occasion of the death of the deceased CARLOS CEDEÑO, already mentioned.

On November 19, 2013, attorney LUIS ALBERTO RIVAS SILVA, registered in the Venezuelan Bar Association under No. 19,993, acting in accordance with the provisions of the final part of Article 168, of the Code of Civil Procedure, as representative without power of attorney of the defendant citizen CARLOS EDUARDO ORENSE AZOCAR, already identified, filed a written answer to the claim, which in extract, the relevant facts of legal importance are pointed out, in the following terms:

Prior to the answer to the merits of the claim, attorney LUIS ALBERTO RIVAS SILVA, previously identified, as point [Roman numeral] I, explains the legal arguments that frame his legal action as a representative without power of attorney, in accordance with the provisions of Article 168 of the Code of Civil Procedure. As point [Roman numeral] II, he alleges procedural defects and abandonment of the proceeding, in which he argues that the Organic Law for the Protection of Children and Adolescents foresees the need to have special Public Defenders for the protection of Children and Adolescents in each locality where a Court for the Protection of Children and Adolescents is constituted, where said Public Defenders are not authorized to represent adults, nor to continue representing children and adolescents in trials once they reach the age of majority. He contests the special power of attorney granted to him by Nuncia Acosta Zambrano and Carmen Alicia Arrieta Rivas, in their capacity as legal representatives of the minors, in which said power of attorney was to represent the petitioners before the Criminal Courts of this Judicial District, for which reason he contests said power of attorney. And in the same vein, the defendant alleges that the aforementioned children and adolescents are now of legal age and as a consequence, the Public Defender, the Alternate Public Defender and their parents cannot represent them, nor should they be allowed any representation in this trial, since he alleges that the Public Defender ceased ipso- jure *[ipso-jure- by the law itself]* in his functions, which originates the dismissal of the proceeding and the extinction of the process and so therefore requests that it be declared by the Court. On the other hand, the defendant

3

USAO_003944

alleges that the hearing held on November 5, 2013 is vitiated by absolute nullity of the mediation phase of the Preliminary Hearing, since the petitioners did not appear at the hearing after it was announced: CARLA ORIANA CEDEÑO ACOSTA, TRINIDAD MARIA DEL VALLE CEDEÑO ARRIETA and CARLA DE LA TRINIDAD CEDEÑO ARRIETA, neither personally nor through duly constituted legal proxies as ordered by law.-

As point III answers to the merits of the claim, to wit:

That it denies, rejects and contradicts both the facts and the law set forth and presented in the claim by the defendant. He

denies, rejects and contradicts that his client is civilly liable in the case at hand, because although it is true that he was convicted for the commission of the crime of homicide in a quarrel foreseen in article 424 second part of the Penal Code, it is also very true that the homicide occurred in a quarrel and under threat to his life made by CARLOS CEDEÑO, as also indicated by the petitioner in his lawsuit in the above mentioned folio One.

He argues that even though the law establishes that every person criminally liable for a crime is also civilly liable and that by virtue of the fact that the facts occurred in a fight and under the fear that he could lose his life, he is exempt from civil liability.

Based on article 1.188 of the Civil Code, and that due to the fact that his represented party for preserving his life, this reveals and exempts him from civil liability and for this reason he affirms that he is not obliged to repair the damages.

He argues based on article 1.189 of the Civil Code, that even in cases of quarrel, the fact that the victim contributed to cause the damage, which relieves his client from civil liability.

Denies, rejects and contradicts that as a consequence of the death of CARLOS CEDEÑO, the petitioners suffer lack of affection, moral and economic protection, and that this negatively affects their quality of life and their psycho-affective family behavior.

Denies, rejects, contradicts and challenges the evidence marked with letters A, D, E, F, G, H, I, J, K and L, which the petitioner annexed to its complaint.

He denies, rejects and contradicts that his represented party should be condemned by this court to pay the amount of two hundred and fifty two thousand bolivars, according to the law of monetary counterclaim for reparation of material damages and indemnification of the damages arising from illicit acts as a consequence of the criminal conviction of which he was the object, based on article 1.196 of the Civil Code and taking as a parameter that the petitioners, now of legal age, cannot overcome the death and absence of their father.

He denies, rejects and contradicts that his client should pay for loss of earnings, the amount of 1,500,000.00 (equivalent to 1,500,000 bolivars) until the age of 25 years of age of the petitioners.

Denies and contradicts the petitioners' claim for the amount of 252,000,000.00

4

USAO_003945

(equivalent to 252,000,000.00 bolivars), since their deceased father was a prosperous businessman in the oil industry.

He contests the amount of the claim which was estimated at 600,000,000.00 bolivars (equivalent to 600,000.00 current bolivars).

Pursuant to the provisions of article 474, once the defendant was notified and certified by the secretary, the mediation phase of the preliminary hearing began, all in accordance with the provisions of article 467 of the Organic Law for the Protection of Children and Adolescents. Upon expiration of the mediation phase, without the parties having been able to reach a satisfactory agreement, this first phase was expressly terminated, and the substantiation phase of the preliminary hearing began. Now, in accordance with the provisions of article 474 of the Organic Law for the Protection of Children and Adolescents, the defendant had the procedural burden of answering the merits of the claim within 10 days following the conclusion of the mediation phase of the preliminary hearing.

In this common period of 10 days, both parties also had the procedural burden of offering the means of evidence they considered convenient. Although it is true that article 474, *ejusdem*, establishes that the defendant must file two pleadings, one of answer and the other of means of evidence, in spite of what is established in the norm, it does not opt for the defendant to file only one pleading containing the allegations, defenses and means of evidence offered, that is, the answer to the claim and the pertinent and legal means of evidence to prove the alleged and disputed facts.

On January 15, 2014, on the procedural opportunity to hold the beginning of the substantiation phase of the preliminary hearing, to which Articles 473, 474, 475, 476, and 477 of the Organic Law for the Protection of Children and Adolescents on the occasion of the present matter are contracted, whose minutes are inserted in folios 220 and 224 of this file, where it was recorded the appearance of the petitioner in the person of the Public Defender, attorney ARTURO GUILLEN and the citizens CARLA ORIANA CEDEÑO, ACOSTA, NUNCIA ELENA ACOSTA ZAMBRANO, Venezuelan, of legal age, holders of identity cards No. V-8.874.998 and V-20.740.955, respectively, also on record was the appearance of attorney LUIS ALBERTO RIVAS SILVA, registered in the Venezuelan Bar Association under No. 19.993, acting in accordance with the provisions of the final part of Article 168, of the Code of Civil Procedure, as representative without power of attorney of the defendant citizen CARLOS EDUARDO ORENSE AZOCAR, already identified, prolonging in minutes dated March 17, 2014, a student, in folios 228 to 238 of this file, and dated March 24, 2014, whose minutes are inserted at folios 240 to 246 of this file, culminating the mentioned preliminary hearing in phase of substantiation in minutes dated April 23, 2014.- Having complied with the other formalities of the aforementioned substantiation hearing, the same was terminated and it was ordered to refer the present matter to this trial court.

Once received in this court, by order dated April 29, 2014, the oral and public

5

hearing was set by separate order, which was effectively held on June 16, 2014. It was expressly stated that the trial hearing was reproduced through audiovisual media, with an HP equipment model V5040U, handled by the audiovisual technician, citizen David Alcino Valera Pinho, an official assigned to this Judicial Circuit, as provided for in Article 487 of the Organic Law for the Protection of Children and Adolescents. Having complied with all the procedural formalities, in accordance with the provisions of article 484 of the same law, the oral and public hearing was held, in terms of form, place and time. Likewise, having complied with the procedural formalities, we proceeded to hear the defenses and allegations of the parties, the control of the evidence and the corresponding conclusions, granting them a prudential period of time.

This operator of justice, acting in accordance with the provisions of articles 450, paragraphs J and k and 485 of the Organic Law for the Protection of Children and Adolescents and article 509 of the Code of Civil Procedure, based on the principle of exhaustiveness of the evaluation of the means of evidence, which imposes to all jurisdictions to evaluate and analyze each and every one of the means of evidence brought to the files, Therefore, the merit of all the means of evidence, that is to say, the *Thema probandi* or *Thema probandum* provided by the parties, must be evaluated, according to the free reasoned conviction and without subjection to the rules of common law, but in any case, when analyzing it, the principles of equity and law on which the evaluation is based must be expressed. An analysis must be made of the evidence in relation to the facts taken as proven and not proven, of the applicable law and of the exceptions raised by the parties. In the operative part of this judgment, an express pronouncement shall be made on all the claims raised.

THE EVIDENCE  Petitioner: Regarding the means of evidence promoted by the petitioner, concerning the evacuation of the means of DOCUMENTARY EVIDENCE promoted by the Second Public Defender for the Protection of Children and Adolescents, Attorney ARTURO GUILLÉN, acting on behalf of the petitioner, he provided the following:

 1) He promoted, reproduced and asserted so that the same be incorporated to the process Certified Copy of Notarized Power of Attorney, marked with the letter "A", inserted from folio 8 to 12 of the present case. It is a certified copy of the power of attorney granted to attorney ARTURO GUILLÉN, by the citizens: NUNCIA ACOSTA ZAMBRANO and CARMEN ALICIA RIVAS, who act in the name and representation of their daughters CARLA ORIANA CEDEÑO ACOSTA and the adolescents .....The aforementioned document was attacked by the defendant for procedural defects and irregularities denounced in the defense brief of the defendant previously presented, challenging and rejecting the representation of the Public Defense Office, this judgment considers that the Public Defense Office has acted in accordance with the powers conferred by law and by an intrinsic obligation of the principles established in Article 6 of the Organic Law of the Public Defense Office. That is to say that he acted within the

6

USAO_003947

framework of the attributions of the Public Defense, since on the date of the filing of the present lawsuit before the Civil Court, he was acting on behalf of the mothers of the petitioner girls who were minors, noting that at that time the mentioned law of Public Defense was not in force and after the entry into force of said law the Public Defender Arturo Guillén continued exercising his functions with the attributions conferred by the same. Likewise, once the girl and the adolescent petitioners reached the age of majority, this fact does not exclude them from being covered by the special jurisdiction in matters of minors, as it is appreciated that Article 3 of the Code of Civil Procedure establishes the following:

 Jurisdiction and competence are determined according to the factual situation existing at the time of the filing of the lawsuit, and subsequent changes in such situation have no effect with respect to them, unless otherwise provided by law.

