UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

CARLOS ORENSE AZOCAR,
   a/k/a "El Gordo,"

                 Defendant.

21 Cr. 379 (VSB)

# THE GOVERNMENT'S OPPOSITION TO THE
# DEFENDANT'S MOTIONS *IN LIMINE*

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Kaylan E. Lasky
Michael D. Lockard
Kevin T. Sullivan
Assistant United States Attorneys
   *Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

DISCUSSION ...................................................................................................... 2

    I.    The Proposed Testimony of the Drug Trafficking Expert Is Admissible, and a *Daubert* Hearing is Unwarranted ............................................................... 2

        A.    Background ................................................................................ 2

        B.    Applicable Law ......................................................................... 4

        C.    Discussion ................................................................................ 7

    II.    The Government Should Be Permitted to Cross-Examine the Defendant On His Prior Homicide Conviction if the Defendant Opens the Door to Such Testimony ....................................................................................... 14

        A.    Background .............................................................................. 14

        B.    Applicable Law ....................................................................... 16

        C.    Discussion .............................................................................. 17

    III.    The Defendant's Objections to the Admissibility of Co-Conspirator Statements Are Meritless ................................................................ 20

        A.    Background .............................................................................. 20

        B.    Discussion .............................................................................. 22

CONCLUSION ................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*Bourjaily v. United States*,
   483 U.S. 171 (1987)..................................................................................................... 5

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)................................................................................................ 4, 5

*Davis v. Carroll*,
   937 F. Supp. 2d 390 (S.D.N.Y. 2013) ...................................................................... 5

*Kumho Tire Co., Inc. v. Carmichael*,
   526 U.S. 137 (1999)............................................................................................ 5, 9, 11

*United States v. Alatorre*,
   222 F.3d 1098 (9th Cir. 2000) ................................................................................. 9

*United States v. Alexander*,
   48 F.3d 1477 (9th Cir. 1995) ................................................................................... 19

*United States v. Amuso*,
   21 F.3d 1251 (2d Cir. 1994) ................................................................................. 5, 7

*United States v. Anderson*,
   851 F.2d 384 (D.C. Cir. 1988)................................................................................. 7

*United States v. Arroyo*,
   600 F. App'x 11 (2d Cir. 2015) ............................................................................. 23

*United States v. Beverly*,
   5 F.3d 633 (2d Cir. 1993) ....................................................................................... 18

*United States v. Campo Flores*,
   15 Cr. 765 (PAC), 2017 WL 1133430 (S.D.N.Y. Mar. 24, 2017)...................... 6, 10

*United States v. Carmona-Bernacet*,
   16 Cr. 547 (FAB), 2023 WL 2646700 (D.P.R. Mar. 24, 2023)................................ 8

*United States v. Castillo*,
   924 F.2d 1227 (2d Cir. 1991) ................................................................................. 13

*United States v. Dukagjini*,
   326 F.3d 45 (2d Cir. 2003) ................................................................................... 5, 7

*United States v. Duncan*,
   42 F.3d 97 (2d Cir. 1994) ....................................................................................... 6

*United States v. Dupree,*
    706 F.3d 131 (2d Cir. 2013) ............................................................... 23

*United States v. Dupree,*
    870 F.3d 62 (2d Cir. 2017) ............................................................ 22, 23

*United States v. Estrada,*
    430 F.3d 606 (2d Cir. 2005) ..................................................... 16, 18, 19

*United States v. Farhane,*
    634 F.3d 127 (2d Cir. 2011) ............................................................... 13

*United States v. Feliciano,*
    223 F.3d 102 (2d Cir. 2000) ................................................................. 6

*United States v. Fuentes Ramirez,*
    15 Cr. 379 (PKC) (S.D.N.Y. 2021) ................................................. 6, 10

*United States v. Garcia,*
    936 F.2d 648 (2d Cir. 1991) ............................................................... 17

*United States v. Gotti,*
    457 F.Supp.2d 395 (S.D.N.Y.2006) ................................................... 23

*United States v. Grecco,*
    728 F. App'x 32 (2d Cir. 2018) .......................................................... 24

*United States v. Havens,*
    446 U.S. 620 (1980) ........................................................................... 16

*United States v. Hayes,*
    553 F.2d 824 (2d Cir. 1977) ............................................................... 17

*United States v. Hernandez Alvarado,*
    15 Cr. 379 (PKC) (S.D.N.Y. Sept. 23, 2019) ............................. 6, 10, 13

*United States v. Hossain,*
    19 Cr. 606 (SHS) (S.D.N.Y. 2021) ..................................................... 11

*United States v. Jenkins,*
    02 Cr. 1384 (RCC), 2003 WL 21047761 (S.D.N.Y. May 8, 2003) .............. 17, 18

*United States v. Khan,*
    787 F.2d 28 (2d Cir. 1986) ................................................................... 6

*United States v. Locascio,*
    6 F.3d 924 (2d Cir. 1993) ..................................................... 5, 6, 7, 13

*United States v. McCallum,*
    584 F.3d 471 (2d Cir. 2009) ............................................................... 25

*United States v. Menees,*
   21 Cr. 151 (TDD), 2023 WL 127032 (E.D. Okla. Jan. 6, 2023) ........................................ 8, 9

*United States v. Mesbahuddin,*
   10 Cr. 726, 2011 WL 3841385 (E.D.N.Y. Aug. 26, 2011)....................................................... 18

*United States v. Nektalov,*
   S2 03 Cr. 828 (PKL), 2004 WL 1469487 (S.D.N.Y. June 30, 2004)..................... 6, 11, 12, 13

*United States v. Onumonu,*
   967 F.2d 782 (2d Cir. 1992) ................................................................................... 6, 11, 13

*United States v. Ortiz,*
   553 F.2d 782 (2d Cir. 1977) ............................................................................................ 19, 20

*United States v. Ortiz,*
   962 F. Supp. 2d 565 (S.D.N.Y. 2013) .................................................................................... 22

*United States v. Paige,*
   335 F. App'x 98 (2d Cir. 2009) .............................................................................................. 12

*United States v. Payton,*
   159 F.3d 49 (2d Cir. 1998) ............................................................................................... 16, 17

*United States v. Reyes,*
   18 F.3d 65 (2d Cir. 1994) ....................................................................................................... 24

*United States v. Roldan-Zapata,*
   916 F.2d 795 (2d Cir. 1990) ................................................................................................... 14

*United States v. Ruggiero,*
   928 F.2d 1289 (2d Cir. 1991) ................................................................................................. 13

*United States v. Sanchez,*
   606 F. App'x 971 (11th Cir. 2015) ......................................................................................... 11

*United States v. Sasso,*
   59 F.3d 341 (2d Cir. 1995) ..................................................................................................... 23

