# Exhibit A

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| In the Matter of the Search of | **23 MAG 6930** |
| *(Briefly describe the property to be searched or identify the person by name and address)* | |
| In the Matter of the Application of the United States Of America for a Search and Seizure Warrant for a Black iPhone with International Mobile Equipment Identity No. 356168097262658 in a Clear Case, Vouchered as N-167 by the DEA | Case No. |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See attached Affidavit and its Attachment A

located in the _____ Southern _____ District of _____ New York _____ , there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attached Affidavit and its Attachment A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 963; 46 U.S.C. §§ 70506(b) and 70504(b)(2); 18 U.S.C. §§ 924(c) and 924(o) | narcotics importation conspiracy; conspiracy to violate maritime drug enforcement laws; and possession of firearms, including machineguns and destructive devices; conspiracy to possess firearms, including machineguns and destructive devices |

The application is based on these facts:

See attached Affidavit and its Attachment A

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/S/ Matthew Passmore (with permission given to VSB)
*Applicant's signature*

_____
Matthew Passmore, Special Agent, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ Telephone _____ *(specify reliable electronic means)*.

Date: _____ 10/24/2023 _____

_____
*Judge's signature*

City and state: New York, NY

_____
Hon. Vernon S. Broderick
*Printed name and title*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 23 MAG 6930

In the Matter of the Application of the United States Of America for a Search and Seizure Warrant for a Black iPhone with International Mobile Equipment Identity No. 356168097262658 in a Clear Case, Vouchered as N-167 by the DEA

**TO BE FILED UNDER SEAL**

**Agent Affidavit in Support of Application for Search and Seizure Warrant**

SOUTHERN DISTRICT OF NEW YORK) ss.:

MATTHEW S. PASSMORE, Special Agent, Drug Enforcement Administration ("DEA") being duly sworn, deposes and says:

## I. Introduction

### A. Affiant

1.      I am a Special Agent with the DEA. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C)—that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been employed by the DEA since approximately 2009. I am currently assigned to the Bilateral Investigations Unit of the Special Operations Division. During my time as a Special Agent with the DEA, I have participated in investigations of criminal activity, including international narcotics trafficking and weapons offenses. As a result of my participation in the foregoing investigations, as well as my training, I am familiar with some of the tactics, methods, and techniques of individuals involved in such criminal activity. Through my training and experience, I am also familiar with the use of cellphones and other electronic devices in furtherance of such criminal activity, and the forensic analysis of electronically stored

information ("ESI") recovered from such devices. I have participated in the execution of search warrants for such ESI.

2.      I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the electronic device specified below (the "Subject Device") for the items and information described in Attachment A. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of cellphones in criminal activity and the forensic analysis of ESI. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**B.   The Subject Device**

3.      The Subject Device is particularly described as a black iPhone with International Mobile Equipment Identity ("IMEI") No. 356168097262658 in a clear case, vouchered as N-167 by the DEA.

4.      Based on my training, experience, and research, I know that the Subject Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.

5.      The Subject Device is presently located in the custody of the United States Attorney's Office for the Southern District of New York.

### C.  The Subject Offenses

6.  For the reasons detailed below, I believe that there is probable cause to believe that the Subject Device contains evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 963 (narcotics importation conspiracy); 46 U.S.C. §§ 70506(b) and 70504(b)(2) (conspiracy to violate maritime drug enforcement laws); and 18 U.S.C. §§ 924(c) (possession of firearms, including machineguns and destructive devices, in connection with a drug trafficking crime) and 924(o) (conspiracy to possess firearms, including machineguns and destructive devices, in connection with a drug trafficking crime) (collectively, the "Subject Offenses").

## II.  Probable Cause

### A.  Probable Cause Regarding Subject's Commission of the Subject Offenses

7.  On April 23, 2021, Carlos Orense Azocar ("Orense") was charged by complaint in the Southern District of New York with the Subject Offenses. A true and correct copy of the complaint is attached hereto as Exhibit 1 and incorporated by reference as if fully set forth herein.

8.  On or about May 13, 2021, Orense was arrested in Fronsinone, Italy, by Italian law enforcement authorities based on the charges contained in the Complaint.

9.  On or about June 4, 2021, a grand jury in the Southern District of New York returned Indictment 21 Cr. 379 (the "Indictment"), charging Orense with violating the Subject Offenses. A true and correct copy of the Indictment is attached hereto as Exhibit 2 and incorporated by reference as if fully set forth herein.

### B.  Probable Cause Justifying Search of the Subject Device

10.  Based on my training and experience, and my participation in this investigation, including my review of law enforcement reports and records, as well as my conversations with other law enforcement officers, I have learned the following, in substance and in part:

a.      As described above, on or about May 13, 2021, Orense was arrested in Fronsinone, Italy, by Italian law enforcement authorities based on the charges contained in the Complaint.

b.      At the time of Orense's arrest, Italian law enforcement officers seized the Subject Device from Orense.

c.      On or about June 22, 2022, Orense was extradited from Italy to the United States, at which time Italian law enforcement authorities provided the Subject Device to the DEA.[1]

d.      The Subject Device is currently located at the United States Attorney's Office in the Southern District of New York.

e.      Based on my communications with a cooperating witness ("CW-1"),[2] I am aware that Orense often used cellphones to communicate with CW-1 and others in furtherance of the narcotics and weapons offenses that underlie the charges against Orense in the Indictment. For example, Orense frequently used cellphones to speak with CW-1 and other co-conspirators regarding the status of cocaine loads and the location of narcotics proceeds, from at least in or about 2003 through in or about 2010, when CW-1 worked for a drug trafficking organization led by Orense and others.

---

[1] Pursuant to a request under the relevant mutual legal assistance treaty between the United States and Italy, Italian law enforcement authorities subsequently provided a forensic extraction of the Subject Device to DEA agents (the "Italian Extraction"). The Government is not relying on the contents of the Italian Extraction in connection with the instant application for a search warrant.

[2] The CW-1 described in the instant application for a search warrant is the same individual who is described as "CW-1" in the complaint. *See* Ex. A ¶ 13(b). In or about 2015, CW-1 was convicted of federal fraud and other offenses. CW-1 has completed his sentence. CW-1 has been assisting law enforcement since at least in or about 2015 in an effort to obtain charging, sentencing, and immigration benefits, and for payment. Information that CW-1 has provided has been deemed credible and reliable, and has been corroborated in part through independent means, including information provided by other witnesses.

2017.08.02

11.     Based on my training and experience, I have learned that, like individuals engaged in any other kind of activity, individuals engaged in the Subject Offenses often use cellphones to communicate in furtherance of such criminal activity, and often store records relating to such activity and to individuals involved in such activity with them on electronic devices such as the Subject Device, including for months or even years after such activity took place. Such records can include, for example, text, email, and audio communications with co-conspirators and purchasers of narcotics; records reflecting narcotics transactions; contact information of co-conspirators, including phone numbers, email addresses, and identifiers for instant messaging and social media accounts; and financial records relating to the proceeds of narcotics trafficking. Individuals engaged in such criminal activity often store such records in order to, among other things, (1) keep track of co-conspirators' contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, dividing those proceeds with co-conspirators; (4) store photographs and other data regarding narcotics; (5) store records concerning the user's and others' locations and contact information; and (6) communicate with co-conspirators in furtherance of the criminal activity. Cellphones such as the Subject Device can be particularly important for individuals engaged in international narcotics trafficking because it is often difficult to arrange in-person meetings when co-conspirators are not located in the same country. As set forth above, this investigation has revealed that Orense used cellphones in furtherance of the Subject Offenses, including to communicate about large-scale narcotics transactions and related weapons offenses.

