NBT3ORE1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

        v.                      21 Cr. 379 (VSB)

CARLOS ORENSE AZOCAR,
   a/k/a "El Gordo,"

              Defendant.            Trial

------------------------------x

                             New York, N.Y.
                       November 29, 2023
                         9:30 a.m.

Before:

          HON. VERNON S. BRODERICK,
                       District Judge
                       –and a Jury–

                APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  MICHAEL D. LOCKARD
     KAYLAN E. LASKY
     KEVIN T. SULLIVAN
     Assistant United States Attorneys

FOY & SEPLOWITZ LLC
     Attorneys for Defendant
BY:  JASON E. FOY
     ERIC J. SARRAGA

Also Present:  Cristina Weisz
                      Humberto Garcia
                      Mercedes Avalos
                      Vivian Goa
                      Erika de los Rios
                      Interpreters (Spanish)

               William Sirmon, Paralegal Specialist
               Meusette Gonzalez, Paralegal
               Special Agent Matthew s. Passmore

NBT3ORE1

1          (Trial resumed; jury not present)

2          THE COURT:  I apologize.  For some reason I had it in

3     my mind that I had set a later start.

4          So, let me get started with the rulings.  After I made

5     an initial ruling with regard to the expert testimony of

6     Jennifer Taul, the government supplemented its submission with

7     regard to the opinions which Research Specialist Taul would

8     testify.

9          The government supplemented its submission with regard

10    to what the Specialist Taul's opinions would be after I

11    indicated which of the opinions initially submitted were

12    lacking in the detail that I would have expected.  So, here's

13    my ruling:

14         Defendant moves to preclude, and defense -- after the

15    submission of the supplemental opinions by the government, the

16    defense renewed its motion to exclude the testimony of Jennifer

17    Taul.

18         Defendant moves to preclude Research Specialist

19    Jennifer Taul from testifying as an expert on various matters

20    related to international trafficking in cocaine from Colombia

21    and Venezuela.  Specifically, the government seeks to offer

22    Research Specialist Taul's opinions concerning:  (1) the

23    sources and manufacturing process typically used to produce

24    multi-ton loads of cocaine in Colombia; (2) drug trafficking

25    routes commonly used to transport cocaine; (3) the common

methods of operation and transportation employed by

narco-traffickers along those routes; (4) the use of slang and

coded language, including particular terms used in this case

for cocaine and for the Revolutionary Armed Forces of Colombia

or FARC; (5) how large-scale Venezuelan narcotics traffickers

often do business with Mexican drug trafficking cartels and

with Colombian guerillas; (6) the use of illicit business

arrangements between Venezuelan narcotics traffickers and

Venezuelan politicians, law enforcement officers, and military

leaders to protect drug traffickers and facilitate narcotics

load shipments; (7) the approximate prices of cocaine in

various locations, including Colombia, I believe including the

United States, Colombia and Venezuela; and (8) the typical

appearance and packaging of the cocaine.

Defendant argues that I should preclude Research

Specialist Taul's testimony because (1) the government's

disclosure of her opinions is inadequate; (2) she does not

qualify as an expert; (3) the proposed testimony will not

assist the trier of fact under Rule 702; and (4) that even if

her testimony is admissible, that its "probative value is

negligible and should be excluded under 403." Alternatively,

defendant seeks a Daubert hearing.

In opposition, the government argues it provided

adequate notice, and that the "expert testimony is relevant and

admissible in order to assist the jury in its consideration of

NBT3ORE1

other evidence related to large-scale international drug

trafficking of the type at issue" in this case.  Because the

government's initial supplemental disclosure adequately

disclosed Taul's opinion and her testimony will assist the

jury, defendant's motion to preclude the testimony of Research

Specialist Taul is denied.

Federal Rule of Evidence 702 permits the admission of

expert testimony as long as (a) the expert's scientific,

technical, or other specialized knowledge will help the trier

of fact to understand the evidence or to determine a fact in

issue; (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and

methods; and (d) the expert has reliably applied the principles

and methods of the case.

Federal Rule of Evidence 702. "The fundamental

requirements are thus that such evidence be relevant and

reliable." *United States v. Jones*, 965 F.3d 149, 161.  In

*Daubert*, the Supreme Court held that the trial judge is

responsible for "the task of ensuring that an expert's

testimony both rests on a reliable foundation and is relevant

to the task at hand." *Daubert* 509 U.S. 997.  Thus, "while the

proponent of expert testimony has the burden of establishing by

a preponderance of the evidence that the admissibility

requirements of Rule 702 are satisfied, the District Court is

the ultimate gatekeeper." *United States v. Jones*, 965 F.3d

1    149, 161.

2          As the Second Circuit has recognized, however, the

3    inquiry under *Daubert* is limited, and "a minor flaw in an

4    expert's reasoning or a slight modification of an otherwise

5    reliable method will not render an expert's opinion per se

6    inadmissible." *Amorgianos v. National Railroad Passenger*, 303

7    F.3d 256, 267. Rather, "the judge should only view the

8    evidence if the flaw is large enough that the expert lacks good

9    grounds for his or her conclusions." *Id.* 267.

10         "This limitation on when evidence should be excluded

11   accords with the liberal admissibility standards of the federal

12   rules and recognizes that our adversary system provides the

13   necessary tools for challenging reliable, albeit debatable,

14   expert testimony." Same case cite there.

15         "Vigorous cross-examination, presentation of contrary

16   evidence, and careful instruction on the burden of proof are

17   the traditional and appropriate means of attacking shaky but

18   admissible evidence." Same citation.

19         At bottom, the *Daubert* analysis is intended to give

20   the District Court the discretion "needed to ensure that the

21   courtroom door remains closed to junk science while admitting

22   that will assist the trier of fact." Same citation.

23         Although, as I previously indicated, the initial

24   disclosure lacks sufficient detail concerning Taul's opinions,

25   I find that the combination of the initial disclosure and

supplemental disclosure more than adequately describes the

opinions about which Taul will testify.  Where the initial

disclosure on some issues only disclosed the categories of

Taul's proposed testimony, the supplemental disclosure fleshed

out those issues by providing specific examples of Taul's

opinion.

To the extent defendants question Taul's

qualifications to testify as an expert, I find Taul is

qualified to provide the jury with expert testimony.

Specifically, she has over 20 years' experience with the DEA,

including more than three years stationed in Caracas,

Venezuela, three years stationed at the DEA's Bogota country

office in Bogota, Colombia, and almost two years assigned to

the specialized Bilateral Investigations Unit of the DEA's

Special Operations Division.  During her various assignments,

Taul focused on transnational organizations that engaged in

cocaine trafficking, weapons trafficking, and money laundering.

I find that the fact that she has never before testified as an

expert of minimum probative value, since the focus of her

qualifications to opine on issues related to international

narcotics trafficking should be the focus of whether she is

qualified to testify.  In any event, every expert witness must

have testified for the first time in at least one trial.  I

also find that a Daubert hearing is not necessary.  Taul's

testimony is consistent with expert testimony admitted without

such a hearing in cases involving narcotics trafficking, gang

activity, and organized crime.

With regard to the relevancy of Taul's testimony, and

whether or not it will assist the jury in understanding the

evidence or aid the jury, the Second Circuit has held "the

operations of narcotics dealers are a proper subject for expert

testimony under Rule 702." *United States v. Onumonu*, 967 F.2d

782, 787.  As Judge Peter K. Leisure found in *United States v.*

*Nektalov*, "the Second Circuit has routinely upheld the

admission of expert testimony offered by the government to

explain the workings of criminal transactions and

enterprises -- such as narcotics trafficking, organized crime,

and money laundering -- that, without explanation, would be

esoteric or otherwise beyond the understanding of the average

juror."  That's at 2004 WL 1469487 at *2.  Indeed, expert

testimony regarding "cocaine smuggling methods and practices"

is "particularly relevant to prove the charged importation

conspiracy, a scheme dependent on numerous individuals

performing discrete roles."  *United States v. Vertil*, 566 F.

App'x 36, 39.  Therefore Taul's testimony is appropriate and

will assist jurors in understanding aspects of the trial

evidence, including testimony from law enforcement and

cooperating witnesses who will testify about their roles

working with the defendant to transport and import large

quantities of cocaine ultimately bound for the United States.

1          Contrary to defendant's contention, Taul's testimony

2     will not be unfairly prejudicial.  Rather, it will assist the

3     jury in understanding drug trafficking production, including

4     locations, routes of transport for distribution, and pricing

5     involving Venezuela, Colombian, the Caribbean, and the United

6     States.  Her testimony will also provide context for the fact

7     testimony of witnesses.

8          In addition, I find that providing a instruction in

9     the charge will also mitigate any potential prejudice to the

10     defendant.

11          For all of these reasons, defendant's motion to

12     preclude the testimony of Research Specialist Taul is denied.

13          Second, with regard to the motion related to the

14     defendant's cell phone.  I will supplement what I'm about to

15     say later on with a more detailed oral decision.

16          Here, as we discussed yesterday, the defendant was

17     arrested by authorities in Italy.  I'll go briefly through the

18     facts.

19          On or about April 23, 2021, a warrant for defendant

20     Carlos Orense Azocar's arrest was issued.  On May 13, 2021, the

21     defendant was arrested by Italian law enforcement based on a

22     request for a provisional arrest.  On June 3, 2021, an

23     indictment against defendant was returned.  On June 22, 2022,

24     Italian authorities extradited the defendant to face the

25     charges in the indictment.  Defendant was arrested in

1    possession of various items, including a cell phone.

2         After the defendant's arrest, but before his

3    extradition, the government submitted a request to the Italian

4    Central Authority pursuant to the treaty between the United

5    States of America and the Italian Republic on Mutual Assistance

6    in Criminal Matters for Italian law enforcement to seize all

7    electronic devices in the defendant's possession at the time of

8    his arrest, and to provide those devices along with forensic

9    copies of those devices to the United States.

10         In response to this request, Italian authorities

11   transferred the cell phone and a forensic copy of the cell

12   phone to the Drug Enforcement Administration in connection with

13   defendant's extradition to the United States.

14         On December 19, 2022, the government, as part of

15   discovery in this case, produced to defendant a forensic copy

16   of the cell phone created by the Italian authorities.

17   Defendant never sought to suppress the discovery, the forensic

18   copy, or the copy of the cell phone provided in discovery that

19   had been made by the Italian authorities.

20         The government applied for and obtained a warrant to

21   search the cell phone on October 23, 2023.  The next day,

22   defendant was provided with a copy of the search warrant, and

23   on October 26, defendant was provided a forensic copy of the

24   contents of the cell phone extracted pursuant to the search

25   warrant.

1    As a result of defendant's inability to access the

2    extraction, the government provided the defendant with a

3    replacement extraction on November 1st, 2023.

4    The parties filed motions in limine on November 3,

5    2023, in accordance with the schedule that I set.  As part of

6    its motions, the defendant described and produced as exhibits

7    materials from the cell phone indicating that it intended to

8    introduce those items at trial.

9    On November 13, the government provided the defendant

10   with data from the cell phone identified as responsive to the

11   search warrant.  The government also produced draft English

12   translations of Spanish language materials from the responsive

13   materials from that cell phone.

14   On November 24, defendant filed the instant motion

15   seeking to suppress the extraction of the cell phone pursuant

16   to a search warrant, principally on the basis that the delay in

17   the obtaining of the search warrant was inappropriate, and

18   therefore any evidence from the cell phone should be excluded.

19   Now, according to the annex to the treaty between the

20   United States of America and the Italian Republic on Mutual

21   Assistance in Criminal Matters, Article I titled "obligation to

22   render assistance," the treaty provides that "requests for

23   assistance shall include, among other things, executing

24   requests for search and seizure."  Article IV of that document,

25   among other things, indicates that "the courts of the requested

state," here that would be Italy, "shall issue subpoenas,

search warrants or any other process necessary in the execution

of a request." "A request shall be executed in conformity with

the provisions of this treaty and according to the laws of the

requested state" and "procedures specified in the requests

shall be followed, unless prohibited by the laws of the

requested state."

With regard to the application of the Fourth

Amendment's exclusionary rule, "suppression is generally not

required when evidence at issue is obtained by foreign law

enforcement officers." *United States v. Lee*, 723 F.3d 134, 140.

There are two exceptions to this rule, which is

sometimes known as the International Silver Platter Doctrine.

I find that those exceptions simply do not apply in this case.

And that even if the government had not obtained a warrant, in

all likelihood the information that was on the cell phone would

have been admissible at the trial, assuming a proper foundation

was laid with regard to authenticity of the materials that were

obtained from the phone. Even if that were not the case with

regard to the cell phone, I find that this matter is -- in

connection with the delay, with regard to the factors stated in

*Smith*, this case is outside of that, because of the way the

information was obtained. In other words, the defendant's

property interests and privacy interests in the cell phone was

either extinct, distinguished, or substantially dissipated by

the actual seizure and search of the phone by the Italian

authorities.  And therefore, the same situation as presented in

*Smith* is not presented here.

In addition, I find that the cell phone itself has

independent evidentiary value, including the fact that based

upon the specific identifiers of cell phones, that cell phone

could be tied to other information, including subscriber

information as well as telephone records which could tie the

defendant to that cell phone, as I understand, using a reported

alias that the defendant used as well as tie the defendant to

other co-conspirators.

So I find that on that basis, that the search warrant

was timely obtained and was sought appropriately.

Lastly, with regard to the cell phone and the

application of the good faith exception.  Here, both sides

concede that they were unable to find a case specifically on

point, and by that I mean a situation where a cell phone was

seized at the time of arrest in a foreign country pursuant to a

treaty.  Here, that's Italy.  As I understand it, I've been

unable to find, and the parties have not provided me with, a

specific case related to Italy or another foreign jurisdiction

with a similar treaty related to the seizure and search of a

cell phone by a foreign government.  There is case law that

deals with the issue of Mutual Legal Assistance Treaties and

the seizure of materials, and that, as I indicated earlier,

1    that case law indicates that there are really only two

2    exceptions to where a Court would apply U.S. law to that

3    situation.

4         But in any event, this is not a situation where law

5    enforcement officers on the face of the warrant would recognize

6    that there was some deficiency in the warrant, and therefore,

7    the execution of the warrant by law enforcement officers was

8    reasonable.  And that even if there was a deficiency -- and I

9    find that there was not -- the good faith exception would apply

10   and I would deny defendant's motion to preclude the use of

11   information found on the defendant's -- what is purported to be

12   the defendant's cell phone.  Therefore, that motion is denied.

13        Any questions from the government?

14        MS. LASKY:  No, your Honor.

15        THE COURT:  From the defense?

16        MR. FOY:  No.

17        THE COURT:  Obviously, Mr. Foy, Mr. Sarraga, all of

18   your objections are preserved for purposes of the record.

19        Are there any issues, other issues we should take up,

20   before I check with Ms. Disla on the status of the jury?

21        MR. SULLIVAN:  Your Honor, the parties have an

22   agreement on what should be stricken from yesterday's

23   transcript.

24        THE COURT:  Okay.

25        MR. SULLIVAN:  It will be from 247:11 to 251:1.

1          THE COURT:  Let me ask Mr. Foy, is that consistent

2     with your understanding?

3          MR. FOY:  It is.

4          THE COURT:  So I will strike the following parts of

5     the transcript:  That's line 247:11-251:1.  And I would request

6     with regard to that section that is modified, because we have a

7     copy of the trial transcript, that an amended trial transcript

8     be prepared striking those portions of the testimony.

9          Let me ask, am I correct?  I'm not looking at it the

10    now, but does that exclude the colloquy that both Mr. Foy then

11    had after we had the sidebar and everything after that?  Do you

12    understand what I'm saying?  Let me just take a quick look.

13         MR. SULLIVAN:  It excludes the questioning of the

14    witness itself.

15         THE COURT:  And the answer.

16         MR. SULLIVAN:  Yes.  That's what it is limited to.

17         THE COURT:  It retains --

18         MR. SULLIVAN:  What happens at sidebar and --

19         THE COURT:  -- and then subsequently --

20         MR. SULLIVAN:  -- after that.

21         THE COURT:  Thank you.  Does that seem like the

22    correct way to proceed from the government's perspective?

23         MR. SULLIVAN:  I'm sorry?

24         THE COURT:  Does that seem like, in other words, my

25    orally indicating that those portions of the transcript will be

1    stricken, and directing that an amended transcript from

2    yesterday be prepared without that testimony, the questions and

3    answers?

4           MR. SULLIVAN:  Yes, your Honor.

5           THE COURT:  Mr. Foy, anything?

6           MR. FOY:  We agree.

7           THE COURT:  Anything else before we check to see on

8    the status of the jury?

9           MR. SULLIVAN:  Nothing from the government.

10          THE COURT:  Mr. Foy?

11          MR. FOY:  Nothing further.

12          THE COURT:  I've been advised that everyone is here,

13   so we will bring the jury out.

14          If we could get the witness.  Ms. Disla's lining the

15   jurors up right now.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  You can step up, Mr. Arvelaiz.  Have a

3     seat.  We're going to continue with the direct examination of

4     Mr. Arvelaiz.

5          You may inquire.

6      ANTONIO ARVELAIZ,

7          called as a witness by the Government,

8          having been previously sworn, testified as follows:

9     DIRECT EXAMINATION (Continued)

10    BY MS. LASKY:

11    Q.  Mr. Arvelaiz, before we turn back to discussing the

12    defendant's drug trafficking, I'd like to go back to a couple

13    of topics that we discussed earlier yesterday.

14    A.  Okay.

15    Q.  Okay.  Directing you to 2014, before your arrest in 2015.

16    Which law enforcement agency were you assisting?

17    A.  ATF.

18    Q.  Is that also known, if you know, as the Bureau of Alcohol,

19    Tobacco, Firearms and Explosives?

20    A.  Yes.

21    Q.  What kind of case, generally speaking, were you assisting

22    ATF with?

23    A.  Weapons contraband.

24    Q.  Did the ATF agents ask you about drug trafficking?

25    A.  No.

1    Q.   Did they ask about your previous drug trafficking?

2    A.   No.

3    Q.   When were you arrested for fraud?

4    A.   In April 2015.

5    Q.   After that, which law enforcement agency did you meet with?

6    A.   With the DEA and the HSI, Homeland Security.

7    Q.   Does DEA, is that sometimes or does that stand for the Drug

8    Enforcement Administration?

9    A.   Correct.

10   Q.   And HSI, does that refer to Homeland Security

11   Investigation?

12   A.   Correct.

13   Q.   Did you meet with prosecutors?

14   A.   Yes.

15   Q.   From what office?

16   A.   The offices in Miami.

17   Q.   You testified yesterday that you signed a plea agreement in

18   Miami?

19   A.   That's right.

20   Q.   What year was that?

21   A.   In 2015.

22   Q.   Fast forwarding, after you got out of prison, well, first I

23   should ask.  What year did you get out of prison?

24   A.   In 2019.

25   Q.   After that, did you start working as a confidential source

1    for the DEA?

2    A.   Correct.

3    Q.   Around when was that?

4    A.   The end of 2019.

5    Q.   Did you receive payments for the cases that you worked on

6    as a confidential source for the DEA?

7    A.   Yes.

8    Q.   Without getting into specifics about cases, approximately

9    how many cases have you worked on with the DEA?

10   A.   Over 10.

11   Q.   Over the course of those couple of years, so I guess since

12   the end of 2019, have you been paid by the DEA for your work?

13   A.   Yes.

14   Q.   Was that for all of the different cases that you worked on?

15   A.   Yes.

16   Q.   What were those payments for?

17   A.   Because of my -- for my cooperation with the DEA, and the

18   information, my information.

19   Q.   Did that also include reimbursements for money that you

20   spent out of pocket?

21   A.   That's right.

22   Q.   Have you also received payments for this case?

23   A.   Yes.

24   Q.   Okay.  Just a couple more things from yesterday.

25        Yesterday, you testified that General Hugo Carvajal was the

1   head of military counterintelligence in Venezuela, and you also

2   stated that there were letters that are used to refer to that

3   organization in Venezuela.

4           THE INTERPRETER:  There are letters that what?

5   Q.  That are used to refer to that organization.

6   A.  That's right.

7   Q.  What letters?

8   A.  DIM, DIM.

9   Q.  Do you know what DIM stands for?

10  A.  Yes.  The *Direccion Nacional de Inteligencia Militar*.

11  Directorate of military counterintelligence.

12  Q.  We'll also go into this in more detail later today.  But

13  you mentioned yesterday that General Carvajal provided

14  credentials to the security team.

15  A.  That's right.

16  Q.  Can you please describe what credentials are.

17  A.  The credentials are IDs that identify the person, together

18  with a badge, accrediting you with the police, that's an

19  official badge allowing you to carry firearms.  And it allows

20  you to go through checkpoints.  And it allows you to circulate

21  throughout the national territory with weapons.

22  Q.  So yesterday when we left off, you were explaining General

23  Carvajal's role in the cocaine operation.  Can you please

24  remind the jury what his role was.

