UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

UNITED STATES OF AMERICA,

       - against -                                   21 Cr. 379 (VSB)

CARLOS ORENSE AZOCAR,

              Defendant.

------------------------------------------------------X


# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CARLOS ORENSE AZOCAR'S MOTION FOR A NEW TRIAL


JASON E. FOY (JF5839)
ERIC J. SARRAGA (ES6095)
Foy & Seplowitz, LLC
105 Main Street
Hackensack, NJ 07601
(201) 457-0071

*Attorneys for Carlos Orense Azocar*

January 16, 2024

**PRELIMINARY STATEMENT**

On December 12, 2023, a jury sitting in the Southern District of New York returned guilty verdicts against Defendant Carlos Orense Azocar on Count 1 (Narcotics Importation Conspiracy in violation of 21 U.S.C. § 960 (b)(1)(B) & 963), Count 2 (Conspiracy to Possess Machineguns and Destructive Devices in violation of 18 U.S.C. §§ 924(c)(1)(A) & (c)(1)(B)(ii)), 3238 and § 2), and Count 3 (Conspiracy to Possess Machineguns and Destructive Devices in violation of 18 U.S.C. §§ 924(o), and 3238).

For the reasons that follow, Defendant Carlos Orense Azocar, by and through counsel, hereby moves for a new trial in the interest of justice pursuant to Rule 33 of the Federal Rules of Criminal Procedure on the grounds that the verdicts should be set aside to avert a miscarriage of justice based on the weight of the evidence, the lack of credibility of the principal witnesses, and because the soundness of the verdict is highly doubtful.

**TRIAL SUMMARY**

A jury convicted Mr. Carlos Orense Azocar ("Mr. Orense") after an eleven-day trial which centered around the testimony of four cooperating witnesses: Antonio Arvelaiz, Robert Perdigon Lopez, Ronmel Jose Boada, and Mario Satizabal. Both Arvelaiz and Perdigon made in-court identifications of Mr. Orense and gave testimony implicating him in the crimes charged. Arvelaiz's testimony primarily focused on the period between 2003-2011. Perdigon's testimony primarily focused on criminal conduct in 2006, 2009, and plans to traffic cocaine in 2012 that did not come

1

to fruition due to Perdigon's arrest.  Boada and Satizabal also testified but did not make in-court identifications.  Boada's testimony related to the seizure of approximately 992 kilograms of cocaine by the U.S. Coast Guard.  Satizabal's testimony related to a single meeting with Mr. Orense regarding efforts to transport cocaine from Venezuela to Europe in 2006.

The other witnesses testified to matters that did not prove that Mr. Orense knowingly and intentionally participated in the charged crimes.  Witnesses Enrique Santos and Owen Foley, both of whom work for the U.S. Attorney's office, testified regarding the extractions of information from the phone recovered from Mr. Orense's custody and control.  Santos testified about the process of extracting information via Cellebrite and Foley testified by reading text messages that were moved into evidence and related material extracted from the phone (i.e., search history, WhatsApp messages, deleted materials, photographs, screenshots of documents, etc.)  None of the cooperators or anyone that was a party to the text messages testified about any image, message, search, or other information extracted from the phone.

Finally, Mr. Orense called one witness, Carel Ydler, who is his ex-wife and the maternal aunt of cooperator Arvelaiz.  Ms. Ydler was called in support of the defense theory that cooperator Arvelaiz had a motive and bias to falsely implicate Mr. Orense.  Ms. Ydler, who is also godmother to Arvelaiz and his daughter, testified that while Mr. Arvelaiz was incarcerated and after he was released, he told her of his plan to falsely implicate Mr. Orense and he disclosed that he had met with inmates while he was incarcerated who were prepared to assist in falsely implicating Mr. Orense.

