UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                     :

UNITED STATES OF AMERICA,       :

                                       :

      -against-                   :           21-CR-379 (VSB)

                                       :

                                     :          **OPINION & ORDER**

CARLOS ORENSE AZOCAR,      :

                                     :

          Defendant.         :

                                     :
-------------------------------------------------------X

<u>VERNON S. BRODERICK, United States District Judge</u>:

On December 12, 2023, following a twelve-day jury trial, Defendant Carlos Orense Azocar ("Defendant" or "Azocar") was convicted of (1) conspiracy to violate the narcotics laws of the United States, in violation of 21 U.S.C. §§ 952(a), 959(a), 959(c), 960(a)(1), 960(a)(3), and 960(b)(1)(B); (2) possession of machineguns in connection with the drug trafficking conspiracy in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 924(c)(1)(B)(ii); and (3) conspiracy to possess machineguns in furtherance of the drug trafficking conspiracy, in violation of 18 U.S.C. § 924(o).[1]  Before me are Defendant's motions for a judgment of acquittal and/or for a new trial.  Because I find that Defendant has not met his burden to show that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt and that letting a guilty verdict stand would not result in a manifest injustice such that I have a concern that an innocent person may have been convicted, Defendant's motions are DENIED.

---

[1] With regard to Counts Two and Three, the jury found that the Government had not proven beyond a reasonable doubt that that the offense involved in these counts involved a destructive device.  (Doc. 60.)

I.      **Background and Procedural History**

    A.      *The Indictment*

On June 3, 2021, the Government filed a four-count indictment alleging that from at least

in or about 2003 up to and including in or about 2021, the Defendant and others agreed to traffic

or ship large quantities of cocaine to the United States.  (Doc. 3.)  The Government also alleged

that from at least in or about 2003 up to and including in or about 2021, the Defendant and others

agreed to, and that the Defendant did, possess and use firearms, including machineguns and

destructive devices, to further such trafficking or shipment of cocaine to the United States.  (*Id*.)

Based on this alleged conduct, the indictment charged the Defendant with four counts:

Count One charged Defendant with participating in a conspiracy to:  (i) import cocaine into the

United States; (ii) manufacture or distribute cocaine, knowing or intending that it would be

imported into the United States; and (iii) possess cocaine with intent to distribute, or manufacture

or distribute cocaine, on board an aircraft registered in the United States; Count Two charged the

Defendant with participating in a conspiracy to violate United States Maritime Drug

Enforcement Laws; Count Three charged the Defendant with using or carrying firearms,

including machineguns or destructive devices, in furtherance of the drug trafficking crime

charged in Count One; and Count Four charged the Defendant with conspiring to use or carry

firearms, including machineguns or destructive devices, in connection with or in furtherance of

the drug trafficking crime charged in Count One.  (*Id*.)

On April 13, 2023, I set trial to begin on November 27, 2023.  (Doc. 24.)  On November

13, 2023, prior to trial, the Government chose not to proceed on Count Two of the indictment.

(*See* Doc. 47.)

## B.    *Trial*

Jury selection took place on November 20, 2023 and the morning of November 27, 2023. The parties agreed to re-number Counts One, Three, and Four as Counts One, Two, and Three in the jury instructions I gave the jury and on the verdict form prior to the submission of the case to the jury.  (*See* Doc. 60; *see also* Tr. 1244–45 (charge conference); *id*. 1407–39 (jury charge).) For purposes of this Opinion & Order, I shall continue to refer to Counts One, Three, and Four in their original numbering.

### 1.   The Government's Case

At trial, the Government introduced evidence of Azocar's guilt on Counts One, Three and Four through, among other things:  (1) testimony from Travis Mills, a United States Coast Guard officer who participated in the interdiction of a speedboat in international waters south of the Dominican Republic, boarded the speedboat, recovered approximately 990 kilograms of cocaine, and arrested the four individuals on the speedboat, (*see* 1st Opp'n 18; *see also* Tr. 106–15, 119–33); (2) testimony from Ronmel Jose Boada, a cooperating witness who was arrested during the interdiction of the speedboat that was transporting the cocaine to the Dominican Republic, (*see* 1st Opp'n 17–18; *see also* Tr. 143–53; 199–281); (3) testimony from Jeffrey Spears, a Drug Enforcement Administration ("DEA") Supervisory Special Agent who transported the seized cocaine to a Homeland Security Investigations facility and calculated the amount to be approximately 1,000 kilograms of cocaine, (Tr. 281–87); (4) testimony from Scott Hacker, a DEA Supervisory Special Agent who served as a country attaché in the DEA office in Rome, Italy and was involved in the arrest and extradition of the Azocar to the United States, (Tr. 295–305); (5) testimony from Antonio Guillermo Arvelaiz Idler, a cooperating witness who is Azocar's nephew and who worked for the him from approximately 2003 until approximately 2010, (*see* 1st Opp'n; *see also* Tr. 343–666); (6) testimony from Intelligence Research Specialist

Jennifer Taul, an expert witness who, among other things, described drug trafficking routes commonly used to transport cocaine, including land, air, and maritime routes, from Colombia and Venezuela to the United States, (*see* Gov't Suppl. Disclosure as to Expert Witness Jennifer Taul at 3; *see also* Tr. 678–750); (7) testimony from Mario Satizabal Rengifo, a cooperating witness and a former drug trafficker from Colombia who, in 2006, met Azocar to arrange for the transportation of load of cocaine that had become stalled from Venezuela to Europe, (*see* 1st Opp'n 11–13; *see also* Tr. 750–845); (8) testimony from Roberto Manuel Lopez Perdigon, a cooperating witness and former narcotics trafficker who, among other things, assisted Azocar's smuggling of narcotics proceeds from Mexico to Venezuela, (*see* 1st Opp'n 13–17; *see also* Tr. 848–1016); (9) testimony from Enrique Santos, an investigative analyst in the Office of the United States Attorney for the Southern District of New York ("SDNY") who performed a forensic examination of Defendant's iPhone, (Tr. 1056–89); (10) testimony from Owen Foley, a paralegal in the Office of the United States Attorney for the SDNY who during his testimony reviewed certain Government exhibits including a phone extraction, photographs, and text messages, (Tr. 1090–1106; 1117–29); (11) testimony from John Miller, a Firearms Enforcement Officer in the Bureau of Alcohol, Tobacco, and Firearms, who testified as an expert witness describing the functions of various automatic and semi-automatic firearms, (Tr. 1138–80; 1190–98); (12) video and photographs of the United States Coast Guard interdiction of the speedboat that was transporting cocaine to the Dominican Republic, (*see* GX 701, GX 617, 618, 629–645, 650–51, 901); (13) photographs of planes that Azocar used to transport cocaine, (GX 606, 607); (14) photographs of the Melia Hotel in Caracas, Venezuela where Azocar's office was located, (GX 649); and (15) materials obtained from Azocar's cellphone, including his Venezuelan identification card and passport, (GX 523, 529, 500-A), chats showing that Azocar's connection