 According to the above-transcribed provision, jurisdiction is determined in accordance with the factual situation existing on the date on which the case is filed, a principle referred to by the doctrine as, and which implies that changes generated during the course of the proceeding do not affect the jurisdiction of the court hearing the case.

Based on this conceptual basis, it can be seen that the present case was initiated on November 30, 2005, when the lawsuit for DAMAGES AND INJURIES was filed in which the following citizens are involved: ...., respectively, daughters of the citizen: CARLOS CEDEÑO, reaching the age of majority during its course, and by then the Law for the Protection of Children and Adolescents was in force, therefore, according to the reasoning stated above, the competent court to hear the case corresponds to the court with competence in matters of children and adolescents.

Having stated the above, it can be seen that the present case was initiated in 2005 and up to date nine (09) years later, which is why the provisions of Article 3 of the Code of Civil Procedure must be applied, thus guaranteeing the right to effective judicial protection, the matter was brought in accordance with the principle of *perpetual litis*, contemplated in Article 3 of the Code of Civil Procedure, Therefore, this court adheres to the legal arguments explained in the record dated March 17 of this year by the First Court of First Instance of Mediation and Substantiation for the Protection of Children and Adolescents of the Judicial District of the State of Anzoátegui, El Tigre extension, because it grants evidential value to the power of attorney in the case file marked with the letter "A". It is thus established.

 2) Promoted, reproduced, and made to be incorporated to the process a Simple Copy of the Declaration of Sole and Universal Heirs, marked with the letter "B", inserted in folios 13 and 14 of the present case. It is a simple copy that demonstrates the filial link between the citizen: CARLOS RAMON CEDEÑO, the same was not challenged by the defendant, and nothing contributes for the

7

solution of the controversy, reason why it is granted probative value. Thus, it is established

3) Promoted, reproduced and made to be incorporated to the process, Certified Copy of the Minutes of the preliminary hearing held before the Court of First Criminal Instance, in Control Function No. 1 of the State of Anzoátegui, marked with the letter "C", inserted from folio 16 to 36 of the present case. It is a certified copy issued by a Criminal Court of the Bolivarian Republic of Venezuela of the minutes of the preliminary hearing duly certified by the respective official, thus complying with the formalities of law, therefore the Court confers to this documentary, the probative value indicated in article 1.359 Civil Code, since the same was authorized with the legal solemnities of the Secretariat of the Court in criminal jurisdiction and therefore it makes full faith, therefore it is granted evidentiary value Thus it is established.

4) Promoted, reproduced and asserted so that the same be incorporated to the process Proof of studies of the citizen Carla de la Trinidad Cedeño Arrieta, issued by the *Instituto Educativo Colegio San Pedro* marked with the letter "D", inserted in folio 38 of the present case. It is the original of the Certificate of Studies issued on October 18, 2005, by the Educational Unit Colegio San Pedro, San Cristóbal, Táchira State, in the name of the citizen: CEDEÑO ARRIETA, CARLA DE LA TRINIDAD, who studied High School in said Institution corresponding to the school year 2005-2006, inserted in folio 38. It does not have probative value, since it constitutes a private document signed by a third party, who is not a party to the present trial, which must be ratified in its content by means of testimonial evidence, in accordance with the provisions of Article 431 of the Code of Civil Procedure.

5) Promoted, reproduced, and made to be incorporated to the process Certification of studies of the citizen Carla de la Trinidad Cedeño Arrieta, issued by the *Instituto Educativo Colegio San Pedro*, marked with the letter "E", inserted in folio 39 of the present case. It is the original of the Certification of Studies issued on October 18, 2005, by the Educational Unit *Colegio San Pedro,* San Cristóbal, Táchira State, in the name of the citizen: CEDEÑO ARRIETA, CARLA DE LA TRINIDAD, who studied High School in said Institution corresponding to the school year 2005-2006, inserted in folio 39. It does not have probative value, since it constitutes a private document signed by a third party, who is not a party to the process, which must be ratified in its content by means of testimonial evidence, in accordance with the provisions of Article 431 of the Code of Civil Procedure.

6) Promoted, reproduced, and made to be incorporated to the process, the Budget Constancy of the semester of September 2005 and February 2006 of the citizen Trinidad María Cedeño Arrieta, of the *Instituto Universitario Politécnico* Santiago Mariño, marked with the letter "F", inserted in folio 42 of the present case. It is the original of the Budget Certificate issued on October 17, 2005, by

USAO_003949

the *Instituto Universitario Politécnico "Santiago Mariño", Extension San Cristóbal*, in the name of the citizen: TRINIDAD MARIA CEDEÑO ARRIETA, corresponding to the school year September 2005-February 2006, inserted in folio 42. It is not granted evidentiary value, since it constitutes a private document signed by a third party, who is not a party to the process, which must be ratified in its content by means of testimonial evidence, in accordance with the provisions of Article 431 of the Code of Civil Procedure.

7) Promoted, reproduced and made to be incorporated to the process, proof of study of the citizen Carla Oriana Cedeño Acosta, issued by the Private Educational Unit CHURUM MERU, marked with the letter "G", inserted in folio 43 of the present case. It is the original of the Certificate of Studies issued on October 25, 2005, by the Private Educational Unit *"Churum Meru",* in the name of the citizen: CEDEÑO ACOSTA, CARLA ORIANA, who was in seventh grade during the 2005-2006 school year, inserted in folio 43. It does not have probative value, since it constitutes a private document signed by a third party, who is not a party to the process, which must be ratified in its content by means of testimonial evidence, in accordance with the provisions of Article 431 of the Code of Civil Procedure.

8) Promoted, reproduced, and made to be incorporated to the process Budget and school enrollment of the year 2005-2006 of Carla Oriana Cedeño Acosta, marked with the letter "H", inserted in folio 44 of the present case. It is the original of the Budget Certificate issued on October 31, 2005, issued by the Private Educational Unit *"Churum Meru",* in the name of the citizen: CEDEÑO, KARLA corresponding to the school year September-2005 to August-2006, inserted in folio 44. It is not granted evidentiary value, since it constitutes a private document subscribed by a third party, who is not a party in the process, which must be ratified in its content through testimonial evidence, in accordance with the provisions of article 431 of the Code of Civil Procedure.

9) Promoted, reproduced and made to be incorporated to the process solvency of payments of the school year 2004 and 2005 of Carla Oriana Cedeño Acosta, marked with the letter "I", inserted from folio 45 to 53 of the present case. It is the original of the Proof of Payment, issued on September 20, 2004, for School Insurance in the name of the citizen: CEDEÑO, KARLA, inserted in folio 45. It is not granted evidentiary value, since it constitutes a private document subscribed by a third party, who is not a party to the process, which must be ratified in its content through testimonial evidence, in accordance with the provisions of article 431 of the Code of Civil Procedure.

10) Promoted, reproduced and made to be incorporated to the process Medical evidence marked with the letter "K", inserted in folio 55 of the present case. These are reports issued by doctors who work at the *Institute of Social Welfare and Assistance* for the personnel of the Ministry of Education (IPASME), in a hospital, which, being attached to the Ministry of Education, are administrative

9

USAO_003950

entities, and, consequently, the documents subscribed by the officials authorized to do so have the connotation of administrative documents, which is different from the private document, nature that the defendant wants to attribute to it. Therefore, since they are administrative documents, those who sign them, being public officials, are exempt from the provisions of Article 431 of the Code of Civil Procedure. The nature of administrative acts of this type of medical reports has been explained by the Political Administrative Chamber of the Supreme Court of Justice in a decision dated December 14, 2005 (St. No. 6556). No. 6556), when it said the following: ...*omissis*...

It is clear that the medical reports provided, "based on the content of the act in question and the organ from which they emanate, the Chamber considers that such documents must be considered as public administrative documents, which enjoy a presumption of legitimacy, authenticity and veracity, which can be disproved by proof to the contrary" (SPA, St. No. 0499 of March 20, 2007). Proof to the contrary is the responsibility of the person challenging it, who must rebut the presumption of legitimacy, authenticity, and veracity. In this case, the burden of proof is on the defendant, who merely challenged them but did not rebut the presumption of legitimacy, authenticity, and veracity.

The documents emanating from physicians (reports, rests, validations, etc.), assigned to public hospitals, are documents that as we know cannot be assimilated to private documents, since these employees are empowered to attest to the facts they witness. Such is the case of Social Security physicians. Documents that as previously mentioned, even though they are not strictly public documents due to a matter of mere formality, they do have in court the same value as public documents, and this is due to the fact that their authorization has been given by a doctor who deserves public faith on the medical fact that he has treated. Therefore, full probative value is granted. - Thus, it is established.


11) Promoted, reproduced and made to be incorporated to the process medical evidence, marked with the letter "L", inserted in folio 56 of the present case. These are reports issued by doctors who work at the Institute of Social Welfare and Assistance for the personnel of the Ministry of Education (IPASME), in a hospital, which, being attached to the Ministry of Education, are administrative entities, and, consequently, the documents signed by the officials authorized to do so have the connotation of administrative documents, which is different from the private document, nature that the defendant wants to attribute to it. Therefore, since they are administrative documents, those who sign them, being public officials, are exempt from the provisions of Article 431 of the Code of Civil Procedure.

The nature of administrative acts of this type of medical reports has been explained by the Political Administrative Chamber of the Supreme Court of Justice in a decision dated December 14, 2005 (St. No. 6556). No. 6556), when

USAO_003951

it said the following:

*...omissis...*

It is clear that the medical reports provided, "based on the content of the act in question and the organ from which they emanate, the Chamber considers that such documents must be considered as public administrative documents, which enjoy a presumption of legitimacy, authenticity and veracity, which can be disproved by proof to the contrary" (SPA, St. No. 0499 of March 20, 2007). Proof to the contrary is the responsibility of the person challenging it, who must rebut the presumption of legitimacy, authenticity, and veracity. In this case, the burden of proof is on the defendant, who merely challenged them but did not rebut the presumption of legitimacy, authenticity, and veracity.

The documents emanating from physicians (reports, rests, validations, etc.), assigned to public hospitals, are documents that as we know cannot be assimilated to private documents, since these employees are empowered to attest to the facts they witness. Such is the case of Social Security physicians. Documents that as previously mentioned, even though they are not strictly public documents due to a matter of mere formality, they do have in court the same value as public documents, and this is due to the fact that their authorization has been given by a doctor who deserves public faith on the medical fact that he has treated. Therefore, full probative value is granted - It is so established.