*United States v. Savoca,*
   335 F. Supp. 2d 385 (S.D.N.Y. 2004) .................................................................................... 22

*United States v. Schulte,*
   17 Cr. 548 (PAC) (S.D.N.Y. 2020) ........................................................................................ 11

*United States v. Smalls,*
   719 F. App'x 83 (2d Cir. 2018) .............................................................................................. 10

*United States v. Sterling,*
   22 Cr. 247(EK), 2023 WL 1967526 (E.D.N.Y. Feb. 12, 2023) .............................................. 24

*United States v. Tapia-Ortiz*,
    23 F.3d 738 (2d Cir. 1994) ................................................................... 12

*United States v. Taylor*,
    239 F.3d 994 (9th Cir. 2001) ............................................................ 7, 14

*United States v. Taylor*,
    18 F.3d 55 (2d Cir. 1994) ....................................................................... 23

*United States v. Thomas*,
    214 F. Supp. 3d 187 (E.D.N.Y. 2016) ................................................. 20

*United States v. Tucker*,
    18 Cr. 119 (SJ), 2020 WL 93951 (E.D.N.Y. Jan. 8, 2020) ................... 11

*United States v. Tutino*,
    883 F.2d 1125 (2d Cir. 1989) .................................................................. 6

*United States v. Vertil*,
    566 F. App'x 36 (2d Cir. 2014) ............................................................ 12

*United States v. White*,
    312 F. Supp. 3d 355 (E.D.N.Y. 2018) ................................................. 18

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007) ............................................................ 9, 10

## **<u>Rules</u>**

Fed. R. Crim. P. 16 ..................................................................................... 4, 8

Fed. R. Evid. 403 ................................................................................... *passim*

Fed. R. Evid. 608 ......................................................................................... 16

Fed. R. Evid. 609 ......................................................................................... 16

Fed. R. Evid. 702 ........................................................................... 5, 10 11, 12

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in further support of its November 3, 2023, motions *in limine* (Dkt. 37, "Gov't MIL"), and in opposition to the defendant's November 3, 2023 motions *in limine*, which seek to preclude (i) testimony by one of the Government's experts, Drug Enforcement Administration ("DEA") Intelligence Research Specialist Jennifer Taul, relating to international drug trafficking; (ii) cross-examination of the defendant, if he testifies, regarding a prior conviction for killing his business partner in Venezuela; and (iii) certain co-conspirator statements. (Dkt. 36, "Def. MIL").

First, the defendant challenges the Government's expert disclosure concerning Research Specialist Taul and argues that the testimony is unfairly prejudicial, and the witness is lacking in specialized knowledge. As set forth below, the Government has provided adequate notice and, as other courts within this District have repeatedly found in similar cases, the expert testimony is relevant and admissible in order to assist the jury in its consideration of other evidence related to large-scale international drug trafficking of the type at issue here.

Second, the defendant also seeks to preclude the Government from cross-examining the defendant, should he choose to testify, regarding a 2004 homicide conviction in Venezuela. However, as set forth below, should the defendant open the door to such testimony—such as by suggesting on cross-examination that he does not carry a firearm or have access to firearms—the Government respectfully seeks a ruling that it be permitted to cross-examine the defendant regarding this issue.

The defendant's third motion, regarding co-conspirator statements, is largely moot, as the Government does not intend to offer as evidence most of the statements described in the defendant's motions *in limine*. Of the remaining statements—relating to a statement that the

defendant wanted to kill ██████████ ("CC-5")[1], and statements by ████████ ("CC-20") and █████████████████ ("CC-21") regarding the defendant's drug trafficking practices in approximately 2014 to 2016—the former is admissible as a non-hearsay statement for its effect on the listener, and the latter is admissible under Rule 801(d)(2)(E).

## DISCUSSION

I.     **The Proposed Testimony of the Drug Trafficking Expert Is Admissible, and a *Daubert* Hearing is Unwarranted**

A.     **Background**

On October 26, 2023, the Government provided the defendant with notice, pursuant to Rule 16(a)(1)(G), that it intends to call Ms. Taul as an expert witness to testify at the defendant's trial regarding international drug trafficking. (*See* Ex. A (Taul expert notice)). In particular, the Government informed the defendant that Ms. Taul would testify regarding the following: First, Ms. Taul will describe the sources and manufacturing processes typically used to produce multi-ton loads of cocaine in Colombia. (*Id.*). Second, Ms. Taul will describe drug trafficking routes commonly used to transport cocaine, including land, air, and maritime routes, from Colombia and Venezuela to the United States. (*Id.*). Third, Ms. Taul will testify about common methods of operation and transportation employed by narcotraffickers along these routes. (*Id.*). Fourth, Ms. Taul will testify about the use of slang and coded language, including particular terms used in this case, for cocaine, and for the Revolutionary Armed Forces of Colombia (the "FARC"). (*Id.*). Fifth, Ms. Taul will describe how large-scale Venezuelan narcotics traffickers often do business with Mexican drug trafficking cartels and with Colombian guerillas. (*Id.*). Sixth, Ms. Taul will describe the use of illicit business arrangements between Venezuelan narcotics traffickers and Venezuelan

_____

[1] Terms are defined herein so as to be consistent with the Government's opening motions *in limine*.

politicians, law enforcement officers, and military leaders to provide protection to narcotraffickers and facilitate narcotics load shipments. (*Id.*). Seventh, Ms. Taul will describe approximate prices of cocaine, including in Venezuela and the United States, in both wholesale and retail quantities. (*Id.*). Finally, Ms. Taul will describe the typical appearance and packaging of cocaine. (*Id.*).

The Government's notice explained that Ms. Taul's expertise was based in part on her "participat[ion] in multiple international narcotics trafficking investigations, including those involving Venezuela," and that her work involved the following:

> extensive global travel, including within South America; discussions and coordination with foreign law enforcement and DEA officers stationed abroad, including in Colombia, Venezuela, Central America, the Caribbean, and Mexico; conversations with confidential sources with personal knowledge of, and proffers of defendants involved in, the production, transportation, and distribution of narcotics, including cocaine from Colombia; and review of recordings and electronic communications of individuals involved in narcotics trafficking relating to the production, transportation, and distribution of cocaine from Colombia.

(*Id.*).

In serving its notice, the Government attached Ms. Taul's *curriculum vitae*, which detailed her extensive qualifications. (*See* Ex. B (Taul *curriculum vitae*)). As described therein, Ms. Taul's experience includes (i) over twenty years with the DEA in the United States and overseas, including more than three years stationed in Caracas, Venezuela; (ii) more than three years stationed at the DEA's Bogota Country Office in Bogotá, Colombia; and (iii) nearly two years assigned to the specialized Bilateral Investigations Unit of the DEA's Special Operations Division. (*See id.*). Ms. Taul's *curriculum vitae* also describes her educational history, awards, Spanish-language abilities, professional training, and affiliations. (*See id.*).