12.     Electronic files or remnants of such files can be recovered months or even years after they have been created or saved on an electronic device such as the Subject Device. Even when such files have been deleted, they can often be recovered, months or years later with forensics

tools. Thus, the ability to retrieve from information from the Subject Device depends less on when the information was first created or saved than on a particular user's device configuration, storage capacity, and habits.

13.     Relatedly, based on my training and experience, I have learned that, like individuals engaged in any other kind of activity, individuals engaged in the Subject Offenses obtain new cellphones from time to time, including cellphones that they use to communicate with co-conspirators and customers regarding the Subject Offenses. I am further aware that when such individuals obtain new cellphones, they frequently transfer portions or all of the electronic content from the prior cellphone to the new cellphone. Thus, although the Subject Device was seized from Orense on or about May 13, 2021, the Subject Device is likely to contain data from an earlier time period, including data that was originally captured using a prior cellphone of Orense, including during the time period in which CW-1 conspired with Orense from at least in or about 2003 through at least in or about 2010.

14.     Based on the foregoing, I respectfully submit there is probable cause to believe that Orense is engaged in the Subject Offenses, and that evidence of this criminal activity is likely to be found on the Subject Device.

## III.   Procedures for Searching ESI

### A.   Review of ESI

15.     Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government

control) will review the ESI contained on the Subject Device for information responsive to the warrant.[3]

16.    In conducting this review, law enforcement may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses. Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of search terms related to the subject matter of the investigation. (Keyword searches alone are typically inadequate to detect all information subject to seizure. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.)

17.    Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant. Depending on the circumstances, however, law enforcement may need to conduct a complete review of all the ESI from the Subject Device to locate all data responsive to the warrant.

---

[3] As noted above in footnote 1, the Government is not relying on the Italian Extraction for a probable cause finding in connection with the instant application to search the Subject Device. The Government, however, intends to attempt to extract the phone using a "Backup password" listed in the Italian Extraction, among other techniques.

## IV. Conclusion and Ancillary Provisions

18.     Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this Affidavit and to the Search and Seizure Warrant.


/S/Matthew Passmore (with permission given to VSB)
_____
MATTHEW S. PASSMORE
Special Agent
DEA


Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1, this
24th day of October, 2023

_____
HON. VERNON S. BRODERICK
UNITED STATES DISTRICT JUDGE

**Attachment A**

## I.  Device Subject to Search and Seizure

The device that is the subject of this search and seizure warrant (the "Subject Device") is described as follows:

A black iPhone with International Mobile Equipment Identity ("IMEI") No.

356168097262658 in a clear case, vouchered as N-167 by the DEA.

## II.  Review of ESI on the Subject Device

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained on the Subject Device for evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 963 (narcotics importation conspiracy); 46 U.S.C. §§ 70506(b) and 70504(b)(2) (conspiracy to violate maritime drug enforcement laws); and 18 U.S.C. §§ 924(c) (possession of firearms, including machineguns and destructive devices, in connection with a drug trafficking crime) and 924(o) (conspiracy to possess firearms, including machineguns and destructive devices, in connection with a drug trafficking crime) (the "Subject Offenses") described as follows:

1. Evidence of the identities of the users of the Subject Device, as well as other co-conspirators in contact with the Subject Device;

2. Evidence relating to the geolocations of the users of the Subject Device, at times relevant to the Subject Offenses;

3. Evidence relating to the participation in the Subject Offenses by the users of the Subject Device, co-conspirators, and others using or in communication with the Subject Device;

4. Evidence concerning financial transactions in furtherance of the Subject Offenses;

5. Evidence showing the states of mind of the users of the Subject Device and co-conspirators as they relate to the Subject Offenses, including any motive for narcotics trafficking, weapons offenses, or other evidence of the Subject Offenses;

6. Evidence of and relating to computers or other online accounts and facilities (such as cellphones and email addresses) controlled or maintained by the users of the Subject Device;

7. Photographs depicting travel, narcotics trafficking, weapons offenses, related financial transactions, or other evidence of the Subject Offenses;

8.  Evidence of Internet searches showing the location, travel, attempts to evade law enforcement, narcotics trafficking, weapons offenses, and related financial transactions of the users of the Subject Device, or other evidence of the Subject Offenses;

9.  Evidence indicating how, when, and where the Subject Device was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the Subject Offenses and to the account owner(s);

10. Passwords or other information needed to access or identify computer or other online accounts, post office boxes, security deposit boxes, storage facilities, or other places where additional evidence, fruits, or instrumentalities of the Subject Offenses may be located; and

11. Evidence of efforts to conceal any of the above evidence or conduct, including by deleting or destroying evidence.

## **EXHIBIT 1**

**(Complaint)**

Approved: _____
          Jason A. Richman / Kyle Wirshba
          Benjamin Woodside Schrier
          Assistant United States Attorneys

Before:   HONORABLE JAMES L. COTT          **21 MAG 4456**
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :      **SEALED COMPLAINT**
                                  :
       - v. -                     :      Violations of
                                  :      18 U.S.C. §§ 924, 2;
CARLOS ORENSE AZOCAR,             :      21 U.S.C. § 963; and
    a/k/a "El Gordo,"             :      46 U.S.C. § 70506
                                  :
                  Defendant.      :      COUNTY OF OFFENSE:
                                  :      NEW YORK
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        MATTHEW S. PASSMORE, being duly sworn, deposes and says
that he is a Special Agent with the Drug Enforcement Administration
("DEA") and charges as follows:

                          COUNT ONE
              (Narcotics Importation Conspiracy)

        1.   From at least in or about 2003, up to and including
at least in or about October 2016, in Venezuela, Colombia, the
Dominican Republic, Mexico, and elsewhere, and in an offense begun
and committed out of the jurisdiction of any particular State or
district of the United States, CARLOS ORENSE AZOCAR, a/k/a "El
Gordo," the defendant, and others known and unknown, at least one
of whom will be first brought to and arrested in the Southern
District of New York, intentionally and knowingly combined,
conspired, confederated, and agreed together and with each other
to violate the narcotics laws of the United States.

        2.   It was a part and an object of the conspiracy that
CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, and others
known and unknown, would and did import into the United States and

into the customs territory of the United States from a place outside thereof a controlled substance, in violation of Title 21, United States Code, Sections 952(a) and 960(a)(1).

3.    It was further a part and an object of the conspiracy that CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, and others known and unknown, would and did manufacture, distribute, and possess with intent to distribute, a controlled substance, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, in violation of Title 21, United States Code, Sections 959(a) and 960(a)(3).

4.    It was further a part and an object of the conspiracy that CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, and others known and unknown, would and did, on board an aircraft registered in the United States, manufacture, distribute, and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Sections 959(c) and 960(a)(3).

5.    The controlled substance that CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, and others known and unknown, conspired to (a) import into the United States and into the customs territory of the United States from a place outside thereof; (b) manufacture, distribute, and possess with intent to distribute, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States from a place outside thereof; and (c) manufacture, distribute, and possess with intent to distribute on board an aircraft registered in the United States, was five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 960(b)(1)(B).

(Title 21, United States Code, Section 963; and Title 18, United States Code, Section 3238.)

## COUNT TWO

(Conspiracy to Violate Maritime Drug Enforcement Laws)

6.    From at least in or about 2003, up to and including at least in or about October 2016, in Venezuela, Colombia, the Dominican Republic, Mexico, on the high seas, and elsewhere, and in an offense begun and committed out of the jurisdiction of any

2

particular State or district of the United States, CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, and others known and unknown, at least one of whom will be first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate the maritime drug enforcement laws of the United States.

7. It was a part and an object of the conspiracy that CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, and others known and unknown, while on board a vessel subject to the jurisdiction of the United States, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 46, United States Code, Section 70503(a)(1).