25  A.  Yes, of course.  He provided us with logistical support,

1   credentials, and official vehicles so that we could circulate

2   throughout the national territory, and that way we could avoid

3   the checkpoints in case it was necessary.

4   Q.   In addition to that, did he have any other role in the

5   organization?

6   A.   Yes.  He was Mr. Carlos Orense's partner.

7   Q.   Going back for one moment.  Approximately how much money

8   did you receive in connection with your work with the DEA?

9   A.   Over $30,000.

10  Q.   Do you know where -- excuse me, one moment.

11       Did General Carvajal have any role with respect to

12  obtaining cocaine?

13  A.   Yes.

14  Q.   What role?

15  A.   He provided the connections with people from Colombia,

16  members of the FARC, and people who distributed cocaine from

17  Colombia to Venezuela.

18  Q.   You mentioned the FARC.  What is the FARC?

19  A.   *Fuerzas Armadas Revolucionarias de Colombia*.

20           Armed Revolutionary Forces of Colombia.

21  Q.   Who are they, generally?

22  A.   The guerilla.

23  Q.   Do you know from what country the defendant, Carvajal, and

24  Pedro Luis Marin got the majority of their cocaine?

25  A.   Yes.

1    Q.  How do you know that?

2    A.  Because I assisted in bringing in the merchandise, the

3    cocaine from Colombia into Venezuela.

4    Q.  So to be clear, from what country did they get the majority

5    of their cocaine?

6    A.  Colombia.

7    Q.  A moment ago, you said you assisted with bringing cocaine

8    from Colombia to Venezuela.

9        After the cocaine was in Venezuela, was it transported

10   elsewhere?

11   A.  Yes.

12   Q.  To which countries did they commonly transport cocaine?

13   A.  Guatemala, the Dominican Republic, and Puerto Rico.

14   Q.  What did they use in order to transport the cocaine?

15   A.  Planes and speedboats.

16   Q.  How large was a typical airplane load of cocaine?

17   A.  1,000 kilos.

18   Q.  To be clear, did that sometimes vary?

19            THE INTERPRETER:  I'm sorry?

20   Q.  To be clear, did that sometimes vary?

21   A.  Yes.  Depending on the size of the aircraft.

22   Q.  How large was a typical boatload of cocaine?

23   A.  Between 800 and 1,000 kilos.

24   Q.  Again, did that sometimes vary?

25   A.  Yes.

1    Q.  Approximately how often did the defendant transport

2    thousand-kilogram loads of cocaine?

3    A.  Once a week.

4    Q.  Is that for the whole year?

5    A.  No, we would rest or take breaks on the holidays,

6    Christmas.  Approximately for 10 months a year.

7    Q.  Approximately how much cocaine is that per year?

8    A.  A little over 40,000 kilos.

9    Q.  Did the defendant ever talk about waiting on payments for

10   his cocaine from the United States?

11   A.  He said that he had some money that was retained here in

12   the United States, that he hadn't been able to take out.

13   Q.  Do you remember any cities in particular that he mentioned?

14   A.  Chicago.

15   Q.  Were you paid by the defendant?

16   A.  Yes.

17   Q.  In what currency were you paid?

18   A.  U.S. dollars.

19   Q.  Approximately how much did he pay you per month?

20   A.  Between 4 and $5,000.

21   Q.  Did you also receive other payments?

22   A.  Yes.

23   Q.  How did that work?

24   A.  I would receive a bonus for every airplane that we sent or

25   every boat that we sent.

1    Q.  How would the bonus work?

2    A.  They would give us 20 to 25 kilos, depending on the amount

3    that would leave or go out.

4    Q.  Did the defendant make money from selling cocaine?

5    A.  Yes.

6    Q.  How did the defendant use the narcotics proceeds that he

7    received?

8    A.  He led a very luxurious life in five-star hotels, expensive

9    cars, security, weapons, jewelry, travel.

10   Q.  Did he own properties?

11   A.  I know some of them in Venezuela.

12   Q.  Did he also use money in order to pay his workers?

13   A.  Yes.

14   Q.  Did he also pay officials?

15   A.  Yes.

16   Q.  How did that work?

17   A.  Depending on the situation, if he needed to pay somebody to

18   give us logistical support, well, that's what it was used for.

19   Q.  What do you mean by "logistical support"?

20   A.  So for this business to work well, we needed the support of

21   people, from the authorities, and that's what they were paid

22   for, to get that assistance.

23   Q.  So Mr. Arvelaiz, I'd like to now discuss these subjects in

24   more detail.

25       First I'd like you to orient us on a map.  Mr. Sirmon,

1   please show just the Court, the witness, and the parties

2   Government Exhibit 206.

3          Do you recognize this?

4   A.  Yes.

5   Q.  What is it?

6   A.  It is a map of the central to the northern part of my

7   country, Venezuela.

8   Q.  Does this photograph or does this map fairly and accurately

9   depict that portion of Venezuela?

10  A.  Yes.

11         MS. LASKY:  The government offers Government Exhibit

12  206.

13         THE COURT:  Any objection?

14         MR. FOY:  No objection.

15         THE COURT:  Government Exhibit 206 is admitted in

16  evidence.

17         (Government's Exhibit 206 received in evidence)

18         THE COURT:  You may show it to the jury.

19         MS. LASKY:  Thank you.  Mr. Sirmon, please display

20  Government Exhibit 206.

21  Q.  Mr. Arvelaiz, due to some technology limitations, we're not

22  going to be able to draw on the screen today.  But if you could

23  please describe, using the screen, some of the locations in

24  Venezuela where you knew the defendant had properties.

25  A.  Yes.

1   Q.  Please go ahead.

2   A.  Over here.

3   Q.  If you could say the name of the location, and then I can

4   describe where on the map you were pointing.

5   A.  Yes.  In Zaraza.

6           MS. LASKY:  One moment.

7   Q.  Mr. Sirmon will help with notating the locations that you

8   describe.

9   A.  Okay.

10  Q.  If you could please repeat what you just said.

11  A.  In Zaraza.

12  Q.  Let me pause you there for a moment.

13          MS. LASKY:  I'll just do it talking.  That's okay.

14  Q.  Mr. Arvelaiz, you mentioned Zaraza.  Where is that located

15  on the screen?

16  A.  In the state of Guarico, in the central area towards the

17  eastern side of the country.

18  Q.  What kind of property did the defendant have in Zaraza?

19  A.  A *finca*.

20  Q.  When you say *finca*, what does that mean?

21  A.  A very large plot of land with construction and structures

22  within it.  That is what a *finca* -- by the interpreter,

23  "ranch"-- is in Venezuela.

24  Q.  Did this particular ranch have a name?

25  A.  Yes.

1   Q.   What was the name?

2   A.   Los Garanones.

3   Q.   So besides Los Garanones, which you said was located near

4   Zaraza, were there other properties that the defendant had?

5   A.   In Caracas.

6   Q.   What kind of property or properties did he have in Caracas?

7   A.   He had a very big house in Valle Arriba.

8          THE INTERPRETER:  May the interpreter clarify with the

9   witness.

10  A.   An apartment in Macaracuay.

11  Q.   Those two names in Spanish that you just said, are those

12  neighborhoods?

13  A.   Yes.

14  Q.   So, Caracas, Zaraza, were there any others?

15  A.   In the state of Apure.

16  Q.   Where, generally speaking, is Apure on this map?

17  A.   Apure is on the west side, very close to the Colombian

18  border.

19  Q.   Do you see the Colombian border on this map or a portion of

20  it?

21  A.   Correct.

22  Q.   How are you able to see the border or what does it look

23  like?

24  A.   It is shown with a black line that divides Venezuela from

25  Colombia.

NBT3ORE1                    Arvelaiz - Direct

1    Q.  Does that black line go, broken in some parts, but from the

2    top of the screen to the bottom of the screen on the left-hand

3    side of Government Exhibit 206?

4    A.  Correct.

5    Q.  So you just described where Apure is.  Where in particular

6    in Apure did the defendant have property or properties?

7    A.  The area is called Las Matas.  He had a ranch there.

8    Q.  Is Las Matas located next to or near to another location

9    that you can identify on the map in front of you?

10   A.  Yes, it is near or it's in the state of Apure.

11   Q.  Are you able to see any towns on the map where Apure is,

12   just to help locate us?

13   A.  Yes, there's one here called Guasdualito, and there is

14   another one here called Manteal.

15           MS. LASKY:  If you go to the bottom of the screen to

16   the right.  You're now capturing Manteal and the other location

17   that Mr. Arvelaiz just said.

18   Q.  So Mr. Arvelaiz, you've now mentioned Las Matas, Los

19   Garanones which was in Zaraza, you mentioned Caracas.

20           Were there any other locations where you were aware

21   that the defendant had properties?

22   A.  No.

23   Q.  Earlier you said you began working for the defendant around

24   2003.  When you first started working for him, what was your

25   role?

1    A.  I would run errands, I would bring the kids to school, I

2    would do simple tasks.

3    Q.  Did that evolve over time?

4    A.  Yes.

5    Q.  What were the next things that you started doing for the

6    defendant?

7    A.  Little by little I started to build trust.  I was becoming

8    an adult.  I started to have more responsibilities in the job,

9    and I became part of the security detail.  And later on, I

10   started to perform tasks in drug trafficking.

11   Q.  I believe you told us yesterday that you were around 20

12   years old when you started working for the defendant; is that

13   right?

14   A.  Correct.

15   Q.  Now, around when you first started working for the

16   defendant, what kind of business or work did you think the

17   defendant was doing?

18   A.  Well, I knew that he was in business, but I did not know

19   what type of business he was in.  I was always curious, because

20   I would see a security detail, armored cars, and people that

21   were armed, but I did not truly know what it was that he -- his

22   work entailed.

23   Q.  How, generally speaking, was your understanding able to

24   change over time?

25   A.  Well, after things that I saw as I became more involved, as

1  I started to gain more responsibility, it becomes obvious to

2  you what kind of work you're doing.  You come to know what it

3  is that you are doing, and my responsibilities were increasing

4  as I gained more trust.

5  Q.  Were you also present for conversations between the

6  defendant and some of his drug partners?

7  A.  Yes.

8  Q.  Now, earlier on, do you recall any of these conversations

9  in particular?

10 A.  Yes.

11 Q.  Around what year was this?

12 A.  In around 2004, 2005.

13 Q.  Do you recall where this conversation occurred?

14 A.  Yes, at the Los Garanones ranch.

15 Q.  That was the ranch that you told us earlier was near

16 Zaraza, right?

17 A.  Correct.

18 Q.  Who attended that meeting?

19 A.  Mr. Carlos Orense was there, this Colombian man was there,

20 and General Carvajal was there.

21 Q.  Do you know the Colombian man's name?

22 A.  Yes.

23 Q.  What?

24 A.  Wilber Varela.

25 Q.  Did any of the individuals you just named bring other

1    people with them?

2    A.   Yes.

3    Q.   What kind of men?

4    A.   Armed men in different vehicles with machine guns and

5    handguns.

6    Q.   Did each of those men bring security?

7    A.   They were the security detail of the Colombian man that was

8    there.

9    Q.   Did your uncle also have security there at that time?

10   A.   He always had security with him.

11   Q.   What about General Carvajal?

12   A.   Him too.

13   Q.   Do you remember any of the people on the security detail in

14   particular who were there that day, besides yourself?

15   A.   Yes.

16   Q.   Who?

17   A.   I remember that Henry, who worked in the security detail

18   with us, was there.

19   Q.   Moving back now to the man you first referred to as the

20   Colombian, and then clarified was Wilber Varela.  Do you know

21   who Wilber Varela is?

22   A.   Yes.

23   Q.   How do you know?

24   A.   After that meeting, I learned who he was.  I was curious to

25   find out who he was, and the guys in our own security detail,

1    Henry that is, told me who he was.

2    Q.  What do you recall Henry saying?

3    A.  That this was a very powerful Colombian man, that he

4    enjoyed a lot of power, that he was very strong, and that he

5    was doing very big things with Carlos Orense.

6    Q.  Did there also come a time that you spoke with the

7    defendant about Wilber Varela?

8    A.  Yes.

9    Q.  What did he say?

10   A.  That he was a very powerful man from Colombia, that he was

11   having problems with his own group, there was a war within his

12   own group, and that he was working now from Venezuela.

13   Q.  What do you mean by a war within his own group?

14   A.  Well, that within his own team of work, his own people, his

15   partners, they were all fighting one another, they were at war.

16   Just the way it sounds.

17   Q.  And when you say team of work, are you referring to his

18   drug trafficking organization?

19   A.  Yes, correct.

20   Q.  Around when did the defendant tell you this?

21   A.  A few days after that meeting, late 2004, 2005.

22   Q.  At that meeting, you mentioned that Varela brought armed

23   security to Los Garanones.  Around how many?

24   A.  Well, they were in three or four SUVs, between 15 to 20

25   people.

1    Q.  Were they carrying weapons?

2    A.  Yes.

3    Q.  What kind of weapons?

4    A.  Yes, they were carrying handguns and automatic Uzi machine

5    guns and MP5s, HK MP5s.

6    Q.  So you mentioned Uzis a moment ago.  Did you ever carry an

7    Uzi when working for the defendant?

8    A.  Many times.

9    Q.  What were you doing when you were carrying an Uzi?

10   A.  I was either carrying on with my duties as a bodyguard or

11   protecting the drug trafficking business.

12   Q.  What do you mean by protecting the drug trafficking

13   business?

14   A.  Generally there were places where cocaine was stored, it

15   was waiting to go out on a plane or a boat, and so I needed to

16   protect the product from a potential robbery or any other

17   issues, so I needed to be armed.

18       Sometimes we would have to escort cars that were loaded

19   with drugs, so we needed to have weapons on us.

20   Q.  Did the defendant instruct you to carry weapons?

21   A.  Yes, he would give them to us.

22   Q.  A moment ago you said "product."  What did you mean by

23   product?

24   A.  Cocaine.

25   Q.  So moving back to the Uzis for one moment.

1          Mr. Sirmon, can you please show to just the witness,

2     the Court, and the parties Government Exhibit 413.

3          What is shown in Government Exhibit 413?

4     A.   A mini Uzi machine gun.

5     Q.   Does Government Exhibit 413 fairly and accurately depict

6     the type of gun that you saw or one of the types of guns that

7     you saw Varela's security detail carry?

8     A.   Correct.

9          MS. LASKY:  The government moves to admit Government

10    Exhibit 413.

11         THE COURT:  Any objection?

12         MR. FOY:  No objection.

13         THE COURT:  Government Exhibit 413 is admitted in

14    evidence and may be shown to the jury.

15         (Government's Exhibit 413 received in evidence)

16         MS. LASKY:  Mr. Sirmon, please publish.

17    Q.   Mr. Arvelaiz, in what manner do Uzis fire?

18    A.   They fire on select fire single round shots, or

19    automatically.

20    Q.   What does select fire single round shots mean?

21    A.   Select fire means that every time you push the trigger, it

22    fires one round.

23    Q.   What does fully automatic mean?

24    A.   That when you pull the trigger one single time, it fires

25    all the rounds that it has in the magazine.

1    Q.  What does it sound like?

2    A.  "Brrrrr."

3    Q.  So you were speaking about a -- excuse me.  Strike that.

4        While you were at Los Garanones, what, if anything, do you

5    recall Varela saying?

6    A.  There was some sort of upset, because there was something

7    that was coming in through Apure, some cocaine that was coming

8    in through Apure.  It did not come in in the best of ways, so

9    there was some sort of upset on Varela and Pollo's side.

10   Q.  Can you recall anything else about the conversation at this

11   moment?

12   A.  Yes.

13   Q.  What?

14   A.  Pollo said that that could not happen again.

15   Q.  What did you understand they were discussing?

16   A.  The way that the cocaine had come in to Apure, or some kind

17   of a problem that had happened.

18   Q.  Why did you think they were talking about cocaine?

19   A.  Because that's what they did.

20   Q.  But why did you believe they were speaking about cocaine?

21   A.  Because they were talking about something that had come in

22   to Apure by airplane, some product that had come to Apure.

23   Q.  Why did you think that meant cocaine?

24   A.  Because Wilber Varela was a drug trafficker, and that's

25   what we did, that was our business, that's what we dedicated

1  ourselves to.

2  Q.  Did there come a time that you met any of Varela's

3  partners?

4  A.  Yes.

5  Q.  Who did you meet?

6  A.  A man called Ramon, one of his workers, his security

7  detail, those people.

8  Q.  Where did you see Ramon?

9  A.  I had to pick him up at the airport and take him to the

10  Hotel Melia.

11  Q.  Who told you to do that?

12  A.  Mr. Carlos Orense.

13  Q.  You mentioned the Hotel Melia.  What is that?

14  A.  Hotel Melia is the place where Mr. Carlos Orense resided in

15  Caracas for many years, and that's where he received people.

16  Q.  How many apartments did he have there?

17  A.  Two.

18  Q.  Who generally stayed in each apartment?

19  A.  In one of the apartments he resided together with his

20  family and his wife, his personal things, his children.  And in

21  the other apartment his security detail or some guests he might

22  have had.

23        THE INTERPRETER:  And the interpreter would like to

24  make a correction.  Included in the description of the first

25  apartment, he also had his office.

1          MS. LASKY:  Mr. Sirmon, please show just the Court,

2     the witness, and the parties Government Exhibit 649.

3     Q.  Mr. Arvelaiz, do you recognize this?

4     A.  Yes.

5     Q.  What is it?

6     A.  That's the Hotel Melia Caracas where Mr. Carlos Orense

7     lived.

8     Q.  Does this photo fairly and accurately depict the Melia

9     Hotel in Caracas?

10    A.  Yes.

11         MS. LASKY:  The government offers Government Exhibit

12    649.

13         THE COURT:  Any objection?

14         MR. FOY:  No objection.

15         THE COURT:  Government Exhibit 649 is admitted in

16    evidence and may be shown to the jury.

17         (Government's Exhibit 649 received in evidence)

18         MS. LASKY:  Thank you.  Mr. Sirmon, please publish

19    Government Exhibit 649.

20    Q.  Now, before you put this photo on the screen, you had

21    explained that you picked up Varela's partner Ramon and brought

22    him to the Melia Hotel?

23    A.  Yes.

24    Q.  Was anyone else at the Melia Hotel?

25    A.  Yeah, his security detail and Mr. Carlos Orense.

1   Q.  Do you recall anyone in particular from Ramon's security

2   detail who was there?

3   A.  Yes, it was his secretary or his right-hand man was there.

4   Q.  Do you recall his name?

5   A.  Not his name.  But I know what they called him.

6   Q.  What was that?

7   A.  Pelos.

8   Q.  What did he look like?

9   A.  A white man, slim, with light brown hair, not very fat, not

10  very thin.  A little bit thinner than I am.

11  Q.  Do you recall anything else about this meeting?

12  A.  No, I just left them there and I stayed outside.

13  Q.  What, if anything, did the defendant say about Quintero's

14  relationship with Varela?

15  A.  When they sent me to pick him up, I asked him who it was,

16  because I didn't know who I was picking up.  They told me that

17  it was one of Varela's partners, it was like almost like his

18  lung.  He was the person with the money in that organization.

19  Q.  When you say they told you, who are you referring to?

20  A.  No, Mr. Carlos Orense told me.

21  Q.  Did the defendant say anything about Quintero's drug

22  trafficking organization as a whole?

23  A.  Yes, it was a part of the northern valley, just like

24  Varela.

25  Q.  When you say the northern valley, what are you referring

1    to?

2    A.  That was the group that Varela and Ramon Quintero worked

3    with.

4    Q.  Okay.

5    A.  It is a region in Colombia where most of them come from.

6    Q.  When you say "most of them," what do you mean?

7    A.  Varela, Ramon, all of those people come from the northern

8    valley.

9    Q.  Did they belong to a drug trafficking organization?

10   A.  Yes, the Northern Valley Organization.

11           MS. LASKY:  Mr. Sirmon, please pull up Government

12   Exhibit 206 again.

13   Q.  Mr. Arvelaiz, can you remind the jury where Los Garanones

14   is located on this map.  What town is it close to?

15   A.  Zaraza.

16   Q.  Mr. Arvelaiz, please describe Los Garanones.

17   A.  Los Garanones is a large territory of land.  It has several

18   structures in it.  It has the large main house, together with

19   the horse stalls.  On the right it has some kind of a

20   warehouse, it has several fences, wire fences that divide up

21   the different areas of the *finca*.