**ARGUMENT**

**I.  THE COURT SHOULD SET ASIDE THE VERDICT IN THE INTEREST OF JUSTICE AND ORDER A NEW TRIAL PURSUUANT TO FED. R. CRIM. P. 33(a).**

**A.  Controlling Legal Principles.**

Pursuant to Rule 33(a) of the Federal Rules of Criminal Procedure, "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  In general, "a motion for a new trial 'should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.' " *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003), *quoting*, *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir. 1998).

Unlike in the context of a Rule 29 motion, when considering a Rule 33 motion, the Court "is ***not required*** to view the evidence in the light most favorable to the government," *United States v. Lopac*, 411 F.Supp.2d 350, 359 (SDNY 2006) (emphasis added); *see also United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998), but instead must "examine the entire case, take into account all facts and circumstances, and make an objective evaluation[,]" *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).

The Court may "weigh the evidence" for itself, "and in so doing evaluate for itself the credibility of the witnesses." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992); *see also Landau*, 155 F.3d at 104 ("It is inherent in the proposition that the district judge may weigh the evidence that the judge will consider the

3

credibility of witnesses."), *citing, Song v. Ives Laboratories, Inc.*, 957 F.3d 1041 (2d Cir. 1992) (upholding grant of new trial in wrongful termination case where the evidence of unsatisfactory job performance "rested almost entirely on the testimony of [appellant's] co-workers regarding his allegedly poor inter-personal skills and professional relationships"). The Court is required merely to "strike a balance between weighing the evidence and credibility of witnesses" without "'wholly usurping' the role of the jury," *Ferguson*, 246 F.3d at 133, *quoting, United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000) ("the court found that a new trial was properly granted, even though the evidence was legally sufficient, where "the credibility of the principal witness was weak" and "the soundness of the verdict is highly doubtful.""). Ultimately, the Court should order a new trial under Rule 33 if "it would be a manifest injustice to let the guilty verdict stand." *Sanchez*, 969 F.2d at 1414.

> B. THE CONVICTION SHOULD BE VACATED BECAUSE NO RATIONAL FINDER OF FACT COULD CONCLUDE THAT THE GOVERNMENT PROVED BEYOND A REAONSABLE DOUBT THAT MR. ORENSE KNOWINGLY AND INTENTIONALLY AGREED TO IMPORT COCAINE IN TO THE UNITED STATES AND THAT HE DID SO WHILE POSSESSING MACHINE GUNS IN FURTHERANCE OF THE CONSPIRACY TO IMPORT COCAINE.

Mr. Orense respectfully submits that a new trial should be ordered because the interest of justice so requires based on the failure to prove each count beyond a reasonable doubt. The jury reached a seriously erroneous result by convicting Mr. Orense of all counts of the indictment. An objective evaluation of the evidence presented at trial proves that the guilty verdict is a miscarriage of justice. More

specifically, the weight of the evidence and lack of credibility of the government's primary witnesses further discussed below, coupled with evidence of bias and motive to falsely implicate Mr. Orense, indicate that it would be a manifest injustice to let the guilty verdict stand.

### *Ronmel Jose Boada Testimony*

The government opened the trial by presenting evidence of the seizure at sea of approximately 992 kilograms of cocaine conducted by the U.S. Coast Guard.  The government introduced video and testimony through retired Chief Petty Officer Mills. Officer Mills' testimony did not incriminate Mr. Orense and he did not tend to prove that Mr. Orense had any criminal involvement in the importation of cocaine into the United States.

Boada was the second witness called by the government. Boada was taken into custody during the seizure of the 992 kilograms of cocaine by the U.S. Coast Guard. He testified that he randomly received an offer from a stranger by the name of Jose, to participate in the transport of cocaine from Venezuela to the Dominican Republic, which led him to the finca where he says he met Mr. Orense. Tr. 151-152, 199-203. Boada described Mr. Orense, who he stated was introduced to him by first and last name, as a fat man and wearing a white hat.  Tr. 204.  He stated that the encounter lasted 10-15 minutes.  Tr. 204:18. Despite this testimony, he did not identify Mr. Orense in court.