to the Melia Hotel and the Centro Comercial Ciudad Tamanaco ("CCCT") (a shopping mall and office complex in Caracas), (*see* GX 500-C, 500-C-T), and WhatsApp messages and a letter relating to Defendant's ranch, "*Los Garanones*," and co-conspirators, (GX 512, 512-T, 500-A, GX 505, 505-T, GX 508, 508-T, 508-A, 508-B, 508-C, 508-D, 508-E, GX 506, 506-T, GX 510, 510-T, GX 500-C, 500-C-T).

Travis Mills, Chief Petty Officer of the United States Coast Guard, testified about his participation in the interdiction of a speedboat in international waters south of the Dominican Republic, the recovery of approximately 990 kilograms of cocaine, and the arrest of four drug-traffickers operating the speedboat. (*See* Tr. 106–15, 119–33.) The Government introduced the following exhibits through Mills during his testimony:  GX 617, 618, 629–45, 650–51, 901. These exhibits depicted the seized narcotics, the United States Coast Guard boat interdicting the speed boat and arresting four individuals, and multiple containers filled with fuel. The parties also stipulated to the following facts:  (1) that on or about April 7, 2016, the United States Coast Guard seized approximately 990 kilograms of suspected cocaine from a go-fast vessel in international waters, south of the Dominican Republic; and (2) that a senior forensic chemist employed by the DEA conducted a forensic analysis of a portion of the substances obtained from the go-fast boat, and concluded that the substances in the sample contained approximately 9,934 grams of mixtures and substances containing a detectable amount of cocaine. (*See* Doc. 901 at 1.) Mills was cross-examined about, among other things, the interdiction and his documentation of the cocaine. (*See* Tr. 136–43.)

Ronmel Jose Boada ("Boada"), an admitted drug-trafficker and cooperating witness who was among the individuals arrested on April 7, 2016 during the go-fast boat interdiction, gave detailed testimony about his interactions with Azocar and his drug-trafficking work.

Specifically, he testified about his agreement to transport drugs on a fiberglass speedboat from Venezuela to the Dominican Republic in exchange for $15,000.  (*See* Tr. 151–52.)  After accepting the job, Boada described his journey to a *finca*, or large ranch,[2] that was protected by armed guards wearing "military uniform[s]" and carrying "long guns," where he was introduced to the Defendant.  (*See* Tr. 202–05.)  Boada then described how he was taken to a second *finca,* where he witnessed various workers place fuel and a load of narcotics into the speedboat that he and three others would sail to the Dominican Republic.  (*See* Tr. 205–09.)  He further described how the "son of the boss" arrived with the GPS coordinates that the boat crew was to use to reach their destination.  (*See* Tr. 208–09.)  Boada testified about the United States Coast Guard interdiction of his speedboat, the seizure of the narcotics, and his arrest.  (*See* Tr. 210–23.)  Boada was cross-examined about, among other things, (1) the benefits he hoped to receive as a result of his cooperation with the Government and his testimony, and (2) his prior drug-trafficking conviction in Venezuela.  (*See* Tr. 223–68.)

Jeffrey Spears, a DEA Supervisory Special Agent, testified about his transportation of the seized cocaine to a Homeland Security Investigations facility and calculation of the seized drugs to be just under 1,000 kilograms of cocaine.  (*See* Tr. 283–87.)  Spears stated that it was "the largest physical seizure that I ever had in my 24 years of law enforcement."  (*See* Tr. 286.)  He also testified about the representative sample that he sent to the DEA lab.  (*See* Tr. 287–92.)  The Government also introduced a photograph of the seized narcotics—GX 615—during Spears' testimony.  (*See* Tr. 286–87.)  Spears was then subject to a brief cross-examination about the documentation of the narcotics seizure.  (*See* Tr. 292–93.)

Scott Hacker, a DEA Supervisory Special Agent who served as a country attaché in the

---

[2] Boada described a *finca* as "a large territory where they keep cattle and things like that."  (*See* Tr. 203.)

DEA office in Rome, Italy, testified about his involvement in the arrest and extradition of the Azocar to the United States. (*See* Tr. 295–305.) He described how his office received information that the Defendant was in Italy, and that his office provided that information to the Italian authorities and Interpol. (*See* Tr. 298.) Hacker stated that the Italian authorities, with the assistance of Interpol, then located and arrested the Defendant. (*Id*.) He further testified that he was part of the security team that transported the Defendant and the items that were in his possession at the time of his arrest—his passport, cellular phone, and certain documents—to the United States. (*See* Tr. 299–303.) Hacker was then subject to a brief cross-examination about the seizure of Defendant's cellular phone. (*See* Tr. 304.)

Antonio Guillermo Arvelaiz Idler, ("Arvelaiz"), a cooperating witness who is the Defendant's nephew and who worked for the Defendant from approximately 2003 to approximately 2010, testified extensively about Defendant's drug-trafficking operation. (*See* Tr. 305–23; 343–666). Arvelaiz testified that he worked for Defendant in various capacities, including as a driver, a member of Defendant's security detail, as the leader of Defendant's security detail who was also responsible for managing the receipt, transportation, and payment for Defendant's cocaine loads. (*See* Tr. 316–18; 374; 444.) Arvelaiz testified in detail about Azocar's importation of tons of cocaine to the United States and his use of military-grade weapons to protect cocaine loads, Defendant's narcotics proceeds, Defendant's receipt and sale of military-grade weapons in connection with his narco-trafficking activities, and Defendant's collusion with corrupt Venezuelan officials including Clíver Alcala Cordones, Pedro Luis Martin Olivares, and Hugo Carvajal Barrios, among others. (*See* Tr. 305–23, 343–666). During Arvelaiz's testimony, the Government introduced photographs of weapons—such as automatic rifles, M4s, AR15s, AK-47s, AK-103s, machine guns, Uzi machine guns, and handguns—as

examples of the types of weapons with which Azocar armed his security detail.  (*See*, *e.g.*, GX 402, 403, 404, 406, 410).  Arvelaiz also testified about Defendant's dealings with the *Fuerzas Armadas Revolucionarias de Colombia* ("FARC")—which Arvelaiz described as a "guerilla" organization which supplied large quantities of cocaine from Colombia[3]—and how the Defendant's organization used various types of planes to transport narcotics.  (Tr. 347, 451 ("guerilla"); *see id.* 372, 427–30, 435–40, 440–49, 502–03; GX 606, 607.)  Arvelaiz was then subject to a thorough cross-examination regarding his acrimonious relationship with Azocar and his family, his history of theft and fraud, and the benefits he hoped to receive as a result of his cooperation with the Government and his testimony.  (*See* Tr. 518–88; 649–66.)