12) Promoted, reproduced and made to be incorporated to the process, a certificate of study inserted in folio 190 of the present case. It is the original of the Certificate of Studies issued on November 15, 2013, by the *Universidad Gran Mariscal de Ayacucho*, in the name of the citizen: CEDEÑO ACOSTA CARLA ORIANA, who is a student of said Institution in the career of Civil Industrial Maintenance Engineering corresponding to the academic period 2-2013 between September 2013 and February 2014, it is inserted in folio 190. 13). It is not granted evidentiary value, since it constitutes a private document signed by a third party, who is not a party to the process, which must be ratified in its content through testimonial evidence, in accordance with the provisions of Article 431 of the Code of Civil

Procedure. - Thus, it is decided: -

Promoted, reproduced and presented for the incorporation of the same to the process, a proof of study, marked with the number "2", inserted in folio 191 of the present case. It is the original of the Certificate of Studies issued on November 13, 2013, by the *Universidad Alonso de Ojeda*, in the name of the citizen: TRINIDAD MARIA DEL VALLE CEDEÑO ARRIETA, who is enrolled in said Institution in the career of Administration Mention Management and marketing, it is inserted in folio 191. It is not granted evidentiary value, since it constitutes a private document signed by a third party, who is not a party to the process, which must be ratified in its content through testimonial evidence, in accordance with the provisions of Article 431 of the Code of Civil Procedure.

USAO_003952

14) Promoted, reproduced, and made to be incorporated to the process, Registration Form of the citizen Trinidad María del Valle Cedeño Arrieta, marked with the number "3", inserted in folio 192 of the present case. It is the Original of the Certificate of Enrollment Form issued on August 30, 2013, by the Universidad Alonso de Ojeda, in the name of the citizen: TRINIDAD MARIA DEL VALLE CEDEÑO ARRIETA, who is enrolled in said Institution in the career of Administration with mention in Management and Marketing, inserted in folio 192. It does not have probative value, since it constitutes a private document signed by a third party, who is not a party to the process, which must be ratified in its content through testimonial evidence, in accordance with the provisions of Article 431 of the Code of Civil Procedure. -

15) Promoted, reproduced, and presented so that the same be incorporated to the proceeding, a proof of studies, marked with the number "4", inserted in folio 193 of the present case. It is the Original of the Certificate of Enrollment of Studies issued on November 14, 2013, by the *University Alonso de Ojeda*, in the name of the citizen: CEDEÑO ARRIETA CARLA DE LA TRINIDAD, who studied in said Institution in the career of Nursing, inserted in folio 193. It is not granted evidentiary value, since it constitutes a private document subscribed by a third party, which must be ratified in its content through testimonial evidence, in accordance with the provisions of Article 431 of the Code of Civil Procedure. -

16) Promoted, reproduced, and made the same to be incorporated to the proceeding, a proof of studies, marked with the number "5", inserted in folio 194 of the present case. It is an Original Report of Qualifications issued on November 15, 2013 by the *Instituto Universitario de Tecnología Juan Pablo Pérez Alfonso*, in the name of the citizen: CEDEÑO ARRIETA, CARLA TRINIDAD, who studied in said Institution, inserted in folio 194. It is not granted evidentiary value, since it constitutes a document subscribed by a third party, which must be ratified in its content through testimonial evidence, in accordance with the provisions of Article 431 of the Code of Civil Procedure. -

17) Promoted, reproduced and made to be incorporated to the process, a certificate certified by Dr. Saúl González, marked with the number "5", inserted in folio 195 of the present case. It is an undated original of Medical Certificate, issued by the *"Táchira" Polyclinic*", in the name of the citizen: TRINIDAD CEDEÑO ARRIETA, inserted in folio 195. It is not granted evidentiary value, since it constitutes a document subscribed by a third party, which must be ratified in its content through testimonial evidence, in accordance with the provisions of article 431 of the Code of Civil Procedure. -

18) Promoted, reproduced and made the same to be incorporated to the process Bank vouchers, inserted in folios 196, 197, 198, 199, 199, 200, 205, 210, 211 and 212 of the files. In the case of the bank deposits, the petitioner appears as the depositor, who accompanied as evidence such deposits or deposit slips with the purpose of proving the payment of studies. However, the

12

USAO_003953

defendant considers that these deposits must be ratified by means of witness evidence, according to the provisions of Article 431 of the Code of Civil Procedure, since it constitutes a document issued by a third party. Now, this judge states that bank deposits are not documents that are formed unilaterally by a third party, the banks. In their formation, the depositor and the bank participate, who receives the money on behalf of its principal -the account holder- and certifies the deposit by means of symbols and validation proper of that operation and banking institution and not by means of a signature, for which reason they fit within the evidentiary means called "tarjas" (a swipe) although it is true that the plans of the deposit are not the same as those of a third party, but rather they are the same as those of a third party.) although it is true that the deposit slips do not constitute a free means of evidence, since they are assimilated to the cards and therefore are a means of evidence specifically established in the law, with respect to which there is an express legal rule that regulates its evidentiary effectiveness, as it is article 1.383 of the Civil Code, it is an effective means capable of attesting to its content, which proves a fact, but does not prove the material damage caused since the same are supported by the statements of accounts and records that were not ratified as was said, following the norms contemplated in the Code of Civil Procedure, specifically in its article 431, for which reason they contribute nothing to the solution of the present controversy, and as a consequence it is not granted full probative value. And so, it is established as follows:

Defendant: Regarding the means of evidence promoted by the defendant, concerning the evacuation of the means of DOCUMENTARY EVIDENCE promoted by Attorney LUIS ALBERTO RIVAS SILVA, legal representative of the defendant citizen: CARLOS EDUARDO ORENSE AZOCAR, he contributed the following:

1.- It reproduces the content of the special power of attorney conferred by the parents of the defendants to the Public Defender of Children and Adolescents, which is attached to folios 8 to 12 of the present case. Said evidence is evaluated in item 1 of the documentary evidence submitted by the petitioner. - It is thus established. -

2.- He reproduced the procedural acts where it is stated that the petitioners are of legal age. The fact alleged by the defendant that the petitioners reached the age of majority during the course of the trial, material and functional competence is protected by the principle denominated by the doctrine as perpetuatio iurisdictionis, which implies that the changes generated during the course of the process do not affect the competence of the court that is hearing the case. Therefore, the defendant's allegation must be dismissed as established in point No. 1 of the Evidence. -

3.- The minutes of the Mediation Phase of the preliminary hearing dated 05-11-2013, inserted in folio 180 of the present case. It is the Minutes of the mediation phase of the preliminary hearing to which the defendant makes reference in an

USAO_003954

enunciative manner, and to which the same complies with the requirements contemplated in article 472 of the Organic Law for the Protection of Children and Adolescents, therefore it is not part of the evidentiary record, and consequently this Court does not appreciate it as evidence but as minutes that are part of the procedure of the present case, which complied with the requirements of law for the purpose for which it was proposed.

It is so decided. -

4.- It reproduces what was pointed out by the Public Defender of Protection Attorney Arturo Guillén, regarding the fact that the crime committed by his defendant occurred in a quarrel and because he feared for his own life, from which it is evident that he is not obliged to repair or compensate any damages or prejudices. In this case, the defendant makes his own the allegation of the petitioner in the sense that the crime committed by his defendant occurred in a quarrel and because he feared for his own life, from which it is evident that he is not obliged to repair or compensate any damages or prejudices. Now then, this judge considers it necessary, after reviewing the evidence, the facts presented and the concatenation with the norms of rights invoked, to analyze what is being pursued by the parties as the merits of the present controversy.

As the procedural records show, we can observe that the petitioners are claiming the following:

1.-) That on November 12, 2002, in the city of El Tigre, the citizen CARLOS RAMON CEDEÑO died, who was Venezuelan, of legal age and carried Identity Card No. 3.501.003, according to the death certificate dated November 20, 2002, of which, although it is true that it does not appear in the records of the present case, mention is made in the Minutes of the Preliminary Hearing issued by the Court of Criminal Instance in Control Function No. 1, Criminal Judicial Circuit of the state of El Tigre, in the state of El Tigre. 1, Criminal Judicial Circuit of the State of Anzoátegui, El Tigre extension, which appears on folios 16 to 36 in certified copy, in which the homicide in a quarrel is established, provided for and punished in Article 424, second part of the Venezuelan Criminal Code.

) The guilt and therefore responsibility of the citizen CARLOS EDUARDO ORENSE AZOCAR, Venezuelan, 48 years of age, date of birth April 28, 1965, holder of Identity Card No. V 4.217.557, residing at Calle Barinas, House No. 04-39, Anaco, State of Anaco, Venezuela.

04-39, Anaco, Anzoátegui State, for the occurrence of the crime of Homicide in a quarrel, foreseen and sanctioned in Article 424, second part of the Venezuelan Penal Code, in which the accused requested the right to speak, which was granted and the above mentioned citizen expressed in a clear and intelligible voice the following: "I admit the facts for homicide in a quarrel which was what happened there, that is to say the qualification given by the Court, I admit that I acted in that way in the course of the quarrel and under the threat to my life

14

USAO_003955

given by Carlos Cedeño", according to sentence dated January 12, 2004, dictated by the Court of Appeals of the Venezuelan Criminal Court of Appeals.004, dictated by the Court of First Instance in Trial Functions number 01 of the Criminal Judicial Circuit of the State of Anzoátegui. Under this premise, the petitioner requests that the defendant be condemned by the Court to pay the sum of Two Hundred and Fifty-Two Thousand Bolivars (Bs. 252,000) (after the legal monetary conversion), as compensation for the material damage and indemnification for damages arising from an unlawful act as a consequence of the criminal conviction to which the defendant was subject. On the other hand, the defendant alleges in his answer to the merits of the claim that although it is true that the defendant was convicted for the commission of the crime of homicide in a quarrel, provided for and punished in article 424, second paragraph of the Penal Code, it is also very true that the homicide occurred in a quarrel and under threat to his life by Carlos Cedeño, as also indicated by the petitioner in his claim in folio number one; that even though the law establishes that every person is criminally liable for a crime or misdemeanor, he is also civilly liable, his client is not civilly liable, since the facts occurred in a fight and under the fear that he could lose his life, as indicated by the petitioner in the complaint (page 1), therefore he is relieved and exempt from civil liability in the case at hand in accordance with the provisions of Article 1.188 of the Civil Code; he also alleges that the criminal liability incurred by his represented party was to preserve himself, to preserve his life, consequently, he is relieved and exempted from civil liability and he is not obliged to repair or compensate any damage or harm, in accordance with the provisions of article 1.188 of the Civil Code; before mentioned, that even more in the worst of the cases, the maxims of experiences indicate us that in case of homicide in quarrel, obviously the fact of the victim contributed to cause the damage, which relieves the defendant of civil liability according to the established in article 1.189 of the Civil Code.