The defendant moves to preclude Ms. Taul from testifying, arguing that (i) the Government's notice regarding Ms. Taul's testimony is insufficient; and her testimony (1) is not relevant under Rule 401, (2) is unfairly prejudicial under Rule 403, and (3) runs afoul of Rule 702,

because she does not possess specialized knowledge helpful to the trier of fact. (Def. MIL at 1-7). In the alternative, the defendant argues that the reliability of Ms. Taul's methods must be tested at a hearing under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). (*See* Def. MIL at 2). The defendant is wrong on all counts. Because Ms. Taul has specialized knowledge that will assist the jury in understanding the evidence and determining key facts in dispute, and because the probative nature of her testimony far outweighs any potential prejudice, her testimony should be admitted. Moreover, a *Daubert* hearing is neither required nor warranted in this case.

### B.    Applicable Law

The current version of Rule 16 of the Federal Rules of Criminal Procedure requires the Government to provide to the defendant, "a complete statement of all opinions that the government will elicit from the witness in its case-in-chief or [rebuttal]; the bases and reasons for them; the witness's qualifications, including a list of all publications authored in the previous 10 years; and a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition." Fed. R. Crim. P. 16(a)(1)(G)(iii). As relevant here, the Amendment "delete[d] the phrase 'written summary' [from the former version of the Rule] and substitute[d] specific requirements that the parties provide 'a complete statement' of the witness's opinions [and] the bases and reasons for those opinions." Fed. R. Crim. P. 16, Advisory Committee Comments, 2022 Amendments. "The amendment . . . does not require a verbatim recitation of the testimony the expert will give at trial." *Id.*

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable

principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The party that proffers expert testimony bears the burden of showing that it is admissible. *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). The trial court must also find that the proposed testimony is both relevant and reliable prior to admitting it into evidence. *Daubert*, 509 U.S. at 589-90; *Kumho Tire Co., Inc. v. Carmichael*, 526 U.S. 137, 141 (1999). Specifically, the trial judge has "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. Applying Rule 702, the Court must determine whether the expert's reasoning and the methodology underlying the expert's testimony is valid, and whether that reasoning or methodology was applied reliably to the facts, so as to be relevant and helpful to the jury. *See Kumho Tire Co.*, 526 U.S. at 148-49.

An expert's testimony is admissible when (1) "the expert has sufficient qualifications to testify," and (2) the proffered testimony has a "sufficiently reliable foundation." *Davis v. Carroll*, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013) (internal quotation marks and citations omitted). "The Rules of Evidence provide a liberal standard for the admissibility of expert testimony," *United States v. Dukagjini*, 326 F.3d 45, 52 (2d Cir. 2003), and the Second Circuit has held numerous times that expert testimony can be helpful to inform the jury about concepts involved in the trial that are "beyond the ken of the average juror," *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994).

This standard requires a "common sense inquiry into whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993). Undoubtedly, "expert witnesses are often uniquely qualified [in] guiding the trier of fact through complicated morass of

obscure terms and concepts," and "[b]ecause of their specialized knowledge, their testimony can be extremely valuable and probative." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).

Applying these principles, the Second Circuit has "repeatedly held" that "'the operations of narcotics dealers are a proper subject for expert testimony under [Rule 702].'" *United States v. Onumonu*, 967 F.2d 782, 787 (2d Cir. 1992) (quoting *United States v. Tutino*, 883 F.2d 1125, 1134 (2d Cir. 1989) and citing *United States v. Khan*, 787 F.2d 28, 34 (2d Cir. 1986)); *see also United States v. Nektalov*, S2 03 Cr. 828 (PKL), 2004 WL 1469487, at *2 (S.D.N.Y. June 30, 2004) ("The Second Circuit has routinely upheld the admission of expert testimony offered by the government to explain the workings of criminal transactions and enterprises—such as narcotics trafficking, organized crime and money laundering—that, without explanation, would be esoteric or otherwise beyond the understanding of the average juror."); *accord, e.g.*, *United States v. Campo Flores*, 15 Cr. 765 (PAC), 2017 WL 1133430, at *2 (S.D.N.Y. Mar. 24, 2017) (summarizing drug trafficking expert testimony in 2016 cocaine importation trial); *United States v. Fuentes Ramirez*, 15 Cr. 379 (PKC) (S.D.N.Y. 2021) (permitting expert testimony regarding, *inter alia¸* cocaine trafficking routes through South America and Central America to the United States, cocaine pricing, and the sources of cocaine and methodologies of transportation); *United States v. Hernandez Alvarado*, 15 Cr. 379 (PKC), Dkt. 85 (S.D.N.Y. Sept. 23, 2019) (same); *see also United States v. Feliciano*, 223 F.3d 102, 109, 120-22 (2d Cir. 2000) (rejecting challenges to testimony of expert witness who testified regarding "the structure, leadership, practices, terminology, and operations of Los Solidos," which is a gang); *Locascio*, 6 F.3d at 937 ("[D]espite the unfortunate fact that our society has become increasingly familiar with organized crime and its activities from such sources as newspapers, movies, television, and books, it is still a reasonable assumption that jurors are not

well versed in the structure and methods of organized crime families. Moreover, much of the information gleaned from such sources may be inaccurate.").

Although expert testimony may not be "used exclusively to bolster the government witnesses' versions of the events," overlap between expert testimony and fact witness testimony does not render expert testimony improper. *Amuso*, 21 F.3d at 1263-64 (2d Cir. 1994); *Locascio*, 6 F.3d at 939 ("There is no requirement that prohibits a government agent from testifying as an expert merely because an accomplice witness is also available.").

In addition, expert testimony may properly assist the jury in assessing the veracity of other witnesses whose credibility has been attacked. *See United States v. Taylor*, 239 F.3d 994, 998 (9th Cir. 2001); *see also United States v. Anderson*, 851 F.2d 384, 393 (D.C. Cir. 1988) (finding expert testimony relevant insofar as it "could have helped the jury to determine the credibility of the government's prostitute-witnesses, which counsel for appellant had sought to undermine on cross-examination").

As with all evidence, the Court retains the discretion to exclude expert testimony when its probative value is "substantially outweighed by the danger of unfair prejudice." *Dukagjini*, 326 F.3d at 51-52.