8. The controlled substance that CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, and others known and unknown, conspired to distribute and possess with intent to distribute on board a vessel subject to the jurisdiction of the United States was five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 46, United States Code, Section 70506(a), and Title 21, United States Code, Section 960(b)(1)(B).

(Title 46, United States Code, Sections 70506(b) and 70504(b)(2); and Title 18, United States Code, Section 3238.)

<u>COUNT THREE</u>
(Possession of Machineguns and Destructive Devices)

9. From at least in or about 2003, up to and including at least in or about October 2016, in Venezuela, Colombia, the Dominican Republic, Mexico, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States and for which at least one of two or more joint offenders will be first brought to and arrested in the Southern District of New York, CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, to wit, the conspiracy to import narcotics charged in Count One of this Complaint and the conspiracy to violate maritime drug enforcement laws charged in Count Two of this Complaint, knowingly used and carried firearms, and, in furtherance of such crime, knowingly possessed firearms, and aided and abetted the use, carrying, and possession of firearms, to wit, machineguns that were capable of automatically shooting more than one shot, without manual reloading, by a single function of the trigger, as well as destructive devices.

(Title 18, United States Code, Sections 924(c)(1)(A),
924(c)(1)(B)(ii), 3238, and 2.)

COUNT FOUR
(Conspiracy to Possess Machineguns and Destructive Devices)

10.   From at least in or about 2003, up to and including
at least in or about October 2016, in Venezuela, Colombia, the
Dominican Republic, Mexico, and elsewhere, and in an offense begun
and committed out of the jurisdiction of any particular State or
district of the United States, CARLOS ORENSE AZOCAR, a/k/a "El
Gordo," the defendant, and others known and unknown, at least one
of whom will be first brought to and arrested in the Southern
District of New York, intentionally and knowingly combined,
conspired, confederated, and agreed together and with each other
to violate Title 18, United States Code, Section 924(c).

11.   It was a part and object of the conspiracy that
CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, and others
known and unknown, during and in relation to a drug trafficking
crime for which they may be prosecuted in a court of the United
States, to wit, the conspiracy to import narcotics charged in Count
One of this Complaint and the conspiracy to violate maritime drug
enforcement laws charged in Count Two of this Complaint, would and
did use and carry firearms, and, in furtherance of such drug
trafficking crime, possess firearms, including machineguns that
were capable of automatically shooting more than one shot, without
manual reloading, by a single function of the trigger, as well as
destructive devices, in violation of Title 18, United States Code,
Sections 924(c)(1)(A)(i) and 924(c)(1)(B)(ii).

(Title 18, United States Code, Sections 924(o) and 3238.)

The bases for my knowledge and for the foregoing charges
are, in part, as follows:

12.   I am a Special Agent with the DEA.  This affidavit
is based on my conversations with law enforcement officers and the
witnesses described herein, as well as my review of documents,
during the course of the investigation.  Because this affidavit is
being submitted for the limited purpose of establishing probable
cause, it does not include all the facts that I have learned during
the course of the investigation.  Where the actions, statements,
and conversations of others are reported herein, they are reported
in substance and in part, except where otherwise indicated.

## The ORENSE DTO

13.   Based on my participation in this investigation; my conversations with other law enforcement officers and witnesses; my review of law enforcement reports and records and other documents; and my training and experience, I have learned the following, in substance and in part:

a.   On or about March 5, 2020, a federal grand jury sitting in the Southern District of New York returned a superseding indictment (the "Superseding Indictment") charging Nicolás Maduro Moros, Diosdado Cabello Rondón, Hugo Armando Carvajal Barrios ("Carvajal"), Clíver Antonio Alcalá Cordones, Luciano Marín Arango, and Seuxis Paucis Hernández Solarte with various narco-terrorism, narcotics trafficking, and weapons offenses.  The Superseding Indictment is attached hereto as Exhibit A, and is expressly incorporated herein.

b.   A cooperating witness ("CW-1")[1] has provided the following information, in substance and in part:

i.   From at least in or about 2003 through at least in or about 2010, CW-1 worked for a drug trafficking organization (the "ORENSE DTO") led by CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, and others.  The ORENSE DTO purchased at least approximately tens of thousands of kilograms of cocaine from sources of supply located in or around Colombia and Venezuela, and facilitated the transportation of the cocaine from South America to Puerto Rico and various countries in Central America, including the Dominican Republic and Mexico, so that the cocaine could be imported into the contiguous United States.

ii.   CW-1 worked directly for ORENSE, including by supervising aspects of the ORENSE DTO's transportation of shipments containing thousands of kilograms of cocaine.  For example, in or about 2008 or 2009, in or around

---

[1] In or about 2015, CW-1 was convicted of federal fraud and other offenses.  CW-1 has completed his sentence.  CW-1 has been assisting law enforcement since at least in or about 2015 in an effort to obtain charging, sentencing, and immigration benefits, and for payment.  Information that CW-1 has provided has been deemed credible and reliable, and has been corroborated in part through independent means, including information provided by other witnesses.

Caracas, Venezuela, CW-1 supervised the ORENSE DTO's receipt of at least approximately three shipments that each contained at least approximately 1,000 kilograms of cocaine. While CW-1 was supervising the ORENSE DTO's receipt of the foregoing shipments, CW-1 was armed with a machinegun, as were at least several other individuals working for the ORENSE DTO who were helping with the receipt of the shipments. CW-1 also supervised the ORENSE DTO's receipt of at least several loads containing thousands of kilograms of cocaine that were transported from Colombia to Venezuela by airplane. At or around the landing strips where the airplanes landed in Venezuela, which were on or around the border with Colombia, CW-1 observed several individuals providing security, some of whom were armed with AK-47 rifles, and some of whom were wearing Venezuelan military uniforms.

        iii.    ORENSE told CW-1 about additional shipments of thousands of kilograms of cocaine that the ORENSE DTO had purchased, and which were ultimately being imported into the United States. For example, in or about 2007 or 2008, ORENSE discussed with CW-1 a shipment containing approximately 5,000 kilograms of cocaine that the ORENSE DTO was helping to transport to Mexico. CW-1 understood from the conversation that the shipment ORENSE described was going to be imported into the United States.

        iv.    CW-1 also participated in or heard conversations between ORENSE and other individuals, including Carvajal, regarding the ORENSE DTO's purchase of thousands of kilograms of cocaine that were imported into the United States after arriving in Mexico.

        v.    ORENSE used a security detail when traveling in Venezuela, including in furtherance of the ORENSE DTO's drug trafficking activities. The security detail typically consisted of at least approximately eight individuals traveling in at least two vehicles. The security detail stored an M4 rifle in each of the vehicles. Additionally, ORENSE often carried at least one additional machinegun on his person or in the vehicle in which he was traveling, including an FN P90 submachine gun.