22   Q.  You said large.  Around how large?

23   A.  Large.  More than 2,000 hectares, 2,000 hectares.

24   Q.  Are there animals on the ranch?

25   A.  At that time, there were animals.

BY MS. LASKY:

Q.  And were there crops grown there as well?

A.  Yes, there were also crops.

Q.  Now, how often were you at Los Garanones when you worked
for the defendant?

A.  Quite a bit.

Q.  What does that mean?

A.  Once a week.

Q.  Is that an estimate?

A.  More or less.  Sometimes I would stay longer.  Sometimes I
would just stay, and sometimes I would go back.

Q.  Was there a place that you could sleep there if you needed
to?

A.  Yes.  If we didn't stay at the ranch, or the *finca*, we
would stay at a hotel in town.

Q.  Now, did the defendant use Los Garanones in connection with
his drug trafficking?

A.  Right.

Q.  So, generally speaking, how did he use the ranch in
connection with his drug trafficking?

A.  At the *finca*, we stored cocaine.  We stored our weapons.
We had money, and we had some airstrips.

Q.  What is an airstrip?

A.  These are makeshift landing strips, made -- they're not
paved, where aircraft can depart and arrive.

1    Q.  And how did the defendant use airstrips at Los Garanones --

2    strike that.

3        What did the defendant use the airstrips at Los Garanones

4    for?

5    A.  To send cocaine by airplane.

6    Q.  Did the defendant also hold meetings with other

7    drug-trafficking partners at Los Garanones?

8    A.  Yes.

9    Q.  You mentioned that the defendant stored cocaine at Los

10   Garanones.

11       Where at Los Garanones did he store the cocaine?

12   A.  At a warehouse that was right next to the main house.

13   There's some underwater water tanks at the *finca*, and that is

14   something that is very common -- underground water tanks.  They

15   didn't have any water, obviously.  They were covered by

16   concrete covers.  And inside they stored the cocaine.

17   Q.  Approximately how many underground tanks were inside the

18   warehouse?

19   A.  Four.

20   Q.  And about how large was each tank?

21   A.  About eight feet long, six feet wide and ten feet high.

22   Q.  You mentioned a hatch.  Was there ever anything on top of

23   the hatch?

24   A.  Yeah.  Very often at the *finca*, there was -- they would

25   park a truck or some kind of large, heavy vehicle on top of

1    that hatch so that it wouldn't -- it wouldn't be seen and you

2    couldn't move it.

3    Q.  Did you ever see the cocaine?

4    A.  Yes, many times.

5    Q.  What did the cocaine look like?

6    A.  The cocaine generally comes in the form of bricks, which

7    are covered with several layers of plastic and has a very

8    strong smell.  And very often it has some kind of a seal

9    that -- like this sticker, you might put it on top and the

10   sticker might have some kind of a mark or brand.

11   Q.  Did the defendant in particular -- or did the defendant use

12   any particular markings commonly?

13   A.  I remember seeing many.

14   Q.  Which do you remember seeing on the defendant's cocaine?

15   A.  The Audi, the seal of an Audi.  The crown of the Rolex

16   logo.  A $2 bill -- I'm sorry.  A two-bolivar bill from

17   Venezuela.  And R, as in Rolls-Royce.  There were many

18   brands -- many marks, markings.

19   Q.  And to be clear, these were brands you saw on the

20   defendant's cocaine?

21   A.  Yes.

22   Q.  Now, earlier, in addition to cocaine, you also mentioned

23   that the defendant kept weapons at Los Garanones?

24   A.  Yes.

25   Q.  Where did the defendant keep his weapons?

1    A.  In the main house there were many weapons.  There were also

2    weapons in the warehouse.  The majority of the weapons were

3    inside the house.

4    Q.  Did he also keep weapons in other locations -- well, when

5    you're talking about the house, are you speaking about an area

6    where the defendant would sleep?

7    A.  Yes.

8    Q.  Did the defendant keep weapons in locations other than the

9    house on Los Garanones?

10   A.  At all the locations where we were there were weapons.

11   There were weapons at the Melia hotel.  There were weapons at

12   his mother's house.  In all of the houses there were weapons.

13   Q.  I'm speaking specifically about Los Garanones.  Did the

14   defendant keep weapons in locations -- I'm sorry.  Strike that.

15       When you were referring to the house earlier, were you

16   talking about the house at the Melia hotel, or were you

17   speaking about the house on the property at Garanones?

18   A.  Both.

19   Q.  OK.  Did the defendant store weapons in the warehouse at

20   Los Garanones?

21   A.  Yes.

22   Q.  Approximately how many?

23   A.  There were many, many guns and a lot of ammunition.

24   Q.  Are you able to give an approximate estimate of how many

25   guns?

1   A.  Over 150, 200 rifles, handguns, machine guns.

2   Q.  You also mentioned ammunition.  Where did the defendant

3   keep his ammunition at Los Garanones?

4   A.  They were kept in the house, just to keep them at hand in

5   case they became necessary.  But then they were also stored in

6   a large -- in large drums.

7            THE INTERPRETER:  Interpreter correction.

8   A.  In large drums inside the warehouse, there were a lot, a

9   lot of ammunition.

10  Q.  When you say a lot, do you have an estimate?

11  A.  I don't know how many could fit in a drum.  They were --

12  there are approximately a thousand in a box.  There might have

13  been a hundred thousand there, because there were 30 or 40

14  drums of that size.

15           MS. LASKY:  Mr. Sirmon -- oh, we still have Government

16  Exhibit 206 up.

17  Q.  Referring to Government Exhibit 206, besides the airstrips

18  at Los Garanones, which you've just described, did the

19  defendant use other airstrips to transport cocaine?

20  A.  Yes.

21  Q.  Where were the other airstrips located?

22  A.  In the state of Apure.

23  Q.  And are you referring to the ranch or ranches near Las

24  Matas that you described earlier?

25  A.  Yes, correct.

1   Q.  Approximately how many airstrips were at Las Matas?

2   A.  I became familiar with two ranches, and there were four

3   airstrips combined on the two ranches.

4           MS. LASKY:  Mr. Sirmon, the witness previously

5   indicated that, on Government Exhibit 206, that the Las Matas

6   ranch was close to Mantecal.  If you could circle that for the

7   jury.

8   Q.  Besides airstrips such as the ones you've been talking

9   about, did the defendant send out planes -- besides dirt

10  airstrips of the type that you were discussing earlier, did the

11  defendant send out planes carrying cocaine from other types of

12  locations?

13  A.  Yes.

14  Q.  What kinds of locations?

15  A.  We also worked out of the Valencia airport.

16  Q.  What kind of airport is the Valencia airport?

17  A.  It's an international airport.

18  Q.  Were there any other airports that the defendant used to

19  traffic cocaine?

20  A.  Not that I know of.

21  Q.  Now, you mentioned earlier that there came a time that your

22  responsibilities changed and you became the chief.  Around when

23  did your responsibilities for the defendant change?

24  A.  More or less in about 2005, 2006, I started to have

25  different responsibilities and work commitments.

1    Q.  And did those commitments involve working more directly

2    with the defendant's drug-trafficking business?

3              MR. FOY:  Objection.

4              THE COURT:  Yes.  Sustained.

5    BY MS. LASKY:

6    Q.  Mr. Arvelaiz, I'd now like to discuss in more detail how

7    the defendant obtained cocaine.

8        Do you know who the defendant obtained his cocaine from?

9    A.  Yes.

10   Q.  Who were the defendant's main suppliers?

11   A.  Some Colombian people, people from the FARC.  I also met

12   Mr. Jorge San Martin.  That.

13   Q.  And how do you know that the FARC and Jorge San Martin were

14   some of the defendant's main suppliers?

15   A.  Because I personally received many loads of cocaine that

16   came to Venezuela.

17   Q.  And was that while you were working for the defendant?

18   A.  Correct.

19   Q.  All right.  So let's first talk about the FARC.

20       What was the defendant's connection to the FARC?

21   A.  General Hugo Carvajal.

22   Q.  How do you know that?

23   A.  Because I overheard many conversations.  I was present

24   during many conversations, and I would always hear the

25   discussion.

1   Q.  Was that while you were working on the defendant's security

2   detail?

3           MR. FOY:  Objection.

4           THE COURT:  Sustained.

5           When did you overhear these conversations?

6           THE WITNESS:  In different places.  On the phone,

7   during meetings, in the car, at the Melia hotel.  There were

8   different places where there were lots of discussions about our

9   activities.

10          THE COURT:  And what position did you hold when you

11  heard these conversations?

12          THE WITNESS:  I was working as a bodyguard.

13          THE COURT:  Go ahead.

14          MS. LASKY:  Mr. Sirmon, you can take down Government

15  Exhibit 206.

16          One moment?

17          THE COURT:  Sure.

18  BY MS. LASKY:

19  Q.  Mr. Arvelaiz, earlier you said that your responsibilities

20  changed over time.

21          How did they change?

22  A.  Well, as months and years went by, I started to earn their

23  trust, and I was able to be present during conversations and

24  meetings.  And I was also assigned additional responsibilities.

25  Q.  So what were your different responsibilities?

1  A.  After being a bodyguard, I was still in the security

2  detail, but now I was not only responsible for the safety of

3  Carlos Orense, but I was also responsible for protecting the

4  drug-trafficking business.  I would be at the ranch to oversee

5  the departure of a plane, to make sure that the cocaine was

6  loaded on a plane, to make sure that there was fuel, to pay the

7  pilots.  Many times I had to escort the transportation of the

8  product to make sure that it reached its final destination.

9  Basically those things.

10 Q.  All right.  A moment ago we were talking about the FARC.

11     Mr. Arvelaiz, do you recall any conversation about paying

12 the FARC?

13 A.  Yes.

14 Q.  Who was present for this conversation?

15 A.  General Carvajal and Carlos Orense.

16 Q.  Was anyone else there?

17 A.  Many members of the security detail.

18 Q.  And around when did this conversation occur?

19 A.  In around 2007, mid-2007, late 2007.

20 Q.  And why do you believe the conversation took place

21 somewhere around that time frame?

22 A.  Because during that time I had to be present at the ranch,

23 at Los Garanones, and I was there that year.

24 Q.  And what do you recall about this conversation?

25 A.  General Carvajal was telling Carlos Orense that payments to

1  these people, to the *patas de goma*, could not be delayed; that

2  the situation with these people was very sensitive, and that

3  payments to them could not fall behind.

4  Q.  And what does *patas de goma* mean?

5  A.  That is what the nickname for the guerilla in Venezuela is.

6  Q.  What does it literally mean?

7  A.  Well, the thing is that the guerilla wear rubber boots.

8  They're not the typical leather military boots, and that's why

9  they're called *patas de goma*.

10        THE INTERPRETER:  Rubber feet, by the interpreter.

11  BY MS. LASKY:

12  Q.  Now let's discuss San Martin, the other supplier you

13  mentioned.

14  A.  OK.

15  Q.  Do you know who San Martin is?

16  A.  Yes, of course.

17  Q.  How do you know who San Martin is?

18  A.  I met him many years ago in Venezuela.  I did some of my

19  uncle's organization's deals with him.  I received lots of

20  cocaine from him in Caracas.  I made several payments to him.

21  That's how I know him.

22  Q.  And what, in particular, were San Martin's

23  responsibilities?

24  A.  San Martin was a man who owned a very big transportation

25  company in Colombia.  He had set up his routes from Colombia to

1  Venezuela to bring cocaine.  He had it all organized and well

2  structured, so he was able to bring the cocaine to whatever

3  location you needed him to.

4  Q.  And what kind of vehicle did San Martin use in his

5  transportation company?

6  A.  He had very large trucks, which, in Venezuela, we called

7  *gandolas*, being very big trailers with many wheels.

8  Q.  And what did he use to transport the cocaine?

9  A.  He had his trailers already to bring the cocaine, but he

10  never told me, or he never gave me the details of how it is

11  that he did his jobs or how it is that he organized things, but

12  that is what he used to do.  He had his transportation company.

13  Q.  Approximately how many times did the defendant receive

14  cocaine from San Martin while you were working for the

15  defendant?

16  A.  About four or five times.

17  Q.  And around how large was each load of cocaine that the

18  defendant received from San Martin?

19  A.  Approximately 1,000 kilos.

20  Q.  And around how much did each one-ton load of cocaine cost?

21  A.  $2 million, $2,000 per kilo.

22  Q.  Now, where did the defendant receive loads from San Martin?

23  A.  Different locations.  Generally in Caracas.

24  Q.  And who was actually there to receive the loads from the

25  defendant's organization?

1   A.  I was present every time that the loads I mentioned

2   previously were received.

3   Q.  You mentioned Caracas.  Were there any particular locations

4   in Caracas that you received cocaine from San Martin?

5   A.  Yes, at the CCCT.  Once in La Boyera.  The other times at

6   the CCCT.

7   Q.  What does CCCT stand for?

8   A.  It's a building or shopping mall that has offices, a hotel,

9   a shopping mall, and it's next to the military airport in

10  Caracas.

11  Q.  Do you know what the letters CCCT stand for?

12  A.  Yes.

13  Q.  What?

14  A.  Centro Comercial Ciudad Tamanaco.

15         MS. LASKY:  Mr. Sirmon, please show the Court, the

16  witness and the parties Government Exhibit 648.

17  Q.  Do you recognize this?

18  A.  Yes.

19  Q.  What is it?

20  A.  That's the inverted pyramid that belongs to the CCCT.

21  Q.  So this is the CCCT?

22         OK.  Does this photo fairly and accurately depict the CCCT?

23  A.  Yes.

24         MS. LASKY:  The government offers Government Exhibit

25  648.

1          THE COURT:  Any objection?

2          MR. FOY:  No objection.

3          THE COURT:  All right.  Government Exhibit 648 is

4    admitted in evidence and may be shown to the jury.

5          (Government Exhibit 648 received in evidence)

6          MS. LASKY:  Mr. Sirmon, please publish Government

7    Exhibit 648.

8    Q.  Why did you go to the CCCT to pick up cocaine?

9    A.  That was the order that was given to me.

10   Q.  And where in particular at the CCCT did you go to pick up

11   cocaine?

12   A.  In the basements -- in the lower basement, the last one.

13   Q.  Did you communicate with the defendant when you picked up

14   cocaine?

15   A.  Yes, of course, always.

16   Q.  When would you speak with him?

17   A.  When we were in the place, or there, when the merchandise

18   was arriving, and when we were leaving.

19   Q.  And how would you speak with him?

20   A.  Via BlackBerry.

21   Q.  How did the defendant pay San Martin for cocaine?

22   A.  I made the payments of the loads that I received.

23   Q.  And how much did you pay?

24   A.  Generally, I would pay him half upon receipt, and then the

25   rest, remaining portion, was paid to him two to three weeks

1    later, depending on how we had negotiated the deal.

2    Q.  And where did you pay the defendant the second half of the

3    payment?

4    A.  Most every time that I met with him was in Cucuta.

5          MS. LASKY:  Mr. Sirmon, please pull up Government

6    Exhibit 206, which is already in evidence.

7    Q.  Mr. Arvelaiz, you mentioned Cucuta.  Do you see that on the

8    map?

9    A.  Yes.

10   Q.  Where?

11         MS. LASKY:  One moment?

12   Q.  So, can you please describe with words where you are seeing

13   Cucuta on the map?

14   A.  On the western part, on the border between Colombia and

15   Venezuela, near a city called San Cristobal.

16   Q.  And to be clear, is that on the Venezuela side -- excuse

17   me.

18         Is Cucuta on the Venezuela side or the Colombia side?

19   A.  On the Colombian side.  It's a city in Colombia.

20   Q.  And what form was the payment in?

21   A.  Cash.

22   Q.  What was the amount of money you paid Luis Martin for the

23   cocaine loads that he delivered to the defendant?

24   A.  I don't understand the question.

25   Q.  How much money, in total, did the defendant -- did you pay

1   Luis Martin for the cocaine loads he delivered to the

2   defendant?

3           MS. LASKY:  Strike that.

4   Q.  Earlier, you said that you paid San Martin for a load of

5   cocaine, in part, upon delivery?

6   A.  Yes.

7   Q.  How much did you -- how much money did you give to San

8   Martin at that time?

9   A.  Now I understand the question.  You were saying Luis

10  Martin, and I didn't understand.  Luis Martin.

11  Q.  My apologies.  San Martin.

12      How much money did you pay to San Martin upon -- when he

13  delivered the cocaine to you?

14  A.  We would give him $1 million when we received the kilos.

15  Q.  And how much money would you pay to San Martin a couple

16  weeks later?

17  A.  We would pay off the other 50 percent that we owed him,

18  which would be another million dollars.

19  Q.  So how much, in total, did you pay San Martin for a

20  thousand-kilogram load of cocaine?

21  A.  $2 million.

22  Q.  And what form was that payment in?

23  A.  In U.S. dollars.

24  Q.  Now, besides the CCCT, were there other locations where you

25  received cocaine for the defendant?

1   A.   Yes.

2   Q.   Where?

3   A.   In Caracas.  Also in an area called La Boyera.  Also at the

4   Hotel Melia.

5   Q.   Where at the Hotel Melia did you receive cocaine?

6   A.   In the parking lots that are -- when you -- as you entered,

7   to the left.

8   Q.   So besides receiving cocaine, what, if any,

9   drug-trafficking activities happened at the Hotel Melia?

10  A.   There were meetings with people.  We received cocaine.  I

11  received money.  We had weapons there.  Yes.

12  Q.   What people did you meet with there?

13  A.   Pedro Luis Martin would go.  Pollo would go.  Mr. Ramon

14  would go with his people.  Different people.

15  Q.   And who was Pollo?

16  A.   General Hugo Carvajal.

17  Q.   When you said you received money at Hotel Melia, what did

18  you mean?

19  A.   There was money there.  I would receive money, like, when I

20  had to go make payments, I had to go pay the pilots, I had to

21  pay San Martin.

22          THE COURT:  Counsel, is now a good time nor for us to

23  take our morning break?

24          MS. LASKY:  Yes, your Honor.

25          THE COURT:  All right.  Ladies and gentlemen, we're

1  going to take our morning break.  You can leave your pads

2  there, or you can take them with you.  Remember, do not discuss

3  the case.  No research.  Go back and relax, and we'll come get

4  you in about ten minutes or so.  All right?

5          I apologize.  I know you had difficulty entering this

6  morning.  I think we're going to get that fixed.

7          Thank you.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  You may be seated.

3           The witness may step down.

4           (Witness not present)

5           THE COURT:  First, is there anything that we need to

6    take up before we take the break?

7           MS. LASKY:  Not from the government, your Honor.

8           THE COURT:  From the defense.

9           MR. FOY:  No.

10           THE COURT:  Ms. Lasky, do you have a sense of

11    approximately how much longer you have?

12           MS. LASKY:  Give me one moment to do some math?

13           THE COURT:  Sure.  All right.  OK.

14           MS. LASKY:  Your Honor, I think we have between three

15    and four hours left.

16           THE COURT:  OK.  All right.

17           OK.  We're going to take our break.  I'll see

18    everybody in about ten minutes or so.  OK?

19           Thank you.

20           (Recess)

21           THE COURT:  We're going to get the jury.

22           (Continued on next page)

23

24

25

1          (Jury present)

2          THE COURT:  You may be seated.

3          We're going to continue with the direct exam.

4          Counsel, you may inquire.

5          MS. LASKY:  Thank you, your Honor.

6   Q.  Mr. Arvelaiz, before the break, you were describing how you

7   received cocaine in Caracas for the defendant?

8   A.  Correct.

9   Q.  After you received cocaine, where did you typically take

10  it?

11  A.  We would deliver the SUVs at this house in Valle Arriba and

12  we would leave them there.

13  Q.  And besides Valle Arriba, where would you take cocaine?

14  A.  To Los Garanones.

15  Q.  How did you bring cocaine to Los Garanones?

16  A.  On highway.

17  Q.  Please describe how you took the cocaine.

18  A.  Well, the -- to bring the cocaine, there was one car with a

19  driver and a copilot usually ahead.  It was the security detail

20  who was making sure that there were no checkpoints on the road,

21  to be sure that the car that was in the middle, which is the

22  car that carried the product, and it depended on how many --

23  how much product was there; sometimes there was two cars that

24  were carrying the cocaine, that they were safe for their

25  passage.

1    And then I was in the last car with one more guy, and we --

2    that is the way in which we would travel until, finally, we

3    would reach the final destination, which was the ranch.

4         MS. LASKY:  Mr. Sirmon, please pull up Government

5    Exhibit 206 again.

6         Mr. Sirmon, can you please circle Caracas and Zaraza.

7    Q.  Mr. Arvelaiz, around how long would this drive from Caracas

8    to Zaraza take?

9    A.  Well, it all depended on the route that was taken.  There

10   were two routes.  One was through the western part of the

11   country, and another one was through the valley, so it

12   depended.  It could be between four and four and a half hours.

13   Q.  Was the security detail armed when you drove cocaine loads

14   to Los Garanones?

15   A.  Yes, always.

16   Q.  And let me ask.  Around -- strike that.

17       What kind of guns did the security detail carry on these

18   trips?

19   A.  We would carry M4 550 gauge rifles, AK-47s, sometimes

20   AK-103s, and the handguns that everyone had on their person.

21   Q.  Around how many times did you personally escort loads of

22   cocaine for the defendant from Caracas to Los Garanones?

23   A.  Many times.  Over 20 times.

24   Q.  Besides the defendant's security team, did anyone else

25   escort the defendant's cocaine?

1    A.   Yes.

2    Q.   Who?

3    A.   Many times we had the support of the armed forces or the

4    support of the police.