When Boada was taken into custody he conceded that he lied multiple times about his history of drug trafficking. Tr. 230-231:8.  He further conceded that he

"would be willing to say whatever it took to receive the benefit that [he was there] to get[.]" Tr. 226:15-17. Although he did mention some of the names of people he had trafficked cocaine in the past (i.e., Javier, [1]Tr. 234:21-24), Boada did not mention Mr. Orense to law enforcement until after he was approached by two inmates with photographs of a person they stated was Carlos Orense. Tr. 241-246. It was not until July 19, 2016, after approximately three months in custody, that he mentioned the name Carlos Orense Azocar to the government. Tr. 267:9-12.

Boada's testimony is not credible. He lied to law enforcement about his history of drug trafficking. He did not implicate Mr. Orense until after he was approached by two inmates who spoke with him and showed him a picture of Mr. Orense, one of whom was cooperator Arvelaiz. He did not disclose these encounters until the first day of the trial, November 27, 2023. Tr. 268:5-17.

*Antonio Arvelaiz Testimony*

The government's main cooperating witness, Antonio Arvelaiz, had a strong bias against Mr. Orense and motive to falsely implicate him in the conspiracy for which he was convicted. Arvelaiz's bias and motive against Mr. Orense was established through his direct examination, cross examination, and through defense witness Carel Ydler. The defense case established that Arvelaiz told Ms. Ydler while he was in prison between 2015-2019 that he planned to "take revenge against Carlos." Tr. 1277:22-25. Ms. Ydler testified that in 2015 Arvelaiz told her that he would "take vengeance on that cocksucking fat ass and that [Mr. Orense's] family would pay for

---

[1] Arvelaiz denied showing a photograph of Mr. Orense to any inmate while in custody. Tr.609:3-19.

him being in prison. Tr. 1278:6-13. She went on to testify that Arvelaiz stated that "he was building a case against Carlos, so that he can be brought to court. That he had met some people in jail, and that he was going to pay them for them to testify against him. And these were people who were involved in the drug world that he had met while he was in prison." Tr. 1278: 18-24. Finally, Ms. Ydler testified that Arvelaiz stated that "he was going to fuck [Carlos and] that he had everything ready. And that […] Carlos's family would suffer everything that [Arvelaiz's] own family had suffered [when he was incarcerated]. And that he would also fuck his children, that they wouldn't even be able to visit him when he was in jail." Tr. 1279:7-13.

Arvelaiz's bias against Mr. Orense was further exhibited on direct examination when he testified to attempting to kill Mr. Orense, tying up his workers at Los Guaranones, and stealing weapons and ammunition to "weaken" him. Tr.510-515. Arvelaiz testified that he concluded that Mr. Orense and his partners were responsible for him getting shot because he "had no other problems at the moment, but for the money that went missing." Tr. 512:24-513:1. Arvelaiz's assertion that he had no problems outside of his alleged dispute with Mr. Orense was directly contradicted on cross examination. Arvelaiz testified that many people in Venezuela "have ill will toward[him]." Tr. 539:2-4. His problems with others in Venezuela was related to frauds he committed against others, drug trafficking, and police officers that wanted to kill him. Tr. 539:2-8; Tr. 542:9-11.

Arvelaiz's credibility is further diminished by his illogical reason for leaving Venezuela and his unsupported belief that Mr. Orense wanted to kill him. Arvelaiz

7

contradicted himself by further testifying that the last time he saw Mr. Orense before the trial was in May 2013. On cross examination, Arvelaiz stated that when he saw Mr. Orense in Miami in 2013, they went to lunch. Mr. Orense proposed an opportunity for Arvelaiz to move some money he had in New York to Maimi, and Arvelaiz took him to a watch store to purchase an expensive watch. Tr. 651:4-17.