Jennifer Taul ("Taul"), an Intelligence Research Specialist and expert witness, testified about (1) the sources and manufacturing processes typically used to produce cocaine in Colombia, and (2) drug trafficking routes commonly used to transport cocaine, including land, air, and maritime routes, from Colombia and Venezuela to the United States through Central America, Mexico, and the Caribbean.  (*See* Tr. 678–750).  Specifically, Taul testified that from approximately 2003 through 2021, one method used by international drug traffickers to distribute Colombian-produced cocaine was to transport it by land from Colombia to Venezuela, then transport it to the United States either (A) by air or boat to Central America then overland through Mexico to the United States, or (B) by boat through the Caribbean Sea landing along the eastern seaboard of the United States.  (*Id.* 698–718; *see also* GX 803 at 11.)  She also testified about certain methods of operation employed by narcotraffickers along these routes. Specifically, Taul described the types of airplanes, boats, and vehicles such as trucks, including

---

[3] Jennifer Taul, an expert witness, later testified that the FARC comprised "armed paramilitary groups that were opposed to the [Colombian] government and used drug trafficking to fund their activities."  (Tr. 694.)

military vehicles, that were frequently used; the use of legitimate businesses to conceal narcotics trafficking; the use of modifications to small airplanes used to transport cocaine to increase their carrying capacity and flight range; the use of cavities in boats and airplanes to conceal drug loads; and large-scale Venezuelan narcotraffickers' use of weapons to protect cocaine loads during transport of the narcotics.  (Tr. 698–718.)  She described the typical appearance and packaging of cocaine, including that particular stamps or brands were frequently used by drug-traffickers, as well as about the approximate price of cocaine, including in Venezuela and the United States, from approximately 2003 through 2021.  (*Id*. 697–98, 720–24.)  Taul also testified about the use of slang and coded language for words like cocaine and for the FARC, in an effort to evade law enforcement.  (*Id*. 718–19.)  She further testified about how large-scale Venezuelan narcotraffickers often do business with Mexican drug trafficking cartels and with Colombian *guerrillas* such as the FARC.  (*Id*. 713–14.)  Finally, Taul described the use of illicit business arrangements between Venezuelan narcotics traffickers and Venezuelan politicians, military leaders, and law enforcement officers to provide protection to narcotraffickers and facilitate the shipments of their narcotics.  (*Id*. 690, 703, 708–11.)  Taul was then subject to a cross-examination about her debriefings with confidential informants, her experience investigating drug-trafficking in Central and South America, and her knowledge of various large-scale drug-traffickers.  (*See* Tr. 735–47.)

Mario Satizabal Rengifo ("Satizabal"), a former drug trafficker from Colombia and cooperating witness, testified about the Azocar's partnership with Colombian drug traffickers to transport thousands of kilograms of United States-bound cocaine to the Dominican Republic.  (*See* Tr. 750–845.)  Specifically, he described meeting the Defendant in 2006 along with Wilber Varela, one of the leaders of the Colombia-based *Cartel del Norte del Valle* ("NVC") and

Satizabal's boss, Ramon Quintero Sanclemente ("Quintero"), a former leader of the NVC operating his own drug-trafficking organization. (*Id*.) During the meeting, Azocar agreed to help move Quintero's stalled drug load out of Venezuela to Europe. (*Id*. at 762–63 ("Because we had some merchandise in Venezuela that we had not been able to dispatch to Europe, and so my boss, Ramon Quintero, told Varela that we needed his help with something.").) Satizabal was then cross-examined about, among other things, his prior criminal activity, and the benefits he hoped to obtain as a result of his cooperation with the Government and his testimony. (*See* Tr. 810–45.)

Roberto Manuel Lopez Perdigon ("Perdigon"), a former drug trafficker from Venezuela and cooperating witness, testified about Defendant's smuggling of narcotics proceeds from Mexico to Venezuela with his assistance and the assistance of the Venezuelan National Guard. (*See* Tr. 848–1016.) He also described the Defendant's transportation of 2,000 kilograms of narcotics by plane using Venezuelan military transponder codes, as well as Defendant's plan to build additional boats to transport United States-bound drug loads to the Dominican Republic. (*Id*.) Perdigon was cross-examined about, among other things, his prior drug-trafficking activities, his credit card fraud conviction, his relationship with Arvelaiz, and the benefits he hoped to receive as a result of his cooperation with the Government and his testimony. (*See* Tr. 932–40; 949–78; 992–97; 1009–16.)

Enrique Santos ("Santos"), an investigative analyst in the Office of the United States Attorney for the SDNY who performed a forensic examination of Azocar's iPhone, testified about his use of Cellebrite—a forensic tool that unlocks and extracts data from cellular telephones, and generates reports with data found on those devices—on the Defendant's cellular phone. (Tr. 1056–89). Santos was cross-examined about, among other things, the seizure of

10

Azocar's cellular telephone by Italian law enforcement, their forensic extraction of data from the phone, the lack of security measures on the device (such as a passcode, biometric finger scan, or facial recognition scan), and the phone's location information on April 6 and April 7, 2016. (*See* Tr. 1077–87.)

Owen Foley ("Foley"), a paralegal in the Office of the United States Attorney for the SDNY, who did not have personal knowledge related to the case but testified concerning certain Government exhibits provided to him related to Azocar's cellular telephone, including a cellular phone extraction, several photographs, and text messages exchanged between the Azocar and various other individuals. (*See* Tr. 1090–106; 1117–29.) For example, through Foley's testimony, the Government introduced July 18, 2016 WhatsApp messages between the Defendant and "SIERRALTA.PTJ," in which "SIERRALTA.PTJ" attaches a photo of firearms and ammunition, noting it was "A photo of what was received." (*See* Tr. 1099–101; GX 501, 501-A, 501-A-T, 500-A.) Defense counsel did not cross-examine Foley. (*See* Tr. 1128–29.)