CONTROVERSIAL SYNTHESIS:
In the present proceeding there arises controversy on the following facts:
1) The veracity of the exchange instruments called invoices, proof of studies, payment receipts, medical report
2) The demonstration of the material damage and the compensation of damages arising from the unlawful act as a consequence of the criminal conviction, the reparation of the moral damage and the loss of profits.
THE COURT TO DECIDE OBSERVES:
Having assessed the evidence and determined the occurrence of the crime of Homicide in a Quarrel, foreseen and punished in article 424, second part of the Penal Code, as it can be seen in the decision published on 12-01-2004, file No. 1C-1756-02, it is up to this Judge to examine the viability of the concepts claimed in the demanded pretension, not without first making a brief outline of what constitutes the liability for the illicit fact.

15

USAO_003956

Article 1,185 of the Civil Code establishes:

"He who with intent, or by negligence or imprudence, has caused damage to another, is obliged to repair it.

He who has caused damage to another, exceeding, in the exercise of his right, the limits set by good faith or by the object in view of which that right has been conferred to him, must also make reparation."

This fact is called by the doctrine as a wrongful act, which according to *Ennecerus*: "It is the culpable or fraudulent conduct, contrary to law and from which the legal system derives as a substantive consequence the duty to compensate it".

This duty to indemnify is translated into the so-called Civil Liability, whose constitutive elements are analyzed by this Judge, to determine whether or not they are applicable in the present case; Eloy Maduro Luyando in his Course on Obligations refers that the doctrine indicates as constitutive elements of civil liability the following: 1° The damages caused to a person; 2° The non-compliance due to the debtor's fault or due to facts that are attributable to him and 3° The causal relationship between the non-compliance and the damage.

1° Damages: Damages are understood as any diminution or loss that a person experiences in his patrimony or material assets or in his moral assets. In the first place, regarding the damage alleged to have been suffered by the petitioners, the judge observes that in the first place, the occurrence of the crime of homicide in a quarrel foreseen and punished in article 424, second part of the Venezuelan Criminal Code, is a fact that was not disputed, since said fact was fully proven in the criminal jurisdiction as already explained, likewise the parties expressly admit that fact and do not object to it, fully accepting that the parties were involved in a quarrel in which the father of the petitioners, citizen CARLOS CEDEÑO, was killed: CARLOS CEDEÑO, framing these facts in the norm contained in article 1.188 of the Civil Code, in its second part, which cleared any doubt in relation to the non-occurrence of the first presupposition, that is to say, the existence of damages caused to a person, and that from the minutes that conform the present file and through what was debated in the hearing it was demonstrated that the parties intervened in a fight that had as fatal outcome the death of one of them as was the case of the citizen: CARLOS CEDEÑO, fact that is not debated.

2° The non-fulfillment by fault of the debtor or by the facts that are imputable to him:

Established as it is the existence of the crime of Homicide in quarrel, it is necessary to analyze to which person should be attributed the guilt of the damaging event, in such sense, in the same way it turns out to be an uncontroverted fact that in the criminal process to which reference was already made, specifically in sentence dated January 12 of 2.004, dictated by the Court of First Instance in Control Functions number 01 of the Criminal Judicial Circuit of the State of Táchira, the citizen CARLOS EDUARDO ORENSE was

16

USAO_003957

condemned to serve a prison sentence for the commission of the crime of *HOMICIDIO EN RIÑA, [HOMICIDE WHILE QUARRELING]* to the detriment of the citizen CARLOS RAMON CEDEÑO, with which it was fully demonstrated his guilt, with respect to the fact occurred, guilt that must be analyzed in the civil sphere, as it is requested in the present case, adjusted to the provisions of the aforementioned second part of Article 1.188 of our substantive law, that is to say in a shared manner, by virtue of the fact that it was derived from an illicit fact of Homicide in a quarrel in which both parties are in agreement that, as it is established in the certified copy that contains the PRELIMINARY HEARING carried out before the Criminal Court of First Instance in Control Function No. 1, of the Criminal Judicial Circuit of the State of El Salvador, in the Criminal Judicial Circuit of the State of El Salvador. 1, of the Criminal Judicial Circuit of the State of Anzoátegui, El Tigre extension, in which the following citizen was sentenced: CARLOS EDUARDO ORENSE AZOCAR for the commission of the crime of Homicide in Quarrel, in which the accused admits the facts, in which he expresses that he acted in that manner in the course of the quarrel and under the threat to his life issued by Carlos Cedeño, a fact that was not attacked by the petitioner in the present proceedings, since he alleges it in the same manner in his libel brief, all of the above is administered to the provisions of the so many times mentioned in the Civil Code in Article 1.188 of the Civil Code which establishes in its second paragraph: "He who causes a damage to another to preserve himself or to protect a third party from an imminent and much more serious damage, is not obliged to repair but to the extent that the judge deems it convenient ...."Therefore, fault is not a fact debated, since the parties are in agreement that the fact occurred and under the circumstances in which the same arose, and by virtue of this, the second condition was not demonstrated in this process in its totality, that is to say, the fault of the agent generating the damage, a fault which this sentencing judge asserts is inherent to the subjects who intervened in the quarrel from which the illicit act was derived.-.

3° The causal relationship between the breach and the damage.

In order to determine if such action generates the obligation to repair the damage caused to the citizen CARLOS RAMON CEDEÑO, it is evident in the record that the causal relationship between the damage suffered by him and the guilt of the citizen CARLOS EDUARDO ORENSE AZOCAR, are not intertwined, consequently originating joint and several liability between the aforementioned citizens, with which in the opinion of the judge, the causal relationship between the fact imputed to the defendant and the damages suffered by the petitioners has not been verified, thus not complying with the requirements for the establishment of civil liability, since the petitioner did not demonstrate the damage caused by the alleged civil liability, as a consequence of the crime of homicide in a quarrel. Thus, it is established:

Having analyzed the procedural requirements that must be met for the proceeding of the Civil Liability for Illicit Fact, it is up to this Court to analyze the

USAO_003958

proceeding or not of the compensations claimed by the petitioners, as well as the determination of the person obliged to pay them. Thus, in the instant case, the petitioners claim three (03) types of damages that they claim to have suffered as a consequence of the crime of homicide in quarrel that occurred on November 20, 2002, that is, they allege to have suffered material damages, loss of profits and moral damages.

I.-) Material damage:

The petitioners allege, represented by their Public Defender, that the parents of the daughters of the citizen: CARLOS CEDEÑO have had to pay for their daughters' studies, as well as medical and psychological consultations.

The material damage constitutes an immediate decrease of the patrimony of the person who experiences it, therefore, it must be analyzed at all events and applying the principle of the valuation of the evidence in the case file, if from the evidence contributed to the process there is evidence of the existence of elements demonstrating the expenses or monetary disbursements that the petitioner claims to have made on the occasion of the crime of homicide in quarrels and the damages suffered; In relation to this, it is observed that the documents (invoices and other private instruments) promoted to this effect were discarded for not having been ratified in the process, which were studied, specifically in the section of evaluation of the evidence, documents that were not given full probative value, determining that they do not comply with the requirements established in article 431 of the Code of Civil Procedure, consequently with said instruments was not fully proven, the civil liability requested, since the same were not ratified by the persons who issued the same, for being third parties in the present controversy, therefore it is forced to declare who here judges to resolve said petition and before the determination of our legislation, with respect to the burden of proof, observes that it is contemplated in article 1.354 of the Venezuelan Civil Code, which is taken up by the Code of Civil Procedure, which establishes in its article 506 the following:

Article 506.- The parties have the burden of proving their respective factual assertions. Whoever requests the execution of an obligation must prove it, and whoever claims that he has been released from it, must prove the payment or the extinctive fact of the obligation.

Notorious facts are not subject to proof.

According to the doctrine, the burden of proof has the purpose of indicating to the Judge how he must sentence when a fundamental fact for the resolution of the controversy is not proven in the process, considering that there is a prohibition to absolve the instance, contained in article 244 of the Code of Civil Procedure.

In this sense, the former Supreme Court of Justice stated the following:

"It is a doctrinal criterion that is peacefully consolidated that the Judge has the duty to apply the legal regime of the distribution of the burden of proof in the specific hypothesis that arises when at the time of sentencing he finds the lack

USAO_003959

of proof on a factual statement implied in the respective litigious object". (Judgment dated May 26, 1999 of the Civil Cassation Chamber of the Supreme Court of Justice, with report of the Conciliator-Judge Dr. Andrés Octavio Méndez Carballo, taken from Venezuelan Jurisprudence Ramírez & Garay, Volume CLIV, p. 465).

On the other hand, this rule of the burden of proof indicates to the parties what activity they must perform within the process in order to obtain a favorable sentence and in this sense the parties will know that they must provide proof of their assertions, so that these are taken as true in the sentence and based on them the judge makes the decision.

Consequently, in view of the lack of ratification of the evidence in the case file with respect to the fact that the petitioner wanted to demonstrate with them the expenses incurred and that influenced in the reduction of his patrimony, he was not able to determine them since they were not ratified so that they would have the effects of the law, likewise it was not demonstrated how much was the monthly income of the deceased citizen: CARLOS CEDEÑO, it was only mentioned that he was a prosperous oil businessman, as well as it was not demonstrated how much said citizen paid for the maintenance of the petitioners in the present lawsuit, therefore this Court considers that it must declare the request for material damages is inadmissible in accordance with the provisions of Article 506 of the Code of Civil Procedure. It is so decided.

II.) Loss of Profit:

In the writ of claim, the indemnity for loss of profits is claimed, since according to the petitioner, considering that the average age of the daughters of the citizen: CARLOS RAMON CEDEÑO, is 14.6 years old, it is estimated that at the rate of 500.00 bolivars/month, for each child, it is equal to 1.500.00 up to the age of 25 years, that is to say what remains between the average age and the age of majority of the represented parties, considering that the LOPNNA, in article 384, establishes that the maintenance obligation extends to the age of 25 years, that is to say the amount of two hundred and fifty two thousand bolivars, since the father of the represented parties was a prosperous businessman in the oil industry.