### C.  Discussion

First, the Government's October 26 notice satisfied Rule 16(a)(1)(G)(iii). (Def. MIL at 2). The Government's notice describes in detail Ms. Taul's opinions and conclusions. (Ex. A). As noted above, the notice lays out specific information, including details relating to the particular routes and means that narcotraffickers use to transport Colombian-produced cocaine through Central America and the Caribbean, by air and by boat, to the United States, including specific transshipment points that are commonly used, down to the city and region; the nature of the

business relationships between narcotraffickers and political, law enforcement, and military leaders to facilitate cocaine loads; and the sources and manufacturing processes, and typical pricing and packaging of cocaine. The Advisory Committee has made clear that the Rule "does not require a verbatim recitation of the testimony the expert will give at trial." Fed. R. Crim. P. 16, Advisory Committee Comments, 2022 Amendments. Because the Government's October 26 notice sets forth the opinions and conclusions that Ms. Taul will offer at trial, it is sufficient under Rule 16. *See, e.g.*, *United States v. Carmona-Bernacet*, 16 Cr. 547 (FAB), 2023 WL 2646700, at *3 (D.P.R. Mar. 24, 2023) (finding that a "summary" set forth in the Government's notice and IN response to defendant's motion *in limine* satisfies the Rule 16 notice requirement, for an expert who was a "veteran law enforcement officer with over 30 years of experience"); *United States v. Menees*, 21 Cr. 151 (TDD), 2023 WL 127032, at *2 (E.D. Okla. Jan. 6, 2023) (finding that notice was sufficient where it "appropriately informs Defendants what subject areas will be covered by Dr. Conway's testimony and articulates with specificity Dr. Conway's opinion").

Second, the defendant is wrong that Ms. Taul does not qualify as an expert, and a *Daubert* hearing is neither warranted nor required. (Def. MIL at 2-5). Ms. Taul's ability to testify reliably as an expert on these topics is apparent: Ms. Taul has over twenty years' experience in the counternarcotics field, including significant time stationed in Colombia and Venezuela, the countries that will be discussed most at trial. (Ex. B). She has largely focused on transnational criminal organizations in Colombia, Venezuela, and elsewhere involved in large-scale drug trafficking—of cocaine, in particular—as well as weapons trafficking and money laundering. (*Id.*). She has in-depth expertise on these matters, drawn from her experience from coordinating with foreign law enforcement; her discussions with confidential sources and defendants involved in the international narcotics trade, and her analysis of recordings and electronic communications

relating to large-scale narcotics trafficking. (*Id.*). It is thus not surprising that, despite having been provided with Ms. Taul's over two-decade career with the DEA, the defendant does not engage with Ms. Taul's qualifications. (Def. MIL 1-7). Rather, he urges the Court to adopt a bright line rule: a *Daubert* hearing must be held whenever an expert witness testifies for the first time in a federal criminal trial or has not published papers—an argument that flies in the face of all relevant case law. (Def. MIL at 4.)

It is also not surprising that the defense cites no support for this novel proposition. To the contrary, the Supreme Court has emphasized that while a district court must serve its gatekeeping function, a court also "must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable." *Kumho Tire Co.*, 526 U.S. at 152 (noting that the "abuse of discretion" standard "applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion" because "[o]therwise, the trial judge would lack the discretionary authority needed . . . to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted"); *see United States v. Williams*, 506 F.3d 151, 161 (2d Cir. 2007) (in a case involving ballistics expert testimony, holding that "[w]hile the gatekeeping function requires the district court to ascertain the reliability of [the expert's] methodology, it does not necessarily require that a separate hearing be held in order to do so"); *United States v. Alatorre*, 222 F.3d 1098, 1100 (9th Cir. 2000) ("In light of the Supreme Court's emphasis on the broad discretion granted to trial courts in assessing the relevance and reliability of expert testimony . . . we conclude that trial courts are not compelled to conduct pretrial hearings in order to discharge the gatekeeping function."). Here, Ms. Taul's qualifications more than

suffice. She is highly qualified based on her years of experience working on cases involving international drug trafficking organizations in Venezuela, Colombia, Central America, the Caribbean, and Mexico, as well as the in-depth training that she has received during that period as documented in her *curriculum vitae*. *See also, e.g.*, *Campo Flores*, 15 Cr. 765 (PAC), 2017 WL 1133430, at *2; *Fuentes Ramirez*, 15 Cr. 379 (PKC) (S.D.N.Y. Feb. 1, 2021); *Hernandez Alvarado*, 15 Cr. 379 (PKC), Dkt. 85 (S.D.N.Y. Sept. 23, 2019).

The defendant also argues that, since Ms. Taul will not testify about "scientific" or "technical" issues, her testimony lacks a reliable reasoning or methodology. (Def. MIL at 4). Again, the defendant ignores the third prong of Rule 702—that an expert witness can testify from not just scientific of technical knowledge, but "other specialized" knowledge, as well, such as the knowledge Ms. Taul has gained from over 20 years of experience. *See* Fed. R. Evid. 702(a). Indeed, the methods by which Ms. Taul and other experts in the field of international drug trafficking acquire that specialized knowledge have been repeatedly reviewed and approved by the numerous courts that have admitted such testimony. *See, e.g.*, *Campo Flores*, 15 Cr. 765 (PAC), 2017 WL 1133430, at *2; *Fuentes Ramirez*, 15 Cr. 379 (PKC) (S.D.N.Y. 2021); *Hernandez Alvarado*, 15 Cr. 379 (PKC), Dkt. 85 (S.D.N.Y. Sept. 23, 2019). The Government respectfully submits that Ms. Taul's credentials and methods may be evaluated in light of her extensive *curriculum vitae* and in conjunction with the foundation the Government will lay in qualifying her as an expert before the jury—this will provide an adequate foundation for the Court to find that Ms. Taul's testimony may be admitted pursuant to Rule 702. *See Williams*, 506 F.3d at 161 (holding that no separate hearing is required, "particularly . . . if, at the time the expert testimony is presented to the jury, a sufficient basis for allowing the testimony is on the record"); *United States v. Smalls*, 719 F. App'x 83, 86 (2d Cir. 2018) (affirming district court's decision to forego

*Daubert* hearing because the district court "ascertained the police detective's expertise and reliability"); *United States v. Tucker*, 18 Cr. 119 (SJ), 2020 WL 93951, at *3 (E.D.N.Y. Jan. 8, 2020) (declining to hold a *Daubert* hearing on the admission of DNA evidence after judge's review of the extensive record made by other courts on the same topic). In short, given the record before the Court, there is no need for an "unnecessary 'reliability' proceeding" in this case. *Kumho Tire Co.*, 526 U.S. at 152; *see also, e.g.*, *United States v. Schulte*, 17 Cr. 548 (PAC) (S.D.N.Y. 2020), Dkt. 256 at 4 (admitting without a *Daubert* hearing the testimony of expert on WikiLeaks who had not previously testified in federal court as "appropriate under FRE 702"); *United States v. Hossain*, 19 Cr. 606 (SHS) (S.D.N.Y. 2021), Dkt. 154, at 45-48 (admitting without a *Daubert* hearing the testimony of expert who had not previously testified regarding background on the Taliban because the testimony has "probative value that's not outweighed by wasting time or confusing the jury or distracting the jury").