<u>The April 2016 Seizure of Boat-1 and 900 Kilograms of Cocaine</u>

        c.    On or about April 7, 2016, U.S. Coast Guard personnel interdicted a go-fast vessel with no indicia of nationality ("Boat-1") in international waters south of the Dominican Republic. Coast Guard personnel recovered at least approximately 900 kilograms of substances that later tested positive for cocaine from Boat-1.

d.    At least four men occupied Boat-1 at the time of the interdiction.  One or more of Boat-1's crew claimed that Boat-1 was registered in Colombia, but the Colombian government informed the Coast Guard that it could neither confirm nor deny the nationality of Boat-1.  The four crewmembers of Boat-1 were subsequently arrested based on alleged violations of Title 46, United States Code.

e.    One member of Boat-1's crew ("CW-2")[2] has provided the following information, in substance and in part:

i.    Boat-1 departed from a beach in or around Coro, Venezuela ("Beach-1"), carrying approximately 1,000 kilograms of cocaine, with an intended destination of the Dominican Republic.[3]

ii.    On or about April 4, 2016, approximately two days before Boat-1 departed Venezuela, two co-conspirators not named as defendants herein ("CC-1" and "CC-2") transported CW-2 and several other Boat-1 crewmembers to an estate owned by ORENSE, where CW-2 and the other crewmembers met with ORENSE and were served dinner.  At the estate, CW-2 observed approximately 20 well-armed individuals providing security.  Some of the foregoing individuals were wearing Venezuelan military uniforms.

iii.    On or about April 5, 2016, CC-1 and CC-2 transported CW-2 and other Boat-1 crewmembers to Beach-1, where they met with an individual who described himself as ORENSE's partner.  Shortly thereafter, CW-2 and the other crewmembers

_____

[2] In or about 2016, CW-2 was convicted of a violation of Title 46, United States Code, and sentenced principally to 120 months' imprisonment in connection with the interdiction of Boat-1.  CW-2 is serving his sentence as of the filing of this Complaint.  CW-2 has been providing information to law enforcement in an effort to obtain, *inter alia*, sentencing benefits.  Information that CW-2 has provided has been deemed credible and reliable, and has been corroborated in part through independent means, including information provided by other witnesses.

[3] According to CW-1, in or about mid-2016, while CW-1 and CW-2 were incarcerated at the same prison facility, CW-2 told CW-1, in sum and substance, that CW-2 had recently been arrested while transporting cargo that belonged to ORENSE by boat from Venezuela.

boarded Boat-1 and departed for the Dominican Republic with the cocaine later seized by the Coast Guard.

<u>The October 2016 Seizure of Boat-2 and 350 Kilograms of Cocaine</u>

f.    On or about October 27, 2016, U.S. Coast Guard personnel interdicted a go-fast vessel with no indicia of nationality ("Boat-2") in international waters north of Bonaire, an island in the Caribbean Sea that is a special municipality within the country of the Netherlands.  Coast Guard personnel recovered at least approximately 350 kilograms of substances that later tested positive for cocaine from Boat-2 and the water in the vicinity of Boat-2.

g.    At least five men occupied Boat-2 at the time of the interdiction.  One or more of Boat-2's crew claimed that Boat-2 was registered in Venezuela, but the Venezuelan government informed the Coast Guard that it could neither confirm nor deny the nationality of Boat-2.  The five crewmembers of Boat-2 were subsequently arrested based on alleged violations of Title 46, United States Code.

h.    One member of Boat-2's crew ("CW-3")[4] has provided the following information, in substance and in part:

i.    CC-1 hired CW-3 to work as a crewmember on Boat-2.  Boat-2 departed from Tucacas, Venezuela, with an intended destination of the Dominican Republic.  After Boat-2 had traveled approximately 100 miles, crewmembers of another boat transferred approximately 1,000 kilograms of cocaine to Boat-2.

ii.    CW-3 continued with Boat-2 following the transfer.  On Boat-2, another crewmember told CW-3 that an individual in Venezuela not named as a defendant herein ("CC-3") owned the boat that transferred the cocaine to Boat-2, and that

--------------------------------------

[4] In or about 2016, CW-3 was convicted of a violation of Title 46, United States Code.  In or about 2017, CW-3 was sentenced principally to 80 months' imprisonment in connection with the interdiction of Boat-2.  CW-3 is serving his sentence as of the filing of this Complaint.  CW-3 has been providing information to law enforcement in an effort to obtain, *inter alia*, sentencing benefits.  Information that CW-3 has provided has been deemed credible and reliable, and has been corroborated in part through independent means, including information provided by other witnesses.

CC-3 was partially responsible for dispatching Boat-2 from Venezuela to the Dominican Republic.

           i.    According to CW-1, CC-3 was an associate of ORENSE and the ORENSE DTO.

    WHEREFORE, I respectfully request that a warrant be issued for the arrest of CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, and that he be imprisoned or bailed, as the case may be.

/s/Matthew S. Passmore  with permission JLC

_____

MATTHEW S. PASSMORE
Special Agent
Drug Enforcement Administration

Sworn to me through the transmission of this Complaint by reliable electronic means, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, this
23rd day of April, 2021

_____

JAMES L. COTT
United States Magistrate Judge

# **EXHIBIT A**

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - v. -

NICOLÁS MADURO MOROS,
DIOSDADO CABELLO RONDÓN,
HUGO ARMANDO CARVAJAL BARRIOS,
    a/k/a "El Pollo,"
CLÍVER ANTONIO ALCALÁ CORDONES,
LUCIANO MARÍN ARANGO,
    a/k/a "Ivan Marquez," and
SEUXIS PAUCIS HERNÁNDEZ SOLARTE,
    a/k/a "Jesús Santrich,"

                Defendants.

- - - - - - - - - - - - - - - - - - X

**SUPERSEDING INDICTMENT**

S2 11 Cr. 205  (AKH)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: MAR 0 5 2020

**COUNT ONE**
**(Narco-Terrorism Conspiracy)**

The Grand Jury charges:

*Overview*

    1.    From at least in or about 1999, up to and including in or about 2020, NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, participated in a corrupt and violent narco-terrorism conspiracy between the Venezuelan *Cártel de Los Soles* and the *Fuerzas Armadas Revolucionarias de Colombia* ("FARC").

2.     From at least in or about 1999, up to and including
in or about 2020, the FARC was a terrorist organization -- led at
times by LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS
PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants,
among others -- that became one of the largest producers of cocaine
in the world and perpetrated acts of violence against United States
nationals and property.

3.     From at least in or about 1999, up to and including
in or about 2020, the *Cártel de Los Soles*, or "Cartel of the Suns,"
was a Venezuelan drug-trafficking organization comprised of high-
ranking Venezuelan officials who abused the Venezuelan people and
corrupted the legitimate institutions of Venezuela -- including
parts of the military, intelligence apparatus, legislature, and
the judiciary -- to facilitate the importation of tons of cocaine
into the United States.  The name of the *Cártel de Los Soles* is a
reference to the sun insignias affixed to the uniforms of high-
ranking Venezuelan military officials who are members of the
Cartel.

4.     NICOLÁS MADURO MOROS, the defendant, helped manage
and, ultimately, lead the *Cártel de Los Soles* as he gained power
in Venezuela.  Under the leadership of MADURO MOROS and others,
the *Cártel de Los Soles* sought not only to enrich its members and
enhance their power, but also to "flood" the United States with

2

cocaine and inflict the drug's harmful and addictive effects on users in this country.  Thus, whereas most drug-trafficking organizations in South and Central America have sought to recede from their roles in importing narcotics into the United States in an effort to avoid U.S. prosecution, the *Cártel de Los Soles*, under the leadership of MADURO MOROS and others, prioritized using cocaine as a weapon against America and importing as much cocaine as possible into the United States.

5.    While pursuing these and other objectives, NICOLÁS MADURO MOROS, the defendant, negotiated multi-ton shipments of FARC-produced cocaine; directed that the *Cártel de Los Soles* provide military-grade weapons to the FARC; coordinated foreign affairs with Honduras and other countries to facilitate large-scale drug trafficking; and solicited assistance from FARC leadership in training an unsanctioned militia group that functioned, in essence, as an armed forces unit for the *Cártel de Los Soles*.

### The Cártel de Los Soles and the Venezuelan Defendants

6.    At various times between 1999 and 2020, NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," and CLÍVER ANTONIO ALCALÁ CORDONES, the defendants, acted as leaders and managers of the *Cártel de Los Soles* and the narco-terrorism conspiracy with the FARC.