5    Q.   And when you say the armed forces, what group in

6    particular, or groups, are you referring to?

7    A.   The National Guard.

8    Q.   Who, in particular, from the military escorted or assisted

9    with escorting loads of cocaine?

10   A.   Hugo Carvajal helped us out.  He provided us with a lot of

11   support, and -- yeah, Hugo Carvajal.

12   Q.   To be clear, was Hugo Carvajal present when loads were

13   escorted?

14   A.   No.

15   Q.   Who was present?

16   A.   Different members of the armed forces.  Sometimes they were

17   in uniform.  Sometimes they were without uniform, but they were

18   always in official armed forces vehicles, many military men.

19   Q.   Do you recall anyone in particular who escorted loads of

20   cocaine from the military?

21   A.   Yes.

22   Q.   Who?

23   A.   Captain Vassyly Kotosky.

24   Q.   And who is Vassyly Kotosky?

25   A.   Vassyly Kotosky was an armed forces captain that assisted

1    us a lot.  He provided us with a lot of support, and he helped

2    us a lot in our drug-trafficking work.

3    Q.  And why did you understand Vassyly Kotosky assisted you

4    with cocaine loads?

5    A.  Money.

6    Q.  Did you ever learn who directed Vassyly Kotosky to assist

7    you?

8    A.  Yes.  General Hugo Carvajal.

9    Q.  And how did you learn that?

10   A.  Because I attended meetings where they were present.

11   Q.  And what happened at those meetings?

12   A.  Captain Kotosky was given the order to escort us, to escort

13   the product that was arriving or about to arrive.

14   Q.  Who gave Vassyly Kotosky that order?

15   A.  General Hugo Carvajal.

16   Q.  And was the defendant also present?

17   A.  Yes.

18   Q.  Now, the military officers who would sometimes escort the

19   cocaine loads, what kinds of weapons did they typically carry?

20   A.  Yes, they would carry --

21          THE INTERPRETER:  Interpreter correction.

22   A.  They would use AK-103 rifles and 9 millimeter handguns.

23   Q.  And in what manner do AK-103s fire?

24   A.  Semiautomatically and full -- fully automatic.

25   Q.  Now, what would happen when you arrived at Los Garanones

1  with a load of cocaine?

2  A.  Well, generally, we would arrive, and upon arrival, the car

3  would be driven in to the warehouse to unload the cocaine.

4  There, assistance was provided to unload the cocaine, and we

5  would escort the entrance of the ranch and the surrounding

6  areas in order to make sure that there were no robberies or any

7  government groups that might come in and arrest us.

8  Essentially, to avoid any problems.

9  Q.  So, who actually unloaded the cocaine?

10  A.  Generally, it was people that were on the ranch; we would

11  assist in unloading the cocaine.  The armed forces would stay

12  on the perimeter, on the outside perimeter, in their official

13  vehicles and in uniform.  And we, the group that was inside,

14  would assist in unloading and storing the cocaine wherever it

15  had to be stored.

16  Q.  And why did you understand the military officials were

17  outside the perimeter?

18  A.  Well, it was done to prevent any potential threats by other

19  government groups that were not working for us or any other

20  unit of the police or any unit of the armed forces or any other

21  potential threats.  Their job basically was to escort and

22  protect the load.

23  Q.  And when the workers unloaded the cocaine from the car,

24  where did they put it?

25  A.  Inside the concrete, concrete underground tanks that were

1   in the warehouse.

2   Q.  Now, Mr. Arvelaiz, was the defendant present during these

3   trips?

4   A.  No.

5   Q.  And what was your understanding about why the defendant was

6   not present?

7   A.  He didn't need to be present.  That's why we were there,

8   because we were there to receive orders.

9   Q.  Did you communicate with the defendant during these trips?

10  A.  Yes, of course.

11  Q.  How?

12  A.  Via BlackBerry.

13  Q.  And what happened to this BlackBerry?

14  A.  The phone has many years of age.  I am no longer using it.

15  Q.  So you don't have it anymore?

16  A.  No.  I haven't had it for many years now.

17  Q.  Did you speak in code with the defendant?

18  A.  We did not openly use names of drugs, but we did have our

19  own way of communication, a way in which we understood each

20  other.

21  Q.  Will you describe that?

22  A.  How are you guys doing?  Did the *cosos* --

23          THE INTERPRETER:  By the interpreter, things.

24  A.  -- arrive?  Yes, they arrived.  Have you guys made it to

25  the ranch already?

1    You know, simple things like that but that we could read

2    between the lines.

3    Q.  And why did you and the defendant use language like that?

4    A.  It was a normal manner of speech for us.  It wasn't normal

5    to speak openly.

6    Q.  Now, besides the neighborhood in Caracas and Los Garanones,

7    were there other locations that you took the defendant's

8    cocaine?

9    A.  Yes.

10   Q.  Where?

11   A.  A house in Valle Arriba, Caracas.

12   Q.  Were there also locations outside of Caracas?

13   A.  No.  About two or three occasions we brought product to

14   Apure, from the border to Apure, but it was not a typical way

15   of doing it.

16   Q.  And now, within Caracas, were there other locations where

17   you took cocaine?

18   A.  No.

19        MS. LASKY:  Mr. Sirmon, please show just the Court,

20   the witness and the parties Government Exhibit 210.

21   Q.  Do you recognize this?

22   A.  Yes.  It's a map of Caracas.

23   Q.  Does this map fairly and accurately depict Caracas?

24   A.  Yes.

25        MS. LASKY:  The government offers Government Exhibit

1   210.

2           THE COURT:  Government Exhibit 210 is admitted in

3   evidence.

4           (Government Exhibit 210 received in evidence)

5           MS. LASKY:  Mr. Sirmon, please publish Government

6   Exhibit 210.

7   Q.  Mr. Arvelaiz, using this map, are you able to point out any

8   of the locations -- or please point out any of the locations

9   where you brought cocaine.  Strike that.

10          Mr. Arvelaiz, using this map, please describe locations

11  connected to some of the subjects that we just discussed.

12  A.  Here is the CCCT shopping mall.

13  Q.  Can you please describe where on the map you are pointing?

14  A.  Where it says Chuao, east side of Caracas.

15  Q.  Thank you.

16          And above that it says Centro Comercial Ciudad Tamanaco?

17  A.  Right.

18  Q.  And can you please remind the jury, what is the Centro

19  Comercial Ciudad Tamanaco?

20  A.  The Centro Comercial Ciudad Tamanaco --

21          THE INTERPRETER:  By the interpreter, Tamanaco City

22  shopping mall.

23  A.  -- is one of the places where we received cocaine.

24  Q.  Do you see any other locations on this map that we

25  discussed?

1   A.  Yes.  Valle Arriba.

2   Q.  Where do you see Valle Arriba on the map?

3   A.  Right here, where it says Edificio Oktogono.

4           MS. LASKY:  So, in the middle of the screen,

5   Mr. Sirmon, if you could draw a circle.

6   Q.  And what is in Valle Arriba?

7   A.  The house.

8   Q.  Whose house?

9   A.  My uncle's.

10  Q.  And do you see any other locations?

11  A.  I'm looking for La Boyera.

12      It's missing a portion of the map on this side.

13  Q.  On which side of the screen are you pointing?

14  A.  Towards the right.  Towards the east.

15  Q.  OK.  And what happened in Boyera?

16  A.  La Boyera is one of the locations where I received one of

17  San Martin's loads.

18  Q.  And do you see any other locations?

19  A.  No.

20  Q.  Do you see the Melia on this map?

21  A.  I'm trying to locate it, but I can't find it.

22  Q.  Take your time.

23  A.  It's right here.  I found it.

24  Q.  Where on the screen are you pointing?

25  A.  Where it says Bello Monte.

1  Q.  And that's where the Hotel Melia is located?

2  A.  Yes, that's correct.

3  Q.  Do you see on the left side of the screen where it says

4  Helicoide?

5  A.  Yes, correct.

6  Q.  What is Helicoide?

7  A.  Helicoide is the main office of Venezuela's political

8  police.

9  Q.  And what is that organization called?

10  A.  DISIP.  Now it is called Sebin.

11  Q.  Did you ever go to Helicoide?

12  A.  Many times.

13  Q.  Why did you go to Helicoide?

14  A.  Because Pedro Luis Martin Olivares's office was in

15  Helicoide.

16  Q.  So why did you go to Pedro Luis Martin's office in

17  Helicoide?

18  A.  We went there for many different reasons.  Many meetings

19  with Mr. Carlos Orense were held there.  That's where we went

20  so that we would be given the official credentials for the

21  organization.

22       MS. LASKY:  Mr. Sirmon, please show the Court, the

23  witness and the parties Government Exhibit 652.

24  Q.  Do you recognize this?

25  A.  Yes.

1    Q.  What is it?

2    A.  Helicoide.

3    Q.  And does this photo fairly and accurately depict Helicoide?

4    A.  Yes.

5              MS. LASKY:  The government offers Government Exhibit

6    652.

7              THE COURT:  Any objection?

8              MR. FOY:  No objection.

9              THE COURT:  Government Exhibit 652 is admitted in

10   evidence and may be shown to the jury.

11             (Government Exhibit 652 received in evidence)

12             MS. LASKY:  Mr. Sirmon, please publish Government

13   Exhibit 652.

14   Q.  Mr. Arvelaiz, using this photo, can you please describe

15   where Mr. Pedro Luis Martin's office was?

16   A.  Yes.  In the upper part, where you see a silver dome.

17   Q.  All right.  Mr. Arvelaiz, let's now switch gears for a

18   moment to discuss weapons.

19       Did there come a time when the defendant began requiring

20   his security to carry a particular type of weapon?

21   A.  Yes.

22   Q.  What kind of weapon?

23   A.  Glock handguns.

24   Q.  Any particular kind of Glock handgun?

25   A.  We used model 27, model 19 and model 17.

1    Q.  And did there come a time that the defendant asked the

2    security team to use any particular modification for weapons?

3    A.  Yes.

4    Q.  What kind of modification?

5    A.  We would use a switch selector, which you would apply to

6    the handgun in the back, and it would turn the handgun from

7    semiautomatic to fully automatic.

8    Q.  Is that referred to as a selector switch?

9    A.  Yes, a selector switch.

10   Q.  Around when did the defendant begin requiring his security

11   to use selector switches?

12   A.  I don't remember what year it was, but it was not long

13   after I started working with him.

14   Q.  And you started working with him, you said, around 2003?

15   A.  Yes.

16   Q.  What, if anything, did the defendant say about why the

17   security team's guns needed selector switches?

18   A.  Because -- because it would turn the guns into automatic

19   rifles and -- it would turn the handgun into an automatic

20   rifle, and that way we didn't have to get off anywhere with a

21   large rifle, because the handguns were now automatic.

22   Q.  Did any of the guns that the defendant's security team

23   carried have any other types of modifications?

24   A.  Yeah.  We would put in a 32-bullet magazine, in them.

25   Q.  Are you familiar with the term "suppressor"?

1    A.  Yes.

2    Q.  Did any of the guns that the defendant had his security

3    team use have suppressors on them?

4    A.  Yes.

5    Q.  And what is a suppressor?

6    A.  It suppresses the sound when you shoot, and so it doesn't

7    make any noise.

8    Q.  Now, you mentioned credentials earlier today?

9    A.  Correct.

10   Q.  Who had credentials?

11   A.  My uncle and all of the security detail.

12   Q.  What kind of credentials did the defendant have?

13   A.  General commissioner of the DISIP.  He had another one,

14   which was from an upper hierarchy of the DIM in different

15   periods of time.  Initially, we used the ones from the DISIP,

16   and then later on we used the one for the DIM.

17   Q.  And what was the purpose for these credentials?

18   A.  The credentials identified us as active officers of the

19   political police in Venezuela.  And it allowed us to circulate

20   throughout the national territory.

21          THE INTERPRETER:  May the interpreters?

22   A.  Political police and military counterintelligence, active

23   officers.

24   Q.  Did you use the credentials?

25   A.  Yes.

1   Q.  How did you use them?

2   A.  At any checkpoint, if they would stop us at a checkpoint.

3   We would use them to identify ourselves to any kind of law

4   enforcement or government entity.  And we used them to be able

5   to carry our weapons throughout the country.

6   Q.  Now, you mentioned DISIP?

7   A.  Yes.

8   Q.  Can you remind me, what is DISIP?

9   A.  National directorate of counterintelligence and prevention

10  services.

11  Q.  And what was your connection to DISIP?

12  A.  With the credential that was given to me, I was an active

13  officer of that entity.

14  Q.  Who gave you DISIP credentials?

15  A.  Mr. Pedro Luis Martin Olivares.

16  Q.  Now, besides credentials, did Pedro Luis Martin provide

17  anything else to you?

18  A.  Yes.  He provided us with weapons, with credentials.

19  Q.  What kind of weapons would he provide?

20  A.  Beretta handguns.  92FS Beretta handguns.

21  Q.  OK.  And you also mentioned DIM credentials.  Who

22  authorized the DIM credentials?

23  A.  General Hugo Carvajal.

24  Q.  And who was there when you received those credentials?

25  A.  We -- we went to the DIM offices for them to give them to

1   us, and we had our picture taken.  They were legitimate

2   credentials.

3   Q.  Who was there?

4   A.  Other members of the security detail who came with me.  And

5   inside the officers were present with Pollo.  And another area

6   where we went to downstairs, that's where they took our

7   pictures, and there were officers present also.

8   Q.  And when you said Pollo a minute ago, is that Carvajal?

9   A.  Yes.

10  Q.  Why did you go to get the credentials from Carvajal?

11  A.  Under the orders of Mr. Carlos Orense.

12  Q.  And why did you obtain credentials from DISIP?

13  A.  Upon the orders of Mr. Carlos Orense.

14  Q.  OK.  Did the defendant carry guns?

15  A.  Yes.

16  Q.  What kind of guns did the defendant carry?

17  A.  He had a Glock, a 26 model Glock.  He had many weapons, but

18  generally I saw that one, and I saw a Beretta 92FS on him.  He

19  had a small rifle, a P90.

20  Q.  And where did he keep the rifle?

21  A.  In a case that generally was inside the car.

22          MS. LASKY:  Mr. Sirmon, please show the witness, the

23  Court and the parties only Government Exhibit 411.

24  Q.  What is shown here?

25  A.  A rifle FN P90.

1  Q.  Does Government Exhibit 411 fairly and accurately depict

2  the type of gun that you saw the defendant keep in his car?

3  A.  Yes.

4           MS. LASKY:  The government moves to admit Government

5  Exhibit 411.

6           THE COURT:  Any objection?

7           MR. FOY:  No objection.

8           THE COURT:  Government Exhibit 411 is admitted in

9  evidence and may be shown to the jury.

10          (Government Exhibit 411 received in evidence)

11          MS. LASKY:  Mr. Sirmon, please publish Government

12  Exhibit 411.

13  Q.  In what manner did the defendant's P90 fire?

14  A.  In a semiautomatic way and fully automatic way.

15  Q.  So it had the option for both?

16  A.  Yes.

17  Q.  Please describe this weapon.

18  A.  It's a small rifle.  It has a magazine that comes -- you

19  put in through the top that holds 50 bullets.  It has a switch

20  selector.  So, the switch selector allows you to select it to

21  be semiautomatic, fully automatic, or it also -- you can

22  activate the safety mechanism.

23  Q.  Did the defendant's P90 have any modifications?

24  A.  So, the case that it came in had a suppressor, and it had a

25  cannon, a sort of cannon that you could attach.  It was a

1    tactical weapon.

2    Q.   What do you mean by tactical weapon?

3    A.   It's a weapon that is designed to use a suppressor.  It's a

4    fully military -- I mean fully -- it's a military weapon, and

5    it's fully automatic.

6            THE COURT:  Counsel, it's about 12:45 or so.  Is this

7    a good time to take our lunch break?

8            MS. LASKY:  Can I ask just one more question?

9            THE COURT:  Absolutely.  Go ahead.

10            MS. LASKY:  Thank you.

11    Q.   Mr. Arvelaiz, do you know how the defendant obtained the

12    P90?

13    A.   Yes.

14    Q.   How did he obtain it?

15    A.   Pollo Carvajal gifted it to him one day at the ranch.

16    Q.   How do you know that?

17    A.   Because I was there.

18            THE COURT:  OK.  All right.  Ladies and gentlemen,

19    we're going to take our lunch break.  Please remember not to

20    discuss the case with one another, and no researching the case.

21    Have a relaxing lunch.  You can either leave your pads on your

22    chairs, or you can take them in the back with you.

23            Thank you very much.  We'll see you at 2 o'clock.

24            (Continued on next page)

25

NbtWore2

1          (Jury not present)

2          MS. LASKY:  Would you like the witness to step down,

3   your Honor?

4          THE COURT:  Yes.  The witness may step down.

5          (Witness not present)

6          THE COURT:  You may be seated.

7          Is there anything that we need to take up before we

8   take the lunch break?

9          From the government.

10          MS. LASKY:  No, your Honor.

11          THE COURT:  From the defense.

12          MR. FOY:  Your Honor, when the government does finish

13   their direct examination, whenever that is, I'm going to ask

14   that we take a break so that I can confer with counsel, get set

15   up, versus doing it in front of the jury and then start.  Is

16   that OK?

17          THE COURT:  Yes.  That's fine.

18          Ms. Lasky, are we still projecting another two hours

19   or so?

20          MS. LASKY:  Your Honor, I think it may be more.

21          THE COURT:  OK.

22          MS. LASKY:  I think it might be more like three.  It

23   probably will take us to the end of the day.

24          THE COURT:  The balance of the day.

25          MS. LASKY:  Yes.

NbtWore2

1           THE COURT:  OK.  All right.  I'll see everybody at

2      2:00.

3           Thank you very much.

4           (Luncheon recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    AFTERNOON SESSION

2                         2:00

3          THE COURT:  Just checking.  Do we need to take

4    anything up before we get the jury?  Obviously we'll wait for

5    Mr. Foy, obviously.

6          MS. LASKY:  Not from the government.

7          THE COURT:  Let's just let me see if Mr. Foy has

8    anything.

9          MR. LOCKARD:  In the meantime, we'll get the witness.

10          THE COURT:  If you could.

11          MR. SARRAGA:  Mr. Foy is just in the bathroom.

12          THE COURT:  I mentioned something to my deputy clerk

13    and she's going to mention it to the jurors, something that I

14    hadn't mentioned previously.  Just so that if the jurors want,

15    the district executive has masks if people want to wear masks.

16    I know some -- I'm not sure if the folks who are seated here,

17    some of the prospective jurors were wearing masks, so it's up

18    to them.

19          The other thing is that if any juror is feeling ill

20    coming in, we can, if they're early, we can give them a COVID

21    test if they would like, if they don't have one at home.

22    Obviously, they can do it at home.  Those are the two things

23    that we're going to mention.  I've asked Ms. Disla to mention

24    to the jurors.

25          Anything, Mr. Foy?  We're going to get the jury.

1        MR. FOY:  We're good.

2        THE COURT:  We can get the jury.

3        (Jury present)

4        THE COURT:  I hope everyone had a good lunch, and

5   we're going to continue with the direct examination of

6   Mr. Arvelaiz.

7        You may proceed.

8        MS. LASKY:  Mr. Sirmon, please show to the witness,

9   the Court, and the parties only Government Exhibit 405.

10  BY MS. LASKY:

11  Q.  What is shown here?

12  A.  An FS 92 Beretta handgun.

13  Q.  Does Government Exhibit 405 fairly and accurately depict

14  one of the types of guns that you saw the defendant carry?

15  A.  Yes.

16       MS. LASKY:  The government offers Government Exhibit

17  405.

18       THE COURT:  Any objection?

19       MR. FOY:  No objection.

20       THE COURT:  Government Exhibit 405 is admitted in

21  evidence and may be shown to the jury.

22       (Government's Exhibit 405 received in evidence)

23       MS. LASKY:  Mr. Sirmon, please publish Government

24  Exhibit 405.

25  Q.  Mr. Arvelaiz, how does this gun fire?

1    A.  Semi-automatically.

2    Q.  And did the defendant's Beretta FS 92 have any

3    modifications?

4    A.  No.

5    Q.  You also mentioned a Glock 26.  When did the defendant

6    carry the Glock 26?

7    A.  Sometimes he would carry the Beretta, sometimes he would

8    carry the Glock.  It varied.  One day he would use one, the

9    another day he would use the other.

10         MS. LASKY:  Mr. Sirmon, you can take down Government

11   Exhibit 405.

12   Q.  And how did the defendant's Glock 26 fire?

13   A.  It had a selector switch, which gave it the option of being

14   fired automatically or semi-automatically.

15   Q.  When did the defendant carry the firearms that you've just

16   described?

17   A.  He was armed every single day.  He would regularly carry

18   guns.

19   Q.  Did that include when the defendant was meeting with

20   partners and associates in connection with cocaine

21   transactions?