Arvelaiz was the first person to implicate Mr. Orense in this case. Cooperators Perdigon and Satizabal did not speak to the government about Mr. Orense until he was taken into custody in 2021. Tr. GX905 and 906. Arvelaiz's bias against Mr. Orense motivated him to implicate Mr. Orense in this case and is demonstrated by his connection to the other cooperators.

On direct examination, Arvelaiz conceded that he met Ramon Quintero while in custody in Miami. Tr. 313:15-20. Quintero is the DTO boss of the Northern Valley Cartel in Colombia, and he was a superior of cooperator Mario Satizabal. Tr. 753:17-754:25. It was Quintero who sent a message to cooperator Satizabal instructing him to cooperate against Mr. Orense. Tr. 829:14-831:13. Cooperator Roberto Perdigon was a longtime friend of Arvelaiz who he assisted in cooperating with the government. He assisted Perdigon by providing the government with his contact information, giving him a place to stay for 4-7 days[2], paying for his ticket to travel to New York to meet with the government, and discussing Mr. Orense with Perdigon. Tr.593-594:13; Tr. 954:15-956:9.

*Mario Satizabal Testimony*

---

[2] When question about Perdigon staying with him, Arvelaiz denied it. Tr. 594:2-4.

Cooperator Satizabal did not make an in-court identification of Mr. Orense. His interaction with Mr. Orense was limited to one meeting in 2006 when he and Quintero came from Colombia to Venezuela to discuss the transportation of cocaine to Europe. Tr. 762:19-763:11. He did not offer any testimony regarding Mr. Orense conspiring to import cocaine into the United States. Satizabal's testimony was triggered by a message from Quintero advising him of an opportunity to cooperate against Mr. Orense after they learned of his arrest. Satizabal spent a significant amount of time in the Federal Detention Center in Miami during the same period that Arvelaiz was there. Tr. 666:10-12; Tr. 832:7-9. The opportunity to coordinate their testimony existed due to their access to each other while in custody in Miami.

### *Roberto Lopez Perdigon Testimony*

Cooperator Perdigon was arrested in 2012 and began cooperating with the government after initially lying about his involvement in trafficking cocaine. Tr. 961:5-23. Perdigon withheld information during the initial stages of his cooperation and was confronted by the government about it. Tr.994:15-996:18. After being admonished for withholding information, Perdigon continued to provide information to mitigate the consequences of his crimes. Tr. 997:16-21. The first time Perdigon mentioned Mr. Orense to the government was on April 30, 2021, almost a decade after he was arrested and began cooperating. Tr. 998:1-4.

Perdigon's credibility was undermined by his failure to implicate Mr. Orense despite his cooperation regarding narcotics traffickers and Venezuelan government officials who were allegedly connected to Mr. Orense. Perdigon testified about Hugo

9

Carvajal and other officials that had a relationship with Mr. Orense, but he did not mention Mr. Orense until after his arrest. However, just before his arrest in 2012, Perdigon testified that he was about to do business with Mr. Orense but failed to do so because he was arrested. Mr. Orense's contact information was not in Perdigon's telephone, which was accessed by the government. If Perdigon's testimony were truthful, he would have included Mr. Orense in the extensive list of traffickers that he informed the government about in 2012. Instead, he waited nine years until Mr. Orense was arrested to disclose Mr. Orense's name.

Furthermore, Perdigon's strong connections to Arvelaiz should be considered when evaluating the weight of his testimony and his credibility. Perdigon and Arvelaiz were friends since Arvelaiz was a kid, which was over 20 years ago. Tr. 934:15 – 935:6. Both lived together in Miami for approximately one week in 2021. Tr. 954:20-21. While they lived together, Perdigon was aware that Arvelaiz was cooperating with the government against Mr. Orense, and they discussed the case. Tr. 955:3-6. Arvelaiz shared his bias against Mr. Orense with Perdigon by sharing the specific problems he had with Mr. Orense. Tr. 956:2-3. These connections support Ms. Ydler's testimony regarding Arvelaiz's motivation to falsely implicate Mr. Orense by colluding with other individuals against him.