John Miller ("Miller"), an expert in firearms, machine guns, and destructive devices, testified about the functions of various automatic and semi-automatic firearms. (Tr. 1138–80; 1190–98.) These were the same type of weapons that Arvelaiz identified as used by Azocar and members of his drug organization. (*See* Tr. 360, 398–414 (Arvelaiz's testimony regarding Azocar and the organization's firearms); GX 402–07, 409–11, 412, 601 (photographs of various weapons that Arvelaiz identified); Tr. 1150–79, 1190–97 (Miller's testimony identifying and describing firearms that Arvelaiz mentioned based on the Government's exhibits).) The Defense chose not to cross-examine Miller. (*See* Tr. 1198.)

### 2. The Defense's Case

The Defense called one witness, Carel Ydler, Azocar's ex-wife and Arvelaiz's aunt. (Tr. 1277–82). She testified that in 2015, when Arvelaiz was incarcerated, Arvelaiz told her that he

11

was going to exact revenge on Azocar and his family, and that he was going to pay individuals he met in prison to testify against Azocar. (*Id.*) This evidence was not admitted for the truth, and I instructed the jurors they could only consider the evidence for a limited purpose; "for example . . . bias, motive, state of mind, or knowledge of another person." (Tr. 1282.)

### 3.   The Verdict

During its deliberations, after sending nine notes related to the jury charge and evidence presented during trial, the jury convicted Azocar on all counts. (Tr. 1517–1520; *see also* Doc. 60.) With respect to Count One, the jury found that the offense involved five or more kilograms of mixtures and substances containing a detectable amount of cocaine. (*See* Doc. 60 at 1.) With regard to Count Three, (renumbered as "Count Two" on the Jury Verdict form), the jury found that the Government had proven beyond a reasonable doubt that the offense charged in Count Three involved a machine gun, but that the Government had not proven that the offense involved a destructive device. (*Id.* at 2.) Regarding Count Four, (renumbered as "Count Three" on the Jury Verdict form), the jury similarly found that the Government had proven beyond a reasonable doubt that the offense charged in Count Four involved a machine gun, but that the Government had not proven that the offense involved a destructive device. (*Id.* at 3.)

### C.   *Post-Trial Briefing*

On January 16, 2024, Azocar filed a motion for a new trial. (Doc. 89 ("1st Mot.").) The Government filed its opposition to Azocar's motion on March 7, 2024, (Doc. 92 ("1st Opp'n")), and on March 29, 2024, Azocar declined to file a reply brief in further support of his motion, (Doc. 94). On June 20, 2024, Azocar sent me a letter, "invoking his Sixth Amendment right to self-representation," moving for a new trial, and asserting that his attorneys provided him with ineffective representation. (*See* Doc. 109 at 2–4 ("Pro Se Mot.").)

After I received this correspondence from Azocar and provided a copy to defense

counsel, I held a change-of-counsel hearing, relieved defense counsel of record, and appointed new counsel.  (*See* Minute Entry dated July 15, 2024.)  On August 6, 2024, I directed Defendant's letter motion dated June 20, 2024 be filed on the docket, and that his new counsel file a supplemental memorandum.  (Doc. 96.)  Azocar, through counsel, filed the supplemental memorandum on November 15, 2024.  (Doc. 99 ("2d Mot.").)  The Government filed its opposition—which included its arguments in opposition to Defendant's first motion—on January 29, 2025.  (Doc. 105 ("2d Opp'n").)  Defendant filed his reply on March 5, 2025.  (Doc. 108 ("Reply").)

## II.    <u>Legal Standards</u>

### A.  *Rule 29*

Federal Rule of Criminal Procedure 29(c)(2) provides, in part, that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal."  A district court may enter a judgment of acquittal under Rule 29 "only if, after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt."  *United States v. Reyes*, 302 F.3d 48, 52 (2d Cir. 2002) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  In other words, the "evidence that the defendant committed the crime alleged [must be] nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt" for a court to acquit.  *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted).  When making this determination a court cannot usurp the role of the jury or "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury."  *Id.* at 129 (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)).  The court must "consider the

evidence in its totality, not in isolation, and the government need not negate every theory of innocence." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (citation omitted).  If "the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." *Guadagna*, 183 F.3d at 129 (alteration in original) (internal quotation marks omitted).  A defendant faces a "heavy burden" in meeting this standard.  *United States v. Bullock*, 550 F.3d 247, 251 (2d Cir. 2008).

### B.  *Rule 33*

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  A district court has "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."  *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).  However, the court must "strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury."  *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (internal quotation marks omitted and alteration adopted).  It is the jury's role to weigh the evidence and assess a witness's credibility, and a district court generally "must defer to the jury's resolution" of those issues.  *United States* v. *Bell*, 584 F.3d 478, 483 (2d Cir. 2009) (per curiam) (quoting *Sanchez*, 969 F.2d at 1414).  "Matters of the choice between competing inferences, the credibility of the witnesses, and the weight of the evidence are within the province of the jury, and [a court is] not entitled to second-guess the jury's assessments."  *United States v. Rea*, 958 F.2d 1206, 1221–22 (2d Cir. 1992) (collecting cases); *see also United States v. Temple*, 447 F.3d 130, 136 (2d Cir. 2006) (explaining that a court may not "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury" (internal quotation marks omitted)).  Indeed, only in "exceptional circumstances" may a trial

judge "intrude upon the jury function of credibility assessment." *Sanchez*, 969 F.2d at 1414.

"The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict." *Ferguson*, 246 F.3d at 134 (internal quotation marks omitted). "There must be a real concern that an innocent person may have been convicted. It is only when it appears that an injustice has been done that there is a need for a new trial in the interest of justice." *Bell*, 584 F.3d at 483 (internal quotation marks omitted). "The defendant bears the burden of proving that he is entitled to a new trial." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009). Where a defendant fails to demonstrate that an erroneous evidentiary ruling resulted in "manifest injustice" he has not met his burden under Rule 33 and is not entitled to a new trial. *See McCourty*, 562 F.3d at 477 (internal quotation marks omitted).