The loss of profit is defined as the non-increase of the patrimony of the person who experiences it due to having been deprived of some utility considered as a certain income in such patrimony.

From the procedural records it is evidenced that in the criminal proceeding already referred to, it is established that the defendant admitted the facts for homicide in a quarrel which was what happened there, that is to say the qualification given by the Court, he admitted that he acted in that manner in the course of the quarrel and under the threat to his life made by Carlos Cedeño; it was fully proven that the mentioned illicit fact caused the death of the citizen CARLOS CEDEÑO, generated by the quarrel established between the citizens: CARLOS CEDEÑO and CARLOS EDUARDO ORENSE, for which reason this

court is not given to legally analyze the criminal sentence since it would be invading the sphere of its competence in reason of the matter; it is given, however, to analyze the articles of the Venezuelan substantive law such as the Civil Code that the parties have indicated to support their pretensions, for which reason this court then goes on to pronounce on the scope of the civil liability derived from the unlawful act: Now, the first element of civil liability is the non-execution of a predetermined conduct or activity that should have been executed by the legal subject. Such conduct or predetermined activity may consist of an obligation that the debtor should have performed because it was assumed conventionally or because it was imposed by law, or of a pre-existing legal duty that the law presupposes and whose violation entails the obligation of the offender to make reparation, as occurs with the wrongful act provided for in Art. 1185 of the CC.

In this order of ideas and as established by the doctrine, in order for tort liability to proceed, a series of circumstances must be present (see Henri León and Jean Mazaud and F. Chabas, _Lecons de Droit Civil, Obligations_, Paris, 1991, pp. 395 et seq.; Eloy Maduro Luyando, _Curso de Obligaciones_, Caracas 1993, pp. 129 et seq.; José Melich Orsini, _Civil responsibility for illegal acts_, Caracas, 1994, volume I, pp. 37 et seq, cf. C.E. Acedo Sucre,

The role of culpability in the responsibility for an illegal act. Found in Venezuelan law, Caracas, 1993). To begin with, it is necessary that there is a fault or faults, that is to say, a wrongful act, then the presence of a damage is required, which in turn must have a certain character and a personal character and finally, the petitioner must demonstrate the cause-effect relationship or causal relationship, since it is not enough that a private individual has suffered damages, but it is also necessary that such damages can be attributed to the predetermined wrongful act, this causal relationship can also be broken in the presence of exonerating circumstances, viz: fault of the victim, force majeure, fortuitous event and the act of a third party. (Underlining of this Court) In the same sense and emphasizing the damage, G. Viney, points out:

"it is the compensation of damages that is considered as the essential object of liability" (La responsabilité: conditions, LGDJ, Paris, 1982, N° 36), damages that, as a rule, the petitioner must prove "both in their existence and in their consistency" (Y. Chartier, La réparation du préjudice, Dalloz, Paris, 1983, p. 1). Thus, "in a liability proceeding, the victim, by definition, is any person who has suffered damage: without damage, there is no liability" (J. Moreau, La responsabilité administrative, PUF, QSJ, Paris, 1986, p. 80). In short, in any liability case "what is at stake is to obtain reparation, which necessarily presupposes that there is damage to be repaired. The damage is the element that gives the creditor an interest in bringing an action for liability...".

For his part, J. Melich Orsini points out in his work "the civil responsibility for an illegal act", Caracas, 1994, t. I, pp. 37 and 38. "That, as regards the causal

USAO_003961

relationship, it is simply a matter of linking the other two elements of tort liability, i.e., that the damage effectively caused is the responsibility of the subject imputed as the author of the wrongful act (...). In the same context, Article 1.185 of the Civil Code is brought up, which refers to profoundly different facts or aspects. In the different hypotheses of the first paragraph, it is sufficient to prove the damage caused by an intentional, negligent, or reckless act of another; a simple, almost elementary matter. On the other hand, in the second case, it is a serious and complicated situation, a delicate and complex legal problem: to specify when a right has been used rationally and when it has been abused, (underlined by this Court), expressed in the terms of the law itself, when the exercise of the right exceeds "the limits set by good faith or by the object in view of which that right has been conferred", it can be said that we are dealing with two conflicting rights, a delicate question in itself that cannot be resolved in a simplistic manner. It is common that general provisions, such as the first paragraph of Article 1.185 of the Civil Code, both in criminal and civil matters, are then restricted by exceptions and special cases that require different hypotheses. Therefore, article 1.185 of the Civil Code contemplates two different situations: that of the one who abuses his right, and that of the one who proceeds without any right..." (o.c. J. R&G, T-CLXIV, p. 611). Consequently, this sentence specifies that the extremes that configure the real and reliable certainty of the damages that are intended to be asserted by means of the action here proposed are not given, making it necessary to declare that the petitioner through its Public Defender, ARTURO GUIILÉN, attorney at law, failed to demonstrate the alleged damages derived from the unlawful act as a consequence of the Crime of Homicide in a Quarrel, given the allegations of the parties in which they state that the crime was derived from a quarrel between the citizens: CARLOS CEDEÑO and CARLOS EDUARDO ORENSE AZOCAR, as well as of the instrumental evidence provided in the evidentiary phase which were not ratified in order to make use of the control of the evidence, thus not being able this judge to determine the material damage caused with the evidence provided, which were analyzed previously, added to the fact that the fact generating the damage was caused by the quarrel of which were protagonists the citizens: CARLOS CEDEÑO and CARLOS EDUARDO ORENSE AZOCAR, which fits in the norm contemplated in article 1.189 of the Civil Code which establishes: "When the unlawful act of the victim has contributed to cause the damage, the obligation to repair it will be diminished to the extent that the victim has contributed to that...), ( bold of this court); not being demonstrated the occurrence of the material damage, therefore it is forced to this Court to declare it unjustified, and consequently the loss of profits is dismissed. And so, it is decided

II.-) Moral damage: Having been demonstrated the psychological affection caused to the daughters of the deceased CARLOS CEDEÑO, framing the same in the moral damage suffered. The Supreme Court of Justice points out that the

USAO_003962

moral damage is neither proved nor measured, but it is estimated, and it corresponds only to the Judge to estimate the amount to be paid within the discretionary power conferred by Article 1.196 of the Civil Code, so that once the crime has been proven, the compensation of the damage is left to the appreciation or subjective criteria of the Judge, taking into consideration the magnitude or relevance of the damage, the degree of guilt of the agent, the participation that the victim had in the crime and an appreciation of the intensity of the suffering, in such a way that the sentence that is not motivated in these assumptions would be null (Judgments of the Supreme Court of Justice, Civil Cassation Chamber, Case No. 95-281 dated 12-12-95 and Case No. 99-896 dated 10-08-2000).

In a judgment dated October 10, 1973, the Civil Cassation Chamber of the Supreme Court of Justice stated that the amount of the material damage is proven, established or measured through an expert opinion; not so the amount of the moral damage, in which the judge has the legal power of estimation within his prudent and sovereign arbitration, criterion that reflects the provision of Article 250 of the Code of Civil Procedure, which establishes the exemption of expert opinion in the moral damage, since its estimation corresponds to the judge within his discretionary power.

Likewise, it has been established that the amount of the moral damage is not susceptible to indexation or monetary correction, that is to say, it is adjustable to the inflation indexes of the country at the historical moment when the sentence is issued since the punishable act occurred, and this is due to the fact that the moral damage is a non-patrimonial damage, which the person experiences in his spiritual or affective values. (T. S. J., Civil Cassation Chamber, Judgment No. 131, dated April 26, 2000). The material damage produced by the crime is not susceptible to indexation either, since this, according to the analyzed judgment, is only applicable to the payment of social benefits due to the worker. The distinction between material and moral damages has also been established by the Supreme Court of Justice, whose Civil Cassation Chamber has pointed out that the physical damage experienced by the person due to the effects of the typical conduct "constitutes an organic material damage whose reparation implies medical treatment, medicines and loss of profits, participating primarily in a characteristic of physical pain and moral suffering, and the physical damage or personal injury is considered by the Legislator to be similar to the attack to honor, reputation or those of the family or personal freedom, so it is evident that such bodily damages or physical injuries are conceptualized as moral and not material damage", while it circumscribes material damage to the losses or impairment that the person suffers in his economic patrimony and in the objects of his property. (T. S. J., Civil Cassation Chamber, Decision No. 103, dated April 6, 2000).

The petitioner alleges the production of moral damages caused to his principals on the occasion of the death of the father of his principals, the now deceased

USAO_003963

CARLOS CEDEÑO, which is requested to be fixed by this Court, in consideration of the provision contained in Article 1.196 of the Civil Code. Article 1.196 of the Venezuelan Civil Code establishes that:

"The obligation of reparation extends to all material or moral damages caused by the unlawful act.

The judge may, especially, award compensation to the victim in case of bodily injury...omissis..." (Underlining of the Court).

As it has to be observed, our legislation in principle contemplates the duty to repair the moral damage caused on occasion of the unlawful act, likewise, it is enough that within the process the existence of the unlawful act is proven to have the conviction and certainty of the presence of the moral damage, as in effect our Maximum Court has held, in a judgment dated June 5, 2007, the Civil Cassation Chamber with report of Magistrate Emiro García Rosas, file 2005-4725, who stated the following: In order to decide, the Chamber observes: "...In the present complaint the appellant states that the *ad quem* violated rule 1.196 of the Civil Code for improper application, as well as article 1.354 of the same Code and Article 506 of the Code of Civil Procedure, both for lack of application, since according to his criteria, the appellee first establishes with the evidence of the record, that since there was no certain damage in the reduction of the petitioner's patrimony, the claim could not be declared admissible, and later appears condemning the defendant to the payment of an unproven psychological moral damage, so it is evident for the appellant that Article 1.196 of the Civil Code has been infringed for improper application, since the claimed damage is not proven in any manner whatsoever. The appellant also denounces the infringement of Articles 1.354 ibidem and 506 of the Code of Civil Procedure for lack of application, since the petitioner did not prove her assertion of the libeled facts regarding the claimed moral damages.

To this effect, Article 1,354 of the Civil Code states the following:

"...Whoever requests the execution of an obligation must prove it, and whoever claims to have been released from it must prove the payment or the fact that has produced the extinction of his obligation..."