The defendant next argues that Ms. Taul's testimony "is irrelevant because it does not make any fact at issue more or less likely to be true and will not assist the jury in understanding the evidence or aid in answering the questions at issue in the case." (Def. MIL at 5). This argument is meritless. As the Second Circuit has held, "the operations of narcotics dealers are a proper subject for expert testimony under [Rule 702]." *See, e.g.*, *Onumonu*, 967 F.2d at 787. Expert testimony is appropriate to help the jurors understand aspects of the trial evidence, including testimony from cooperating witnesses who played distinct roles, in different countries, using various means, while working with the defendant to import large quantities of cocaine ultimately bound for the United States, which were protected with firearms. "The government is free both to offer expert testimony as background for an offense and to assist in proving one or more elements." *Nektalov*, 2004 WL 1469487, at *3 (quotation marks and internal citations omitted); *see also United States v. Sanchez*,

606 F. App'x 971, 975 (11th Cir. 2015) (finding no unfair prejudice where expert "limit[ed] his testimony to drug trafficking routes generally"). Indeed, expert testimony regarding "cocaine smuggling methods and practices" is "particularly relevant to prove the charged importation conspiracy, a scheme dependent on numerous individuals performing discrete roles." *United States v. Vertil*, 566 F. App'x 36, 39 (2d Cir. 2014); *see also United States v. Paige*, 335 F. App'x 98, 100 (2d Cir. 2009) ("Insofar as the expert witness's testimony tended to establish that the equipment and quantities of drugs that traffickers use in the course of distribution generally, that information was beyond the ken of the jury for the purposes of Fed. R. Evid. 702."). Furthermore, "[t]estimony about the weight, purity, dosages, and prices of cocaine clearly relates to knowledge beyond the ken of the average juror." *United States v. Tapia-Ortiz*, 23 F.3d 738, 741 (2d Cir. 1994). Ms. Taul's testimony will also explain that Venezuelan drug traffickers limit their criminal exposure by "reced[ing] their role in getting the cocaine to the United States." *Campo Flores*, 2017 WL 1133430, at 7; *see also Nektalov*, 2004 WL 1469487, at *3 (permitting expert testimony regarding "the regulatory framework that exists to combat money laundering, and would describe some of the ways money launderers attempt to avoid this framework"). Such expert testimony is relevant to help the jurors evaluate evidence of the defendant's state of mind in certain actions that will be described by cooperating witnesses, and conscious avoidance of the importation-related object of the defendant's conspiracy. Thus, testimony from Ms. Taul regarding the allegations in this case, including the manner in which drugs are transported along the Central American and Caribbean routes, as well as the use of firearms, and the incentives and motives faced by participants in drug deals like the ones the defendant joined for over a decade, is admissible.

The defendant's citation to *United States v. Castillo* is unavailing, as the *Castillo* court merely expressed doubt that "New York jurors" would be assisted by expert testimony regarding

"the function of a scale or index card in a drug deal." 924 F.2d 1227, 1233 (2d Cir. 1991). The complex, international drug trafficking operations at issue in this case are more sophisticated. The proposed expert testimony from Ms. Taul will provide a common frame of reference to evaluate the evidence. *Cf. Onumonu*, 967 F.2d at 788 ("While the average juror in the New York metropolitan area may be familiar with the purported methods of Washington Heights drug dealers . . . , we think it likely that the average New York juror knows little about diamond smuggling out of Nigeria, and even less about the feasibility of internally smuggling diamonds by swallowing condoms" (quotations and citations omitted)); *see also United States v. Farhane*, 634 F.3d 127, 159 (2d Cir. 2011) (holding that rationale for admitting expert testimony regarding organized crime families "[d]espite the prevalence of organized crime stories in the news and popular media" "applies with equal force to terrorist organizations"); *Hernandez Alvarado*, 15 Cr. 379 (PKC), Dkt. 85 (S.D.N.Y. Sept. 23, 2019). Therefore, *Castillo* does not suggest that the proffered testimony from Ms. Taul is inadmissible.

The defendant's arguments under Rule 403 also fail. First, the Government will not seek to enhance the credibility of other witnesses through the testimony of Ms. Taul. (*See* Def. MIL at 6-7). Because the proposed testimony of Ms. Taul "will not include opinions about whether the defendant's conduct constitutes [international drug trafficking], the testimony lacks the dangers attendant to impermissible bolstering expert testimony." *Nektalov*, 2004 WL 1469487, at *4. The Court's jury instructions will also confirm that witness credibility is a matter for the jurors, alone, to resolve. *See United States v. Ruggiero*, 928 F.2d 1289, 1305 (2d Cir. 1991) (noting limiting instruction when rejecting appellate challenge to expert testimony); *see also. Locascio*, 6 F.3d at 939 ("There is no requirement that prohibits a government agent from testifying as an expert merely because an accomplice witness is also available.").

Second, the Government is not relying on Ms. Taul's testimony to "impermissibly encourage the inference of guilty" based on actions by other persons. (Def. MIL at 7). Rather, Ms. Taul's testimony will assist the jury in understanding drug-trafficking production, sourcing, routes, and pricing—in these regions and on this scale—which is beyond the understanding of the average juror.  Her testimony will provide context for the testimony that will be provided by fact witnesses in the case. Further, Ms. Taul's testimony will be no "more sensational or disturbing than the crimes with which [the defendant] was charged," *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990), which included trafficking massive quantities of cocaine to the United States and protecting the loads with military-grade weapons. Rule 403 provides no basis to reject Ms. Taul's testimony.

Finally, much of the evidence in this case will come through testimony of the defendant's co-conspirators, and the crux of the defendant's defense is likely to involve attacking the credibility of these co-co-conspirators. Accordingly, Ms. Taul's testimony will additionally "assist the jury in assessing the veracity of other witnesses whose credibility has been attacked." *Taylor*, 239 F.3d at 998. The Court is also well-positioned to use limiting instructions to mitigate any risk that the jurors will infer that cooperating witnesses are more credible because certain aspects of their testimony regarding drug trafficking is consistent with the general patterns described by Ms. Taul.