7. NICOLÁS MADURO MOROS, the defendant, is a Venezuelan citizen, was previously the president of Venezuela, and is now the *de facto* ruler of the country. MADURO MOROS also previously held a seat in the Venezuelan National Assembly between in or about 2000 and in or about 2006, acted as the Venezuelan foreign minister between in or about 2006 and in or about 2013, and acted as the vice president of Venezuela in or about 2013. MADURO MOROS succeeded to the Venezuelan presidency after Hugo Chávez died in or about 2013 and, during his presidency, continued to participate in cocaine trafficking with the *Cártel de Los Soles* and the FARC. In or about 2018, MADURO MOROS declared victory in a presidential election in Venezuela. In or about 2019, the National Assembly of Venezuela invoked the Venezuelan constitution and declared that MADURO MOROS had usurped power and was not the president of Venezuela. Since in or about 2019, more than 50 countries, including the United States, have refused to recognize MADURO MOROS as Venezuela's head of state and instead recognized Juan Guaidó as the interim president of Venezuela. In or about January 2020, the United States Department of State certified the authority of Guaidó, as the interim president of Venezuela, to receive and control property in accounts at the United States Federal Reserve maintained by the Venezuelan government and the Central Bank of Venezuela.

4

8.   DIOSDADO CABELLO RONDÓN, the defendant, is a Venezuelan citizen, president of Venezuela's National Constituent Assembly, and a member of the Venezuelan armed forces.   CABELLO RONDÓN previously acted as chief of staff to Chávez in or about 2001, vice president of Venezuela in or about 2002, governor of Venezuela's Miranda State between in or about 2004 and in or about 2008, and president of Venezuela's National Assembly between in or about 2012 and in or about 2016.

9.   HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," the defendant, is a Venezuelan citizen and was the director of Venezuela's military intelligence agency, which was known as the *Dirección de Inteligencia Militar* ("DIM"), between in or about 2004 and in or about 2011.   In or about 2013, NICOLÁS MADURO MOROS, the defendant, made CARVAJAL BARRIOS the director of the DIM for a second time.   Between in or about January 2014 and in or about June 2014, CARVAJAL BARRIOS held the title of Venezuela's consul general to Aruba.   In or about January 2016, despite being a fugitive on drug-trafficking charges that have been pending in the Southern District of New York since at least in or about 2011, CARVAJAL BARRIOS was elected to the Venezuelan National Assembly. As of the filing of this Superseding Indictment, CARVAJAL BARRIOS remains a fugitive on pending charges in underlying indictments in

the Southern District of New York and subject to a lawful order of extradition issued by Spain in or about 2019.

10.   CLÍVER ANTONIO ALCALÁ CORDONES, the defendant, is a Venezuelan citizen and a former general in the Venezuelan military.

### The FARC and the FARC Defendants

11.   Between at least in or about 1999, up to and including in or about 2020, the FARC became one of the largest producers of cocaine in the world.   The FARC has also directed violent acts against United States persons and property in foreign jurisdictions, including, but not limited to, Colombia.   For example, the FARC leadership ordered FARC members to kidnap and murder United States citizens and to attack United States interests in order to dissuade the United States from continuing its efforts to fumigate FARC coca fields and disrupt the FARC's manufacturing and distribution of cocaine and cocaine paste.   Consistent with these activities, in or about 1997, the United States Department of State designated the FARC as a Foreign Terrorist Organization. The FARC remains so designated as of the filing of this Superseding Indictment.

12.   LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," the defendant, is a Colombian citizen who joined the FARC in or about 1985.   In or about 2006, the United States Attorney's Office for

the Southern District of New York filed a drug-trafficking charge
against 50 leaders of the FARC, including MARÍN ARANGO.  As of the
filing of this Superseding Indictment, MARÍN ARANGO is a fugitive
on that charge and a member of the FARC's Secretariat, which is
the FARC's highest leadership body.

13.  SEUXIS  PAUCIS  HERNÁNDEZ  SOLARTE,  a/k/a  "Jesús
Santrich," the defendant, is a Colombian citizen who joined the
FARC in or about 1991.  As of the filing of this Superseding
Indictment, HERNÁNDEZ SOLARTE is a member of the FARC's Central
High Command, which is the FARC's second-highest leadership body.

*Means and Methods of the Narco-Terrorism Conspiracy*

14.  In furtherance of the narco-terrorism conspiracy,
at various times between in or about 1999 and in or about 2020,
members  of  the  conspiracy  organized  their  drug-trafficking
activities as follows:

a.  Beginning in or about 1999, while the FARC was
purporting  to  negotiate  toward  peace  with  the  Colombian
government, the FARC agreed with leaders of the *Cártel de Los Soles*
to  relocate  some  of  its  operations  to  Venezuela  under  the
protection of the Cartel.

b.  Members and associates of the FARC, operating
under the leadership of LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez,"
and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the

7

defendants, among others, cultivated coca leaves on farms in Colombia and Venezuela, such as in southwest Colombia and in the Serranía del Perijá mountain range that spans Colombia and Venezuela.

c. The FARC and the *Cártel de Los Soles* dispatched processed cocaine from Venezuela to the United States via transshipment points in the Caribbean and Central America, such as Honduras. By in or about 2004, the United States Department of State estimated that 250 or more tons of cocaine were transiting Venezuela per year. The maritime shipments were shipped north from Venezuela's coastline using go-fast vessels, fishing boats, and container ships. Air shipments were often dispatched from clandestine airstrips, typically made of dirt or grass, concentrated in the Apure State.

d. In order to achieve safe passage for the large cocaine shipments transiting Venezuela, members and associates of the FARC and the *Cártel de Los Soles* paid bribes, which ultimately benefited NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," and CLÍVER ANTONIO ALCALÁ CORDONES, the defendants, among others, in exchange for, for example, access to commercial ports and data from air and maritime radar in Venezuela. According to the United States Department of State, approximately 75 unauthorized flights

8

suspected of drug-trafficking activities entered Honduran airspace in 2010 alone, using what is known as the "air bridge" cocaine route between Venezuela and Honduras.

e.   MADURO  MOROS,  CABELLO  RONDÓN,  CARVAJAL BARRIOS,  and  ALCALÁ  CORDONES  coordinated  with  the  FARC  in furtherance  of  the  narco-terrorism  conspiracy  in  order  to: transport and distribute these large cocaine shipments; benefit from, and cause others to participate in, the provision of heavily armed  security  to  protect  the  cocaine  shipments;  cause  large quantities  of  previously-seized  cocaine  to  be  sold  to  drug traffickers in exchange for millions of dollars; interfere with drug-trafficking  investigations  and  pending  criminal  cases  in Venezuela and elsewhere; and help provide the FARC with military-grade  weapons,  including  machineguns,  ammunition,  rocket launchers, and explosives equipment.

*Acts in Furtherance of the Narco-Terrorism Conspiracy Between the Cártel de Los Soles and the FARC*

15.   In furtherance  of  the  narco-terrorism  conspiracy and  to  effect  the  illegal  objects  thereof,  the  following  overt acts, among others, were committed:

a.   In or about 2003, an associate of the FARC and the *Cártel de Los Soles* paid SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a

"Jesús Santrich," the defendant, $300,000 to help establish a FARC camp near Apure, Venezuela where the FARC could process cocaine.

b.    In or about 2005, Chávez instructed NICOLÁS MADURO MOROS, the defendant, who was then a member of the Venezuelan National Assembly, and others, that Venezuelan judges who would not protect the FARC and its activities should be removed from their positions.  That same year, the Venezuelan government largely terminated Venezuela's participation in bilateral counter-narcotics operations with the Drug Enforcement Administration ("DEA").

c.    In or about 2006, Chávez made MADURO MOROS the foreign minister of Venezuela.  During the same year, the FARC paid MADURO MOROS $5 million in drug proceeds, through a third party, in connection with a money-laundering scheme that was part of the narco-terrorism conspiracy.  MADURO MOROS and others agreed to launder many millions of dollars from the FARC, including the $5 million, by purchasing palm oil extraction equipment from Malaysia with drug proceeds, which would be used to support the operation of African palm plantations in Apure that would appear legitimate.  In connection with this scheme, in or about December 2006, Venezuela announced trade agreements with Malaysian firms relating to African palm oil extraction and crude oil exploration in Venezuela.