22   A.  Yes, he would always carry firearms.

23   Q.  So now let's discuss the security detail.

24        What kinds of weapons did the security detail carry on

25   them?

1   A.  We carried different guns.  Automatic rifles such as M4s,

2   AK-47s, Uzi M6s, 9-millimeter HKs, 12-gauge and 16-gauge

3   rifles, handguns such as Beretta 92F, Glocks, Taurus; there

4   were lots of guns.

5   Q.  You mentioned M4s.  What is an M4?

6   A.  An M4 is a 556-gauge rifle that can fire semi-automatically

7   and automatically.

8           MS. LASKY:  Mr. Sirmon, please show to the witness,

9   the Court, and the parties only Government Exhibit 410.

10  Q.  What's shown here?

11  A.  An M4 rifle.

12  Q.  Does Government Exhibit 410 fairly and accurately depict

13  the type of M4 rifle that the security detail sometimes

14  carried?

15  A.  Correct.

16          MS. LASKY:  The government offers Government Exhibit

17  410.

18          THE COURT:  Any objection?

19          MR. FOY:  No objection.

20          THE COURT:  Government Exhibit 410 is admitted in

21  evidence and may be shown to the jury.

22          (Government's Exhibit 410 received in evidence)

23          MS. LASKY:  Mr. Sirmon, please publish.

24  Q.  Where did the security detail keep their M4s?

25  A.  In general, we would always carry our M4s with us when we

1    were at a ranch or any of the properties, whenever we were

2    outside.  Generally, they were kept inside the house whenever

3    we were in a house, but when we were traveling, they were kept

4    in the car.

5    Q.   What do you mean by traveling?

6    A.   If we were on a highway headed to a ranch or anywhere else,

7    we would always keep the rifle inside the car.

8    Q.   Does that include when you were escorting cocaine?

9    A.   Yes, of course.

10   Q.   How did the M4s fire?

11   A.   M4s fire either semi-automatically or automatically.

12   Q.   Did you personally have an M4 that you used?

13   A.   Yes.

14   Q.   Did it have any modifications?

15   A.   Yes.

16   Q.   What modifications?

17   A.   Yeah, I had many accessories.  It had a red dot sight, it

18   had an extended magazine, the barrel had the ability to twist

19   on a suppresser, the butt had been modified, it had

20   modifications to the firing device.  It had many modifications.

21   Q.   Where did you get that M4?

22   A.   Carlos Orense gave it to me.

23   Q.   Did you use the M4 in connection with protecting his

24   cocaine?

25           MR. FOY:  Objection.

1              THE COURT:  Sustained.

2    Q.  How did you use the M4?

3    A.  I would use the M4 to protect the drug trafficking business

4    that we were in.

5    Q.  What does that mean?

6    A.  Whenever we were escorting the cocaine, whenever the

7    cocaine was being boarded onto planes, whenever we were

8    carrying out security-related activities on properties,

9    whenever we were on the highway traveling with cocaine,

10   whenever we needed to escort the product.

11             MS. LASKY:  Mr. Sirmon, please show the witness, the

12   Court, and the parties only Government Exhibit 406.

13   Q.  What is shown here?

14   A.  A Glock 17 9-millimeter -- a 9-millimeter Glock 17.

15   Q.  Does Government Exhibit 406 fairly and accurately depict a

16   type of gun that the defendant's security team carried?

17   A.  Yes.

18             MS. LASKY:  The government offers Government Exhibit

19   406.

20             THE COURT:  Any objection?

21             MR. FOY:  No objection.

22             THE COURT:  Government Exhibit 406 is admitted in

23   evidence and may be shown to the jury.

24             (Government's Exhibit 406 received in evidence)

25             MS. LASKY:  Mr. Sirmon, please publish Government

1   Exhibit 406.

2   Q.  Mr. Arvelaiz, how do Glock 17s fire?

3   A.  Semi-automatically.

4   Q.  Did any of the Glock 17s have selector switches on them?

5   A.  Yes, almost all of them did.

6   Q.  What was the result of the -- strike that.

7       What did the selector switches do to those Glock 17s?

8   A.  It would modify the handgun from being a semi-automatic

9   gun, and it would turn it into a fully automatic gun.

10  Q.  Does this example here that you're looking at have a

11  selector switch on it?

12  A.  No.

13  Q.  Can you describe what the select selector switch would look

14  like?

15  A.  The selector switch is a small piece that goes, that is

16  attached to the back of the gun, right where that cover is.

17  And it has a pin that prevents the gases from being released,

18  which essentially turns the gun into a fully automatic gun.

19  Q.  Did the defendant's security team have access to other

20  weapons that they did not typically carry?

21  A.  All the guns at the ranch.

22  Q.  Besides transportable weapons, was there heavy weaponry

23  kept at the ranch?

24          MR. FOY:  Objection.

25          THE COURT:  Sustained.

NBT3ORE3                        Arvelaiz - Direct

1           Were there any other types of weapons at the ranch?

2           THE WITNESS:  Yes.

3           THE COURT:  What were they?

4           THE WITNESS:  There was a large 50-gauge --

5     interpreter correction -- there was a large 50-gauge machine

6     gun.  There was another bolt action with a saw rifle.  There

7     were grenades that were used on rifles, like a mortar type.

8     There were many types of guns there.

9     Q.  Where did the defendant keep those weapons?

10    A.  Different places throughout the ranch, and generally the

11    guns were kept inside the house.

12    Q.  Where were the weapons stored in comparison to where the

13    cocaine was stored at Los Garanones?

14    A.  There were many guns that were stored in the main house,

15    but then there were also other guns that were stored in the

16    warehouse, the same warehouse where the cocaine was stored in

17    the underground tanks.

18    Q.  Let's now go through a few of the other weapons that you've

19    described.

20          Mr. Sirmon, please show the witness, the Court, and the

21    parties only Government Exhibit 402.

22          Mr. Arvelaiz, what is shown here?

23    A.  That is an AK-47 rifle, it is a 762-gauge by

24    56 millimeters.

25    Q.  Does Government Exhibit 402 fairly and accurately depict a

1    type of gun that the defendant kept at Los Garanones?

2    A.  Yes, many of these.

3    Q.  Do you have any estimate as to how many?

4    A.  Over 200.

5         MS. LASKY:  The government moves to admit Government

6    Exhibit 402.

7         THE COURT:  Any objection?

8         MR. FOY:  No objection.

9         THE COURT:  Government Exhibit 402 is admitted in

10   evidence and may be shown to the jury.

11        (Government's Exhibit 402 received in evidence)

12        MS. LASKY:  Mr. Sirmon, please publish Government

13   Exhibit 402.

14   Q.  In what manner does the AR-47 fire bullets?

15   A.  Semi-automatically and automatically.

16        MS. LASKY:  Mr. Sirmon, please show to the witness,

17   the Court, and the parties only Government Exhibit 403.

18   Q.  What is shown here?

19   A.  That is an AK-103 rifle.

20   Q.  Does Government Exhibit 403 fairly and accurately depict a

21   type of gun that the defendant stored at Los Garanones?

22   A.  Yes.

23        MS. LASKY:  Mr. Sirmon, please show to the witness,

24   the Court, and parties only Government Exhibit 404.

25        I apologize.  I don't believe I moved to admit

1    Government Exhibit 403.

2              THE COURT:  You did not.

3              MS. LASKY:  The government moves to admit Government

4    Exhibit 403.

5              THE COURT:  Any objection?

6              MR. FOY:  No objection.

7              THE COURT:  Government Exhibit 403 is admitted in

8    evidence and may be shown to the jury.

9              (Government's Exhibit 403 received in evidence)

10             MS. LASKY:  Mr. Sirmon, please publish Government

11   Exhibit 403.

12   Q.  Mr. Arvelaiz, please remind us who used these weapons?

13   A.  That is the official gun of the Venezuelan Armed Forces.

14   Q.  When you say the Venezuelan Armed Forces, does that include

15   the National Guard?

16   A.  Yes, correct.

17             MS. LASKY:  Mr. Sirmon, please show to the witness,

18   the Court, and the parties only Government Exhibit 404.

19   Q.  What is shown here?

20   A.  An M16 rifle.

21   Q.  Does that ever go by another name?

22   A.  An M16 rifle.

23   Q.  Does Government Exhibit 404 fairly and accurately depict

24   the type of gun or a type of gun that the defendant stored at

25   Los Garanones?

1    A.  Yes.

2              MS. LASKY:  The government moves to admit Government

3    Exhibit 404.

4              THE COURT:  Any objection?

5              MR. FOY:  No objection.

6              THE COURT:  Government Exhibit 404 is admitted in

7    evidence and may be shown to the jury.

8              (Government's Exhibit 404 received in evidence)

9              MS. LASKY:  Mr. Sirmon, please publish Government

10   Exhibit 404.

11   Q.  Mr. Arvelaiz, approximately how many M16s did the defendant

12   keep at Los Garanones?

13   A.  Many.  There were at least 50.

14             MS. LASKY:  Mr. Sirmon, please cycle through for the

15   witness, the Court, and the parties only Government Exhibits

16   601, 602, and 604.

17   Q.  Mr. Arvelaiz, generally speaking, what were those images?

18   A.  Several of my handguns.

19   Q.  Do Government Exhibits 601, 602, and 604 accurately depict

20   several of your handguns?

21   A.  Yes.

22             MS. LASKY:  The government moves to admit Government

23   Exhibits 601, 602, and 604.

24             THE COURT:  Any objection?

25             MR. FOY:  Can I just see them really quick one more

1   time.

2           THE COURT:  If you can put them up.  That's 601.  602.

3   And 604.

4           MR. FOY:  No objection.

5           THE COURT:  Government's Exhibits 601, 602, and 604

6   are admitted in evidence.

7           (Government's Exhibit 601, 602, 604 received in

8   evidence)

9           MS. LASKY:  Mr. Sirmon, please publish Government

10  Exhibit 604.

11  Q.  Mr. Arvelaiz, what does this image show?

12  A.  A Glock 19 handgun.

13          MS. LASKY:  Mr. Sirmon, I apologize.  Could you please

14  publish 604 side by side with 601.  604 next to 602.  My

15  apologies.

16  Q.  Mr. Arvelaiz, can you please describe these images from

17  left to right.

18  A.  It is a Glock 9-millimeter model number 19 handgun, and the

19  one next to it is the same handgun, but from a different angle.

20  Q.  How do you know that this is your handgun?

21  A.  Because they found it amongst my stuff.

22  Q.  Who found it?

23  A.  A person from my family.

24  Q.  Do you recognize that person's hand in this photo?

25  A.  Yes.

1    Q.  Where did you get this gun?

2    A.  Carlos Orense gave it to me.

3    Q.  Did you use the gun when you worked for the defendant?

4    A.  Yes.

5    Q.  How does this gun fire?

6    A.  In a semi-automatic fashion.

7    Q.  Let's now please publish Government Exhibit 601.  You said

8    this was your firearm as well.  How do you know that?

9    A.  That's my handgun, for my personal use.

10   Q.  How can you tell?

11   A.  Because of the marks it has on the grip.

12   Q.  Can you please describe what the grip is.

13   A.  That's where you hold the gun.

14   Q.  What do the marks look like on this picture that you're

15   referring to?

16   A.  It's got like some dents in here.

17   Q.  On the grip?

18   A.  Yes.

19   Q.  Does this gun have a selector switch?

20   A.  Yes.

21   Q.  Where?

22   A.  On the top on the left on the slide where you see the

23   handle, the lever.

24   Q.  What shape is it?

25   A.  It's like a switch.  It's a little stick that's on the top.

1    Q.  Would you describe it as being on the right side of the

2    image?

3    A.  On the image, you can see the upper part of the gun that

4    moves, it's got something that moves over here, it's like a

5    switch.

6    Q.  Where did you get this gun?

7    A.  Carlos Orense gave it to me.

8    Q.  Did you use this gun when you worked for the defendant?

9    A.  Yes, that's when he gave it to me.

10   Q.  How did you use it?

11   A.  At my job, it was my primary weapon.

12   Q.  So referring now to Government Exhibit 601.  Where is this

13   gun currently located?  Let me strike that.

14       In what country is Government Exhibit 601 currently

15   located?

16   A.  In Venezuela.

17   Q.  Now, referring to Government Exhibits 602 and 604.  In what

18   country is that gun currently located?

19   A.  In Venezuela.

20           MS. LASKY:  Mr. Sirmon, please show just the Court,

21   the witness, and the parties Government Exhibit 605.

22   Q.  Do you recognize this image?

23   A.  I do recognize it.

24   Q.  What is it?

25   A.  That's me shooting the gun.

1    Q.   Which gun?

2    A.   The Glock 17 handgun.

3    Q.   Does this photograph fairly and accurately depict a photo

4    of you firing a gun?

5    A.   Yes.

6            MS. LASKY:   The government offers Government Exhibit

7    605.

8            MR. FOY:   No objection.

9            THE COURT:   Government Exhibit 605 is admitted in

10   evidence.

11           (Government's Exhibit 605 received in evidence)

12           MS. LASKY:   Mr. Sirmon, please publish Government

13   Exhibit 605.

14   Q.   Mr. Arvelaiz, can you tell where you are in this photo?

15   A.   Yes.

16   Q.   Where are you?

17   A.   I'm at the shooting range of Fuerte Tiuna.

18   Q.   What is Fuerte Tiuna?

19   A.   It is the main military fort of the Armed Forces in

20   Venezuela.

21   Q.   Where is it located?

22   A.   In Caracas, Venezuela.

23           MS. LASKY:   Mr. Sirmon, if you could please pull up

24   Government Exhibit 210 which is in evidence.

25   Q.   Mr. Arvelaiz, are you able to locate Fuerte Tiuna on a map?

1    A.  Yes.

2    Q.  Where?

3    A.  Here it is.

4    Q.  Can you please describe with your words what part of the

5    map you are pointing at.

6    A.  On the southern part towards the west.

7    Q.  Is it under a red dot that says Fuerte Tiuna?

8    A.  Yes.

9    Q.  Why were you at Fuerte Tiuna?

10   A.  We were taking a course with the Armed Forces.  We were

11   taking a training course for shooting.

12   Q.  Who was there?

13   A.  I was there, and many people from the security detail were

14   there.

15   Q.  Who invited you?

16   A.  Pollo Carvajal.

17          MS. LASKY:  Mr. Sirmon, please show to the witness,

18   the Court, and the parties only Government Exhibit 409.

19   Q.  What is shown here?

20   A.  A Browning .50 caliber machine gun.

21   Q.  Does Government Exhibit 409 fairly and accurately depict a

22   machine gun that the defendant kept?

23   A.  Correct.

24          MS. LASKY:  The government moves to admit Government

25   Exhibit 409.

1          THE COURT:  Any objection?

2          MR. FOY:  No objection.

3          THE COURT:  Government Exhibit 409 is admitted in

4    evidence and may be shown to the jury.

5          (Government's Exhibit 409 received in evidence)

6          MS. LASKY:  Mr. Sirmon, please publish Government

7    Exhibit 409.

8    Q.  Mr. Arvelaiz, how long is this gun?

9    A.  It's big.  It's around 6 feet long, more or less.

10   Q.  Do you know what model it is?

11   A.  It's an old weapon, M something, I don't remember.

12   Q.  Have you ever fired a gun like this?

13   A.  Yes.

14   Q.  Where?

15   A.  At Los Garanones.

16   Q.  What does it sound like when it is fired?

17   A.  It's a very big loud noise.

18   Q.  I apologize.  Did the witness say one thing at the end or I

19   misunderstood?

20   A.  It's a very big explosion, like a thunder.

21   Q.  Where at Los Garanones did the defendant keep this machine

22   gun?

23          MR. FOY:  Objection, your Honor.

24          THE COURT:  If you could rephrase that question.

25   Q.  You earlier said that the defendant had a machine gun like

1    this at Los Garanones, right?

2    A.  Yes.

3    Q.  Where was it?

4    A.  Between the house and the warehouse in the rear, there was

5    a water tank, and it was hidden in there.

6    Q.  In which direction was the machine gun facing?

7    A.  Towards the main entrance of the *finca*, the entrance.

8    Q.  What, if anything, did the defendant say about why the

9    machine gun should face in that direction?

10   A.  It had to be facing towards the door, because that was the

11   entrance that needed to be protected.  In case somebody would

12   come in, it was there for that.

13          MS. LASKY:  Mr. Sirmon, please show to the witness,

14   the Court, and the parties only Government Exhibit 412.

15   Q.  What is shown here?

16   A.  This is a rifle grenade.

17   Q.  Does Government Exhibit 412 fairly and accurately depict a

18   rifle grenade?

19   A.  Yes.

20   Q.  Were there ever grenades at Los Garanones?

21   A.  Yes.

22   Q.  Did you ever fire a grenade while working for the

23   defendant?

24          MR. FOY:  Objection.

25          THE COURT:  If could you rephrase the question.

1    Objection sustained.

2              MS. LASKY:  Sure.  I'll go back first, apologies.

3              The government moves to admit Government Exhibit 412.

4              THE COURT:  Any objection?

5              MR. FOY:  No objection.

6              THE COURT:  Government Exhibit 412 is admitted in

7    evidence and may be shown to the jury.

8              (Government's Exhibit 412 received in evidence)

9              MS. LASKY:  Mr. Sirmon, please publish Government

10   Exhibit 412.

11   Q.  Mr. Arvelaiz, have you ever fired a grenade that looks like

12   this one?

13   A.  Yes.

14   Q.  Where did you do that?

15   A.  At the Los Garanones ranch.

16   Q.  Why did you fire the grenade?

17   A.  Just for fun.

18   Q.  How do you fire a grenade like this?

19   A.  This grenade has an adapter in the back.  You place it in

20   the cannon, you twist it on, you put a bullet inside the rifle

21   chamber, you separate the rifle from where you are, you put the

22   butt on the floor, and then, very carefully, you hit the

23   trigger.

24   Q.  So you said, you mentioned you're using a rifle to fire

25   this grenade, correct?

1    A.   Yes.

2    Q.   Where on a rifle is this affixed?

3    A.   The grenade is put on the upper part of the rifle.  Not all

4    rifles can fire.  The AK-47 can do it and the FAL.

5    Q.   What is a FAL?

6    A.   It is a small light rifle, caliber 762 by 56.

7    Q.   What does it look like when you fire a grenade using a FAL,

8    for example?

9    A.   What you hear is the sound of the shot, just a regular

10   sound.  And when the grenade falls on the objective, it makes

11   an explosion.

12   Q.   How big of an explosion?

13   A.   Not such a strong explosion.

14   Q.   What does that mean?

15   A.   It is an explosion.  The sound is not as big as when you

16   shoot a .50 caliber machine gun.

17   Q.   Where did you get the grenade?

18   A.   They were at the *finca*.

19   Q.   Now, Mr. Arvelaiz, do you know how the defendant obtained

20   firearms?

21   A.   Some of them, yes.

22   Q.   How do you know?

23   A.   Because I was at the ranch when we received them, and I was

24   present in meetings when they were purchased.

25   Q.   Do you know from whom he received firearms?

A.  Yes, there was a Venezuelan police officer, his name is

Renato Chimarosti, who used to sell firearms.

Q.  Did you meet Renato Chimarosti?

A.  Yes.

Q.  Where did Chimarosti bring the firearms?

A.  To the Los Garanones ranch.

Q.  Approximately how many times did Chimarosti bring weapons

to Los Garanones?

A.  Many times.

Q.  Are you able to estimate?

A.  Over 10, 12 times.

Q.  Approximately how many weapons did Chimarosti bring on each

trip to Los Garanones?

A.  I don't know how many he brought per trip.  But during his

various trips, he brought a lot.

Q.  What does "a lot" mean?

A.  200, 300 rifles, thousands of ammunition, many handguns.

Q.  Approximately how much ammunition did Chimarosti bring on a

given trip?

A.  Wow.  A whole lot.  I don't know, 100,000 rounds, 50,000

rounds, I don't know, I don't know how many.

Q.  Where did the defendant keep the ammunition?

A.  Many were stored in the house, in the main house, and many

were stored in the warehouse, in these large drums with lids on

them.

1    Q.  What happened, generally speaking, when Chimarosti brought

2    weapons to Los Garanones?

3    A.  He would get there, and then all the security detail was

4    activated, because we needed to help them unload all the guns.

5    We also needed to escort the guns in case for some reason there

6    happened to be any crooks around that could rob them, any

7    thugs, because the arms are a very desired item.  So we had to

8    really activate the security, and the security had to be on

9    full alert and also assist in unloading them.

10   Q.  Did the security detail keep all of the weapons that

11   Chimarosti brought to Los Garanones?

12   A.  No, no, not all of them.

13   Q.  What happened or why not?

14   A.  Because there were way more guns than we needed.

15   Q.  So what would happen with the rest of the guns?

16   A.  They were stored on the ranch, inside the house, the

17   ammunition was stored in the warehouse, and we would only keep

18   those guns that were assigned to us, that we were allowed to

19   use for our work.

20   Q.  Allowed by whom?

21   A.  Carlos Orense.

22   Q.  What would you do with the weapons that you weren't allowed

23   to keep?