*Phone Extraction Testimony*

The government admitted images and text messages from the phone taken from Mr. Orense's custody and control. They used employees of the U.S. Attorney's office to lay the foundation for their admissibility and to read into the record select

communications. None of the evidence extracted from the phone and admitted into evidence was used during the testimony of any of the cooperators. As a result, the information was moved into evidence without any testimonial context for the images or text messages. None of the text messages moved into evidence discussed drugs. No witness provided context to evaluate what was being discussed and whether the communications related to drug trafficking. There were many photographs of private planes and plane crashes. None of the images of airplanes were of retrofitted planes that were discussed by the cooperators in this case. There were photographs of Mr. Orense in different countries and in the company of several individuals. There was no testimony to identify whether the photographs contained members of the conspiracy to demonstrate the material relevance of any image. For example, GX 533 in evidence is a photograph of Mr. Orense with the internationally renowned ranchera singer Vicente Fernandez and two other men. In the photograph, Mr. Orense is wearing a white fedora. There was no testimony from Boada as to whether the white hat Mr. Orense was wearing in GX 533 is the same white hat he claims a person her heard call Carlos Orense was wearing in April of 2016. There was no evidence as to when the photograph was taken and where the photograph was taken. There were no firearms or security detail in the photograph. The admission of these images and communications was unduly prejudicial to Mr. Orense and should have been precluded pursuant to FRE 403.

GX519-GX537 were photographs of Mr. Orense as he was travelling to different countries in Europe. None of the photographs showed any evidence of

cocaine trafficking. There was no testimony as to the location, the circumstances that brought Mr. Orense to the location, the identity of the individuals in some of the photographs with Mr. Orense, and there was no testimony regarding the period the photographs represent. The government's decision to admit evidence without eliciting testimony regarding the significance and context of the images and communications required the jury to speculate as to the probative value of the admitted evidence.

Furthermore, during the cross examination of Santos who conducted the extraction, it was established that the phone was in Miami around the same time that Boada testified that he saw Mr. Orense in Venezuela. There was no evidence presented to contradict the metadata related to the geolocation of the phone in April 2016. Tr. 1082:13-1087:20.

Additionally, the voice notes and text messages contained on the phone lacked any testimonial evidence to establish whether the speaker or the person texting was a part of the conspiracy. Furthermore, there was no testimony to establish that the communications were in furtherance of the conspiracy charged in this case.

Thus, an objective evaluation of the evidence proves that it would be a manifest injustice to let Mr. Orense's guilty verdict stand because the charges have not been proven beyond a reasonable doubt. A careful balancing of the weight of the evidence and weak credibility of these witnesses indicates that the soundness of the verdict is highly doubtful. The evidence proves that the government's principal cooperating witness, Antonio Arvelaiz, had a bias against Mr. Orense and motive to falsely

implicate him. On cross examination, the defense effectively illustrated this bias and motive by eliciting evidence of the collusion amongst multiple cooperating witnesses who were all connected to Arvelaiz. Collectively, the coordinated testimony between the cooperators and the remaining evidence that has limited probative value proves that the jury reached a seriously erroneous result and therefore, a new trial should be granted.

## CONCLUSION

Accordingly, for all of the reasons discussed above, defendant Carlos Orense Azocar, by and through counsel, respectfully requests that this Court vacate his convictions and order a new trial pursuant to Rule 33 of The Federal Rules of Criminal Procedure in the interest of justice on the grounds that the verdicts should be set aside to avert a miscarriage of justice based on the weight of the evidence, the credibility of the principal witnesses, and the soundness of the verdict.

Dated:	New York, New York
	January 16, 2024

		Respectfully submitted,

		/S/ *Jason E. Foy*

		JASON E. FOY
		ERIC J. SARRAGA
		*Attorneys for Defendant Carlos Orense Azocar*