### III.   <u>Discussion</u>

Azocar asserts he is entitled to relief for three reasons. First, in Azocar's second post-trial motion submitted by counsel, he argues that the evidence introduced at trial related only to conduct that pre-dated the statutes of limitations for the offenses of conviction, and that therefore I should enter a judgment of acquittal under Rule 29. (2d Mot. 3–9.) Second, Defendant's second post-trial motion incorporates the argument from his first such motion that the testimony of Boada, Arvelaiz, Satizabal, Lopez Perdigon, and the Government's phone extraction witnesses was not credible, and that therefore under Rule 33 it would be a manifest injustice not to order a new trial. (2d Mot. 12; 1st Mot. 4–13.) Third, Defendant asserts that he should be granted a new trial under Rule 33 because the Government failed to disclose that Satizabal pled guilty to the unlawful possession of a cellular phone while he was incarcerated. (2d Mot. 9–12.)

I address these arguments in turn.

### A. *Statute of Limitations*

In Defendant's second motion, he asserts for the first time that under Rule 29, there was insufficient evidence to convict him on Counts I, III, and IV because the trial testimony related to a conspiracy that terminated more than five years before the filing of the Indictment—prior to the applicable five-year statute of limitations. (*See* 2d Mot. 3–4.) I disagree.

### 1. The Argument is Waived

As an initial matter, I agree with the Government that by raising the statute of limitations for the first time in a post-trial brief, Azocar waived this defense. (*See* 2d Opp'n 40–42.) A statute-of-limitations defense "must be submitted to a properly instructed jury for adjudication." *United States v. Grammatikos*, 633 F.2d 1013, 1022 (2d Cir. 1980) (citing *United States v. Alfonso-Perez*, 535 F.2d 1362, 1364 (2d Cir. 1976)). Thus, the "defense is not jurisdictional[,] but is an affirmative defense that may be forfeited or waived." *United States v. Cote*, 544 F.3d 88, 103 (2d Cir. 2008) (Sotomayor, J.) (citing *United States v. Walsh*, 700 F.2d 846, 855–56 (2d Cir. 1983)). Accordingly, a defendant "waive[s] his statute of limitations defense by failing to raise the issue prior to or during his trial." *Id*. at 104.[4]

Azocar did not mention the statute of limitations until his second post-trial motion for a new trial, so I could not "consider a jury instruction on the limitations question," *United States v. Spero*, 331 F.3d 57, 60 n.2 (2d Cir. 2003), and the Government had no reason to elicit testimony regarding the continuation or termination of the conspiracy or to focus its case on the five years

---

[4] "[A] statute-of-limitations defense becomes part of a case only if the defendant puts the defense in issue. When a defendant presses a limitations defense, the Government *then* bears the burden of establishing compliance with the statute of limitations by presenting evidence that the crime was committed within the limitations period or by establishing an exception to the limitations period." *Musacchio v. United States*, 577 U.S. 237, 248 (2016); *see also Smith v. United States*, 568 U.S. 106, 109–14 (2013) (discussing statute-of-limitations defense in relation to conspiracy offenses).

preceding the Indictment.  In these circumstances, the defense is waived, and cannot be the basis

for a Rule 33 motion.[5]  *See, e.g.*, *Grammatikos*, 633 F.2d at 1022 (citing *United States v.*

*Cianchetti*, 315 F.2d 584, 589 (2d Cir. 1963)); *United States v. Kelly*, 147 F.3d 172, 177 (2d Cir.

1998); *Cote*, 544 F.3d at 103–04.

Defendant's only response to the Government's waiver argument is that any waiver was

due to ineffective assistance of counsel.  (Reply 3–4.)  In some circumstances, the failure to

assert a statute-of-limitations defense can be constitutionally ineffective and require a new trial.

*See, e.g.*, *Turner v. Sabourin*, 217 F.R.D. 136, 143–44 (E.D.N.Y. 2003).  However, "a Motion

for a New Trial is an inappropriate vessel to address ineffective assistance of counsel claims."

*United States v. Williams*, No. 10-CR-622, 2017 WL 5483744, at *6 (E.D.N.Y. Nov. 15, 2017)

(citing *United States v. Cammacho*, 462 F. App'x 81, 83 (2d Cir. 2012)); *see also Massaro v.*

*United States*, 538 U.S. 500, 504–05 (2003).  This is because the trial court "record in many

cases will not disclose the facts necessary to decide either prong of the *Strickland* analysis"—

whether trial "counsel's actions were not supported by a reasonable strategy and that the error

was prejudicial."  *Massaro*, 538 U.S. at 505 (citing *Strickland v. Washington,* 466 U.S. 668

(1984)).  Indeed, here Defendant cites *Turner v. Sabourin* in arguing trial counsel's performance

was deficient, (Reply 3–4), but *Turner* relied on affidavits of trial counsel in order to

demonstrate deficient performance and prejudice.  *See* 217 F.R.D. at 143–44.  Given that

Defendant cites nothing in the limited record before me suggesting that trial counsel was

ineffective for not raising a statute-of-limitations argument, I decline to excuse the waiver based

on purported ineffective assistance of counsel.

---

[5] Azocar concedes as much in arguing that failing to raise the defense was ineffective assistance of counsel.  (*See*
Pro Se Mot.; Reply 3–4.)

## 2.  The Statute of Limitations Argument Fails on the Merits

Even if Azocar had not waived the statute-of-limitations defense, the argument fails on the merits.  Defendant's Indictment was returned on June 3, 2021, (Doc. 3 ("Indictment")), and unsealed on June 22, 2022, (Doc. 4).  The parties agree that each count carries a five-year statute of limitations.  (*See* 2d Mot. 4, 7 (Counts One and Four); *id*. 8 (Count Three); 2d Opp'n 27 (Counts One, Three, and Four).)[6]  Thus, Defendant's convictions on Counts One and Four are timely if the conspiracies continued through at least June 3, 2016.  *See Spero*, 331 F.3d at 59. Because Count Three charged Defendant under 18 U.S.C. § 924(c)(1) with using or carrying firearms "in relation to" the drug conspiracy charged in Count One, (Indictment ¶ 9), "the § 924(c)(1) crime itself is a continuing offense," *United States v. Payne*, 591 F.3d 46, 69 (2d Cir. 2010), that continues "until the conspiracy ends" or until there is a separate "termination of the defendant's gun possession," *United States v. Praddy*, 725 F.3d 147, 157 (2d Cir. 2013).