Likewise, Article 506 of the Code of Civil Procedure provides,

"...The parties have the burden of proving their respective factual assertions. Whoever requests the execution of an obligation must prove it, and whoever claims to have been released from it, must on his part prove the payment or the extinctive event of the obligation...".

The Chamber emphasizes that from the provisions contained in the aforementioned regulations the Principle is derived, according to the well-known aphorism of the juris-consult Paulo: *Incumbit Probatio Qui dicit, non qui negat;* that is to say, that it is incumbent upon the one who affirms the existence of a fact, not upon the one who denies it, to prove it. Thus, it is observed that having been fully demonstrated the occurrence of the death of the citizen: CARLOS CEDEÑO and that attending not to the physical injury or loss but to the

23

psychological injury produced in the psyche of the petitioner, leads this sentence to determine that the existence of the psychological or moral injury suffered by the same has been demonstrated, having as corollary of it the psychological reports that go to the records of the present file of which it was granted evidentiary value. Therefore, as it has been previously established, in order for the moral damage to be established, it is only sufficient that the illicit act that gave rise to it is demonstrated, without any bodily injury on the part of the victim. This means that once the facts constituting a moral damage have been demonstrated by a person who has suffered them, and the liability of a third party as to the origin of that damage has been proven, the reparation agreed by the law must proceed without necessarily having to demonstrate the psychological damage beyond the mere demonstration of the moral damage resulting from the wrongful act, making it clear that it is sufficient for moral damages to prove the wrongful act, and being that in the instant case as already explained there is no doubt whatsoever in relation to the occurrence of the wrongful act, as is evident from the certified copies of the preliminary hearing issued by the Criminal Court referred to above, which is in order, we could hardly deny the existence of moral damages.- In the instant case, and in such sense it is inferred that it is natural that the death of a person, conceives sequels of loss in the feelings of the closest relatives, even more if the death occurred in a tragic way, which is framed as a moral damage, which by the request of the petitioners during the process, sufficiently proves the existence of the referred alleged moral damage, whose amount will be determined by criterion of the one who decides here, in correspondence to the established, in the article 1196 of the Civil Code. The petitioner requests the Court to estimate the moral damages, which it does and determines in the amount of ONE HUNDRED THOUSAND BOLIVARS AND ZERO CENTS (Bs. 100,000.oo).000.oo) and even though the suffering cannot be remedied with the payment of an amount of money, in one way or another, there is a duty of reparation and being consistent with the criterion sustained by the Jurisprudence of the Supreme Court of Justice, the amount of its compensation should not constitute in any way an enrichment of the claimant, Consequently, for the aforementioned and by maxims of experience, the judge can determine, in accordance with Article 12 of the Code of Civil Procedure, that the death of the citizen CARLOS CEDEÑO caused the death of the claimant, and that the death of the citizen, CARLOS CEDEÑO, caused the death of the claimant and the claimant: CARLOS CEDEÑO caused a mark of deep pain in the psyche of the petitioners herein, for which it deems appropriate the compensation for the moral damage in the amount of ONE HUNDRED THOUSAND EXACT BOLIVARES (Bs. 100.000,00). It is so decided.

DISPOSITIVE PART

For the reasons of fact and law explained above, this FIRST COURT OF FIRST INSTANCE OF CHILD AND ADOLESCENT PROTECTION TRIAL OF THE

24

USAO_003965

JUDICIAL CIRCUIT OF ANZOATEGUI STATE, Judicial Circuit El Tigre, administering Justice in the name of the BOLIVARIAN REPUBLIC OF VENEZUELA and by authority conferred by law, declares: PARTIALLY SUSTAINED the claim for DAMAGES AND INJURIES, filed by the citizen: ARTURO GUILLEN, Venezuelan, of legal age, holder of identity cards No. 8. 472.425, in his capacity as public defender, in representation of the child: ....The age at the time of the filing of the lawsuit; daughters of CARLOS RAMON CEDEÑO, who was a Venezuelan citizen, of legal age and holder of identity card No. 4.214.557, whose residence was located at Calle Barinas, house No. 4, Anaco, Anzoátegui State, who died in the city of El Tigre on 12/01/2004.The Court has declared: WITHOUT LIEU: the payment of damages, loss of profit and WITH LIEU the moral damage caused in the amount of ONE HUNDRED THOUSAND BOLIVARES (Bs.100,000.00). There is no condemnation in costs given the nature of the present decision - Once the present definitive sentence becomes final, by means of an order, this matter will be sent to the URDD, for its distribution, to the mediation and substantiation court, for its execution. A certified copy of the present decision shall be left herewith. - Given, signed and sealed at the Court of First Instance of Trial for the Protection of Children and Adolescents of the Judicial District of the State of Anzoátegui, judicial circuit El Tigre. Be it fulfilled. Leave a certified copy of this decision. - Given, signed and sealed in the Court of First Instance of Trial for the Protection of Children and Adolescents of the Judicial District of the State of Anzoátegui, Judicial Circuit El Tigre, on the first (1st) day of July two thousand fourteen. -


THE TEMPORARY JUDGE.
ABOG. [ESQ.] MARIANELA QUIJADA [PRESENT]


THE SECRETARY
ABG. [ESQ.] MILAGRO MORENO
On this same date being eight forty-four minutes past eight in the morning (8:44 a.m.), the above sentence was ordered to be published and added to file No. BP12-V-2007-000684.- For the record. -
THE SERCETARY,
ABG. [ESQ.] MILAGRO MORENO


MQE/mm

25

USAO_003966

# EXHIBIT B



*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 26, 2023

**By Email**
Jason Foy, Esq.
Foy & Seplowitz LLC
105 Main Street
Hackensack, NJ 07601

      **Re:**    *United States v. Orense Azocar*, 21 Cr. 379 (VRB)

Dear Mr. Foy:

      Based on your request, this letter provides disclosure pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure of certain expert testimony that the Government intends to offer at trial. Attached to this letter is the disclosure for the following expert witnesses:

- Ms. Jennifer Taul, Intelligence Research Specialist, Drug Enforcement Administration

- Mr. John Miller, Firearms Enforcement Officer, Bureau of Alcohol Tobacco Firearms and Explosives

      Out of an abundance of caution, the Government is also providing notice regarding the expected testimony of Enrique Santos, an Investigative Analyst at the United States Attorney's Office. The Government anticipates calling Mr. Santos to testify regarding data that was extracted from an iPhone that was seized from the defendant when he was arrested in Fronsinone, Italy, on or about May 13, 2021. A forensic image of the extracted data, which was initially extracted by Italian law enforcement authorities and was provided to the United States Government pursuant to the relevant mutual legal assistance treaty between the United States and Italy, was produced previously to you in discovery under Bates numbers USAO_003599 to USAO_003560, on or about December 19, 2022. A forensic image of the extracted data, as extracted by Mr. Santos, will be produced to you under Bates number USAO_004327 via the hard drive we received from you today. The Government expects that Mr. Santos will not testify as to any analysis of the iPhone, but will merely authenticate the forensic extraction as a true and correct copy of material found in and seized from the defendant's iPhone. Although under applicable caselaw, testimony regarding the extraction of data from electronic devices does not constitute expert testimony under Federal Rules of Evidence 702, 703, or 705, we are nonetheless providing this notice out of an abundance of caution. *See United States v. Marsh*, 568 F. App'x 15, 16-17 (2d Cir. 2014) (summary order) (finding no error in allowing lay, non-expert testimony relating to extraction of data from electronic device where witness simply "explained his training," "described" his search, and "testified to the contents of the messages retrieved from the phone"); *United States v. Chavez-Lopez*, 767 F. App'x 431, 434 (4th Cir. 2019) (testimony regarding Cellebrite extraction "about copying data from one drive to another, which is the product of reasoning processes familiar to the

average person in everyday life" properly admitted as lay opinion testimony (internal quotation marks omitted)); *United States v. Berry*, 318 F. App'x 569, 569 (9th Cir. 2009) (agent's testimony not expert testimony where he "simply testified to what he found on the [defendant's] hard drive . . . , without expressing an opinion that required specialized knowledge or offering insight beyond common understanding"); *United States v. Scott-Emuakpor*, 2000 WL 288443, at *12 (W.D. Mich. 2000) ("The question before the Court at this time is not whether these witnesses have the expertise, for example, to develop sophisticated software programs. The question is whether they have the skill to find out what is on a hard drive or a zip drive. Apparently, they have this skill because they determined what was on the drives. By analogy, a person need not be an expert on English literature in order to know how to read.").

The Government reserves the right to supplement this notice with notice of additional expert witnesses and/or additional information concerning the witnesses disclosed herein.

In light of your request for the attached expert witness disclosure, the Government hereby requests reciprocal expert disclosure pursuant to Rule 16(b)(1)(C). In addition, the Government reiterates its request, dated December 19, 2022, for disclosure pursuant to Rule 16(b)(1)(A) of any item within the defendant's possession, custody, or control that the defendant intends to use in the defendant's case-in-chief, and for disclosure pursuant to Rule 16(b)(1)(B) of any results or reports of physical or mental examinations or of any scientific tests or experiments that are in the defendant's possession, custody, or control, and that the defendant intends to use in the defendant's case-in-chief or that were prepared by a witness whom the defendant intends to call at trial.

Pursuant to Rules 12.1, 12.2, and 12.3, the Government requests that the defendant provide notice of any alibi defense, insanity defense, or public-authority defense that the defendant intends to rely upon in this case.

The Government also reiterates its request that the defendant disclose prior statements of witnesses whom the defendant will call to testify, including expert witnesses. *See* Fed. R. Crim. P. 26.2; *United States v. Nobles*, 422 U.S. 225 (1975). We request that such material be provided on the same basis upon which we agree to supply the defendant with 18 U.S.C. § 3500 material relating to Government witnesses.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney


by: _____/s/_____

Kaylan E. Lasky / Michael D. Lockard /
Kevin T. Sullivan
Assistant United States Attorneys
(212) 637-2315 / 2193 / 1587


Attachment: (Expert Witness Disclosures)

# Disclosure as to Expert Witness Jennifer Taul

October 25, 2023

## I.     Statement of Opinions, Bases, and Reasons

The following is a complete statement of all opinions that the Government will elicit from Ms. Jennifer Taul, either in its case-in-chief or during its rebuttal case, to counter testimony that the defendant intends to offer, along with the bases and reasons for them. In addition, the Government reserves the right to supplement this notice with additional testimony to counter testimony that the defendant intends to offer following the disclosure of any expert testimony by the defendant pursuant to Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure.