## II.     The Government Should Be Permitted to Cross-Examine the Defendant On His Prior Homicide Conviction if the Defendant Opens the Door to Such Testimony

### A.     Background

The defendant next asks the Court to preclude the Government from cross-examining the defendant, should he choose to testify, regarding his 2004 conviction for "homicide in a quarrel," in violation of Article 424 of the Venezuelan Criminal Code.  The defendant's conviction (which he does not contest) resulted from a 2004 incident in which the defendant killed his former business

partner, ▆▆▆▆▆▆ ("Victim-1"). (Def. MIL at 7-8; *see* Ex. C (First Court of First Instance of Child and Adolescent Protection Trial of the Judicial Circuit of Anzoategui State, El Tigrey Extension, 2014 Final Judgment)). As background, on December 1, 2004, the defendant shot and killed Victim-1 at a restaurant in El Tigrey, Venezuela. The incident occurred in front of multiple other people, including CC-5, who witnessed the shooting, which occurred during an argument about money. The defendant drew his firearm and shot Victim-1 in the chest at close range three times.[2] Victim-1's children sued the defendant, and the defendant was required to pay 100,000 bolivares in damages. (*See* Ex. C).

The Government does not seek to affirmatively introduce evidence regarding the defendant's 2004 conviction.[3] However, if the defendant opens the door to it, including by suggesting in his testimony that he does not carry a firearm or have access to firearms—which would contradict the facts underlying his criminal conviction—the Government requests that it (i) be permitted to cross-examine the defendant using the underlying facts of his prior conviction, pursuant to Rule 608(b); and (ii) seek to impeach the defendant with the statutory name of the offense, date of conviction, and sentence imposed, pursuant to Rule 609.

---

[2] The defendant also kicked Victim-1 multiple times, after Victim-1 fell to the ground. Subsequently, the defendant fled Venezuela. The defendant—after conferring with his co-conspirators in the drug trafficking conspiracy, ▆▆▆▆▆▆▆ ("CC-1") and ▆▆▆▆▆▆▆ ("CC-2")—directed CC-5 to provide CC-1 with two duffle bags stuffed with cash to bribe the judge handling his case. Aside from the conviction, the Government does not intend to offer evidence regarding the events described herein that occurred *after* the defendant shot Victim-1.

[3] Additionally, the Government does not intend to introduce graphic evidence found on the defendant's phone, including videos showing individuals being tortured and a photo of a decapitated head.

**B.**    **Applicable Law**

Federal Rule of Evidence Rule 608(b) sets forth the circumstances in which a witness may be impeached regarding specific instances of prior conduct. Specifically, Rule 608(b) provides that, "[e]xcept for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b). However, a "court may, on cross-examination, allow them to be inquired into if they are probative of the [witness's] character for truthfulness or untruthfulness." *Id.*

Federal Rule of Evidence 609, in turn, sets forth the "rules [that] apply to attacking a witness's character for truthfulness by evidence of a criminal conviction." Fed. R. Evid. 609(a). Where a conviction is more than ten years old, the conviction must be admitted where the probative value of the evidence "substantially outweighs" its prejudicial effect to that defendant. Fed. R. Evid. 609(b). The evidence admissible under Rule 609 includes "inquiry into the 'essential facts' of the conviction, including the nature or statutory name of each offense, its date, and the sentence imposed." *United States v. Estrada*, 430 F.3d 606, 616 (2d Cir. 2005). The U.S. Supreme Court has explained that "[i]t is essential . . . to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth." *United States v. Havens*, 446 U.S. 620, 626-27 (1980).

Further, cross-examination of a testifying defendant properly includes questions exploring a defendant's credibility generally when "a defendant offers an innocent explanation" for his conduct. *United States v. Payton*, 159 F.3d 49, 58 (2d Cir. 1998) (when such an explanation is offered, "the government is entitled to attack [the defendant's] credibility on cross-examination"). In short, a defendant who "opens the door" by presenting an innocent explanation for his conduct "has no right to avoid cross-examination into the truth of his direct examination, even as to matters

16

not related to the merits of the charges against h[im]." *Id.* The Government is also entitled to cross-examine a defendant about his prior conduct, even where it is not probative generally of truthfulness, when the prior conduct calls into question the credibility of his explanation for his current conduct. *See, e.g., United States v. Garcia,* 936 F.2d 648, 654 (2d Cir. 1991) ("[O]nce [the defendant] testified that he had no idea that the white powder was cocaine, he opened the door for the Government to impeach his testimony by establishing on cross-examination that he was familiar with and indeed had used cocaine as recently as the day before his arrest.").

In weighing the probative versus prejudicial value of impeaching a defendant with his prior conviction, courts in this District generally consider five factors: "[1] the impeachment value of the prior crimes, [2] the date of the conviction and the Defendant's subsequent history, [3] the degree of similarity between the past crimes and this crime, [4] the centrality of the Defendant's credibility in this case, and [5] the importance of the Defendant's testimony." *United States v. Jenkins*, 02 Cr. 1384 (RCC), 2003 WL 21047761, at *2 (S.D.N.Y. May 8, 2003). The "Government has the burden of showing that probative value outweighs prejudice." *United States v. Hayes*, 553 F.2d 824, 828 (2d Cir. 1977).

### C.   Discussion

Pursuant to Rule 608(b), the Government should be permitted to cross-examine the defendant regarding the conduct *underlying* the 2004 conviction—*i.e.*, that he shot and killed his former business partner—should he testify in a manner that contradicts the fact of that conviction, because the incident will thus be probative of the defendant's character for truthfulness, and those of the witnesses against him who will testify regarding his access to and use of firearms. This is because "[a] defendant has no right to avoid cross-examination into the truth of his direct examination, even as to matters not related to the merits of the charges against him." *United States v. Payton*, 159 F.3d 49, 58 (2d Cir. 1998). Accordingly, "[w]here a defendant testifies on direct

[examination] about a specific fact, the prosecution is entitled to prove on cross-examination that he lied as to that fact." *United States v. Beverly*, 5 F.3d 633, 639-40 (2d Cir. 1993) (holding that district court did not abuse its discretion when it permitted the Government to cross-examine the defendant about his prior familiarity with and possession of guns because he testified in a contradictory manner on direct examination); *see also United States v. White*, 312 F. Supp. 3d 355, 364 (E.D.N.Y. 2018) (granting Government's motion to cross-examine the defendant under Rule 609(a)(1)(B), to impeach the defendant with the statutory name of offense, date of conviction, and sentence for a narcotics conviction, and to cross-examine the defendant using the underlying facts of that and other convictions if he testifies in a manner that contradicts the facts underlying the convictions); *United States v. Mesbahuddin*, 10 Cr. 726, 2011 WL 3841385, at *2 (E.D.N.Y. Aug. 26, 2011) (granting Government motion to cross-examine the defendant regarding the "underlying facts" of a prior conviction if the defendant "'open[s] the door' by testifying 'in a manner that contradicts his criminal history'"). Relatedly, pursuant to Rule 608(b)(2), were the defendant to testify that witnesses against him, such as CC-5, are lying about the defendant's conduct, including his access to firearms, the defendant is opening the door to the underlying facts of his homicide conviction.