10

d.   In or about 2006, the *Cártel de Los Soles* dispatched a 5.6-ton cocaine shipment from Venezuela on a DC-9 jet bearing a United States registration number.   DIOSDADO CABELLO RONDÓN and HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," the defendants, worked with other members of the *Cártel de Los Soles* to coordinate the shipment.   The jet departed Venezuela from Simón Bolívar International Airport in Maiquetía, Venezuela (the "Maiquetía Airport"), and landed at Ciudad del Carmen Airport in Campeche, Mexico.   Mexican authorities seized the 5.6 tons of cocaine when it arrived in Campeche.

e.   In or about 2008, Chávez, who was at that time the president of Venezuela and one of the leaders of the *Cártel de Los Soles*, agreed with LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," the defendant, to use funds from the Venezuelan state-owned oil producer, Petróleos de Venezuela (PDVSA), to support the FARC's drug-trafficking and terrorist operations.

f.   In or about 2008, MADURO MOROS, CABELLO RONDÓN, and CARVAJAL BARRIOS attended a meeting with a FARC representative at which the attendees agreed that the *Cártel de Los Soles* would provide the FARC cash and weapons in exchange for increased cocaine production.   During the meeting, MADURO MOROS agreed to abuse his authority as foreign minister to ensure that

11

the border between Venezuelan and Colombia remained open to facilitate drug trafficking.

g.   In or about 2008, CABELLO RONDÓN, CARVAJAL BARRIOS, and CLÍVER ANTONIO ALCALÁ CORDONES, the defendant, held a meeting at which they agreed that ALCALÁ CORDONES would take on additional duties coordinating drug-trafficking activities by the *Cártel de Los Soles* and the FARC.

h.   In or about 2009, MADURO MOROS, CABELLO RONDÓN, and CARVAJAL BARRIOS attended a meeting with a FARC representative at which the attendees discussed a four-ton cocaine shipment that the FARC was prepared to transport to the *Cártel de Los Soles*.   CABELLO RONDÓN directed that the FARC deliver the cocaine to a particular location in Venezuela, where a jet would be waiting to transport the cocaine to Nicaragua for further shipment to Mexico and importation into the United States.   During the meeting, the group also discussed a recent coup d'état in Honduras, and CABELLO RONDÓN warned, in substance and in part, that the resulting instability could "fuck up the business." MADURO MOROS traveled to Honduras after the meeting, purporting to act as the Venezuelan foreign minister, in order to try to intervene on behalf of the *Cártel de Los Soles* so that events in Honduras would not disrupt the drug-trafficking activities of the narco-terrorism conspiracy.

12

i.   In or about September 2013, months after
MADURO MOROS succeeded to the Venezuelan presidency, the *Cártel de
Los Soles* dispatched 1.3 tons of cocaine on a commercial flight
from the Maiquetía Airport to Paris Charles de Gaulle Airport.
French authorities seized the cocaine.   Following the seizure,
MADURO MOROS cancelled a trip to attend a session of the U.N.
General Assembly in New York, citing to the media purported death
threats against him.   In Venezuela, MADURO MOROS convened a meeting
with, among others, CABELLO RONDÓN and CARVAJAL BARRIOS.   During
the meeting, MADURO MOROS told CABELLO RONDÓN and CARVAJAL BARRIOS,
in substance and in part, that they should not have used the
Maiquetía Airport for drug trafficking after the 2006 seizure in
Mexico, and that the *Cártel de Los Soles* should instead use its
other well-established drug routes and locations to dispatch
cocaine.

j.   In or about September 2013, shortly after
French authorities seized the 1.3-ton cocaine shipment from the
*Cártel de Los Soles*, MADURO MOROS and others authorized the arrests
of Venezuelan military officials in an effort to divert public and
law enforcement scrutiny from the participation in the shipment by
MADURO MOROS, CABELLO RONDÓN, and CARVAJAL BARRIOS.

k.   In or about 2014, MADURO MOROS met with MARÍN
ARANGO at a military base in Caracas.   During the meeting, MADURO

13

MOROS agreed to continue to provide weapons to the FARC and requested that the FARC help train an armed militia group in Venezuela.  MADURO MOROS also told MARÍN ARANGO, in substance and in part, that the militia would not be associated with the Venezuelan government, which would afford plausible deniability to government officials for the militia's anticipated violence. MARÍN ARANGO agreed to help MADURO MOROS train the militia and later facilitated training for members of the militia near his FARC camp in Zulia State.

l.    In or about July 2014, Aruban authorities provisionally arrested CARVAJAL BARRIOS at the request of the United States.  In response, MADURO MOROS, CABELLO RONDÓN, and other members of the *Cártel de Los Soles* pressured Aruba and the Dutch government to release CARVAJAL BARRIOS, including by reportedly deploying Venezuelan naval assets toward Aruba.  Aruba released CARVAJAL BARRIOS, and he returned to the protection of the *Cártel de Los Soles* in Venezuela.

m.    In or about 2015, following the agreement between MADURO MOROS and MARÍN ARANGO regarding the provision of weapons and other equipment, members of the *Cártel de Los Soles* diverted Venezuelan military equipment to the FARC. CABELLO RONDÓN personally participated in the delivery of machineguns, ammunition, and rocket launchers to the FARC at a military base in

14

Venezuela.    During  the  delivery,  CABELLO  RONDÓN  and  others discussed  the  fact  that  the  weapons  were  a  partial  payment  for cocaine that the FARC had provided to members of the *Cártel de Los Soles*.

n.    Between  in  or  about  October  2015  and  in  or about  November  2015,  Efrain  Campo  Flores  and  Franqui  Francisco Flores de Freitas -- two relatives of MADURO MOROS -- agreed during recorded  meetings  with  DEA  confidential  sources  to  dispatch  multi-hundred-kilogram    cocaine    shipments    from    MADURO    MOROS's "presidential  hangar"  at  the  Maiquetía  Airport.    During  recorded meetings  with  the  sources,  Campo  Flores  and  Flores  de  Freitas explained that they were at "war" with the United States, described the *Cártel de Los Soles*, discussed a connection to a "commander for the FARC" who was "supposedly high-ranked," and indicated that they were seeking to raise $20 million in drug proceeds to support a campaign by the Venezuelan first lady -- and wife of MADURO MOROS -- in  connection  with  a  late-2015  election  for  the  Venezuelan National  Assembly.    Campo  Flores  referred  to  MADURO  MOROS  as  his "father," and stated that "what we want is for him to take control again of the . . . National Assembly."    Flores de Freitas joked that "any opposing candidate who comes out and starts to become a pest . . . three or four have already been locked up."    In November 2016,  Campo  Flores  and  Flores  de  Freitas  were  convicted  at  trial

in the Southern District of New York of conspiring to import cocaine into the United States.

        o.    In or about 2017, MADURO MOROS continued to work with and direct other members of the *Cártel de Los Soles* to dispatch large cocaine shipments to the United States. Specifically, CABELLO RONDÓN and other members of the *Cártel de Los Soles* facilitated air shipments of ton quantities of cocaine to clandestine airstrips in Venezuela's Barinas State. Uniformed FARC personnel armed with machineguns and other weapons helped receive the cocaine in Barinas and loaded the drugs into vehicles with secret compartments to be transported toward the Venezuelan coast for further distribution.