24   A.  They were stored inside the ranch.

25   Q.  Was there ever a time that you saw weapons leave Los

1    Garanones?

2    A.   Yes.

3    Q.   Please describe that.

4    A.   Yes, once an SUV came, there were actually two marked Armed

5    Forces SUVs came on, they had us load boxes of AK-47 onto the

6    SUVs, and they drove away with them.

7    Q.   What happened when the SUVs arrived?

8    A.   We were told to please bring out the boxes that were

9    carrying AK-47s, and to please help load them onto the SUVs.

10   Q.   Who told you that?

11   A.   Carlos Orense gave the order.  He was the owner of all

12   that.

13   Q.   Were there other times that you saw guns leave Los

14   Garanones?

15   A.   I don't remember right now.

16   Q.   Did you ever participate or overhear conversations

17   involving weapons leaving the *finca*?

18   A.   I overheard conversations.

19   Q.   Around when?

20   A.   2007, 2008.  I don't remember the exact year.

21   Q.   Why did you understand that guns were being loaded onto the

22   trucks?

23   A.   Because they were going to be delivered to someone else, or

24   some business was going to be done with them.

25   Q.   What do you mean by "some business"?

1    A.   That somebody might have been purchasing them.

2    Q.   Did you understand that the defendant sold weapons?

3    A.   I overheard a telephone conversation where he was saying

4    that they should come pick them up, because they were all

5    ready.

6    Q.   What's "them"?

7             THE INTERPRETER:  Can you please repeat for the

8    interpreter?

9    Q.   Pick what up?

10   A.   The weapons.

11   Q.   Did you ever learn what the defendant received in exchange

12   for these weapons?

13            MR. FOY:  Objection.

14            THE COURT:  Sustained.  The answer will be stricken.

15   Q.   What are some examples of the kinds of weapons that

16   Chimarosti brought to Los Garanones?

17   A.   AK-47s, FAL rifles, M4s, M16s, many handguns, many, a lot

18   of ammunition of different calibers.

19   Q.   All right.  Let's shift gears for a moment.

20        So, let's talk about how the defendant shipped cocaine.

21   Earlier you mentioned planes.  What kind of planes did the

22   defendant use to transport drugs?

23   A.   Different types of planes, Cessnas, 421, Cessna Conquest,

24   Turbo Commander, 690, a King 200, a King 690.  There were

25   different types of planes.

1    Q.   How do you know this?

2    A.   Because I saw them.

3    Q.   Around how much cocaine could the planes you just described

4    carry on each trip?

5    A.   Depending on the plane, generally speaking, the trips

6    carried 1,000 kilos.

7    Q.   When the planes loaded with cocaine departed from

8    airstrips, where, generally, were they headed?

9    A.   To Guatemala in the Dominican Republic -- may the

10   interpreter clarify with the witness.

11            Guatemala and the Dominican Republic.

12   Q.   How do you know that?

13   A.   Because I was there; I was the one dispatching the planes.

14   Q.   The planes you just described, did the defendant own any of

15   them?

16   A.   I don't know.  They were on the ranch.  I'd imagine so, but

17   I don't know.

18   Q.   Now, Mr. Arvelaiz, are you familiar with the term

19   retrofitting?

20   A.   Yes.

21   Q.   What does that mean in the context of planes used for

22   transporting drugs?

23   A.   Yes, retrofitting a plane that is used in drug trafficking,

24   usually has an equivalent term that is *enchonche* -- by the

25   interpreter, "makeshift fuel pump."  Which means that an expert

1    technician comes in and adapts the plane, modifies the plane

2    usually by installing multiple tanks of gas inside the cabin,

3    removing the seats, which effectively gives the plane greater

4    range.

5    Q.   What do you mean by greater range?

6    A.   It allows the plane to reach farther distances carrying

7    greater weight.

8    Q.   Greater weight of what?

9    A.   I mean, if we are talking about drug trafficking, drugs.

10   Q.   Did the defendant use planes with these kinds of

11   modifications to transport drugs?

12            MR. FOY:  Objection.

13            THE COURT:  Sustained.  If you can rephrase the

14   question.

15   Q.   You mentioned planes earlier that departed from the *finca*.

16   Did any of those planes have modifications like the ones you

17   just described?

18   A.   All of them.

19   Q.   How do you know?

20   A.   Because I was on them, and I saw all the planes, because I

21   dispatched them.

22       I was inside the cabin.  You see, part of my work was to

23   make sure that there was enough fuel for the plane to reach its

24   destination, it was to talk with the pilots to make sure that

25   everything is okay.  Part of my work was to pay the pilots and

1    check that the drugs were successfully loaded onto the plane.

2    Q.  Where inside the plane was the cocaine loaded?

3    A.  In the middle of the cabin, towards the back.

4    Q.  Around how much room did that leave inside the plane?

5    A.  It depended on the plane.  Usually, the tanks were placed

6    on the floor, seats were removed, which left sufficient room

7    for the tightly bundles of cocaine, which were wrapped in

8    plastic, and each one of them contained between 25 and

9    30 kilos, and those bundles were placed in that room that was

10   created after removing the seats, and usually, many of these

11   bundles were placed on the floor there until you completed the

12   1,000 kilos.  Essentially after that, there was 25 percent room

13   left.

14   Q.  Around how much money would you give a given pilot?

15   A.  Between 150 and $200,000.

16   Q.  Are you familiar with the term tail number?

17   A.  Yes.

18   Q.  What is a tail number?

19   A.  It is the numbers and the letters that identify the

20   aircraft.

21   Q.  Is it shown on an aircraft?

22   A.  Yes.

23   Q.  Where?

24   A.  Yes, it's on the back of the plane.  The letters and

25   numbers are placed -- generally the letters precede the numbers

1    identify the country that the aircraft belongs to, and then the

2    numbers that follow are the registration.

3    Q.   In your experience, are tail numbers ever altered?

4    A.   Yes, they can be altered.

5    Q.   How?

6    A.   They remove one and they replace it with another.

7    Q.   How do they remove -- how are people able to remove tail

8    numbers?

9    A.   So, if they have another one, like another sticker from a

10   plane that's from the same brand and the same year, well, they

11   just place the sticker on top of the existing one.

12            MS. LASKY:  Mr. Sirmon, please show only the witness,

13   the Court, and the parties Government Exhibits 606, and 607.

14   You can place those side by side.

15            THE COURT:  Is now a good time to take a break?

16            MS. LASKY:  Sure.

17            THE COURT:  Ladies and gentlemen, we're going to take

18   our afternoon break.  I think I heard the door open and close

19   back there, so the cookies are back there.  Go back, relax.

20   Remember, do not discuss the case with one another.  No

21   research.  You can leave your pads on your chairs and we will

22   see you in about 10, 15 minutes.  Thank you.

23            (Jury excused)

24            THE COURT:  The witness can step down from the stand.

25            (Witness temporarily excused)

NBT3ORE3                          Arvelaiz - Direct

1              THE COURT:  I hadn't noticed but my deputy clerk

2     noticed that one of the jurors had raised their hand, so that's

3     why we took the break when we did.

4              Is there anything we should deal with before we take

5     our break?

6              MS. LASKY:  No, your Honor.

7              MR. FOY:  No, thank you.

8              THE COURT:  Thank you very much.  See you in about 15

9     minutes.  So about 3:30.

10             (Recess)

11             THE COURT:  Is there anything that we need to take up

12    or can we get the witness and then the jury?

13             MS. LASKY:  The government's ready to proceed.

14             MR. FOY:  I'm ready.  I want to project something real

15    quick.

16             THE COURT:  Okay.

17             MR. FOY:  Let's say the government finished at like

18    5 o'clock.  I imagine my crystal ball says I'm going to make an

19    application to leave 15 minutes early, but I'm trying to --

20    because we're supposed to leave at 5:15, right?

21             THE COURT:  5:30 today.

22             MR. FOY:  Well, I anticipate that's maybe, I don't

23    know, we'll see.  I want to give you time to deliberate in

24    advance of my application.

25             THE COURT:  What I would say is, I'd like to use the

1    whole trial day.  I recognize you won't finish today and not

2    come close, I imagine.  So, but, let's see what happens.

3         MR. FOY:  Let's see what happens.  It is a long day.

4    You know, we made significant progress.

5         THE COURT:  Well, we've made progress.  I don't know

6    if it is significant.  I don't know exactly.

7         Actually, will the government be able to provide me,

8    not necessarily in the order they will be called, but with a

9    complete witness list?  I know I have the 3500 but if I could

10   just get a witness list, provide it to the defense also, of all

11   the folks.  And again, I know that I've been getting on a daily

12   basis the witnesses you anticipate for that particular day.

13   And that's fine.  But if I could get a complete list, that

14   would be fantastic.

15        MS. LASKY:  Of course, your Honor.

16        THE COURT:  Thank you.  Can we get the witness and the

17   jury.

18        MR. FOY:  Yes.

19        THE COURT:  Fantastic.

20        (Continued on next page)

21

22

23

24

25

1        (Jury present)

2        THE COURT:  You may inquire.

3   BY MS. LASKY:

4   Q.  So, we've just discussed firearms at some length.  Before

5   we move on from that subject, I had a couple more questions.

6   A.  Yes.

7   Q.  So, you testified earlier today that you worked with ATF in

8   2014.

9   A.  Yes.

10  Q.  Who was the target of that investigation?

11  A.  Jose Antonio Orense Cochola.

12  Q.  Who is Jose Antonio Orense Cochola?

13  A.  Mr. Carlos Orense's nephew.

14  Q.  On the same side of the family as you?

15  A.  No.

16  Q.  What was that investigation about?

17  A.  He was buying weapons in the U.S. and sending them to

18  Venezuela.

19  Q.  Why were you cooperating with ATF at that time?

20  A.  Because they offered me, they offered they were going to

21  help me with my immigration status.

22  Q.  Why -- strike that.

23      Also regarding weapons, you mentioned earlier using 32

24  bullet magazines with the Glock pistols modified with selector

25  switches.

1    A.   That's right.

2    Q.   What is the capacity of a normal magazine?

3              MR. FOY:  Objection.

4              THE COURT:  Sustained.

5              Without modification, how many bullets would that --

6    what gun was it again, Ms. Lasky, that you were talking about?

7    The Glock.

8              MS. LASKY:  A Glock pistol modified with a selector

9    switch.

10             THE COURT:  Well, a Glock pistol, how many bullets

11   would it hold?

12             THE WITNESS:  The Glock 17 comes with 17 bullets, the

13   number 19 comes with 15 bullets, and Glock 26 with 10 bullets.

14   Q.   To be clear, how many bullets will a 32-bullet magazine

15   hold?

16   A.   32 bullets.

17             THE COURT:  Is it possible to have 32 bullets in a

18   magazine and to put one bullet in the chamber for 33, or is

19   that not possible?

20             THE WITNESS:  That is possible.

21             THE COURT:  Go ahead.

22   Q.   Did you know why the defendant's security team used the

23   32-bullet magazines?

24             MR. FOY:  Objection.

25             THE COURT:  Sustained.  I can't remember if the prior

1    question was asked, in other words, I know that there was one

2    that was modified, but, I didn't --

3            MS. LASKY:  I believe the --

4            THE COURT:  If you can ask the question again.

5            MS. LASKY:  I can ask him.

6    Q.  When you worked on the defendant's security team, did you

7    use 32-bullet magazines with Glocks?

8    A.  Yes.

9    Q.  Did others on the security detail use that same type of

10   weapon?

11   A.  Yes.

12   Q.  Why did you use that type of weapon?

13   A.  Because the 32-round magazine gave us greater capacity of

14   ammunition in a gun, which was turning it from a semi-automatic

15   gun to an automatic gun.  It was turning it into a machine gun.

16   Q.  Why did you need more capacity for a fully automatic gun?

17   A.  Because it would give us greater firing strength if, for

18   some reason, we had some sort of confrontation or we had to

19   fight back during any attack.

20           MS. LASKY:  Mr. Sirmon, can you please show only the

21   witness, the Court, and the parties Government Exhibits 606 and

22   607.  You can place them side by side.

23   Q.  What are these?

24   A.  On 606, it's me with a Turbo Commander plane, and on the

25   other one there is a Turbo Commander at a ranch.

1  Q.  Do Government Exhibits 606 and 607 fairly and accurately

2  depict photographs of those planes that you just described?

3  A.  Yes.

4          MS. LASKY:  The government offers Government Exhibits

5  606 and 607.

6          THE COURT:  Any objection?

7          MR. FOY:  Can have a moment, please.

8          THE COURT:  Yes.

9          MR. FOY:  No objection.

10          THE COURT:  Government Exhibit 606 and 607 are

11  admitted in evidence and may be shown to the jury.

12          (Government's Exhibit 606, 607 received in evidence)

13          MS. LASKY:  Mr. Sirmon, please publish only Government

14  Exhibit 606 at this time.

15  Q.  Mr. Arvelaiz who, is the individual in this photograph?

16  A.  Me.

17  Q.  What kind of airplane is behind you?

18  A.  An A690 Turbo Commander plane.

19  Q.  Whose airplane is that?

20  A.  Mr. Carlos Orense's plane.

21  Q.  Where is this photograph taken?

22  A.  At an airport in Lecheria, Puerta La Cruz.

23          MS. LASKY:  Mr. Sirmon, can you please call up

24  Government Exhibit 206.

25  Q.  Mr. Arvelaiz, do you see Puerta La Cruz on this exhibit?

1    A.  Yes.

2    Q.  Where is it?

3    A.  Here to the right of the map.

4    Q.  Is it along the northern coast of Venezuela toward the

5    right side of the map?

6    A.  Yes.

7    Q.  You mentioned Lecheria Airport.  What is that?

8    A.  It is an airport in Puerta La Cruz.

9    Q.  What is Puerta La Cruz?

10   A.  A western city in Venezuela.

11   Q.  Did the defendant spend time there?

12        THE INTERPRETER:  May the interpreter please correct

13   the witness's -- the interpretation of the witness's answer.

14   It is on the eastern side of Venezuela.  The interpreter

15   inadvertently said on the western side of Venezuela.

16   Q.  Did the defendant spend time in Puerta La Cruz?

17   A.  Yes.

18        MS. LASKY:  Mr. Sirmon, if you could please publish

19   Government Exhibit 606 again.

20   Q.  How did the defendant use this plane?

21   A.  To travel within Venezuela.

22   Q.  Did there come a time that how he used the plane changed?

23   A.  Yes.

24   Q.  Around when?

25   A.  When the engines were just about reaching the end of their

1    flight time, hours.

2    Q.  Do you remember around when that was for this plane?

3    A.  In around 2008, 2009.

4    Q.  How did the way that the defendant used this plane change?

5    A.  This plane was used to send drugs from Venezuela to

6    Guatemala.

7    Q.  Why was its use changed later on in the engine's lifespan?

8    A.  Well, the hours left on the engine were just about coming

9    to their end, and the plane would have had to go through a

10   cyclical process in order to bring it up to speed again and to

11   navigation standards.  And generally, this is what was done

12   with all planes, when they were reaching the end of their

13   useful life cycle, they were used for drug trafficking.

14   Q.  Why not just fix them?

15   A.  Well, sometimes whoever needs them for transportation does

16   fix them.  But, if they're needed for drug trafficking, they

17   just use them for that, and they just leave them as is.

18           MS. LASKY:  Mr. Sirmon, please publish Government

19   Exhibit 607.

20   Q.  Mr. Arvelaiz, what does this photo show?

21   A.  A Turbo Commander plane.

22   Q.  Is this the same plane that we saw in the prior photo,

23   Government Exhibit 606?

24   A.  No.

25   Q.  When you're looking at the airplane, or when you're

1    referring to the Turbo Commander A690, where are you looking on

2    the screen?

3    A.  The center of the plane, or rather the center of the photo

4    where the plane is.

5    Q.  Do you see anything to the right in the background of this

6    photo?

7    A.  In the background on the right?  Yes, another plane.

8    Q.  Where is this photograph taken?

9    A.  On Mr. Carlos Orense's ranch.

10   Q.  Which ranch?

11   A.  Los Garanones.

12   Q.  How did you know this photograph was taken at Los

13   Garanones?

14   A.  Because I took the photo.

15   Q.  Do you remember taking it?

16   A.  Yes.

17   Q.  What, if anything, do you remember about when this

18   photograph was taken?

19   A.  The plane had been idle on the *finca* for several days.  It

20   was going to be used for a specific trip.  We had not yet

21   received the orders to load the plane, and we just happened to

22   be on the *finca*, and I simply took the photo.

23   Q.  Do you remember -- strike that.

24       Did you see this plane again?

25   A.  Not after it left the ranch.

1    Q.  Do you know where it went after it left the ranch?

2    A.  Guatemala.

3    Q.  Around when was this photograph taken?

4    A.  In 2009.

5    Q.  Are you certain if it was exactly in 2009?

6    A.  In 2009, 2008, 2009.  I don't remember the month.

7    Q.  Now, Mr. Arvelaiz, what measures, if any, did the defendant

8    take so that his planes would not be stopped?

9              MR. FOY:  Objection.

10             THE COURT:  Sustained.

11   Q.  Mr. Arvelaiz, can you please walk me through the steps for

12   sending a plane out of Los Garanones?

13   A.  Well, first, we needed to receive the order that the plane

14   was going out.  Sometimes the plane had already arrived on the

15   ranch.  My job was to oversee, to make sure that there was

16   enough fuel in the tanks that had been loaded onto the plane,

17   to make sure that the right amount of drugs were in it, to

18   check and verify that the product was successfully loaded, to

19   pay the pilots whenever it was going to be done, because there

20   was some times when the pilots did not receive payment.  And

21   then wait to receive the order that the plane was able to

22   depart.  And in the meantime, also to report all the steps that

23   were being taken on BlackBerry.

24   Q.  Who gave you the order that the plane was ready to depart?

25   A.  Mr. Carlos Orense.

1    Q.  Did the defendant take any steps to ensure that his planes

2    would not be stopped?

3              MR. FOY:  Objection.

4              THE COURT:  Sustained.

5              Do you have an understanding of what steps, if any,

6    Carlos Orense took prior to you getting the order that the

7    plane was ready to go?

8              THE WITNESS:  Yes.

9              THE COURT:  What is your understanding?

10             THE WITNESS:  Yes.  So, through his partners, Luis

11   Martin and Hugo Carvajal, they had control of the military and

12   civil radars.  And so, they made sure that the transponders

13   were off, to prevent detection of the planes, so that they were

14   able to fly without detection, which in Venezuela is called a

15   black flight.

16             MR. FOY:  Excuse me, your Honor.  Can we have a

17   sidebar for a moment.

18             THE COURT:  Sure.

19             (Continued on next page)

20

21

22

23

24

25

1          (At the sidebar)

2          MR. FOY:  Your Honor, I wanted to object to the

3     answer.  The information he's providing, there is no foundation

4     as to how he is learning this information.  When was it said,

5     was it at a meeting, did he overhear.  He was apparently head

6     of security, so we're taking about transponders and what

7     Carvajal and other people did to, you know, approve the flight.

8     I just don't believe sufficient foundation for this particular

9     witness to testify about those details has been established.

10         THE COURT:  What I think what makes sense is if there

11    is a foundation, Ms. Lasky, you can ask questions.  If the

12    foundation isn't established, you can make an application to

13    strike the answer.  Because I think the next question probably

14    would be "how do you know that."  In other words, what he just

15    said.

16         But I take your objection.  So let's see if there is a

17    basis for this witness to be able to say that.

18         MR. FOY:  Okay.  If I were to come to that conclusion

19    that I want to move to strike, you want me to do it in sidebar

20    or just do it in the open?

21         THE COURT:  You can -- either is fine.  Whatever you

22    feel more comfortable with.  I don't know what the witness is

23    going to say.

24         MR. FOY:  Right.  Me neither.  I'll probably do it

25    from my seat unless I wanted to add something.

NBT3ORE3                        Arvelaiz - Direct

1            THE COURT:  Do you know what, if asked, what he would

2       say concerning how he came to learn about the transponder and

3       turning it off and the like?

4            MS. LASKY:  Yes, your Honor.  I believe the witness

5       has testified that, in addition to security, he was head of

6       logistics.  And part of that involved managing essentially all

7       the plane loads.  So he had direct knowledge, but I can ask

8       about that.

9            THE COURT:  We'll see whether he was involved in

10      turning them off, whether he got ordered or whatever or whether

11      he's talking about something he overheard.  So we'll see where

12      it came from.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  You may proceed.

3     BY MS. LASKY:

4     Q.  Mr. Arvelaiz, can you explain what was your role with

5     respect to plane loads generally?

6     A.  I coordinated the logistics of loading the plane with the

7     cocaine.  I would check so that the plane had enough fuel for

8     it to be able to reach its destination.  Plus, I was in charge

9     of the security detail who was around the area of the aircraft.

10    And wait for the aircraft to take off, and on some occasions

11    pay the pilot.