### a.  The Conspiracies (Counts One and Four)

I first turn to Count One, the drug conspiracy, and Count Four, the machinegun conspiracy.  "The essence of the crime of conspiracy . . . is the agreement to commit one or more unlawful acts." *Praddy*, 725 F.3d at 153 (internal quotation marks, alteration, and emphasis omitted).  "Since conspiracy is a continuing offense, a defendant who has joined a conspiracy continues to violate the law through every moment of the conspiracy's existence, and he becomes responsible for the acts of his co-conspirators in pursuit of their common plot."  *Smith v. United States*, 568 U.S. 106, 111 (2013) (cleaned up) (citing, *inter alia*, *Pinkerton v. United States,* 328 U.S. 640, 646 (1946)).  The crime of conspiracy is "not the initial act of agreement,

---

[6] *See also* 18 U.S.C. § 3282(a) ("[N]o person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.").

but the banding-together against the law effected by that act, which continues until termination

of the conspiracy or, as to a particular defendant, until that defendant's withdrawal." *Id.* at 113;

*see also Pinkerton*, 328 U.S. at 646.

Defendant's argument is not that the Government failed to prove that Azocar was a part

of the charged conspiracies, but instead that any conspiracy "ended outside the five-year statute

of limitations period." (2d Mot. 5.) In other words, the conspiracies ended prior to June 3, 2021.

This argument fails. As Defendant appears to concede,[7] the Government proved the existence of

the conspiracies charged in Counts One and Four, and Defendant does not argue that the

purposes of the conspiracies came to "full fruition" such that the conspiracies ceased to exist

prior to the limitations period. *Pinkerton*, 328 U.S. at 646. Thus, to succeed on his statute-of-

limitations defense, Azocar would need to establish that he withdrew from the conspiracies prior

to June 3, 2016. "[T]he burden of establishing that withdrawal rests upon the defendant." *Smith*,

568 U.S. at 113. Defendant claims that "there is zero evidence that [he] remained in Venezuela

or engaged in any drug-related activities after [April 2016]," and that "the record confirms he

was in Florida on April 7, 2016 and later relocated to Italy . . . demonstrating his abandonment of

any participation in the alleged [*sic*] conspiracy." (Reply 3.) However, "[m]ere cessation of the

conspiratorial activity by the defendant is not sufficient to prove withdrawal . . . [t]he defendant

must also show that he performed some act that affirmatively established that he disavowed his

criminal association with the conspiracy, either the making of a clean breast to the authorities, or

communication of the abandonment in a manner reasonably calculated to reach co-conspirators."

*United States v. Leslie*, 658 F.3d 140, 143 (2d Cir. 2011) (per curiam) (internal quotation marks

---

[7] (*See* 2d Mot. 7 ("At most, the trial evidence indicated Mr. Orense Azocar's participation in such conspiracies outside the statutory period—but no conduct by Mr. Orense Azocar or any co-conspirator within the required time. The government asked the jury to speculate that the conspiracies continued after the arrests of the cooperating witnesses without supporting evidence.").)

omitted).[8]  Defendant does not suggest—and certainly proffered no evidence to the jury to establish—that he affirmatively communicated his purported abandonment of the conspiracy to his co-conspirators.  He has not established the termination of the conspiracies charged in Counts One and Four or his withdrawal from the same.

In any event, the Government introduced evidence at trial suggesting that Azocar's involvement in the drug and machinegun conspiracies continued well after June 3, 2016.  This evidence included messages from July 2016 that an individual had "received" three firearms and a large quantity of ammunition, (GX 501-A), an August 2018 letter regarding the ownership of a *finca* where Arvelaiz testified Defendant stored cocaine, (GX 505), January 2020 messages pertaining to the same *finca*, including images, (GX 508), and chats and web searches spanning from November 2017 to October 2020 in which Azocar discussed private planes and pilots, corresponding to the extensive testimony regarding Azocar's smuggling of drugs on private planes, (GX 500-C, 508, 509).  Defendant argues that "[a]fter June 2016, the only evidence the government relies upon consists of ambiguous images and text messages – none of which were tied to any drug trafficking activities."  (Reply 2.)  However, Defendant ignores the fact that this evidence cannot be viewed in isolation, rather, I must consider the "trial evidence as a whole." *United States v. Archer*, 977 F.3d 181, 189 (2d. Cir. 2020).  The extensive testimony regarding Defendant's participation in the drug and machinegun conspiracies—much of which pertained to storing cocaine on *fincas*, smuggling it into the United States on private planes, and protecting the entire operation with machineguns—suggests that the conspiracies continued beyond June 2016.

---

[8] Defendant is therefore incorrect that "[t]he key fact here is that no overt acts were committed by any co-conspirator after Boada's arrest in April 2016."  (Reply 3.)  The relevant questions are rather whether the conspiracies terminated, or whether Defendant made an overt act to withdraw from them.

b.  The Firearms Offense (Count Three)

Azocar also argues that there was insufficient evidence to convict him on Count Three because "there was no evidence that [he] possessed or used a machine gun—in relation to a narcotics offense—during the five-year statute of limitations window." (2d Mot. 8.)  As discussed, unlike simple possession of a machinegun, Count Three is a continuing offense because it is charged as being "in relation to" the drug conspiracy charged as Count One, and therefore it "continued through the life of [that] conspiracy." *Praddy*, 725 F.3d at 157.  Because the Count One conspiracy continued past June 3, 2016, Count Three did as well, and Defendant's argument fails. *See Payne*, 591 F.3d at 69.

Azocar attempts to argue against this conclusion, pointing out that in *United States v. Praddy*, the Second Circuit held that the presumption that possession of a firearm "continue[s] until the underlying conspiracy offense has run its course" does not apply "after such time as the gun has in fact been seized by law enforcement authorities." 725 F.3d at 159.  However, in *Praddy*, the Second Circuit noted that when "there ha[s] been no termination of the defendant's gun possession by reason of a prior arrest and seizure of the gun," it is "within the realm of reason to characterize [the] firearm offense as one that continue[s] through the life of the conspiracy." *Id*. at 157 (citing *Payne*, 591 F.3d at 69).  Defendant points to no evidence showing the termination of his gun possession through seizure or otherwise, and he was arrested for the instant offenses well within the five-year limitations period.  (*See* Doc. 9 (noting Defendant's arrest on June 22, 2022).)  *Praddy* is therefore inapplicable.