Ms. Taul is employed by the Drug Enforcement Administration ("DEA") as an Acting Group Supervisor for the Hawaii High Intensity Drug Trafficking Areas' Investigative Support Center, and an Intelligence Research Specialist at the Honolulu District Office in the Los Angeles Field Division. Ms. Taul is an expert on international drug trafficking.

*First*, Ms. Taul will describe the sources and manufacturing processes typically used to produce cocaine in Colombia, including in multi-ton quantities and the locations within Colombia where cocaine is typically processed.

*Second*, Ms. Taul will describe drug trafficking routes commonly used to transport cocaine, including land, air, and maritime routes, from Colombia and Venezuela to the United States, including (i) through Central America and Mexico, and (ii) through the Caribbean. More specifically, Ms. Taul is expected to opine that from approximately 2003 through 2021, one method used by international drug traffickers to distribute Colombian-produced cocaine was to transport it by land from Colombia to Venezuela, which included the use of particular areas such as Cúcuta and Arauca as border-crossing points. After the cocaine entered Venezuela, one transportation route involved the use of clandestine airstrips in locations such as the Venezuelan states of Apure, Carabobo, Miranda, Guárico, and Zulia, where the cocaine would be loaded onto small airplanes for air delivery to intermediary destinations in the Caribbean and Central America, and then further transported into the United States. A second transportation route used by international drug traffickers to transport Colombian-produced cocaine after it entered Venezuela was to ports on the north coast of Venezuela, where the cocaine was loaded on watercraft, such as go-fast vessels, delivered to intermediary destinations in the Caribbean and Central America, and then transported into the United States.

*Third*, Ms. Taul will testify about certain methods of operation employed by narcotraffickers along these routes. In particular, she is expected to describe the types of watercraft, airplanes, and vehicles that are frequently used; the use of legitimate business to conceal narcotics trafficking; the use of modifications to small airplanes used to transport cocaine to increase their carrying capacity and flight range; the use of cavities in watercraft and airplanes to conceal

narcotics; and large-scale Venezuelan narcotraffickers' use of weapons to protect cocaine loads in the course of transporting the loads.

*Fourth*, Ms. Taul will testify about the use of slang and coded language, including particular terms used in this case, for cocaine, and for the Revolutionary Armed Forces of Colombia (the "FARC").

*Fifth*, Ms. Taul will describe how large-scale Venezuelan narcotraffickers often do business with Mexican drug trafficking cartels, such as the Beltrán-Leyva Cartel, and with Colombian *guerillas*, such as the FARC.

*Sixth*, Ms. Taul will describe the use of illicit business arrangements between Venezuelan narcotics traffickers and Venezuelan politicians, law enforcement officers, and military leaders to provide protection to narcotraffickers and facilitate the shipments of their narcotics loads.

*Seventh*, Ms. Taul will describe the approximate prices of cocaine, including in Venezuela and the United States, in both wholesale and retail quantities, from approximately 2003 through 2021.

*Finally*, Ms. Taul will describe the typical appearance and packaging of cocaine, including "stamps" or "brands" frequently used by narcotraffickers and the use of various materials to wrap cocaine.

The bases for Ms. Taul's testimony are her training, education, and experience, including her approximately 21 years working at the DEA. Ms. Taul's experience at the DEA includes (i) more than three years stationed in Caracas, Venezuela; (ii) more than three years stationed in Bogotá, Colombia; (iii) and nearly two years assigned to the Bilateral Investigations Unit ("BIU") of the DEA's Special Operations Division. In all of these roles, Ms. Taul participated in multiple international narcotics trafficking investigations, including those involving Venezuela. Ms. Taul's work involved extensive global travel, including within South America; discussions and coordination with foreign law enforcement and DEA officers stationed abroad, including in Colombia, Venezuela, Central America, the Caribbean, and Mexico; conversations with confidential sources with personal knowledge of, and proffers of defendants involved in, the production, transportation, and distribution of narcotics, including cocaine from Colombia; and review of recordings and electronic communications of individuals involved in narcotics trafficking relating to the production, transportation, and distribution of cocaine from Colombia.

## II.    Qualifications

Ms. Taul's qualifications are described above, and her curriculum vitae is attached hereto as Exhibit A. Ms. Taul has not authored any publications in the previous ten years.

### III. List of Cases

To the best of Ms. Taul's recollection and ability to reconstruct, Ms. Taul has not testified as an expert at trial or by deposition in the previous four years.

/s/ Jennifer Taul

**Disclosure as to Expert Witness John Miller**

October 26, 2023

**I.**      **Statement of Opinions, Bases, and Reasons**

The following is a complete statement of all opinions that the Government will elicit from John Miller, either in its case-in-chief or during its rebuttal case, to counter testimony that the defendant intends to offer, along with the bases and reasons for them. In addition, the Government reserves the right to supplement this notice with additional testimony to counter testimony that the defendant intends to offer following the disclosure of any expert testimony by the defendant pursuant to Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure.

John Miller is employed as a Firearms Enforcement Officer ("FEO") in the Firearms and Ammunition Technology Division ("FATD") of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and is an expert on the identification, classification, operation, and design of firearms and explosives.

*First*, FEO Miller will describe the basic function and operation of a firearm. Specifically, FEO Miller will describe the various core components of a firearm, such as the muzzle, barrel, chamber, trigger, grip, firing pin, hammer, and magazine, among others. FEO Miller will explain that a unit of ammunition known as a cartridge consists of four components: (i) the bullet, (ii) the cartridge casing, (iii) the propellant or gunpowder inside the cartridge casing, and (iv) the primer at the base of the cartridge. He will further explain how these various components function and the process of firing of a bullet from a gun.

*Second*, FEO Miller will describe the difference between a semiautomatic firearm and an automatic firearm. In particular, he will explain that a semiautomatic firearm can fire only one bullet per each pull of the trigger. He will explain that, by contrast, an automatic firearm can fire multiple bullets per each pull of the trigger and can in fact empty the magazine of ammunition if the trigger is held down.

*Third*, FEO Miller will describe types of firearms and explosives, such as handguns (*e.g.*, Glocks and the Beretta 92fs), assault rifles (*e.g.*, the M16, M4, and AK variants, such as the AK-47 and AK-103), sub-machine guns (*e.g.*, an Uzi and the HK MP5), rocket propelled grenades, and surface-to-air missiles (*e.g.*, the Igla MANPAD), among others. He will further explain the features and functions of such weapons that qualify them as a "machinegun" or "destructive device" as those classifications are used by the ATF under federal law. In particular, FEO Miller will explain that a "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. FEO Miller will further explain that a "destructive device" includes, among other things, any explosive or incendiary bomb, grenade, rocket with propellent charge, and missile having an explosive or incendiary charge. FEO Miller will also testify about examples of firearms that qualify as a machinegun, such as an Uzi, HK MP5, AK-47, AK-103, and certain models of the M16 and M4. FEO Miller will also testify about examples of weapons that qualify as

destructive devices, such as rocket propelled grenades and surface-to-air missiles like the Igla MANPAD.

*Fourth,* FEO Miller will explain that the term "machinegun" also refers to the frame or receiver of any such firearm and any other part or combination of parts designed and intended to convert such firearm into a machinegun. FEO Miller will describe how an otherwise semi-automatic firearm can be modified to fire automatically through the use of a machinegun conversion device. For example, FEO Miller will explain how a semi-automatic Glock handgun can be converted to a machinegun with the installation of a machinegun conversion device, or "Glock switch," that allows the gun to fire automatically.

The bases for FEO Miller's testimony is his training, education, and experience, including his approximately 27 years working in law enforcement and the military. Since February 2022, FEO Miller has worked as an FEO in the ATF's FATD, where he provides technical information regarding firearms identification, operation, and design to assist law enforcement agencies, the firearms industry, and other government components in the implementation and enforcement of federal laws regarding firearms. As an FEO, he also examines and tests firearms, prepares reports on the identification and origin of firearms and their classification under federal law, conducts trainings, and assists in the maintenance of the FATD's reference library and collection, which includes, among other items, approximately 13,000 firearms of all types. In addition, FEO Miller has received extensive training through the ATF and by the firearms industry, including in numerous courses and armorer certifications, and on specific weapons and firearms design, manufacturing, and operation. Prior to his work at the ATF, FEO Miller worked for more than 14 years as an explosives specialist with the Department of Homeland Security's Transportation Security Administration ("TSA") where, among other duties and responsibilities, he responded to and mitigated explosive and hazardous devices and components of all kinds and provided training on the methods and techniques employed by terrorists, criminals, and criminal enterprises to use explosives and other destructive devices. Prior to his work at the TSA, FEO Miller worked for more than 10 years as an explosive ordnance disposal ("EOD") technician with the U.S. Army and the U.S. Airforce Reserves (with several active-duty deployments) where, among other duties and responsibilities, he responded to and mitigated explosive ordnance of all kinds and weapons caches. As an EOD technician, he also responded to explosions, assisted in related investigations, and prepared technical intelligence reports on novel and rare ordnance and weapons systems.

## II.    Qualifications

Officer Miller's qualifications are described above, and his curriculum vitae is attached hereto as Exhibit B. Officer Miller has not authored any publications in the previous ten years.

(remainder of page intentionally left blank)

### III.    List of Cases

The following is a list, to the best of Mr. Miller's recollection and ability to reconstruct, of other cases in which, during the previous four years, Mr. Miller has testified as an expert at trial or by deposition.

| Approximate Date of Testimony | Case Name & Docket No. | Court |
|---|---|---|
| August 2023 | *United States v. Perez,* 17 Cr. 314 (JAK) | U.S. District Court for the Central District of California |
| October 2023 | *United States v. Martin,* 23 Mag. 178 (SMD) | U.S. District Court for the District of Alabama |

*John W Miller*

John Miller

# EXHIBIT A

# Jennifer M. Taul
Drug Enforcement Administration
jennifer.m.taul@dea.gov

Over 25 years of federal service, more than 21 years with law enforcement intelligence in the United States and overseas. Extensive experience conducting research and analysis; gathering and evaluating data from varied sources for immediate action in priority investigations; collaboration with key partners in police, military, and government agencies in state, federal, and foreign nations; and drawing conclusions for strategic-level reporting. *No previous court testimony; no published work.*

## PROFESSIONAL EXPERIENCE – DRUG ENFORCEMENT ADMINISTRATION

**Intelligence Research Specialist – Honolulu District Office, Los Angeles Field Division**   **1/2021 – Present**
**Honolulu, Hawaii, United States**

PROGRAM AND PERSONNEL MANAGEMENT: Accepted a temporary promotion and designated the Acting Group Supervisor of the Hawaii HIDTA (High Intensity Drug Trafficking Area) Intelligence Support Center and Honolulu Intelligence Group. Since May 2023, oversees the intelligence program and all DEA, Hawaii HIDTA, and Hawaii National Guard Intelligence Group personnel in the Honolulu District Office's area of responsibility.