In addition to impeaching the defendant with evidence regarding the underlying facts of his 2004 conviction, pursuant to Rule 609 the Government should be permitted to impeach the defendant with evidence of his prior conviction, including the "essential facts," such as "the statutory name of each offense, the date of conviction, and the sentence imposed." *Estrada*, 430 F.3d at 615. The factors described above support this conclusion. *Jenkins*, 02 Cr. 1384 (RCC), 2003 WL 21047761, at *2. First, "Rule 609(a)(1) presumes that all felonies are at least somewhat probative of a witness's propensity to testify truthfully." *Id.* at 617. The defendant committed a

serious offense that bears directly on his willingness to disobey the law: the defendant killed his business partner. That renders the conviction probative of the defendant's credibility. *Id.* at 617-18 ("[T]he gravity of an offense may bear on truthfulness, to the extent that more serious offenses indicate a stronger willingness to ignore the law."). The second factor—the date of the conviction and the defendant's subsequent conviction—on balance, weighs in favor as well. Although the conviction occurred more than ten years ago, that the defendant continued to engage in criminal conduct afterward, *i.e.*, through the conduct charged in the instant case, indicates that the defendant places his own interests above those of the community and likely would do so again if he testified. The third factor, dissimilarity to the current crime, also favors admission here because the homicide conviction that the Government seeks to admit is dissimilar to the crimes charged, leaving little risk that their admission will implicate the defendant's propensity to commit large-scale narcotics trafficking or related weapons offenses. The fourth and fifth factors—the importance of the testimony subject to impeachment, and the centrality of the defendant's credibility—are likely to further weigh in favor of the Government's position, pending the defendant's testimony and overall defense strategy. Where the case is "narrowed to the credibility of two persons, the accused and his accuser . . . in those circumstances there is greater, not less, compelling reason for exploring all avenues which would shed light on which of the two witnesses is to be believed." *United States v. Ortiz*, 553 F.2d 782, 785 (2d Cir. 1977) (internal alterations and quotation marks omitted). Should the defendant testify, the case may turn on whose version of events the jury believes: that of his former co-conspirators who are testifying against him such as CC-5, or that of the defendant. Accordingly, the defendant's credibility will be a crucial issue, and if the jury is not permitted to hear limited details about the defendant's prior conviction, the jury will receive a skewed and incomplete picture of the defendant's credibility. *See Ortiz*, 553

F.2d at 785; *United States v. Alexander*, 48 F.3d 1477, 1489 (9th Cir. 1995) ("[I]t is not surprising that the [district] court was unwilling to let a man with a substantial criminal history misrepresent himself to the jury, with the government forced to sit silently by, looking at a criminal record which, if made known, would give the jury a more comprehensive view of the trustworthiness of the defendant as a witness."). To permit the defendant to take the stand and appear "pristine" would be "unfair and misleading to the jury." *Ortiz*, 553 F.2d at 785; *see also United States v. Thomas*, 214 F. Supp. 3d 187, 196 (E.D.N.Y. 2016) (allowing government to cross-examine defendant on prior convictions because, "[i]f Defendant testifies, his testimony would likely contradict the testimony of the Government's witnesses; in such a circumstance, evidence of Defendant's prior convictions would be highly probative for the jury to determine his veracity and credibility").

Finally, the Government has a good-faith basis to inquire about this conduct and it is highly probative of the defendant's character for untruthfulness. Indeed, the defendant himself made a robust record about this conviction and the facts underlying his conviction in his own motion. For example, the defendant admits that he, in fact, committed the murder in question, and that he was later convicted for the crime. (Def. MIL at 7-8). Accordingly, the probative nature is not "substantially outweighed" by any Rule 403 concerns. Fed. R. Evid. 403.

## III. The Defendant's Objections to the Admissibility of Co-Conspirator Statements Are Meritless

### A. Background[4]

Finally, the defendant seeks to preclude the Government from admitting various statements made by the defendant's co-conspirators to cooperating witnesses who will testify at trial. (*See*

---

[4] The law relating to Rules 804(b)(3) is set forth on pages 32 to 33 of the Government's opening motions *in limine.*

Def. MIL at 8-9). The Government is not seeking to introduce most of the statements described in the defendant' motion: CC-5's statements relating to ▮▮▮▮ ("CC-22"); ▮▮▮▮▮▮▮ ("CC-23"); or ▮▮▮▮▮▮▮▮▮▮▮ ("CC-24"); and ▮▮▮▮▮▮▮▮▮'s ("CC-15") statement that he heard from someone else that the defendant had killed someone. The remaining statements challenged by the defense, are CC-5's statements that:

> (i) At some point after CC-5 stopped working with the defendant in 2010, ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ("CC-20"), a wealthy drug trafficker who operated speedboats and worked with the defendant, told CC-5 that the defendant was sending cocaine to the mainland United States through Puerto Rico; and around 2014 to 2016, an individual who was working for the defendant named ▮▮▮ ("CC-21") told CC-5 that the Orense DTO was very busy during this time period, and that the defendant was continuing to send boats and planes laden with massive amounts of cocaine, including to the Dominican Republic, Puerto Rico, and Tortola, from various locations in Venezuela, including from Falcon state. (*Id.; see also* Gov't MIL at 29).

> (ii) Someone in Venezuela told CC-5 that the defendant was going to kill him. (Def. MIL at 9).

With respect to the latter, CC-5 is expected to testify that, in or about 2010, the defendant asked for CC-5's assistance in transporting approximately nine million dollars in narcotics proceeds from the Dominican Republic to Venezuela. The individual who CC-5 and the defendant tasked with transporting the cash disappeared with the money, and the defendant blamed CC-5— thinking that he killed the transporter and stole the money. The defendant summoned CC-5 to a meeting with the defendant, CC-1, and CC-2, where CC-1 accused the defendant of stealing the money. Soon afterward, CC-5 heard from others that the defendant was going to kill him. Within a few months, an unknown shooter shot CC-5 in the arm; CC-5 shot back, and the unknown shooter was injured and went to the hospital. CC-5, in retaliation against the defendant (who he believed had sent the unknown shooter), sent another individual to the hospital to kill the shooter; however, CC-5 called off the attack because of law enforcement presence at the hospital. CC-5 then went to

21

the defendant's *finca* with approximately 20 other people in order to kill the defendant. The defendant was not there, so CC-5 and his men tied up the workers and stole over 70 of the defendant's weapons.[5]

### B.   Discussion

The statements by CC-20 and CC-21 are admissible as statements against interest under Rule 804(b)(3), and the statements that the defendant wanted to kill CC-5 are admissible under Rule 801(c) for the effect they had on CC-5 and to explain the context of subsequent events.