        p.    Beginning in or about 2017, after purporting to negotiate peace agreements with the Colombian government on behalf of the FARC in or about 2016, HERNÁNDEZ SOLARTE agreed to provide a multi-ton quantity of cocaine to DEA confidential sources so that the drugs could be imported into the United States. The sources purported to work for Rafael Caro Quintero, a Mexican drug trafficker who participated in the 1985 torture and murder of DEA Agent Enrique "Kiki" Camarena. During a recorded meeting, HERNÁNDEZ SOLARTE referred to the murder of Camarena by characterizing Caro Quintero as the person who had killed the "son of the bitch of the DEA."

q.    In or about June 2018, Colombian authorities provisionally arrested HERNÁNDEZ SOLARTE, at the request of the United States Attorney's Office for the Southern District of New York, based on a cocaine-importation conspiracy charge in this District related to HERNÁNDEZ SOLARTE's agreement with DEA confidential sources to provide large quantities of cocaine for importation into the United States in or about 2017 and 2018. HERNÁNDEZ SOLARTE was subsequently released, however, and is a fugitive as of the filing of this Superseding Indictment.

r.    In or about July 2019, MADURO MOROS and CABELLO RONDÓN attended a videotaped press conference at which MADURO MOROS announced that the FARC, and in particular MARÍN ARANGO and HERNÁNDEZ SOLARTE, are welcome in Venezuela.

s.    In August 2019, MARÍN ARANGO, standing near HERNÁNDEZ SOLARTE, announced in a videotaped statement that the FARC was beginning a "new phase" of its "armed struggle." MARÍN ARANGO characterized this "struggle" as a "continuation of the rebel fight."

STATUTORY ALLEGATIONS

16.    From at least in or about 1999, up to and including in or about 2020, in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, including in Venezuela, Colombia, Mexico, Iran, Syria,

17

Lebanon, and elsewhere, NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, and others known and unknown, at least one of whom will be first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 21, United States Code, Section 960a.

17.   It was a part and an object of the conspiracy that NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, and others known and unknown, would and did engage in conduct that would be punishable under Title 21, United States Code, Section 841(a) if committed within the jurisdiction of the United States, to wit, the distribution of, and possession with the intent to distribute, five kilograms and more of mixtures and substances containing a detectable amount of cocaine, knowing and intending to provide, directly and indirectly, something of pecuniary value to a person and organization that has engaged and engages in terrorism and terrorist activity, to wit, the FARC (which has been

18

designated by the United States Secretary of State as a foreign terrorist organization pursuant to Section 219 of the Immigration and Nationality Act and remains so designated) and its members, operatives, and associates, having knowledge that such organization and persons have engaged and engage in terrorism and terrorist activity, in violation of Title 21, United States Code, Section 960a.

(Title 21, United States Code, Section 960a; and
Title 18, United States Code, Section 3238.)

## COUNT TWO
### (Cocaine Importation Conspiracy)

The Grand Jury further charges:

18. Paragraphs 1 through 15 of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

19. From at least in or about 1999, up to and including in or about 2020, in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, including in Venezuela, Colombia, Mexico, Iran, Syria, Lebanon, and elsewhere, NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, and others known and unknown, at least

one of whom will be first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate provisions of Title 21, United States Code, Chapter 13, Subchapter II.

20. It was a part and an object of the conspiracy that NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, and others known and unknown, would and did import into the United States from a place outside thereof a controlled substance, in violation of Title 21, United States Code, Sections 952(a) and 960(a)(1).

21. It was further a part and an object of the conspiracy that NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, and others known and unknown, would and did manufacture, distribute, and possess with intent to distribute a controlled substance, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported

into the United States and into waters within a distance of 12 miles of the coast of the United States, in violation of Title 21, United States Code, Sections 959(a) and 960(a)(3).

22.   It was further a part and an object of the conspiracy that NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, and others known and unknown, would and did, on board an aircraft registered in the United States, manufacture, distribute, and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Sections 959(c) and 960(a)(3).

23.   The controlled substance that NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, conspired to (i) import into the United States and into the customs territory of the United States from a place outside thereof, (ii) manufacture and distribute, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the

21

United States from a place outside thereof, and (iii) manufacture, distribute, and possess on board an aircraft registered in the United States, was five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 960(b)(1)(B).

(Title 21, United States Code, Section 963; and
Title 18, United States Code, Section 3238.)

### COUNT THREE
**(Possession of Machineguns and Destructive Devices)**

The Grand Jury further charges:

24. Paragraphs 1 through 15 of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

25. From at least in or about 1999, up to and including in or about 2020, in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, including in Venezuela, Colombia, Mexico, Iran, Syria, Lebanon, and elsewhere, and for which at least one of two or more joint offenders will be first brought to and arrested in the Southern District of New York, NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús

Santrich," the defendants, during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, to wit, the controlled substance offenses charged in Counts One and Two of this Superseding Indictment, knowingly used and carried firearms, and, in furtherance of such crime, knowingly possessed firearms, and aided and abetted the use, carrying, and possession of firearms, to wit, machineguns that were capable of automatically shooting more than one shot, without manual reloading, by a single function of the trigger, as well as destructive devices.

(Title 18, United States Code,
Sections 924(c)(1)(A), 924(c)(1)(B)(ii), 3238, and 2.)

## COUNT FOUR
**(Conspiracy to Possess Machineguns and Destructive Devices)**

The Grand Jury further charges:

26. Paragraphs 1 through 15 of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

27. From at least in or about 1999, up to and including in or about 2020, in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, including in Venezuela, Colombia, Mexico, Iran, Syria, Lebanon, and elsewhere, NICOLÁS MADURO MOROS, DIOSDADO CABELLO

23

RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, and others known and unknown, at least one of whom will be first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 924(c).

28.   It was a part and an object of the conspiracy that NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, and others known and unknown, would and did, during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, to wit, the controlled substance offenses charged in Counts One and Two of this Superseding Indictment, use and carry firearms, and, in furtherance of such drug trafficking crime, possess firearms, including machineguns that were capable of automatically shooting more than one shot, without manual reloading, by a single function of the trigger, as well as destructive devices, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and 924(c)(1)(B)(ii).

(Title 18, United States Code, Sections 924(o) and 3238.)

## FORFEITURE ALLEGATION
### (As to Counts One and Two)

29.  As a result of committing the controlled substance offenses charged in Counts One and Two of this Superseding Indictment, NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Sections 853 and 970, any and all property constituting, or derived from, any proceeds the defendants obtained, directly or indirectly, as a result of the offenses, and any and all property used, or intended to be used, in any manner or part, to commit, and to facilitate the commission of, the offenses charged in Counts One and Two of this Superseding Indictment.

## FORFEITURE ALLEGATION
### (As to Counts Three and Four)

30.  As a result of committing the firearms offenses charged in Counts Three and Four of this Superseding Indictment, NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS

PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d), all firearms and ammunition involved in and used in the commission of the offenses charged in Counts Three and Four of this Superseding Indictment.

Substitute Assets Provision

31.   If any of the above-described forfeitable property, as a result of any act or omission of NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Sections 853(p) and 970, and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 21, United States Code, Sections 853 & 970; and Title 28, United States Code, Section 2461(c).)