12    Q.  In order to do your duties, who did you speak with about

13    these different things you needed to do for the plane?

14    A.  With the person who gave me my orders, Mr. Carlos Orense.

15    Q.  Were you ever present in meetings with any of his partners?

16    A.  Yes.  In several.

17    Q.  During those meetings, what, if anything, was discussed

18    with respect to control towers that you mentioned a moment ago?

19          MR. FOY:  Objection, your Honor.

20          THE COURT:  What, if anything, was discussed with

21    regard to flights or planes?

22          And first, do you remember who the conversation was

23    with?

24          THE WITNESS:  Yes, it was on different occasions,

25    different conversations, but the conversations with different

NBT3ORE3                    Arvelaiz - Direct

1   people.

2   BY MS. LASKY:

3   Q.  Earlier you mentioned black flights.  How did you learn

4   about black flights?

5   A.  When you're in this business, you learn about everything

6   that you need to know.  So a black flight is a flight that

7   departs without any permission, without any military

8   permission -- I'm sorry.  Without any civil or military

9   permission.  When the aircraft departs without any permission

10  to leave and without giving notice about any airstrip it will

11  be going on.  Nobody knows where it's going, you can't trace

12  it.

13  Q.  Did you ever pay money for a black flight?

14  A.  Yes.

15  Q.  How did you know it was for a black flight?

16  A.  Because they sent us to pay the people at the radar, at the

17  control tower.

18  Q.  Who sent you to pay the people at the control tower?

19  A.  Mr. Carlos Orense.

20  Q.  Approximately how much did you pay airport control workers?

21  A.  $600,000 at the Valencia Airport.

22  Q.  Earlier you mentioned the involvement of the defendant's

23  partners with respect to control towers.  Why do you think they

24  were involved?

25  A.  Because I overheard conversations where they said they had

1   squared away with the radar with Puerta La Cruz and another one

2   in Guarico.  It is a military radar.

3   Q.  Do you remember who talked about Puerta La Cruz?

4   A.  Pedro Luis Martin Olivares.

5   Q.  Who talked about the military radar in Guarico?

6   A.  Hugo Carvajal.

7          MS. LASKY:  Are there additional questions I should

8   continue on for this section?

9          THE COURT:  Who else was part of the conversations

10  that the witness just mentioned?

11  Q.  Can you take us through, for the conversation regarding

12  Puerta La Cruz, who was present?

13  A.  Pedro Luis Martin, Carlos Orense, and some members of the

14  security detail.

15  Q.  What did they say about the control towers at Puerta La

16  Cruz?

17  A.  They just said that it was squared away, that it was

18  controlled.

19  Q.  What did you understand that meant?

20  A.  That there was no problem with the radar in Puerta La Cruz,

21  that everything has been arranged everything was squared away,

22  and we could work without any problem.

23  Q.  What do you mean by work without any problem?

24  A.  So we would take planes out of Los Garanones.  The closest

25  civil radar we had was in Puerta La Cruz.

1    Q.  Let's move on, before we talk more about the types of

2    radars, let's talk about the conversation regarding the

3    military radar at Guarico.

4            You mentioned General Carvajal.  Was anyone else

5    present?

6            THE INTERPRETER:  What was the end of the question

7    with Mr. Carvajal?

8    Q.  Was anyone else present?

9    A.  Yes.

10   Q.  Who?

11   A.  Mr. Carlos Orense, Mr. Carvajal, some people that worked

12   for Mr. Carvajal, for the security.

13   Q.  What do you recall about that conversation?

14   A.  They were talking about the radar, the military radar that

15   was in Guarico.  El Pollo said we didn't have to worry about it

16   because he had it under control.

17   Q.  What did you think that meant?

18   A.  Well, the words that he stated that it was under control,

19   that he had it already under control.

20   Q.  Do you understand what the radar does?

21   A.  The radar detects in the air when the aircrafts are going

22   through or coming by.  So the military radar is the one who

23   depicts when there are aircraft in the air that don't have

24   permission, and they alert the military about a plane that is

25   out there who doesn't have a permit, so that they can come and

1    knock them down.

2    Q.  What do you mean they can come and knock them down?

3    A.  If you have a flight that's leaving without any permission,

4    and it's unknown from the control tower without a permission,

5    so, the military radar alerts the Armed Forces, and they

6    immediately send their airplanes from the Armed Forces to knock

7    them out of the air.

8        So the radar alerts that there's an aircraft in the air

9    that doesn't have permission, and then they call the military

10   to send their flights to knock out the airplanes.

11   Q.  So what does a black flight enable you to do?

12   A.  To go through the radars without being detected because

13   they're turned off.  And then the aircraft can leave.

14   Q.  Were there any people in particular who directly helped the

15   defendant with airport controllers?

16   A.  Yes.

17   Q.  Who?

18   A.  Mr. Vassyly Kotosky helped a lot with the radars.  Another

19   person known as Roberto who also helped with the radars.

20   Q.  Did Kotosky work out of any particular locations?

21   A.  He was an officer of the Armed Forces.  He was a captain.

22   Q.  Were there particular airports that he assisted with?

23   A.  Yes, at the Valencia Airport.

24           MR. FOY:  Excuse me, your Honor.  At this time I am

25   going to renew my application at sidebar and move to strike.

1              THE COURT:  Okay.  All right.  The application is

2    overruled.  Go ahead.

3    Q.  You mentioned an individual named Roberto too.  Do you know

4    that person's last name?

5    A.  Yes.

6    Q.  What is it?

7    A.  Roberto Lopez Perdigon.

8    Q.  Going back for a moment to Government Exhibit 607.  You had

9    described a load on this plane, a load of what?

10   A.  Of cocaine.

11   Q.  Approximately how many kilograms of cocaine could the plane

12   show shown in Government Exhibit 607 hold?

13   A.  1,000 kilos.

14   Q.  Now, Mr. Sirmon, you can take that down.

15           Did you carry weapons when overseeing plane loads?

16   A.  Yes.

17   Q.  What kind of weapons?

18   A.  I would carry my handgun, my rifle, my bulletproof vest,

19   sometimes I carried another handgun, I had many magazines on

20   me, and communication equipment.

21   Q.  Besides the security detail, was anyone else ever present

22   when drugs were loaded on a plane?

23   A.  Yes.

24   Q.  Who?

25   A.  Some captains were there, some of the employees at the

1   *finca*.  Maybe they weren't right in the place where the load,

2   where they were loading the plane, but they were in the

3   surrounding areas.

4   Q.  Were they ever in the place where the plane was loaded?

5   A.  No.

6   Q.  Where would they be located?

7   A.  In the surrounding areas, but not right around the

8   aircraft.

9   Q.  Were they in uniform?

10  A.  Who?

11  Q.  The military officials?

12          MR. FOY:  Objection.

13          THE COURT:  Sustained.

14          When you said captains, who were you talking about?

15          THE WITNESS:  The pilots of the airplane, the captains

16  of the aircraft that was going to take off.

17          THE COURT:  Go ahead.

18  Q.  Besides the security detail, were any other groups of

19  people ever present at the landing strips?

20  A.  Yes.

21  Q.  Who?

22  A.  On some occasions we were escorted by the Armed Forces.

23  And on another occasion there was a landing strip in Apure, and

24  the FARC were present there also giving us security.

25  Q.  How do you know they were with the FARC?

1   A.  We had received information via BlackBerry that the FARC

2   was going to be there, that we shouldn't get upset about it,

3   but we shouldn't get too close to them.

4   Q.  Who did you receive the information from?

5   A.  Mr. Carlos Orense.

6   Q.  What farm were you at -- at what location were you?

7   A.  At a ranch in Apure state, where there were some airstrips.

8   Q.  What term did the defendant use for FARC?

9   A.  The guerilla.

10  Q.  Did there come a time that you saw other people at the

11  landing strip besides the security team?

12  A.  Yes.

13  Q.  What did they look like when you saw them?

14  A.  They were armed men carrying rifles.  They were not in

15  uniform; they were in civilian clothing.  There were several

16  cars and about 20 people.  They were right on the outside of

17  their cars, and they were doing what they had been told to do.

18  Q.  What kind of guns were they carrying?

19  A.  I remember that there was no uniformity to the guns that

20  they were carrying.  Some of them were carrying an AK, another

21  one was carrying a Galil rifle, some were carrying M16s, some

22  FALs; they were carrying different types of guns.

23  Q.  Did you hear any of them speak?

24  A.  Yes.

25  Q.  What did they sound like?

1   A.  Colombian.

2   Q.  How could you tell they sounded Colombian?

3   A.  Given the accent they had when they speak.  It is specific

4   to Colombians.

5   Q.  Why did you understand the defendant said not to get too

6   close to the FARC?

7   A.  That we should not allow for them to get too close to us.

8   I don't know.  That was the order that we received, and that is

9   what we did.

10  Q.  What was the name of the -- or what was the area of the

11  ranch that you were at on this occasion?

12  A.  Apure.

13  Q.  Approximately how far from the ranch is the

14  Colombian-Venezuela border?

15  A.  Not too far.  About four hours away by car.

16  Q.  Approximately how many times did you go to the Las Matas

17  airstrip?

18  A.  Some five, six times.

19  Q.  Is that an estimate?

20  A.  Maybe a bit more than that.  I did go there quite a number

21  of times, not as much as I used to go to the other ranch, but I

22  did go there.

23  Q.  Earlier you gave us the size of a typical planeload of

24  cocaine.

25  A.  Okay.

1    Q.  And around how large was that?

2    A.  A 1,000-kilo load.

3    Q.  Do you know if any of the loads that the defendant sent by

4    plane were more than 1,000 kilograms?

5    A.  It depended on the plane.

6    Q.  Do you know, though?

7    A.  Almost all the loads that I shipped out were of

8    1,000 kilos.  Maybe at some point, on a larger plane, either a

9    King 200 or a King 300, there was a load of 1200 kilos or

10   1300 kilos.  I don't know.  But it was not very common that

11   larger loads were sent out.

12   Q.  Did you ever hear conversations about larger loads?

13   A.  Yes.

14   Q.  When were those conversations?

15   A.  I don't remember the exact year, I'm not so clear on the

16   year, but maybe 2009, 2008.

17   Q.  Who participated in the conversation?

18   A.  It was a conversation between Carlos Orense and General

19   Hugo Carvajal.

20   Q.  What do you remember about that conversation?

21   A.  They were talking about the Guanta load, which was a

22   container load of about 2,000 to 3,000 kilos, I don't know

23   where it was headed.  I wasn't there.  But I did hear about

24   that.

25   Q.  What do you mean by Guanta load?

1    A.   Guanta is a customs station in Venezuela, where cargo ships

2    set sail in the direction of different parts of the world.

3    Q.   What you were describing a moment ago, that was about a

4    boat?

5    A.   Well, no, not a boat.  A cargo ship.

6    Q.   Okay.

7    A.   A container.

8    Q.   Do you remember any conversations about larger loads sent

9    by airplane?

10   A.   I don't remember.

11   Q.   A moment ago you mentioned Roberto Lopez Perdigon.  What

12   was Mr. Perdigon's role in the defendant's drug trafficking?

13   A.   Roberto Lopez Perdigon was someone who had a lot of control

14   at the Valencia Airport.  He also supported us with radars at a

15   given time, and he also did a lot of work on planes over the

16   air.

17   Q.   Do you know Mr. Perdigon?

18   A.   Yes, I do.

19   Q.   How do you know him?

20   A.   I've been friends with him for approximately 20 years,

21   perhaps.

22   Q.   What is your relationship with Mr. Perdigon currently?

23   A.   We are friends.

24   Q.   Did you ever see Mr. Perdigon while you were in prison in

25   the United States?

1   A.  No, never.

2   Q.  What about after you got out of prison?

3   A.  Yes.

4   Q.  Have you spoken with Mr. Perdigon about your testimony

5   today?

6   A.  No.

7   Q.  Were you given instructions about whether you should speak

8   with Mr. Perdigon?

9            MR. FOY:  Objection.

10           THE COURT:  Sustained.

11  Q.  What, if anything, have you been told about whether you may

12  speak with Mr. Perdigon?

13  A.  I have been told that I am not allowed to have any

14  discussions regarding this case or investigation with anybody.

15  Q.  Does that include Mr. Perdigon specifically?

16  A.  Everybody.

17  Q.  But does it include Mr. Perdigon specifically?

18  A.  Yes, of course.

19  Q.  Who gave you that instruction?

20  A.  The agents and the prosecutor's office.

21  Q.  Have you followed that instruction?

22           MR. FOY:  Objection.

23           THE COURT:  Sustained.

24  Q.  After receiving that instruction, what, if anything, did

25  you do?

1    A.  I followed the instruction.  We have had conversations, but

2    about other things, not the case though.

3    Q.  Have you ever paid for anything for Mr. Perdigon?

4              MR. FOY:  Objection.

5              THE COURT:  I'll allow it.  Overruled.

6              Well, I'll allow it.  Go ahead.

7    A.  Yes.

8    Q.  Why did you do that?

9    A.  Because I was instructed to do it, because it was necessary

10   to come to New York, to buy airline tickets and pay for a

11   hotel, and Mr. Roberto did not have the funds.  So I paid for

12   it and I was reimbursed later on.

13   Q.  Who told you to do it?

14   A.  A DEA agent.

15   Q.  Who reimbursed you?

16   A.  The DEA.

17   Q.  Approximately how much did you give him?

18   A.  No, I didn't give him anything.  I paid for his expenses

19   and then the DEA reimbursed me.

20   Q.  Thank you for clarifying.

21        Now, let's move on to boats.

22             THE COURT:  Just, the payment and the reimbursement

23   for expenses, and was there a flight you paid for also?

24             THE WITNESS:  Yes.

25             THE COURT:  When did that happen?

1          THE WITNESS:  A year and a half ago or two years ago.

2          THE COURT:  I'm sorry, go ahead.

3          MS. LASKY:  Of course.

4          Mr. Sirmon, can you please show just the Court, the

5     witness, and the parties what has been marked as Government

6     Exhibit 209.

7     Q.  Do you recognize this?

8     A.  Yes.

9     Q.  What is it?

10    A.  A map of the northern region of Venezuela and the

11    Caribbean.

12    Q.  Is it a fair and accurate map of the part of the world you

13    just described?

14    A.  Yes.

15         MS. LASKY:  The government offers Government Exhibit

16    209.

17         THE COURT:  Any objection?

18         MR. FOY:  No objection.

19         THE COURT:  Government Exhibit 209 is admitted in

20    evidence and may be shown to the jury.

21         (Government's Exhibit 209 received in evidence)

22         MS. LASKY:  Mr. Sirmon, please publish Government

23    Exhibit 209.

24    Q.  So, Mr. Arvelaiz, earlier you testified that in addition to

25    planes, the defendant sent cocaine by boat.

1    A.  Correct.

2    Q.  From where in Venezuela or from which locations in

3    Venezuela did the boats depart?

4    A.  They departed from Puerta La Cruz, or they would depart

5    from Punto Fijo, Falcon.

6    Q.  Can you please explain where Puerta La Cruz would be on

7    this map.

8    A.  In this area where the map is cut off, where it says

9    Barcelona, that's where Puerta La Cruz is located.

10   Q.  So, are you referring to the bottom of the map?

11   A.  Yes.

12   Q.  You also mentioned Punto Fijo.  Where is that?

13   A.  The farther western region by the gulf that's here,

14   underneath where it says Aruba.

15           MS. LASKY:  Thank you, Mr. Sirmon.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

1    BY MS. LASKY:

2    Q.  Was it always these two locations?

3    A.  The two that I knew.

4    Q.  Please describe some common routes for the defendant's

5    boats after departing Venezuela.

6         THE INTERPRETER:  May the interpreter confirm

7    something with the witness?

8    A.  I know that the ships would leave from Puerto La Cruz, and

9    they would make their way to Tortola island, and then once the

10   cocaine arrived on that island, another ship would come from

11   Puerto Rico.  It would pick up the cocaine, and then it would

12   head back to Puerto Rico.  And when it came to Puerto Fijo --

13        THE INTERPRETER:  Interpreter correction.

14   A.  And when we are talking about Punta Fijo, the ships would

15   go to the Dominican Republic, to the south of the Dominican

16   Republic, in Bani.

17   Q.  You mentioned Tortola.  Where is that on the map in front

18   of you, Government Exhibit 209?

19   A.  It is to the right of Puerto Rico, where it says British

20   Virgin Islands.  Tortola is there.

21   Q.  Was anyone in particular primarily responsible for

22   assisting with the defendant's maritime shipments of cocaine?

23   A.  Yes.

24   Q.  Who?

25   A.  Mr. Emiliano Martinez.

1   Q.  Is he known by any other name?

2   A.  Yes.

3   Q.  What?

4   A.  Chiche.

5   Q.  And let me ask you, for a moment.  You mentioned earlier

6   that after -- or that you moved to the United States around

7   2012, right?

8   A.  Correct.

9   Q.  After you moved to the United States, did you stay in touch

10  with anyone who did business with your uncle?

11  A.  Yes, with some of them.

12  Q.  With who?

13  A.  Vassyly Kotosky, Chiche Smith, and some people from the

14  security detail.

15  Q.  Directing you to around 2014, 2015, do you know if Chiche

16  was still working with the defendant?

17          MR. FOY:  Objection.

18          THE COURT:  Objection overruled.  I'll allow it.

19          THE INTERPRETER:  Could you please repeat the

20  question?

21  BY MS. LASKY:

22  Q.  Directing you to 2014, 2015, do you know if Chiche Smith

23  was still working with the defendant?

24  A.  Yes.

25  Q.  How do you know?

1  A.   I spoke to Chiche Smith.  I would speak to him regularly,

2  and he told me that they were working hard on -- on waters.

3           MR. FOY:  Objection.  Move to strike.

4           THE COURT:  I'll allow it.  Objection overruled.

5           MR. FOY:  Is it possible to have a sidebar?  I don't

6  want to interrupt, but --

7           THE COURT:  Yes, we can have a sidebar.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (At sidebar)

2        THE COURT:  Yes.

3        MR. FOY:  Your Honor, I want to object based on Rule

4   801(d)(2)(E), in that in this case, the witness has left the

5   country.  He stopped participating in the conspiracy actively

6   in 2010, and now what we're talking about is him having

7   conversation about the gossip.  It's not furthering the

8   conspiracy by having this conversation.  It's not to do

9   anything to accomplish or further its goals.  It's just kind of

10  reporting of what's going on, gossipping, rumors.

11       THE COURT:  Understood.  And I would actually, if that

12  were the basis under which -- I admitted the statement not as a

13  coconspirator statement but as a statement begins interests

14  under 804(b) --

15       MS. LASKY:  I believe it's (3).

16       THE COURT:  804(b)(3).  In other words, that a person,

17  and I can't remember the guy's name, Chiche Smith, wouldn't

18  admit that he's continuing to deal drugs, in other words, and

19  that it would expose that person to potential criminal

20  liability.  So I would admit it under that.  But I agree with

21  you, under 801(d)(2)(E), it would not be admissible.

22       MR. FOY:  I guess our position is that there's a lack

23  of sufficient corroboration clearly indicating trustworthiness

24  at this point based on the record made.

25       THE COURT:  OK.

1      Let me hear from the government with regard to that.

2      The argument that he's making is that, under 804(b)(3)(B), the

3      trustworthiness of the statement isn't sufficiently

4      established.

5          MS. LASKY:  And I'm sorry.  I missed for a moment what

6      you said.  Why are you saying that it was not established?

7          MR. FOY:  Well, so far, what we've heard, meaning the

8      statement between the witness and Chiche, there hasn't been

9      sufficient evidence to show that the statement is trustworthy.

10     There's not corroboration of the statement, of the

11     conversation.

12         THE COURT:  OK.

13         MR. FOY:  Or of even the information contained

14     therein, meaning there's no corroboration that there's drug

15     sales going on.  This is 2015?

16         THE COURT:  2014.

17         MS. LASKY:  If I may?

18     So, my recollection of what the witness said was that

19     he had personal knowledge that Chiche Smith did business with

20     the defendant and that he talked with him for years, including

21     in 2014 and '15.  I asked how.  I think if I probed again, he

22     would say they were continuing to talk by phone, and I do think

23     there's sufficient reliability there based on what has been

24     proffered by the witness.

25         THE COURT:  I think, if my recollection is correct,

1    the witness had also said that previously he had -- and I don't

2    remember if he had conversations, but that Chiche Smith was one

3    of the people that ran the maritime aspect of the defendant's

4    business.

5         MS. LASKY:  That's correct, your Honor.  He said that

6    he was principally responsible for his maritime business.

7         THE COURT:  OK.

8         So in light of the prior testimony, the fact that the

9    witness had contact with Chiche Smith and the witness's

10   testimony about the maritime, before he left the organization,

11   I find that it sufficiently meets the corroborating

12   circumstances under those facts and the fact that he continued

13   to stay in touch with him, for admissibility under 804(b)(3),

14   statement against interests.  OK?