In short, Azocar's statute-of-limitations arguments fail because they are waived and on the merits.

### B. *Manifest Injustice*

In Defendant's first motion, he argues under Rule 33 that "the weight of the evidence and the lack of credibility of the government's primary witnesses," specifically Boada, Arvelaiz, Satizabal, Lopez Perdigon, and the Government's phone extraction witnesses, "coupled with evidence of bias and motive to falsely implicate Mr. Orense, indicate that it would be a manifest injustice to let the guilty verdict stand." (1st Mot. 5.) The general problem with this argument is that the jury heard the Defense's arguments regarding the credibility and bias of these witnesses during trial, and rejected it in its verdict. When considering a motion for a new trial, I must "defer to the jury's assessment of witnesses and resolution of conflicting evidence unless exceptional circumstances can be demonstrated." *United States v. Teman*, 465 F. Supp. 3d 277, 292 (S.D.N.Y. 2020) (internal quotation marks omitted). No exceptional circumstances exist here.

### 1. Boada

Defendant argues that Boada—the cooperator seized on a go-fast boat with nearly a metric ton of cocaine who later implicated Azocar in directing the shipment—gave non-credible testimony because he had previously lied about his involvement in drug trafficking, only belatedly identified Azocar to the government (and did not identify him in court), and stated during trial that he "would be willing to say whatever it took to receive the benefit that [he was there] to get." (1st Mot. 5–6 (quoting Tr. 226:15–17).) However, the Defense elicited all of this information during its cross and recross of Boada during trial, (*see* Tr. 223–68, 278–81), and during closing connected this information to Boada's "bias and motive" to take part in a "coordinate[d] . . . effort to falsely implicate Carlos Orense [Azocar]," (*id*. 1323:6-7, *id*. 1323–27, 1330). In other words, defense counsel made the argument to the jury that Boada should not be believed for the same reasons mentioned in the current motion, and through their verdict the

jury rejected this argument.

Further, Boada testified that he only met Azocar once.  (Tr. 203–04, 232.)  It is therefore logical that the Government apparently decided not to ask him to identify Defendant in court, because the Defense may have objected to such identification or later argued that the identification was tainted.  This is especially so given that on cross-examination, Boada testified that during his April 2016 incarceration in a Miami federal detention center, two inmates[9] showed him a photograph of Azocar.  (*See* Tr. 241–46.)  Instead, the Government elicited testimony regarding Defendant's distinctive appearance—Boada stated when he met Defendant, he saw he was "a fat man" and "wearing a white hat."  (Tr. 204.)  The Government later introduced photographs of Defendant matching this appearance in other situations.  (*See* Tr. 1092–93; GX 527, 533, 537.)  The Government's reasonable trial strategy with respect to Boada was not unduly prejudicial to Azocar and most certainly cannot be seen as contributing to a finding of manifest injustice.

### 2.  Arvelaiz

The jury heard three days of testimony—including nearly a full day of cross- and recross-examination, (*see* Tr. 518–617, 649–66)—from Arvelaiz, Defendant's nephew and a cooperating witness, who spent nearly seven years in Defendant's security detail, eventually leading that detail.  Arvelaiz gave detailed testimony regarding the inner workings of Defendant's drug-trafficking operation based primarily on his firsthand observations.  Azocar argues that this testimony cannot sustain his conviction because his ex-wife, Carel Ydler, testified that while Arvelaiz was incarcerated, he told her that he wanted to "take vengeance" on Azocar by

---

[9] Boada testified that one of the inmates was Defendant's nephew—he did not know whether it was Arvelaiz—and that he was told the other inmate was a former judge or prosecutor in Venezuela.  (Tr. 244, 246.)

"building a case" against him, and that he would "pay [others] . . . to testify against [Defendant]." (1st Mot. 6–7 (quoting Tr. 1278:6-24).) Arvelaiz also testified on direct that he had previously attempted to kill Azocar, during which Arvelaiz tied up Azocar's workers and stole weapons and ammunition from him. (*Id*. (citing Tr. 510–15).)

The jury heard all of this bias and impeachment evidence about Arvelaiz during trial.[10] Moreover, during its summation, the defense counsel argued that Arvelaiz—it referred to him as "Agent Arvelaiz, because he [was] literally working for the government"—was "the main character in this case." (Tr. 1332:1-4.) The Defense pointed out that the Government never corroborated much of Arvelaiz's testimony, that his testimony was otherwise inconsistent, and that based on this and Arvelaiz's criminal background, urged the jury to conclude that Arvelaiz was framing Azocar for crimes he did not commit, including drug trafficking. (*See id*. 1332–42.) Having heard all of this evidence, the jury rejected it as it was entitled to do.

### 3. Satizabal

Defendant argues that Satizabal's testimony is not credible and/or should be disregarded because he did not identify Azocar in court, testified only that Azocar conspired to import cocaine to Europe (rather than the United States), and that he had the "opportunity to coordinate [his] testimony" with Arvelaiz while they were both incarcerated in Miami. (1st Mot. 8.) With regard to where Defendant conspired to import cocaine, Satizabal testified that Defendant conspired to import cocaine to Puerto Rico, which is in the United States, and the Dominican Republic, which Taul testified is sometimes a transit point for cocaine bound for the United States. (Tr. 780–81, 786–67.) During the Defense's summation, counsel argued to the jury that

---

[10] I instructed the jury to consider Carel Ydler's testimony not for the truth of the matter asserted, but only for the limited purpose of "for example, but not limited to, bias, motive, state of mind, or knowledge of another person." (Tr. 1282.)

Satizabal gave a "true account[] of things that actually happened in [his] trafficking business and inserted Carlos Orense" when in fact he was not involved. (Tr. 1448:14-16.) In other words, counsel essentially conceded that Satizabal was truthful in all of his testimony—except for the testimony that implicated Azocar. Yet the jury rejected these arguments, too, in rendering its verdict.

### 4. Lopez Perdigon

Defendant argues that Lopez Perdigon's testimony was not credible because even though he began cooperating with the Government's drug trafficking investigations in 2012, he did not mention Azocar until 2021, even though he knew of Azocar's involvement in drug trafficking at the time he began cooperating. (1st Mot. 9–10.) Additionally, Defendant points out that Lopez Perdigon was a childhood friend of Arvelaiz and spent a week with him in Miami prior to deciding to cooperate with the Government's case against Azocar. (*Id*.) These issues were the subject of Lopez Perdigon's cross-examination, (Tr. 950–55, 963–75), and during the Defense's summation, (*e.g.*, Tr. 1335–36, 1341–43, 1348–50). That the jury had the opportunity to consider and ultimately rejected the Defense's attempts to impeach Lopez Perdigon's credibility does not amount to a manifest injustice warranting a new trial.