LEADERSHIP, PROVIDING TECHNICAL ADVICE AND TRAINING: Created an on-boarding process and universal training plan, to include building QRGs (quick reference guides) and step-by-step instructions for multiple computer programs. Conducts on-the-job training with new intelligence research specialists, military counterdrug analysts, and contract criminal analysts; continues to mentor junior analysts, investigative assistants, and special agents.

INVESTIGATIONS: Collect, audit, research, and evaluate drug-related law enforcement data while prioritizing Organized Crime Drug Enforcement Task Force investigations and networks involved in drug trafficking, weapons trafficking, and money laundering. Analyzing available information to identify co-conspirators, connect other law enforcement investigations, suggest courses of action, and report findings to investigators.

TRENDS: Monitor open source intelligence, law enforcement and intelligence community reporting on regional threats, with a focus on methamphetamine, fentanyl, and international ties; shifts in drug availability and pricing; and report findings.

**Intelligence Research Specialist – Bogota Country Office, Andean Field Division**   **6/2017 – 1/2021**
**Bogotá, Distrito Capital, Colombia**

INVESTIGATIONS: Collected, audited, researched, and evaluated drug-related law enforcement data for investigations into transnational criminal and terrorist groups involved in drug trafficking, weapons trafficking, and money laundering in Colombia and Venezuela.

TRENDS: Monitored open source intelligence, law enforcement and intelligence community reporting on regional threats, with a focus on Venezuela and terrorist organizations trafficking cocaine.

LEADERSHIP, PROVIDING TECHNICAL ADVICE AND TRAINING: Mentored Colombian counterparts in our Sensitive Investigative Unit, growing their skills to focus investigative efforts and pursue priority targets for indictment and extradition to the United States.

### Intelligence Research Specialist – Bilateral and Terrorism Intelligence Support Unit     9/2015 – 6/2017
#### Special Operations Division, Virginia, United States

INVESTIGATIONS: Collected, audited, researched, and evaluated drug-related law enforcement data for investigations into transnational criminal and terrorist groups involved in drug trafficking, weapons trafficking, and money laundering in Colombia and Venezuela.

CRIMINAL PROCEEDINGS: Provided critical assistance in gathering evidence and prisoner processing related to foreign arrests and subsequent extraditions to the US. Drafted INTERPOL Red Notices and executive summaries used to brief personnel such as the DEA administrator and foreign dignitaries.

### Intelligence Research Specialist – FAST (Foreign-deployed Advisory Support Teams)     12/2012 – 9/2015
#### Headquarters, Stafford, Virginia, United States

SPECIALIZED ASSIGNMENT: Provided intelligence analysis support in multiple foreign environments for both tactical operations and information gathering for strategic reporting with a variety of other nations and agencies. Deployments to:

- Bahrain: Regional Narcotics Interagency Fusion Cell (RNIFC)
- Afghanistan: Camp Leatherneck, Kabul Country Office, Jalalabad Air Field, Kandahar Air Field
- Afghanistan: Interagency Operations Coordination Center (IOCC), International Security Assistance Force Headquarters (ISAF)
- Mexico: Regional Intelligence Operations Coordination Center (RIOCC)
- Afghanistan: Camp Leatherneck
- Honduras: Tegucigalpa Country Office Sensitive Investigative Unit

### Intelligence Research Specialist – Tijuana Resident Office, NCAD     1/2010 – 12/2012
#### Tijuana, Baja California, México

INVESTIGATIONS: Collected, audited, researched, and evaluated drug-related law enforcement data for investigations into transnational criminal organizations involved in drug trafficking, weapons trafficking, and money laundering in Mexico.

TRENDS: Monitored open source intelligence, law enforcement and intelligence community reporting on regional threats, with a focus on cocaine and shifts in drug trafficking organizations' leadership, feuds, and transit routes into the western United States.

### Intelligence Research Specialist – Caracas Country Office, Andean Division     11/2006 – 1/2010
#### Caracas, Distrito Capital, Venezuela

INVESTIGATIONS: Collected, audited, researched, and evaluated drug-related law enforcement data for investigations into transnational criminal organizations involved in drug trafficking, weapons trafficking, and money laundering in Venezuela.

TRENDS: Monitored open source intelligence, law enforcement and intelligence community reporting on regional threats, with a focus on identification of criminal leaders and cocaine trafficking routes.

**Intelligence Research Specialist – Southwest Border Unit, El Paso Intelligence Center**    7/2005 – 11/2006
**El Paso, Texas, United States**

STRATEGIC REPORTING: Analyzed significant drug and bulk currency seizures; identified command and control elements of Mexican drug trafficking organizations; maintained where drug corridors existed from Mexico into the United States, and which drug trafficking organization owned them.

**Intelligence Analyst –**     **HIDTA/Phoenix Field Division**     08/2002 – 07/2005
*thru Air National Guard*     **Phoenix, Arizona, United States**

INVESTIGATIONS: Collected, audited, researched, and evaluated drug-related law enforcement data for investigations into transnational criminal organizations involved in drug trafficking, weapons trafficking, and money laundering in Mexico.

TRENDS: Monitored open source intelligence and law enforcement reporting on regional threats, with a focus on Mexican drug trafficking organizations' leadership and cocaine trafficking routes into Arizona.

## MILITARY EXPERIENCE – ARIZONA AIR NATIONAL GUARD

*Production Scheduler –*     *161st Air Refueling Wing*     *6/2002 – 7/2005*
*Phoenix, Arizona, United States*

**Analyst and Database Manager –** **161st Air Refueling Wing**     1/2002 – 6/2002
**Phoenix, Arizona, United States**

ANALYSIS: Gathered, compiled, audited, reviewed, and drew conclusions from maintenance information systems data, considering whether data was accurate. Created analysis reports, in problem solving, or to meet additional ad hoc needs. Leveraged knowledge of statistical methods to interpret findings derived from data and develop recommendations to correct deviations and other issues.

COMPUTER ADMINISTRATION: Provided technical assistance for users of the GO81 database.

## MILITARY EXPERIENCE – UNITED STATES AIR FORCE

**Analyst and Database Manager –** **55th Wing, Offutt Air Force Base**     12/1997 – 12/2001
**Bellevue, Nebraska, United States**

ANALYSIS: Gathered, compiled, audited, reviewed, and drew conclusions from maintenance information systems data, considering whether data was accurate. Created analysis reports, in problem solving, or to meet additional ad hoc needs. Leveraged knowledge of statistical methods to interpret findings derived from data and develop recommendations to correct deviations and other issues.

COMPUTER ADMINISTRATION: Provided help desk support and technical assistance to over 4,400 database users. Identified and corrected programming errors as well as data integrity errors. Managed installation of Core Automated Maintenance System software for hundreds of workstations.

# EDUCATION

**Bellevue University | Bellevue, NE**
Bachelor of Science | 2001 | *Criminal Justice Administration*

**Community College of the Air Force | Maxwell AFB, AL**
Associate Degree | 2000 | *Maintenance Production Management*

# PROFESSIONAL AFFILIATIONS

International Association of Law Enforcement Intelligence Analysts (IALEIA)

# PROFESSIONAL TRAINING

Fentanyl Overdose: Investigations and Prosecution | 1/2023 | *investigative, legal*

Introduction to Haystack | 5/2022 | *software, research/analysis*

Introduction to GeoSpatial | 7/2022 | *software, mapping/analysis*

Transaction Record Analysis Center User Interface | 1/2022 | *software, research/analysis*

Expert Network Social Media Exploitation | 12/2021 | *software, research/analysis*

Advanced PenLink | 9/2021 | *software, analysis*

Fentanyl, Synthetic Opioids, and Street Drugs | 7/2021 | *public safety, trends*

IBM i2 Analyst's Notebook Core Essentials & Importing | 6/2021 | *software, analysis*

FinCEN Advanced Query | 5/2021 | *software, money laundering*

Law Enforcement Information Exchange | 4/2021 | *software, research/analysis*

IPOC 21-1, Indo-Pacific Orientation | 1/2021 | *national security, interagency/foreign collaboration*

Sensitive Investigation Unit Advisor | 12/2017 | *narcotics investigations in Latin America*

PenLink V 10 (PLX) | 8/2016 | *software, analysis*

Introduction to Firetruck | 7/2014 | *software, analysis*

Introduction to Voltron | 7/2014 | *software, analysis*

Introduction to IC Reach | 7/2014 | *software, analysis*

Palantir | 6/2013 | *software, network analysis*

SOAIC, US Army Special Operations Analytics and Intelligence Course | 9/2013 | *methodologies, analysis*

ODNI Analysis | 5/2013 | *analysis, targeting*

NCC, National Collaboration Course | 8/2012 | *targeting, source handling, collection/reporting, analysis*

REID Interview and Interrogation, Basic & Advanced | 6/2010 | *lie detection, interview techniques*

AIT, Advanced Intelligence Training | 12/2008 | *analysis*

BIRS-56, Basic Intelligence Research Specialist course | 7/2005 | *DEA Intelligence core*

Airman Leadership School | 12/2002 | *leadership, problem-solving*

Statistics and Database Operations | 10/1999 | *software, analysis/statistics*

Data Analysis | 4/1998 | *methodology, analysis*

# AWARDS

DEA Performance-based Cash Award  | 4/2019

DEA Performance-based Cash Award  | 4/2018

DEA Performance-based Cash Award  | 4/2017

DEA Performance-based Cash Award  | 3/2015

Pat Roberts Intelligence Scholars Program (PRISP) $10,000 Scholarship Recipient  | 7/2011

DEA Performance Award  | 1/2005

Air Force Achievement Medal  | 6/2002

Operations Group Airman of the Quarter  | 1/2001

Air Combat Command Analyst of the Year  | 10/2000

Air Force Achievement Medal  | 1/1999


# LANGUAGE

Spanish Fluency: Listening, Reading, Speaking, Writing

Tested: DEA – 2006, 2017

Dialects: Colombian, Mexican, Venezuelan