With respect to the statements by CC-20 and CC-21, the declarants are unavailable, and their statements would be probative of their guilt were they to stand trial on drug trafficking charges. Each is believed to be located abroad, in Venezuela, and outside the Government's subpoena power.[6] They would likely invoke the Fifth Amendment if they were questioned under oath regarding their narcotics activities. *See United States v. Savoca*, 335 F. Supp. 2d 385, 390 (S.D.N.Y. 2004) ("[T]he 'unavailability' component is established by the fact that [the declarant] is expected to invoke his Fifth Amendment privilege."); *see also United States v. Ortiz*, 962 F. Supp. 2d 565, 573 (S.D.N.Y. 2013) (finding witness unavailable where located outside United States at time of trial). Each of these statements is against the penal interest of the declarants because the statements "implicated [the declarants] in [illegal] activity," and each declarant "would not have made the statement unless he believed it to be true." *United States v. Dupree*, 870 F.3d 62, 80 (2d Cir. 2017); *see also Ortiz*, 962 F. Supp. 2d at 573.

---

[5] Additionally, around 2014, CC-5 cooperated with an ATF investigation that resulted in the arrest of the defendant's relative for weapons trafficking. Around this time, a man in Miami told CC-5 that the defendant wanted to kill CC-5 because of the relative's arrest. The Government is not seeking to introduce this statement at trial.

[6] Public reporting indicates that CC-20 is in prison in Venezuela.

CC-20's and CC-21's statements, which would be admitted through CC-5's testimony, are also sufficiently reliable because they were made in confidence and to "a person whom the declarant[s] believe[d] [was] an ally, not a law enforcement official." *United States v. Sasso*, 59 F.3d 341, 349 (2d Cir. 1995). Moreover, the statements do not reflect "effort to shift blame" away from the declarants, and there is no possibility that they would have uttered these remarks "solely to curry favor with the authorities." *Id.*; *see also Dupree*, 870 F.3d at 80 (finding sufficient trustworthiness where declarant spoke to perceived ally and did not attempt to shift blame).

Last, these statements are not unduly prejudicial, as they are consistent with much of the other evidence that will be presented at trial relating to the defendant's drug trafficking, and, in some respects, are more docile than other evidence at trial, including testimony about the defendant's use of firearms to protect and promote his drug business. *See United States v. Arroyo*, 600 F. App'x 11, 14 (2d Cir. 2015) (finding that evidence of defendant shooting a round in the air was not "sensational or an appeal to the jury to convict the defendant on some improper consideration," particularly where defendant was alleged to have used a firearm during the commission of drug trafficking and the district court provided a limiting instruction to the jury); *cf. United States v. Taylor*, 18 F.3d 55, 60 (2d Cir. 1994) (rejecting defendant's Rule 403 challenge to expert testimony about preferences of drug dealers for high-powered weapons because "the case itself dealt with whether firearms were involved in a drug trafficking offense [thus] the dangers of drug trafficking could not be far from the jurors' thoughts"). Thus, admitting the statements would not violate Rule 403.

With respect to the statements relating to the defendant's threats against CC-5, the statements are admissible under Rule 801(c) because they are not offered for their truth but rather for their effect on CC-5 and to explain why subsequent events occurred. *See United States v.*

*Dupree*, 706 F.3d 131 (2d Cir. 2013); *United States v. Gotti*, 457 F.Supp.2d 395, 397 (S.D.N.Y.2006) ("[I]t is well established ... that statements offered for their effect on the listener are non-hearsay." (internal quotations and citations omitted)). Such statements are admissible if (1) "the non-hearsay purpose by which the evidence is sought to be justified is relevant;" and (2) "the probative value of this evidence for its non-hearsay purpose is outweighed by the danger of unfair prejudice resulting from" impermissible use of the statement. *United States v. Reyes*, 18 F.3d 65, 70 (2d Cir. 1994).

As to the first question, the Second Circuit has used a four-part inquiry to determine the relevance of background or state of mind evidence. First, "does the background or state of mind evidence bear upon the defendant's guilt?"; second, "[i]f so, how important is it to the jury's understanding of the issues?"; third, "[c]an the needed explanation" of state of mind be accurately conveyed by "other less prejudicial evidence or by instructions?;" and fourth, "[h]as the adversary engaged in a tactic that justifiably opens the door to such evidence to avoid prejudice[?]" *United States v. Grecco*, 728 F. App'x 32, 35 (2d Cir. 2018) (Summary Order) (quoting *Reyes*, 18 F.3d at 70). Here, the statement that the defendant was going to kill CC-5 is relevant to show why CC-5 went to the defendant's *finca* to try to kill the defendant, tied up his workers, and stole approximately 70 of his firearms. In turn, this testimony from CC-5 is relevant because it goes to part of the charged conduct at the crux of the case (*i.e.*, that the defendant owned and operated a *finca* where he stored narcotics and firearms), and because CC-5 will assuredly be cross-examined on this subject (his quarrel with the defendant).

As to the second question, because there is no other less prejudicial evidence available to serve this purpose, the evidence should be admitted. *See United States v. Sterling*, 22 Cr. 247(EK), 2023 WL 1967526, at *3-4 (E.D.N.Y. Feb. 12, 2023) (admitting evidence relating to defendant's

prior narcotics trafficking conviction, and providing limiting instruction, where the Government did not have other, less prejudicial evidence of the defendant's knowledge regarding cocaine) (citing *United States v. McCallum*, 584 F.3d 471, 476 (2d Cir. 2009)). There is no other way to explain why CC-5 took the retaliatory actions described above or took numerous firearms from the defendant's *finca* without placing them in the proper context, by introducing the statements he heard about the defendant's effort to kill him. Moreover, the Court may use a limiting instruction to counteract any undue prejudice that may arise from the admission of statements regarding the reasons why CC-5 attacked the *finca*.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should grant the Government's motions *in limine* and overrule the defendant's objections to the Government's expert, cross-examination on the defendant's killing of his business partner, the introduction of co-conspirators statements.

Dated:  New York, New York
        November 10, 2023

                                          Respectfully submitted,

                                          DAMIAN WILLIAMS
                                          United States Attorney for the
                                          Southern District of New York

                              By:    ___/s/_____
                                          Kaylan E. Lasky
                                          Michael D. Lockard
                                          Kevin T. Sullivan
                                          Assistant United States Attorneys
                                          212-637-2315 / 2193 / 1587

Cc:    Defense Counsel
        *Via ECF & Email (Unredacted)*