_____
FOREPERSON

_____
GEOFFREY S. BERMAN
United States Attorney

28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

NICOLÁS MADURO MOROS,
DIOSDADO CABELLO RONDÓN,
HUGO ARMANDO CARVAJAL BARRIOS,
a/k/a "El Pollo,"
CLÍVER ANTONIO ALCALÁ CORDONES,
LUCIANO MARÍN ARANGO,
a/k/a "Ivan Marquez," and
SEUXIS PAUCIS HERNÁNDEZ SOLARTE,
a/k/a "Jesús Santrich,"

Defendants.

SUPERSEDING INDICTMENT

S2 11 Cr. 205 (AKH)

(21 U.S.C. §§ 960a, 963; and
18 U.S.C. §§ 924, 3238, 2.)

GEOFFREY S. BERMAN
United States Attorney.

A TRUE BILL

*Angella Buceo Dpty* Foreperson.

3/5/2020

Filed Indictment under seal
Arrest warrants issued        USMJ Fox

# EXHIBIT 2

## (Indictment)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X
                       :

UNITED STATES OF AMERICA     :
                       :

     - v. -             :   **SEALED INDICTMENT**

                       :

CARLOS ORENSE AZOCAR,     :   21 Cr.
  a/k/a "El Gordo,"         **21 CRIM 379**

             Defendant.    :

- - - - - - - - - - - - - - - - - - - X

### COUNT ONE
**(Narcotics Importation Conspiracy)**

The Grand Jury charges:

1.    From at least in or about 2003, up to and including in or about 2021, in Venezuela, Colombia, the Dominican Republic, Mexico, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate the narcotics laws of the United States.

2.    It was a part and an object of the conspiracy that CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, and others

known and unknown, would and did import into the United States and into the customs territory of the United States from a place outside thereof a controlled substance, in violation of Title 21, United States Code, Sections 952(a) and 960(a)(1).

3. It was further a part and an object of the conspiracy that CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, and others known and unknown, would and did manufacture, distribute, and possess with intent to distribute a controlled substance, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, in violation of Title 21, United States Code, Sections 959(a) and 960(a)(3).

4. It was further a part and an object of the conspiracy that CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, and others known and unknown, would and did, on board an aircraft registered in the United States, manufacture, distribute, and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Sections 959(c) and 960(a)(3).

5. The controlled substance that CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, conspired to (a) import into the United States and into the customs territory of the United States

from a place outside thereof; (b) manufacture, distribute, and possess with intent to distribute, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States; and (c) manufacture, distribute, and possess with intent to distribute on board an aircraft registered in the United States, was five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 960(b)(1)(B).

(Title 21, United States Code, Section 963; and Title 18, United States Code, Section 3238.)

## COUNT TWO
**(Conspiracy to Violate Maritime Drug Enforcement Laws)**

The Grand Jury further charges:

6.    From at least in or about 2003, up to and including in or about 2021, in Venezuela, Colombia, the Dominican Republic, Mexico, on the high seas, and elsewhere, CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, and others known and unknown, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate the maritime drug enforcement laws of the United States.

7.    It was a part and an object of the conspiracy that CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, and others

3

known and unknown, while on board a vessel subject to the jurisdiction of the United States, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 46, United States Code, Section 70503(a)(1).

8.    The controlled substance that CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, conspired to distribute and possess with intent to distribute while on board a vessel subject to the jurisdiction of the United States was five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 46, United States Code, Section 70506(a) and Title 21, United States Code, Section 960(b)(1)(B).

(Title 46, United States Code, Sections 70506(b) and 70504(b)(2).)

## COUNT THREE
### (Possession of Machineguns and Destructive Devices)

The Grand Jury further charges:

9.    From at least in or about 2003, up to and including in or about 2021, in Venezuela, Colombia, the Dominican Republic, Mexico, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States and for which at least one of two or more joint offenders is expected to be first brought to and arrested in the Southern District of New York, CARLOS ORENSE AZOCAR, a/k/a "El

4

Gordo," the defendant, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, to wit, the conspiracy to import narcotics charged in Count One of this Indictment and the conspiracy to violate maritime drug enforcement laws charged in Count Two of this Indictment, knowingly used and carried firearms, and, in furtherance of such crime, knowingly possessed firearms, and aided and abetted the use, carrying, and possession of firearms, to wit, machineguns that were capable of automatically shooting more than one shot, without manual reloading, by a single function of the trigger, as well as destructive devices.

(Title 18, United States Code, Sections 924(c)(1)(A), 924(c)(1)(B)(ii), 3238, and 2.)

### COUNT FOUR
**(Conspiracy to Possess Machineguns and Destructive Devices)**

The Grand Jury further charges:

10. From at least in or about 2003, up to and including in or about 2021, in Venezuela, Colombia, the Dominican Republic, Mexico, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern

District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 924(c).

11. It was a part and an object of the conspiracy that CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, and others known and unknown, during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, to wit, the conspiracy to import narcotics charged in Count One of this Indictment and the conspiracy to violate maritime drug enforcement laws charged in Count Two of this Indictment, would and did use and carry firearms, and, in furtherance of such drug trafficking crime, possess firearms, including machineguns that were capable of automatically shooting more than one shot, without manual reloading, by a single function of the trigger, as well as destructive devices, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and 924(c)(1)(B)(ii).

(Title 18, United States Code, Sections 924(o) and 3238.)

**FORFEITURE ALLEGATION**
**(As to Count One)**

12. As a result of committing the offense charged in Count One of this Indictment, CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, shall forfeit to the United States, pursuant to Title 21, United States Code, Sections 853 and 970, any and all property constituting, or derived from, any proceeds obtained,

directly or indirectly, as a result of said offense and any and all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

### FORFEITURE ALLEGATION
**(As to Count Two)**

13. As a result of committing the offense charged in Count Two of this Indictment, CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, shall forfeit to the United States, pursuant to Title 46, United States Code, Section 70507(a), and Title 28, United States Code, Section 2461, the following property that was used or intended for use to commit, or to facilitate the commission of, said offense:

      a.    All controlled substances;

      b.    All raw materials, products, and equipment of any kind;

      c.    All listed chemicals, all drug manufacturing equipment, all tableting machines, all encapsulating machines, and all gelatin capsules;

d. All property which is used, or intended for use, as a container for property described in paragraphs 13(a), 13(b), and 13(c) of this Indictment;

e. All conveyances, including aircraft, vehicles, or vessels;

f. All books, records, and research, including formulas, microfilm, tapes, and data;

g. All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate the offense charged in Count Two of this Indictment;

h. All real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements;

i. Any drug paraphernalia; and

j. Any firearm used or intended to be used to facilitate the transportation, sale, receipt, possession, or concealment of property described in paragraph 13(a) and 13(b) of this Indictment, and any proceeds traceable to such property.

**FORFEITURE ALLEGATION**
**(As to Counts Three and Four)**

14. As a result of committing the offenses charged in Counts Three and Four of this Indictment, CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d), all firearms and ammunition involved in and used in the commission of the offenses charged in Counts Three and Four of this Indictment.

Substitute Assets Provision

15. If any of the above-described forfeitable property, as a result of any act or omission of CARLOS ORENSE AZOCAR, a/k/a "El Gordo," the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third person;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21, United

9

States Code, Sections 853(p) and 970, and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 21, United States Code, Sections 853 and 970; and
Title 28, United States Code, Section 2461(c).)

_____
FOREPERSON

_____
AUDREY STRAUSS
United States Attorney

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

**CARLOS ORENSE AZOCAR,**
a/k/a "El Gordo,"

Defendant

---

## SEALED INDICTMENT

21 Cr.

(21 U.S.C. § 963; 46 U.S.C. §§ 70506(b)
and 70504(b)(2); and 18 U.S.C. §§ 924,
3238, and 2.)

AUDREY STRAUSS
United States Attorney

**A TRUE BILL**

*Tracy Mitchell*
Foreperson