15        MR. FOY:  Thank you.

16        THE COURT:  All right.  Thank you.

17        (Continued on next page)

18

19

20

21

22

23

24

25

1            (In open court)

2     BY MS. LASKY:

3     Q.   Now, Mr. Arvelaiz, how do you know that the defendant and

4     Chiche Smith worked together?

5     A.   Because I was present at several meetings when they were

6     there together.

7     Q.   When who were there together?

8     A.   Mr. Carlos Orense and Mr. Emiliano Martinez.

9     Q.   And what happened during these meetings?

10    A.   We spoke about a lot of things: about loads that they were

11    taking out on boats, things that they were doing on the waters.

12    Yeah.   That was what it was about.

13    Q.   Loads of what?

14    A.   Cocaine.

15           MS. LASKY:  Mr. Sirmon, please publish Government

16    Exhibit 211, which is already in evidence.

17    Q.   Now, Mr. Arvelaiz, while you worked for the defendant, did

18    you ever travel?

19    A.   Yes.

20    Q.   To what locations did you travel?

21    A.   The Dominican Republic, Mexico.  Different places.

22    Q.   And who told you -- or why did you travel?

23    A.   I received an order that I was to travel.  I had to do

24    things where I was going.

25    Q.   Received an order from whom?

1   A.  My boss, Carlos Orense.

2   Q.  And what kinds of tasks would require your travel?

3   A.  Well, I had to go and meet with people.  On one occasion I

4   had to deliver a notebook with some annotations.  On other

5   occasions it was to collect money.  That type of thing.

6   Q.  When you say to collect money, what do you mean?

7   A.  They sent me to places sometimes to pick up money that had

8   to be given to somebody else, or they sent me to -- or they

9   sent me to pay attention to some money that had to, was in that

10  place and had to be sent to Venezuela.

11  Q.  Did you know what the money was from?

12  A.  The cocaine loads that were sent there.

13  Q.  Now, you mentioned the Dominican Republic a moment ago.

14  Using Government Exhibit 211, do you see any locations on this

15  map where you traveled while working for the defendant?

16  A.  Yes.

17  Q.  Where?

18  A.  Bani --

19  Q.  And where --

20  A.  -- on the south, in the south of the Dominican Republic,

21  and to Santo Domingo.

22          MS. LASKY:  Mr. Sirmon, can you please circle Bani.

23  And I believe the witness also said Santo Domingo.

24          THE WITNESS:  That's right.

25  BY MS. LASKY:

1  Q.  Were there any other locations that you went?

2  A.  Yes.  Samana and San Francisco de Macoris.

3          MS. LASKY:  Mr. Sirmon, can you please circle San

4  Francisco de Macoris.

5  Q.  And did you -- did you know anything -- strike that.

6      Did you ever speak with the defendant about the work he did

7  in the Dominican Republic?

8  A.  Sometimes I heard things, but I didn't know much about

9  receiving, because I didn't manage that part.

10 Q.  OK.  So I'd like to now discuss some of the defendant's

11 customers.

12     Did you know who the defendant sent cocaine to?

13 A.  I heard at a meeting a person whom they called Pelotero in

14 the Dominican Republic, but I never met him.

15 Q.  What, if anything, did you hear about where Pelotero was?

16         MR. FOY:  Objection.

17         THE COURT:  Sustained.

18         The conversation that you heard about Pelotero, who

19 was involved in that conversation?

20         THE WITNESS:  Mr. Emiliano Martinez and Mr. Carlos

21 Orense.

22         THE COURT:  OK.  Go ahead.

23 BY MS. LASKY:

24 Q.  What do you recall -- what do you remember them saying?

25 A.  I heard Mr. Emilio say that the, that the receiving, the

1  thing that he was going to receive was very good and that he

2  had that connection with Pelotero.  He was a man from Puerto

3  Rico.  I didn't hear much more about it.

4  Q.  And to be clear, you understood he was a Puerto Rican.

5  Where did you understand that he lived?

6            MR. FOY:  Objection, your Honor.

7            THE COURT:  Sustained.

8  BY MS. LASKY:

9  Q.  Where did you understand that Pelotero was located?

10  A.  My understanding from what I overheard is that he lived in

11  the Dominican Republic.

12  Q.  Anywhere in particular in the Dominican Republic?

13  A.  I don't remember where in particular.

14            MS. LASKY:  OK.  Mr. Sirmon, you can take down

15  Government Exhibit 211.

16  Q.  Mr. Arvelaiz, so, not focusing on the Dominican Republic

17  now, but in general, do you know who the defendant sent cocaine

18  to?

19  A.  Yes, some people.

20  Q.  And how are you aware of this information?

21  A.  Because many of the workers for the people that received

22  the cocaine had been in Venezuela with us, who received the

23  cocaine in other countries.

24  Q.  What do you mean they had been in Venezuela with us?

25  A.  They were present in Venezuela.

1   Q.  For meetings?

2   A.  Yes.  For meetings, yeah.  They had lived in Venezuela.

3   Q.  So who were some of the defendant's main customers?

4   A.  In Mexico, Mr. Arturo Beltran Leyva.

5   Q.  Were there any others in Mexico?

6   A.  Indio Gerardo Alvarez.  I don't remember others right now.

7   Q.  Who is El Indio?

8   A.  His name is Gerardo Alvarez.  He was a worker or he was an

9   associate of Don Arturo.

10  Q.  And who is Don Arturo Beltran Leyva?

11  A.  Mr. Don Arturo Leyva is the gentleman from Mexico, and he

12  was involved in drug trafficking.

13  Q.  Did the defendant have other customers in Mexico?

14  A.  I don't remember others right now.

15  Q.  How did the defendant -- strike that.

16      You mentioned earlier traveling to Mexico.

17  A.  Yes.

18  Q.  Why did you travel to Mexico?

19  A.  Because I received orders that I should travel.

20  Q.  Who did you receive orders from?

21  A.  From Mr. Carlos Orense.

22  Q.  And what did you do in Mexico?

23  A.  I met with several individuals on several occasions, and

24  several trips, to carry out the assignments that I had been

25  given.

1    Q.  Let's talk about some of those trips.

2        Around when was the first trip you can recall?

3    A.  Like, 2005, 2006.

4    Q.  And to be clear, is that an estimate?

5    A.  It is an estimate.

6    Q.  And when you traveled to Mexico, did the defendant travel

7    with you?

8    A.  On some occasions.

9    Q.  And on the occasions that the defendant was there, who did

10   you meet with?

11   A.  With Mr. Arturo Beltran Leyva and some other parties known

12   to us.

13   Q.  Who?

14   A.  People that I did not know but that were friends of

15   Mr. Carlos Orense.

16   Q.  Were you present for conversations during those trips?

17   A.  I wasn't that present because they would have private

18   conversations, and I was a little bit away from them.

19   Q.  In what capacity were you working at that time?

20   A.  I was a bodyguard.

21   Q.  Now, you also mentioned that you went without the defendant

22   on certain occasions.

23   A.  Yes.

24   Q.  What did you do on those occasions?

25   A.  I went there to deliver a notebook.  I was instructed to go

1   deliver a notebook to someone, and that's what I did.

2   Q.  Did you look inside the notebook?

3   A.  No.

4   Q.  Why not?

5   A.  Because I did not know what the contents were.  There were

6   lots of numbers and things, but I didn't stop to read them.

7   Q.  Who did you deliver the notebook to?

8   A.  This man in Mexico, in Los Cabos, Mr. Nene Jaramillo.

9   Q.  Was that the first time that you met Nene Jaramillo?

10  A.  Yes, the first and only time.

11  Q.  Where did the defendant send the cocaine when Don Arturo

12  was the customer?

13  A.  The cocaine would almost always arrive in Guatemala.

14  Q.  How do you know that?

15  A.  Because the pilots used to say that they were headed to

16  Guatemala.

17  Q.  Do you know why it was sent to Guatemala?

18  A.  No.

19  Q.  Did you know about the prices at which the defendant sold

20  his cocaine?

21  A.  It was to whatever market rates existed at the time.  The

22  prices fluctuated.  It depended on offer and demand.

23  Q.  But did you know at the time generally what prices the

24  defendant sold his cocaine for?

25  A.  At the time the Guatemalan price for one kilo of cocaine

1    was between six and $7,000.

2    Q.  And how did you know that?

3    A.  Because we would always get a bonus on the loads that were

4    shipped out, and we were paid whatever the market rate was at

5    the moment.

6    Q.  Explain how the bonus would work.

7    A.  Well, generally, on each load that went out by plane, that

8    was successfully done, we would get a percentage, about 25

9    kilos per load.  It was given to us as some sort of incentive.

10   Q.  Would you actually receive physical cocaine?

11   A.  No.

12   Q.  So what would you receive?

13   A.  The money equivalent to the payment for 25 kilos at the

14   Guatemalan rate.

15   Q.  And when would you receive that money?

16   A.  A few days after the load departed, after the plane left.

17   Q.  And what kind of currency did you receive that money in?

18   A.  Dollars.

19   Q.  Did you know at what price approximately the defendant

20   purchased cocaine at?

21   A.  We used to pay $2,000 per kilo to Mr. San Martin.

22   Q.  So doing the math, what would be the profit on one kilogram

23   of cocaine at the prices you just described?

24   A.  If we average $7,000 per kilo at the Guatemalan rate and

25   you deduct about $2,000, expenses, the plane and all their

1  logistical expenses, you are coming to about $3,500 per kilo.

2  Q.  So, for a 1,000-kilogram load, what would that be?

3  A.  $3-1/2 million.

4  Q.  When you worked for the defendant, did you understand where

5  the Mexican buyers sent the cocaine?

6  A.  To the United States.

7  Q.  How do you know that?

8  A.  Because that is what they did.  Being on the border, it was

9  easy for them to send it to the United States.

10 Q.  Were you ever present when a customer in the Dominican

11 Republic paid the defendant?

12 A.  No.

13 Q.  Did you know the approximate price for a kilogram that the

14 defendant sold cocaine in the Dominican Republic?

15 A.  No.  I could come up with an estimate, but not a real

16 price.

17 Q.  I won't ask you to do that.

18     When you were working for the defendant, did you understand

19 where the Dominican buyers sent the cocaine after buying it

20 from the defendant?

21 A.  To Puerto Rico.

22 Q.  Why did you understand that?

23 A.  Because I heard Mr. Chiche Smith saying that they were

24 sending from the Dominican Republic to Puerto Rico and that

25 they had a load from Puerto Rico to New York.

1   Q.  Now, while you worked for the defendant, where, if at all,

2   did the defendant travel?

3   A.  He traveled a lot to Mexico, to the United States, to

4   Europe, to Aruba, to Curacao.  I don't remember what other

5   places.  The Dominican Republic.

6   Q.  How did the defendant travel?

7           THE INTERPRETER:  May the interpreter clarify with the

8   witness?

9   A.  Commercial flights and private planes.

10  Q.  Did he ever take boats?

11  A.  No.  Not that I saw.

12  Q.  Did the defendant have any particular habits when traveling

13  to the United States?

14  A.  I don't remember any.

15  Q.  Do you know how many passports the defendant had?

16          MR. FOY:  Objection.

17          THE COURT:  I'll allow it.  Objection overruled.

18  A.  Yes.  I saw several passports.

19  Q.  And how did you -- how were you in a position to see

20  passports?

21  A.  Because the passports were either at the Melia or at the

22  *finca*, and I managed to see them, and they had different names.

23  Q.  Were they all Venezuelan passports?

24  A.  Yes.

25  Q.  Did the defendant have a cell phone when you worked for

1    him?

2    A.  Yes.

3    Q.  How many?

4    A.  I remember two or three different numbers.

5    Q.  Was that two or three at a time or one phone and then

6    another phone and then another phone?

7    A.  At the same time.

8    Q.  Do you know how he used his different phones?

9    A.  He had one phone for his personal use.  It was the number

10   he always had to stay in touch with his family and those close

11   to him.

12       Then he had another phone.  It was a work phone that he

13   used to communicate with us.

14       And then he had another phone, and I don't know what use he

15   gave that phone.

16   Q.  What do you mean by a work phone?

17   A.  His work phone was a phone used to send text messages via

18   BlackBerry.  It was the phone that he used to communicate with

19   me and with others that we worked with.  And it was used for

20   him to give us orders on that phone and where he would receive

21   messages from us.

22   Q.  And by us, what do you mean?

23   A.  Myself or other members of the security detail or those of

24   us that were involved in the work.

25   Q.  What, if any, measures did the defendant take when talking

1  about cocaine?

2  A.  Well, he never called it cocaine.

3  Q.  What did he call it?

4  A.  *Cosos*.

5       THE INTERPRETER:  Things, by the interpreter.

6  A.  *Bichos*.

7       THE INTERPRETER:  By the interpreter, bugs.

8  A.  But generally *cosos*.

9  Q.  Do you recall any particular occasions when he used the

10 term *"cosos"*?

11 A.  Yeah, on messages, when he would ask if the *cosos* had been

12 loaded onto the plane or on occasions when a load was being

13 sent out.

14 Q.  What, if any, measures did the defendant take when talking

15 about cocaine to Pedro Luis Martin?

16 A.  In person, they would talk openly.  I never really

17 overheard what they would call cocaine over the phone.  I did

18 not hear what Pedro Luis was saying in response to what the

19 defendant was saying to him.  He was very careful during his

20 conversations.

21 Q.  And what, if any, measures did the defendant take when

22 talking about cocaine to Carvajal?

23 A.  Again, he would not talk so openly.  In person, he would

24 speak more comfortably.  Not so much over the phone.  He was

25 always very careful during his conversations.

1  Q.  Did Venezuelan officials assist the defendant with drug

2  trafficking?

3  A.  Yes.

4  Q.  Which ones?

5  A.  General Cliver Alcala Cordones.  A police officer called

6  Jesus Itriago.  Hugo Carvajal.  Pedro Luis Martin Olivares.

7  Vassyly Kotosky.

8  Q.  So let's start with general -- excuse me, with Cliver

9  Alcala.  What was Alcala's position when you were working for

10  the defendant?

11          THE INTERPRETER:  May the interpreter clarify with the

12  witness?

13  A.  Yes.  He was the general, the head of defense, which is the

14  REDI in the state of Carabobo.

15  Q.  And did you ever see the defendant together with Alcala?

16  A.  Yes.

17  Q.  Did the defendant ever tell you how he met Alcala?

18  A.  He did not tell me how he met him.

19  Q.  You said earlier that Alcala assisted the defendant.  How,

20  generally speaking, did he do that?

21  A.  There was this one occasion when we were escorting a truck

22  that was coming with cocaine from the Colombian border to

23  Venezuela.  The truck was stopped at a checkpoint.  I tried to

24  resolve the issue with the officer that was there; it was a

25  lieutenant.  And I was unable to do so, so I texted Carlos

1    Orense to bring him up to speed about what was going on.  And

2    then he told me -- he called me, and he told me that Cliver was

3    going to call me.  And in fact, it did happen.  Cliver did call

4    me, and when he did, I gave the phone to the military official

5    that had stopped us.  They had a conversation on the side, and

6    then we were allowed to go through.

7    Q.  You said you had a load.  How large was the load?

8         THE INTERPRETER:  May the interpreter look up a term,

9    your Honor?

10        THE COURT:  Yes.

11   A.  There was -- there were a thousand kilos loaded onto a

12   large tractor-trailer, a *gandola*.

13   Q.  And were you in a separate car?

14   A.  There was a car that was driving ahead with some people in

15   it.  The *gandola* was driving in the middle, and I was in

16   another vehicle, in the back.

17   Q.  And what, if anything, was in your car?

18   A.  We were carrying money.  There were three other people with

19   myself and our guns.

20   Q.  And you said you tried to resolve the issue.  What do you

21   mean by that?

22   A.  Well, so, they stopped the car, and I received a message

23   from the car that was at the very front, and he told me that he

24   couldn't see the *gandola*, that he thought that it had been

25   stopped.  And then I did see the *gandola*, and I stopped and I

1   got out of the vehicle.  I showed my DIM credentials at the

2   time, showing that I was an officer, and I was trying to

3   resolve the issue with the lieutenant.  But he refused.  And he

4   still wanted to check the load.  He did not want to come to an

5   understanding, and that's when I placed a call.

6   Q.  And the term "*gandola*" has been used.  What does that mean?

7   A.  A large tractor-trailer.

8   Q.  Did you -- after this incident, did you speak with the

9   defendant?

10  A.  Immediately, as the incident was going on.

11  Q.  And what about afterwards?

12  A.  Then too.

13  Q.  And what did he say?

14  A.  That's when Cliver called me on the phone, and he asked me

15  to give the phone to the officer in charge.

16  Q.  What specifically did you say to the national guardsman --

17  or to the lieutenant?

18  A.  That we were on the same team, to let the truck through and

19  not to force me to make the call, because at the end of it all,

20  he still was going to have to let us through.

21  Q.  After you made it through, did you talk to the defendant?

22  A.  Yes, of course.

23  Q.  What did he say?

24  A.  That we had already gone through -- well, I told him that

25  we had already made it through.

1    Q.   And was he happy?

2    A.   No.  Upset.

3    Q.   And why was he upset?

4    A.   Because there had been trouble, and he did not like

5    trouble.

6          THE COURT:  Ms. Lasky, it's 5:30.  Would this be a

7    good place to break for the day?

8          MS. LASKY:  Yes, your Honor.

9          THE COURT:  OK.  Ladies and gentlemen, it's 5:30.

10   Time for you guys to go home.  We'll see you tomorrow at 10

11   o'clock.  Remember, do not discuss the case.  No research.  You

12   can leave your pads either on the chair or in the back, and

13   we'll see you tomorrow morning at 10 o'clock.  Remember, go

14   directly -- hopefully your cards will work.  Ms. Disla said

15   they're working.  Go directly to the jury room.  Do not come

16   into the courtroom.

17         Thank you very much.  Have a good and safe evening.

18         (Continued on next page)

19

20

21

22

23

24

25

NbtWore4

1            (Jury not present)

2            THE COURT:  OK.  The witness may step down.

3            (Witness not present)

4            THE COURT:  OK.  Is there anything that we should

5    discuss before we break for the evening?

6            MS. LASKY:  No, your Honor.

7            THE COURT:  All right.

8            From the defense.

9            MR. FOY:  No.

10           THE COURT:  All right.  I don't know if there's

11   anything -- obviously I will give more details about one of the

12   rulings I made earlier, but I'm not sure -- I'll try and have

13   that done by tomorrow.  We'll see.  I don't think right now

14   that there's any reason to see you earlier.  Be here in time

15   for 10 o'clock.  If there is an issue, please email both

16   Ms. Disla and Ms. Tedla to let them know in addition to sending

17   it to the chambers inbox, so they can make sure that I'm aware

18   of it and we can meet earlier.

19           What are we looking at, Ms. Lasky?

20           MS. LASKY:  Sorry, your Honor.  I think it's going to

21   be about 45 minutes.

22           THE COURT:  OK.  All right.  OK.  Look, obviously I

23   ask these questions, but I'm not going to cut you off.  I

24   understand that it depends upon what the witness's answer is.

25           And similarly, Mr. Foy, at some point during your

NbtWore4

1    cross, I may ask you -- again, it's for estimates.  You'll know

2    if I'm looking to cut you off.  I'll let you know in advance if

3    that's something that's going to happen.  I can tell you it's

4    not likely because I haven't done so in my career yet, but

5    there's always a first.  But you don't want to be that lawyer.

6    I'll put it that way.

7            All right.  Thank you very much.  We'll stand

8    adjourned.  I'll see everybody tomorrow.

9            (Adjourned to November 30, 2023, at 10:00 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

 ANTONIO ARVELAIZ

Direct By Ms. Lasky  . . . . . . . . . . . . . 343

                    GOVERNMENT EXHIBITS

Exhibit No.                                  Received

 206  . . . . . . . . . . . . . . . . . . . . . 351

 413  . . . . . . . . . . . . . . . . . . . . . 360

 649  . . . . . . . . . . . . . . . . . . . . . 363

 648  . . . . . . . . . . . . . . . . . . . . . 378

 210  . . . . . . . . . . . . . . . . . . . . . 391

 652  . . . . . . . . . . . . . . . . . . . . . 394

 411  . . . . . . . . . . . . . . . . . . . . . 399

 405  . . . . . . . . . . . . . . . . . . . . . 404

 410  . . . . . . . . . . . . . . . . . . . . . 406

 406  . . . . . . . . . . . . . . . . . . . . . 408

 402  . . . . . . . . . . . . . . . . . . . . . 411

 403  . . . . . . . . . . . . . . . . . . . . . 412

 404  . . . . . . . . . . . . . . . . . . . . . 413

 601, 602, 604  . . . . . . . . . . . . . . . . 414

 605  . . . . . . . . . . . . . . . . . . . . . 417

 409  . . . . . . . . . . . . . . . . . . . . . 419

 412  . . . . . . . . . . . . . . . . . . . . . 421

 606, 607  . . . . . . . . . . . . . . . . . . . 436

 209  . . . . . . . . . . . . . . . . . . . . . 457