### 5. Phone Extraction Testimony

Defendant argues that much of the evidence from the iPhone was introduced "without any testimonial context," that none of the "text messages moved into evidence discussed drugs," and that generally nothing linked the iPhone evidence with any member of the conspiracy. (1st Mot. 10–12.) Prior to the admission of the iPhone evidence, the Defense made these and similar arguments when it moved to exclude the iPhone evidence under Federal Rule of Evidence 403.[11]

---

[11] Federal Rule of Evidence 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues,

(*See* Tr. 790–803.)  I concluded that the Defense's objections did not warrant preclusion because they went to weight, not admissibility.  (*Id*. at 798–802.)  The Defense then argued during summation that the information from the phone did not link Azocar to any drug conspiracy.  (Tr. 1327–28, 1336–37, 1344–45.)  The Defense also argued on summation, (*id*.), and during cross-examination of the Government's paralegal through whom the iPhone evidence was introduced, (*id*. 1083–89), that the phone's location data indicated it was in Florida at the same time that Boada testified he had met Azocar on the *finca* in Venezuela.  Again, that the jury rejected these arguments does not mean that Defendant is entitled to a new trial.

### 6.  There Was No Manifest Injustice

In sum, although Defendant purports to identify certain weaknesses in individual aspects of the Government's case, he ignores that on a Rule 33 motion, district courts must be "careful not to wholly usurp the role of the jury, [and to] defer to the jury's assessment of witnesses and resolution of conflicting evidence unless exceptional circumstances can be demonstrated." *United States v. Teman*, 465 F. Supp. 3d 277, 292 (S.D.N.Y. 2020) (internal quotation marks omitted); *see also United States v. Archer*, 977 F.3d 181, 188-89 (2d Cir. 2020)  ("We stress that, under this standard, a district court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." (internal quotation marks omitted)).  Moreover, as discussed, "a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis."  *Archer*, 977 F.3d at 189.

Here, the testimony of the Government's witnesses—Mills, Boada, Spears, Hacker, Arvelaiz, Taul, Satizabal, Perdigon, and Miller—was overwhelming and persuasive, and was

---

misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

further corroborated by other evidence introduced during the trial, including physical evidence

from Azocar's cellular telephone.  The jury, weighing all of this evidence and considering

various counterarguments presented by the Defense, ultimately concluded that Azocar was guilty

beyond a reasonable doubt.  For the reasons discussed above, none of Defendant's arguments

amount to "a situation in which the evidence was patently incredible or defied physical realities,"

or a situation that "compromised the reliability of the verdict."  *Archer*, 977 F.3d at 188–89

(internal quotation marks omitted and alteration adopted).

      Accordingly, Defendant has not demonstrated that it would be a manifest injustice to let

the guilty verdict stand.

### C.  *Satizabal's Prior Conviction*

      Finally, Defendant asserts that the Government's failure to disclose one of Satizabal's

prior convictions was a manifest injustice entitling him to a new trial.  On May 7, 2020, the

United States Attorney for the Eastern District of Arkansas filed an information charging

Satizabal with a misdemeanor count of possessing a cell phone while incarcerated in violation of

18 U.S.C. § 1791(a)(2).  *United States v. Satizabal*, No. 2:20-CR-115 (E.D. Ark. May 7, 2020),

ECF No. 1.  Satizabal pled guilty to the information on March 12, 2021, and was sentenced to an

additional one month of incarceration.  *Id*., ECF No. 14.

      Under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, "the government has an

affirmative duty under the Due Process Clause to disclose favorable evidence known to it, even

if no specific disclosure request is made by the defense."  *United States v. Hunter*, 32 F.4th 22,

30 (2d Cir. 2022) (internal quotation marks omitted); *see also Giglio v. United States*, 405 U.S.

150, 154 (1972).  A violation of this duty may entitle a defendant to a new trial under Rule 33 if

the evidence was "(1) favorable" to the defendant, "(2) suppressed" by the government, and

"(3) [the suppression was] prejudicial" to the defense. *Hunter*, 32 F.4th at 31. The Government does not contest that information about Satizabal's conviction was favorable to Defendant.

I need not decide whether the Government "suppressed" the information about Satizabal, *see id.*, because Azocar offers only a conclusory argument that it prejudiced his defense. As Defendant describes it, the 2020 conviction is of a "comparatively lesser nature" than Satizabal's prior convictions for drug trafficking. (2d Mot. 11.) Indeed, on cross-examination, Satizabal testified that in connection with his previous drug trafficking, he was involved in torturing, killing, and dismembering various individuals. (Tr. 822–26.) The contraband conviction was therefore "no more than 'an additional basis on which to impeach a witness whose credibility ha[d] already been shown to be questionable,'" which is generally not the type of prejudice requiring a new trial under *Brady*. *United States v. Shyne*, 292 F. App'x 123, 125 (2d Cir. 2008) (summary order) (quoting *United States v. Payne*, 62 F.3d 1200, 1210 (2d Cir. 1995)). It also does not matter that the conviction occurred during Satizabal's cooperation with the Government—as discussed, the Defense extensively cross-examined Satizabal on his motives for cooperating and his other prior convictions. In the context of all of Satizabal's testimony, information about the prior conviction would have been "cumulative," and therefore the failure to disclose the conviction does not warrant a new trial. *Id.*

IV.    <u>**Conclusion**</u>

For the reasons stated above, Defendant's Rule 29 and Rule 33 motions are DENIED.

The Court will hold Defendant's sentencing proceeding on August 11, 2025 at 10:00am. Defendant's submission is due two weeks prior to the sentencing date, and the Government's submission is due one week prior to the sentencing date.

The Court will direct the Probation Department to prepare a presentence report ("PSR"). If counsel for Defendant wishes to be present for any interview in connection with the PSR, no interview shall occur outside the presence of Defense counsel.

The Clerk of the Court is respectfully directed to terminate the pending motions at Docs. 89, 94, and 99.

SO ORDERED.

Dated: May 22, 2025
       New York, New York

Vernon S. Broderick
United States District Judge